UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ELIJHA MERRITT,

                                        Plaintiff,

                                                                9:18-cv-1067
v.                                                              (DNH/TWD)


J. HICKS, et al.,

                                        Defendants.

_____

APPEARANCES:                                    OF COUNSEL:

ELIJHA MERRITT
*Plaintiff, pro se*
P.O. Box 592
Elmira, NY 14901

HON. LETITIA JAMES                              WILLIAM A. SCOTT, ESQ.
Attorney General for the State of New York      Assistant Attorney General
*Attorney for Defendants*
The Capitol
Albany, NY 12224


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.      INTRODUCTION

*Pro se* Plaintiff Elijha Merritt ("Plaintiff" or "Merritt"), who was at all relevant times in

the custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), commenced this civil rights action under 42 U.S.C. § 1983 ("Section 1983")

asserting claims arising out of his confinement at the Gouverneur Correctional Facility

("Gouverneur") and Mohawk Correctional Facility ("Mohawk").  (Dkt. No. 1.)

Defendants and claims remaining following the District Court's review under 28 U.S.C.

§1915(e) and 28 U.S.C. § 1915A are: (1) Eighth Amendment deliberate medical indifference

claims against Nurse S. Furgison ("Furgison") and Dr. S. Ramineni ("Ramineni"); (2) Eighth

Amendment failure to intervene claim against Sergeant J. Hicks ("Hicks"); (3) First Amendment

retaliation claim against Furgison and Hicks; and (4) supervisory claims against Deputy

Commissioner Chief Medical Officer Carl J. Koenigsmann ("Koenigsmann") and Regional

Health Services Administrator Sarah Van Vorst ("Van Vorst") related to Plaintiff's medical

indifference claims against Ramineni.  (Dkt. No. 4.[1])

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure seeking dismissal of Plaintiff's complaint in its entirety.  (Dkt. No. 34.)  Plaintiff

has responded to the motion and Defendants filed a reply.  (Dkt. Nos. 34, 35.)

The Honorable David N. Hurd, United States District Judge, referred this motion for a

report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  For the

reasons that follow, the Court recommends granting Defendants' motion for summary judgment.

---

[1]  The following claims against unidentified individuals also survived initial review: (1) Eighth
Amendment deliberate indifference claims against Nurse Jane Doe A and Nurse Jane Doe B; (2)
Eighth Amendment excessive force claims against Corrections Officer ("C.O.") John Doe A, B,
C, D, and E; (3) Eighth Amendment sexual assault claim against C.O. John Doe D, and (4) racial
discrimination claim against C.O. John Doe B (collectively, the "Doe Defendants").  (Dkt. No.
4.)  The following claims were dismissed without prejudice for failure to state a claim upon
which relief may be granted: (1) constitutional claims based upon threats, verbal harassment, and
false reports; (2) Eighth Amendment deliberate indifference claims against Hicks,
Lieutenant Theriault ("Theriault"), and C.O. John Doe A, B, C, D, and E; (3) Eighth Amendment
failure to protect claim against Theriault; (4) Fourteenth Amendment due process claim against
Theriault; (5) equal protection claims; (6) First Amendment claims related to mail interference
and access to the courts; (7) claims based upon interference with the grievance process; (8)
conspiracy claims; (9) supervisory claims against Nurse Administrator and CORC Director; (10)
supervisory claims against Koenigsmann and Van Vorst related to excessive force and
retaliation; and (11) substantive due process claims.  *Id.*

## II.     BACKGROUND[2]

### A.     September 12, 2017

On September 12, 2017, at approximately 10:00 a.m., while incarcerated at Gouverneur, Plaintiff requested emergency sick call after noticing blood in his underwear and urine.  (Dkt. Nos. 1 at 10,[3] 30-8 at ¶ 8.)  Plaintiff was seen by Furgison, although the parties have differing accounts of what transpired over the course of the next several days.  (Dkt. Nos. 1 at 10, 30-8 at ¶ 9, 30-19 at 1.)

According to Plaintiff, he presented to emergency sick call and explained his symptoms to Furgison.  (Dkt. No. 1 at 10.)  However, she did not consider his issue to be an "emergency" and indicated Plaintiff would be seen by a doctor in "about three weeks."  *Id*.  Plaintiff became frustrated and asked, "what do I have to do to see the doctor and get some immediate medical attention?  Have someone call the superintendent?"  *Id*.  Thereafter, Furgison called for a corrections officer to escort Plaintiff out of the infirmary because she perceived Plaintiff to be threatening her.  *Id*. at 11.  Hicks and another officer arrived.  *Id*.  Plaintiff overheard Hicks say that Furgison should "add [ ] something more to the ticket" to bolster the allegation that Plaintiff had threatened her.  *Id*.

Hicks then escorted Plaintiff to the "small box" in the Special Housing Unit ("SHU").  *Id*. at 12.  While they walked to the SHU, Hicks verbally harassed and threatened Plaintiff.  *Id*. When they arrived at the SHU, Hicks and C.O. John Doe A continued to threaten Plaintiff with bodily harm.  *Id*.  Plaintiff began to cry and followed orders to strip.  *Id*. at 13.  When Plaintiff

---

[2]  The following facts are drawn from the parties' pleadings and submissions, including Plaintiff's verified complaint and Defendants' Local Rule 7.1 statement.

[3]  Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docket system.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

was standing in his underwear, C.O. John Doe A asked, "you got something to say now you cry baby?" *Id*. When Plaintiff responded, "no," instead of "no, sir," C.O. John Doe A continued to yell expletives, grabbed Plaintiff by the throat, and started punching Plaintiff on the side of the head. *Id*. Plaintiff claims Hicks "encouraged" C.O. John Doe A to punch Plaintiff. *Id*. at 15. Plaintiff was rendered unconscious and awoke on a stretcher. *Id*. at 13. Plaintiff was transported via ambulance to Gouverneur Hospital. *Id*. at 14.

At the hospital, Plaintiff told a nurse that he was beaten by officers and described the incident in detail. *Id*. A CT scan of Plaintiff's head revealed a concussion. *Id*. Plaintiff was discharged back to Gouverneur and placed in the facility's infirmary for a twenty-four hour medical watch. *Id*.

In her declaration, Furgison explains that Plaintiff presented for an emergency sick call on September 12, 2017, instead of the morning's routine sick call. (Dkt. No. 30-19 at ¶ 5.) According to Furgison, all inmates are aware that doctors are present during routine sick call times but are not necessarily present for an emergency sick call. *Id*. She discussed this issue with Plaintiff. *Id*. She asked Plaintiff about his complaints, assessed his physical condition at that time, and found he did not appear to be in any physical distress. *Id*. at ¶ 6. Furgison also asked Plaintiff "why, if this was an ongoing issue, he had not signed up for a routine sick call sooner." *Id*. In response to this question, Plaintiff became loud and argumentative and refused her order to calm down. *Id*. at ¶ 7. Instead, Plaintiff yelled at Furgison to "do your fucking job and help me." *Id*. at ¶ 8. Because Plaintiff refused to calm down, Furgison requested that a corrections officer respond to escort Plaintiff from the infirmary. *Id*. at ¶ 9. As he was being escorted out of the area Plaintiff stated, "it's not hard to find out where you live, I have people." *Id*. at ¶ 10. As a result of his behavior, Furgison completed a misbehavior report charging

Plaintiff with harassment, threats, violent conduct, and creating a disturbance. *Id*. at ¶ 11. The misbehavior report alleged that on September 12, 2017, at 11:45 a.m.:

> [Plaintiff] reported to the infirmary for emergency sick call. I was interviewing inmate Merritt in the exam room when he began to complain that he had been passing blood in his urine for several days. I asked as to why he did not sign up for routine sick call, and he became very load and argumentative, stating "what the fuck, I'm asking for help now." I ordered him to be quiet and calm down but he continued to yell and curse stating "do your fucking job and help me." I again ordered the inmate be quiet and calm down. To no avail the inmate continued to curse and the officer was called to escort him from the area. On his way out of the exam room he stated "it's not hard to find out where you live, I have people." Area Sergeant J. Hicks was notified and responded to the area.

(Dkt. No. 30-20 at 1.) Furgison states she issued the misbehavior report to Plaintiff because of the threatening statements he made, not because he was requesting medical treatment. (Dkt. No. 30-19 at ¶ 14.)

For his part, Hicks states that on September 12, 2017, he responded to a request for assistance from Furgison, who had reported Plaintiff was yelling, cursing, and threatening her. (Dkt. No. 30-17 at ¶ 4.) Hicks declares he did not tell Furgison to include false information in the misbehavior report, nor did he tell Furgison to complete the misbehavior report in retaliation for Plaintiff's request for medical treatment. *Id*. at ¶ 5.

As a result of Plaintiff being accused of Tier III disciplinary charges by Furgison, Hicks and another corrections officer escorted Plaintiff to the SHU. *Id*. at 6. According to Hicks, though Plaintiff was "generally compliant" in the transfer, "his behavior became increasingly erratic and he made several threats of self-harm." *Id*. at ¶ 7. Upon arrival at the SHU, Plaintiff's "odd behavior" continued and Plaintiff continued to make threats of self-harm. *Id*. at ¶ 8. During the strip frisk, which Hicks supervised and is a "standard part of SHU admission,"

Plaintiff "suddenly became unsteady on his feet and fell to the ground." *Id*. at ¶ 9. Plaintiff appeared to be suffering a seizure and Hicks immediately called for medical assistance. *Id*. A nurse responded to the SHU and provided Plaintiff with medical treatment. *Id*. at ¶ 10. However, as Plaintiff continued to be unresponsive, an ambulance was called. *Id*.

Hicks declares that at no point during any of these actions did he use force on Plaintiff, nor did he witness any other staff use force on Plaintiff. *Id*. at 11. Hicks completed an unusual incident report detailing these events. *Id*. at ¶ 7; Dkt. No. 30-18. Hicks states he had no further interactions with Plaintiff. (Dkt. No. 30-17 at ¶ 12.)

The medical record indicates the Gouverneur Rescue Squad arrived at the scene at approximately 12:45 p.m. (Dkt. No. 30-8 at ¶ 23.) The EMTs noted Plaintiff's breathing was in normal ranges and that he presented with no obvious signs of bleeding. *Id*. at ¶ 24. Plaintiff was transported to Gouverneur Hospital where he was examined by the hospital's medical staff and underwent diagnostic testing. *Id*. at ¶ 25. The physical exam revealed that Plaintiff's throat and neck were normal with full range of motion, and the only injury noted was a small bruise to the right temple. *Id*. at ¶ 26. He was neurologically intact, was oriented, and had no motor sensory deficit. *Id*. at ¶ 27. The urinalysis was normal, and no blood was present in Plaintiff's urine. *Id*. at ¶ 28. The CT scan was also normal and showed "[n]o evidence of acute intracranial pathology." *Id*. at ¶ 29. That same day, Plaintiff was discharged back to Gouverneur. *Id*. at ¶ 31.

Upon his return to Gouverneur, Plaintiff was placed on 1:1 suicide watch. *Id*. at ¶ 32. During the 1:1 watch, it was noted Plaintiff was verbally abusive and was continually banging his head on the cell door. *Id*. at ¶ 33.

**B.    September 13, 2017**

Plaintiff claims that on September 13, 2017, he awoke to find Hicks and other officers in his cell on top of him with plastic shields.  (Dkt. No. 1 at 15.)  The officers removed Plaintiff's blanket and Plaintiff began yelling expletives at Hicks.  *Id*.  C.O. John Doe B arrived and told Plaintiff that because he was yelling at Hicks, they would assume that Plaintiff was failing to comply with his scheduled urinalysis test.  *Id*. at 16.  C.O. John Doe B documented Plaintiff's refusal in the logbook and walked away.  *Id*. at 16-17.  Plaintiff began screaming "about anything and everything" and was out of control.  *Id*.  Hicks returned with officers to escort Plaintiff to the "small SHU."  *Id*. at 17.

When Plaintiff arrived at the SHU, he was placed in a cell and continued to yell at officers.  *Id*. at 17-18.  Hicks told Plaintiff that if he did not stop yelling, the officers would enter the cell.  *Id*.  When Plaintiff continued to yell, C.O. John Doe A, B, C, D, and E entered the cell.  *Id*. at 18-19.  Plaintiff claims the officers repeatedly punched and kicked Plaintiff in the head and face and "stomped" on his legs.  *Id*. at 19.  During the assault, Plaintiff was lying on his bed and heard Hicks yelling, "not in the face."  *Id*.  After a couple of minutes, Hicks yelled "that's enough" and the officers left the cell.  *Id*. at 19-20.

After Hicks left the area, the officers returned and subjected Plaintiff to "another beating."  *Id*. at 20-21.  The officers chocked and punched Plaintiff multiple times in the head.  *Id*.  They held Plaintiff's hands so he could not protect himself, pulled Plaintiff's shoulder "out of the socket," and stomped on his thigh and hip.  *Id*.  C.O. John Doe D repeatedly kicked Plaintiff's genitals and rectum.  *Id*. at 23-24.  After the officers left, Plaintiff heard Hicks yell for someone to call the nurse.  *Id*. at 25.  C.O. John Doe D and Hicks documented in the logbook

that Plaintiff was intentionally jumping on the bed and hitting his head against the wall and floor. *Id*.

Nurse Jane Doe A arrived and asked Plaintiff questions. *Id*. at 26. He told her that he had been beaten and sexually assaulted but could not identify his assailants. *Id*. When Plaintiff attempted to show the nurse that he was spitting blood, she said, "I don't see blood." *Id*. at 26.

Fearing for his life, Plaintiff asked the officers if he could speak with Hicks and take the urine test. *Id*. at 27. Thereafter, Plaintiff was taken "on a trip" to a processing room with Hicks. *Id*. at 28. Hicks warned Plaintiff not to discuss the assault with anyone and instructed him to lie about the origin of his injuries. *Id*. at 29. Hicks also stated a misbehavior report regarding the urinalysis test was "still in [his] mailbox" and he agreed to make the ticket "disappear" if Plaintiff "kept his mouth shut." *Id*.

Plaintiff was then transported to Mid-State Correctional Facility ("Mid-State"). *Id*. at 29. When he arrived, the officers and nurses noticed that Plaintiff was in pain and had a black eye, lumps, and scratches on his head and feet. *Id*. at 30. The officers asked Plaintiff what happened, and he said that "Gouverneur is very hands on." *Id*. Plaintiff then asked the officers to "keep that between them." *Id*. Plaintiff testified he was transferred to Mid-State for approximately two days after making a statement that was perceived as self-harm. (Dkt. No. 30-2 at 141-42.)

According to Defendants, however, Plaintiff was transferred to the SHU on September 13, 2017, without incident. (Dkt. No. 30-8 at ¶ 34.) Hicks declares he did not use force on Plaintiff on September 13, 2017, nor did he witness any staff use force on Plaintiff on that date. (Dkt. No. 30-17 at ¶ 13.)

### C.    September 14, 2017

According to Plaintiff, on September 14, 2017, while incarcerated at Mid-State, Plaintiff spoke with a nurse from the Office of Mental Health ("OMH").  (Dkt. No. 1 at 32.)  The nurse noticed the bruising on his feet and Plaintiff reported everything that happened to him at Gouverneur, including the "first beating," his hospitalization, and Hicks' threat to "keep his mouth shut."  *Id*. at 33.

Plaintiff states that he met with the OMH nurse again on September 15, 2017.  *Id*. at 34. She commented that Plaintiff "looked worse" and agreed to keep Plaintiff at Mid-State because he feared for his life.  *Id*.  Plaintiff was assured that his conversations were confidential.  *Id*.  The nurse also told Plaintiff she would "open a case" so that Plaintiff could be transferred out of Gouverneur after the disciplinary hearing on the misbehavior report issued by Furgison.  *Id*. at 35.

Plaintiff was transferred back to the SHU at Gouverneur.  *Id*. at 35.  Plaintiff remained in his cell, in pain, until September 22, 2017.  *Id*. at 36.  Plaintiff did not ask for medical attention because he feared future retaliation.  *Id*. at 36.

### D.    September 21, 2017

On September 21, 2017, Theriault conducted Plaintiff's Tier III disciplinary hearing.  *Id*. at 36.  According to Plaintiff, Theriault told Plaintiff, off the record, that while two tickets were pending before him, he would ignore one because Plaintiff "stood up to [his] part of the deal" with Hicks and did not reveal the assault to anyone at Mid-State.  *Id*. at 36-37.  Plaintiff claims Theriault "coached" him through pleading guilty to the charges stemming from Furgison's misbehavior report and that he lied about the incident because Theriault promised to return him to the general population.  *Id*.

At the conclusion of the hearing, Theriault found Plaintiff guilty of creating a disturbance and harassment.  (Dkt. No. 1-1 at 21.)  Plaintiff was sentenced to sixty days in the SHU with a corresponding loss of recreation, packages, commissary, and telephone privileges.  *Id*.  Fifty days of the sixty-day sentence was suspended.  *Id*.  Theriault threatened Plaintiff, told him not to tell anyone about the beatings, and advised that his outgoing mail would be monitored.  (Dkt. No. 1 at 38.)

The next day, Plaintiff was escorted out of the SHU and assigned to a top bunk.  *Id*. at 38.  When Plaintiff attempted to climb into bed, he experienced agonizing pain.  *Id*.  During the weekend, other inmates noticed Plaintiff's injuries and Plaintiff told them that he was assaulted by officers.  *Id*. at 39.

On September 25, 2017, Plaintiff completed a sick call request complaining about two broken toes, a bruised foot, leg pain, hip pain, and three cracked ribs.  *Id*. at 40.  Plaintiff was seen by Nurse Jane Doe B and requested a bottom bunk pass.  *Id*.  She asked Plaintiff how he received his injures.  *Id*.  When Plaintiff responded, "in the box," Nurse Jane Doe B replied, "Oooo ya . . . I remember you."  *Id*.  (ellipsis in original).  However, she refused to issue a bottom bunk pass and told Plaintiff to reiterate his request to a doctor.  *Id*. at 40-41.

Plaintiff returned to his cell and wrote a complaint to the Nurse Administrator at Gouverneur.  *Id*. at 41.[4]  Plaintiff explained his injuries, the assault, and his need for a bottom bunk.  *Id*.  The Nurse Administrator, however, did not respond.  *Id*. at 42.  Fearing that his mail was monitored and that he would be subjected to retaliation, Plaintiff did not attempt to

---

[4]  Plaintiff's claims against the Nurse Administrator were dismissed without prejudice on initial review.  (Dkt. No. 4.)

communicate with the Nurse Administrator again or file any further sick call requests at Gouverneur.  *Id.*

**E.     October 16, 2017**

On October 16, 2017, Plaintiff was transferred to Mohawk and immediately signed up for sick call complaining of cracked ribs, a dislocated shoulder, broken toes/foot, and pain in his leg and right hip.  *Id.* at 43.  Plaintiff was seen at sick call the next day and explained that he had been beaten by officers.  *Id.*

**F.     November 3, 2017**

On November 3, 2017, Plaintiff was seen by Ramineni.  *Id.* at 44.  Plaintiff explained that he was urinating blood and that it felt as if he had a kidney stone.  *Id.*  He described finding blood in his underwear and stated that it was painful to urinate.  *Id.*  Ramineni told Plaintiff that masturbation could cause his symptoms and scheduled "lab tests."  *Id.*

Plaintiff also told Ramineni that he was assaulted by officers and asked for x-rays.  *Id.* at 44-45.  According to Plaintiff, Ramineni reviewed Plaintiff's medical file and concluded that Plaintiff was lying due to the prior report by officers that Plaintiff was "banging [his] head against the wall."  *Id.* at 45.  When Plaintiff tried to explain, Ramineni told Plaintiff that he had "mental issues."  *Id.*  When Plaintiff started to argue, Ramineni abruptly terminated the visit.  *Id.*

In his declaration, Ramineni states Plaintiff only complained of pain in his right foot and ribs.  (Dkt. No. 30-22 at ¶¶ 4, 5.)  He further explains that aside from Plaintiff's subjective complaints of pain, the only evidence of any possible injury to Plaintiff's right foot was an area of old discoloration.  *Id.* at ¶ 6.  As such, he ordered an x-ray of Plaintiff's right foot, which was performed that day at Mohawk.  *Id.* at ¶ 7.  Ramineni also conducted a physical examination of

Plaintiff to assess whether Plaintiff had any fractured ribs. *Id*. at ¶ 9. The examination revealed

no bruising on or around Plaintiff's ribs and his lungs were clear. *Id*. at ¶ 11.

On November 5, 2017, Plaintiff filed a grievance against Ramineni claiming that he was

unprofessional and incompetent. (Dkt. No. 1 at 6, 45-46.) While waiting for a response to his

grievance, Plaintiff continued to experience pain and difficulty sleeping and walking. *Id*. at 47.

### G.    January 2, 2018

On January 2, 2018, Plaintiff requested a sick call complaining of a concussion and

headaches. *Id*. at 47. In his declaration, Ramineni states he saw Plaintiff on January 10, 2018, at

which time Plaintiff complained of headaches, but made no complaint of pain in his foot, ribs, or

hip. (Dkt. No. 30-22 at ¶ 14.) Plaintiff claims Ramineni asked Plaintiff if he was vomiting and

when Plaintiff responded "No," Ramineni told him there was nothing he could do and gave

Plaintiff a handful of Ibuprofen. (Dkt. No. 1 at 47.)

### H.    March 13, 2018

On March 13, 2018, Plaintiff was seen by Ramineni. (Dkt. No. 30-22 at ¶ 16.) Plaintiff

states he complained of multiple medical issues including pain in his shoulder, ribs, left leg, foot,

loss of breath, and pain during urination. (Dkt. No. 1 at 48-49.) Ramineni concluded that there

was "nothing wrong" with Plaintiff and when Plaintiff inquired about the "lab tests," Ramineni

said, "I don't believe you." *Id*.

According to Ramineni, Plaintiff presented with vague complaints of pain in his ribs,

foot, and shoulder. (Dkt. No. 30-22 at ¶ 17.) However, there was no physical evidence of any

injury to those areas of Plaintiff's body, and he exhibited normal movement of the shoulder. *Id*.

Ramineni determined no further treatment or testing was warranted. *Id*.

I.      **June 17, 2018**

On June 17, 2018, Plaintiff wrote to Koenigsmann and reported the facts related to the

excessive force incidents, his medical treatment, and lodged a formal complaint about Ramineni.

(Dkt. No. 1-1 at 2-14.)  On June 25, 2018, Van Vorst responded to Plaintiff's letter to

Koenigsmann and advised that Plaintiff's complaints were being investigated.  *Id*. at 16.  Van

Vorst directed Plaintiff to bring his medical concerns to the attention of the health care staff.  *Id*.

On July 17, 2018, Koenigsmann responded to Plaintiff's "recent letter."  *Id* at 18.

Koenigsmann's response mirrored that of Van Vorst's.  *Id*.

III.    **SUMMARY JUDGMENT LEGAL STANDARD**

A court shall grant summary judgment only if the submissions of the parties taken

together "show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-

48 (1986); Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial

burden of showing, through the production of admissible evidence, no genuine issue of material

fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at

272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of [the

plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 & n.11 (1986).

"Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and quotation marks omitted).  A verified complaint, as Plaintiff has filed in this case, is treated as an affidavit.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

Where a party is proceeding *pro se*, the court must "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[5]

## IV.    DISCUSSION

### A.    Plaintiff's Failure to File a Response to Defendants' Local Rule 7.1 Statement

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not

---

[5]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

specifically controvert." N.D.N.Y. L.R. 7.1(a)(3). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

As required by the Local Rules, Defendants advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts, as did the Court. (Dkt. Nos. 30, 31.) While Plaintiff submitted a response to Defendants' motion, he failed to do so in the manner required under Local Rule 7.1(a)(3).[6] (Dkt. No. 34.) "Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules." *Marino v. Watts*, No. 9:12-CV-801 (NAM/DJS), 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report-recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 73 (2d Cir. 2019) (summary order).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second

---

[6] Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts. Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and whether to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.[7]

### B.    Furgison and Hicks

As set forth above, Plaintiff claims: (1) Furgison was deliberately indifferent to Plaintiff's serious medical needs on September 12, 2017, in violation of his Eighth Amendment rights; (2) Hicks failed to intervene on September 12 and 13, 2017, while other officers used excessive force on Plaintiff in violation of his Eighth Amendment rights; and (3) Furgison and Hicks prepared a false misbehavior report on September 12, 2017, in retaliation for Plaintiff seeking medical attention in violation of his First Amendment rights. (Dkt. No. 1 at 23, 58-59.)

Defendants argue Furgison and Hicks are entitled to summary judgment because Plaintiff failed to exhaust his available administrative remedies. (Dkt. No. 30-9 at 12-15.) Defendants also contend Furgison and Hicks are entitled to qualified immunity on Plaintiff's First Amendment retaliation claim and that Furgison is entitled to summary judgment on the merits on

---

[7] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted). As to any facts not contained in Defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff's Eighth Amendment deliberate indifference claim.  *Id.* at 15-19.

### 1.    Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016).  Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the institution to which they are confined. *Id.* at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

Exhaustion is an affirmative defense.  *Jones v. Bock*, 549 U.S. at 216.  "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability" under *Ross*. *Ferrer v. Racette*, No. 14-cv-1370, 2017 WL 6459525, at *12 (N.D.N.Y. Dec. 18, 2017) (citation omitted).  In *Ross*, the Supreme Court explained:

> [t]he exhaustion requirement hinges on the "availabl[ity]" of administrative remedies: An inmate, that is, must exhaust available

> remedies, but need not exhaust unavailable ones. . . . [A]n inmate
> is required to exhaust those, but only those, grievance procedures
> that are "capable of use" to obtain "some relief for the action
> complained of."

*Ross*, 136 S. Ct. at 1858-59 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) (citations omitted).

In *Ross*, the Supreme Court highlighted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). First, "an administrative remedy may be unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.'" *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at 123-24 (quoting *Ross*, 136 S. Ct. at 1859). Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

In New York State prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). *See* 7 N.Y.C.R.R. § 701.5. That procedure entails the submission of a grievance within 21 days of the incident to the IGP Supervisor, for a determination by the Inmate Grievance Resolution Committee ("IGRC"), followed by appeals to the facility superintendent and then to the Central Office Review Committee ("CORC"). *See id.* However, special procedures are used when, as in this case, the grievance involves staff misconduct. *See id.* § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(b), (f). If the grievant wishes to appeal the superintendent's decision to

CORC, he must do so within seven days of receipt of the decision. *Id*. § 701.8(h). Thereafter, CORC must render a written decision within thirty days of receipt of the appeal. *Id*. § 701.8(i); *see id*. § 701.5(d)(3)(ii).

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks and citations omitted)).

### 2.    Analysis

In support of their motion, Defendants submit declarations from Laura Looker ("Looker"), the IGP Supervisor at Gouverneur, Joseph Cieslak ("Cieslak"), the IGP Supervisor at Mohawk, and Rachel Seguin ("Seguin"), the Assistant Director of the IGP for DOCCS. (Dkt. Nos. 30-35, 30-33, 30-31.) In their declarations, Looker, Cieslak, and Seguin describe the well-established three steps of the DOCCS IGP and state that complaints or issues such as deliberate medical indifference, failure to intervene during excessive force, and retaliation are proper subjects for a grievance. (Dkt. Nos. 30-35 at ¶¶ 4-11, 30-33 at ¶¶ 4-11, 30-3 at ¶¶ 4-11.)

Looker, Cieslak, and Seguin state they have reviewed the records maintained by Gouverneur, Mohawk, and CORC, respectively, and found no grievance or appeal claiming that: (1) Furgison was deliberately indifferent to Plaintiff's medical needs; (2) Hicks failed to intervene on September 12 and/or September 13, 2017, when other unnamed officers subjected Plaintiff to excessive force at Gouverneur; or (3) Furgison and Hicks retaliated against Plaintiff for seeking medical attention. (Dkt. Nos. 30-35 at ¶ 11, 30-33 at ¶¶ 11, 17, 30-31 at ¶ 16.) *See* 7

N.Y.C.R.R. § 701.5(a) (explaining that to initiate the exhaustion process, an "inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an inmate grievance complaint form").  Likewise, Plaintiff testified that he never filed any grievances related to any of the alleged incidents on September 12 or September 13, 2017.  (Dkt. No. 30-2 at 159.)  Moreover, Plaintiff acknowledged during his deposition that information regarding the IGP was available to him, he was familiar with the inmate grievance process, and the grievance process is available to all inmates if they choose to use it.  (Dkt. Nos. 30-9 at 14, 30-2 at 149-52.)

With these submissions, the Court finds Defendants have met their burden demonstrating Plaintiff failed to exhaust his administrative remedies as to his First and Eighth Amendment claims against Furgison and Hicks prior to commencing this action.  *See, e.g.*, *Encarnaciton v. Spinner*, No. 9:15-cv-01411 (BKS/ML), 2020 WL 2838559, at *14 (N.D.N.Y. June 1, 2020) (finding the defendants satisfied burden by submitting declaration from grievance coordinators stating the plaintiff never filed a grievance for the incident at issue); *Bennett v. Onua*, No. 09-cv-7227, 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that the defendants "adequately supported the affirmative defense of failure to exhaust" where "a search of the grievance log records . . . did not reveal any record of a grievance" filed by the plaintiff).

The burden thus shifts to Plaintiff to establish administrative remedies were unavailable to him under *Ross*.  In his opposition to Defendants' motion, Plaintiff contends "exhaustion is not required by statute when sexual assault is involved."  (Dkt. No. 34 at 11.)  However, as pointed out by Defendants, this assertion is of no moment.  (Dkt. No. 35 at 5.)  Plaintiff has not made any allegation of sexual assault against Furgison and Hicks, and as discussed above, deliberate medical indifference, failure to intervene, and retaliation claims are subject to the PLRA's exhaustion requirement.  *See Porter*, 534 U.S. at 532.

Here, there is no evidence in the record showing the IGP "operate[d] as a simple dead end" to Plaintiff, nor is there any evidence that the IGP was unavailable due to an "opaque" administrative scheme. *See Ross*, 136 S. Ct. at 1859-60.[8] The only *Ross* factor that could potentially be raised is unavailability due to administrators preventing Plaintiff from using the grievance procedure due to "machination, misrepresentation, or intimidation." *See Ross*, 136 S. Ct. at 1859-60.

While Plaintiff claims he did not file grievances regarding the alleged incidents of September 12 and September 13, 2017, because he was subjected to threats and verbal harassment by Hicks and Theriault, afraid of retaliation by Hicks and the Doe Defendants, and "feared for his life," such claims are inconsistent with the fact that he proceeded to report the details of the alleged assaults to medical staff at Gouverneur Hospital, Nurse Jane Doe A, staff at Mid-State, other inmates in the general population at Gouverneur, Nurse Jane Doe B, medical providers at Mohawk, including Ramineni, Koenigsmann, and the CORC Director. (Dkt. No. 1 at 14, 26, 30-35, 39, 40, 43.) *See, e.g., Rodriguez v. Cross*, 2017 WL 2791063, *4 (finding the plaintiff's actions, including telling others about his complaints, disproved any claim of intimidation or fear of retaliation); *Johnson v. Fraizer*, No. 16-CV-6096 (CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016) (rejecting the plaintiff's argument that administrative

---

[8] The Court notes that the evidence submitted by Defendants indicates Plaintiff utilized the IGP by filing a grievance at Mohawk on November 27, 2017. (Dkt. No. 30-34.) Cieslak states, "[t]he sole grievance filed by plaintiff while housed at Mohawk, (MHK-13387-17), concerns a request for x-rays and contains no complaints against defendant Sergeant J. Hicks or Nurse Furgison. (Dkt. No. 30-33, at ¶ 12.) Similarly, Seguin declares, "[th]e sole grievance appealed to CORC by Plaintiff, MHK-13387-17, concerns a request for x-rays and contains no complaints against Defendant Sergeant J. Hicks or Nurse Furgison. (Dkt. No. 30-31 at ¶ 17.) She further states that "[t]hough grievance MHK-13387-17 complains of medical treatment provided by Dr. Ramenini (sic), it at no point mentions Defendant Sergeant J. Hicks or Nurse Furgison. (Dkt. No. 30-31 at ¶ 19.)

remedies were unavailable where the plaintiff alleged he was threatened by correction officers but continued to make and send formal complaints to prison officials and other New York State officials).  Further, "[a] general fear of retaliation is not an exception to the PLRA's exhaustion requirement."  *Saeli v. Chautauqua Cty., N.Y.*, No. 17-CV-6221 (CJS), 2020 WL 3547049, at *5 (W.D.N.Y. June 30, 2020) (finding the defendant-officer's comment—"don't file that"—without more did not rise to the level of "thwarting" the plaintiff from taking advantage of a grievance process through intimidation).  Thus, the Court finds Plaintiff failed to raise a material issue of fact as to availability under *Ross* due to "machination, misrepresentation, or intimidation" where he simultaneously made his complaints known through other means.  (*See* Dkt. Nos. 1 at 14, 26, 30-35, 39, 40, 43, Dkt. No. 34 at 11.)

Read broadly, Plaintiff also suggests he exhausted administrative remedies by reporting the "attacks" to nurses and medical staff and writing letters detailing the incidents to Koenigsmann and the CORC Director.  (Dkt. Nos. 1 at 46, 1-1 at 2-14, 34 at 11.)  This sort of circumvention of the IGP, however, has been consistently rejected by courts in this Circuit under the PLRA.  *See Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007) (informal steps, putting officials on "notice" are insufficient to exhaust administrative remedies); *see also Hall v. Annuci*, No. 9:17-CV-1069 (GTS/DEP), 2018 WL 6607600, at *6 (N.D.N.Y. Nov. 11, 2018), *report and recommendation adopted by* 2018 WL 6605618 (N.D.N.Y. Dec. 17, 2018), *Hurst v. Mollnow*, No. 16-CV-1062 (DNH/TWD), 2018 WL 4178226, at *7 n.9 (N.D.N.Y. Jul. 20, 2018), *report and recommendation adopted by* 2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018); *Chaney v. Vena*, No. 9:15-CV-653 (TJM/ATB), 2017 WL 6756645, at *3 n.3 (N.D.N.Y. Nov. 29, 2017), *report and recommendation adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017), *report*

*and recommendation adopted by* 2017 WL 2790530 (N.D.N.Y. June 27, 2017). Thus, Plaintiff's complaints, whether verbal or written, even to a high-ranking official, are outside the purview of the IGP, and fail to satisfy the PLRA's exhaustion requirement. *See Jones v. Bock*, 549 U.S. at 218 (holding proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

Lastly, to the extent Plaintiff claims the PLRA's exhaustion requirement may be "judicially excus[ed] . . . when irreparable injury may occur without immediate judicial relief," (Dkt. No. 34 at 11), "that avenue has been foreclosed" by *Ross*. *Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016) (summary order). In *Ross*, the Supreme Court held "[c]ourts may not engraft an unwritten 'special circumstances exception' onto the PLRA's exhaustion requirement." *Ross*, 136 S. Ct. at 1862; *accord Williams*, 829 F.3d at 123.

Based on the foregoing, the Court finds Plaintiff has failed to raise a material issue of fact on the question of availability of the IGP under *Ross*. Accordingly, the Court recommends granting Defendants' motion for summary judgment on exhaustion grounds as to Plaintiff's (1) Eighth Amendment deliberate indifference claim against Furgison, (2) Eighth Amendment failure to intervene claim against Hicks, and (3) First Amendment retaliation claim against Furgison and Hicks.[9]

### C.    Ramineni

Plaintiff contends Ramineni was deliberately indifferent to his serious medicals needs by repeatedly denying his requests for medical treatment on multiple occasions despite being aware

---

[9]  Because the Court recommends granting summary judgment to Furgison and Hicks on exhaustion grounds, the Court does not address whether Furgison is entitled to summary judgment on the merits on Plaintiff's Eighth Amendment deliberate indifference claim and whether Furgison and Hicks are entitled to qualified immunity on Plaintiff's First Amendment retaliation claim. (*See* Dkt. No. 30-9 at 15-19.)

that Plaintiff was suffering from extreme pain as a result of the alleged assaults.  (Dkt. No. 1 at

63-65.)  Defendants argue Ramineni is entitled to summary judgment because Plaintiff is unable

to meet either the objective or subjective elements of his deliberate medical indifference claim.

(Dkt. No. 30-9 at 16-19.)

### 1.    Deliberate Medical Indifference

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on

those convicted of crimes, "which includes punishments that involve the unnecessary and

wanton infliction of pain."  U.S. Const. amend. VIII; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d

Cir. 1994) (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  "In order to establish an Eighth

Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate

indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.

1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  This standard contains objective

and subjective components.  *Hathaway*, 37 F.3d at 66.  The first element is objective and

measures the severity of the deprivation, while the second element is subjective and ensures that

the defendant acted with a sufficiently culpable state of mind.  *Id*. at 184 (citing, *inter alia*,

*Chance*, 143 F.3d at 702); *accord Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).

To satisfy the objective element, the alleged deprivation must be "sufficiently serious."

*Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining

whether a deprivation is sufficiently serious also involves two inquiries.  *Id*.  The first question is

whether the plaintiff was deprived of adequate medical care.  *Id*.  Prison officials who act

"reasonably" in response to the inmate's health risk will not be found liable under the Eighth

Amendment because the official's duty is only to provide "reasonable care."  *Id*. (citing *Farmer*,

511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id*. at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id*. (citing *Smith*, 316 F.3d at 185-86). However, where the inadequacy is in the medical treatment that was afforded to the inmate, the inquiry is narrower. *Id*. Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted); *see also Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain"). Thus, although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id*. at 280.

To satisfy the subjective element, the plaintiff must demonstrate that defendants had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . . the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged

official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."  *Id*.; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").  "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law."  *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).  Therefore, "the defendant's belief that his conduct posed no risk of serious harm 'need not be sound so long as it is sincere,' and 'even if objectively unreasonable, a defendant's mental state may be nonculpable.'"  *Wright v. Genovese*, 694 F. Supp. 2d 137, 154-55 (N.D.N.Y. 2010) (quoting *Salahuddin*, 467 F.3d at 281).

Disagreements over medication, diagnostics, forms of treatment, and the need for specialists are not adequate grounds for a Section 1983 claim, since those issues implicate medical judgment and at worst negligence constituting malpractice.  *See Sonds v. St. Barnabas Hosp. Corr. Health Servs*., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).  Stated another way, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106; *accord Hill*, 657 F.3d at 123; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

## 2.    Analysis

As to the first inquiry of the objective prong, the Court finds no reasonable jury could find Plaintiff was "actually deprived of adequate medical care."  *Salahuddin*, 467 F.3d at 276.  The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire.  Rather, prison officials fulfill their obligations

under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester Cty. Dep't of Corrs. Med. Dep't*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 280). The record evidence demonstrates Plaintiff's various medical complaints and conditions, including but not limited to severe pain, were reasonably treated and monitored at all relevant times. *See, e.g.*, *Gray v. Kang Lee*, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) (finding prisoner could not satisfy objective requirement where he was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist); *Nowinski v. Rao*, No. 6:14-CV-06559 (MAT), 2018 WL 2303780, at *5-6 (W.D.N.Y. May 21, 2018) (granting summary judgment to the defendants where record evidence showed the plaintiff was not deprived of adequate care where, *inter alia*, the inmate was provided with extensive care for his knee problems, including multiple surgeries, physical therapy, medications, and accommodations).

Here, the record evidence shows Ramineni, a physician at Mohawk, saw Plaintiff on November 3, 2017, at which time Plaintiff complained of pain in his right foot and ribs. (Dkt. No. 30-22 at ¶ 4.) Ramineni states that aside from Plaintiff's subjective complaints of pain, the only evidence of any possible injury to Plaintiff's right foot was an area of discoloration. *Id.* at ¶ 6. As such, Ramineni ordered an x-ray of Plaintiff' right foot, which was performed that day at Mohawk and revealed no fracture. *Id.* at ¶¶ 7, 8. Ramineni also conducted a physical examination of Plaintiff to determine if he had any fractured ribs. *Id.* at ¶ 9. In his declaration, Ramineni explains that if Plaintiff had a fractured rib, there would have been some observable evidence of the injury. *Id.* at ¶ 10. His examination of Plaintiff, however, revealed no bruising on or around his ribs and his lungs were clear. *Id.* at ¶ 11. Thus, there was no medical indication that Plaintiff had any rib fractures. *Id.* at ¶ 12. Ramineni further states that "[a]s a practical

matter, even if the Plaintiff had a rib fracture, and there is no evidence of this, there is no further surgery or treatment that he could have rendered to remedy such a condition beyond bed rest." *Id*. at ¶ 13.

The record evidence demonstrates Plaintiff was next seen by Ramineni on January 10, 2018, at which time Plaintiff complained of a concussion and headaches but made no complaint of pain in his foot, ribs, or hip. *Id*. at ¶ 14. Plaintiff was provided with pain medication. (Dkt. No. 30-25.) Plaintiff's medical records indicate that on February 23, 2018, he was seen by another medical provider at Mohawk. (Dkt. No. 30-22 at ¶ 15.) It was noted Plaintiff presented with subjective complaints of pain, but was in no apparent distress, sat, stood, and bended normally, and ambulated without difficulty. *Id*.; Dkt. No. 30-25. On March 13, 2018, Plaintiff presented to Ramineni with complaints of pain in his ribs, foot, and shoulder. (Dkt. No. 30-22 at ¶ 17.) Ramineni states, however, there was no physical evidence of any injury to these areas of Plaintiff's body and he exhibited normal movement of the shoulder. *Id*. Thus, Ramineni explains no further treatment or diagnostic testing was warranted. *Id*.

Accordingly, the Court finds the evidence in the record does not raise a genuine issue of fact as to whether Ramineni deprived Plaintiff of adequate medical care under the objective prong of the deliberate indifference analysis. Therefore, the Court finds summary judgment is warranted on this ground.

Moreover, even assuming Plaintiff could satisfy the objective prong, the Court finds no reasonable jury could find Ramineni acted with a sufficiently culpable state of mind. While Plaintiff claims Ramineni was deliberately indifferent to his serious medical needs because he failed to x-ray his ribs and/or did not adequately treat his subjective complaints of pain, prison officials have broad discretion in determining the nature and character of medical treatment

afforded to inmates.  *See Sonds*, 151 F. Supp. 2d at 311.  A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim.  *Id*.  Thus, the fact that a plaintiff might have preferred an alternative treatment or believes he did not get the medical attention he wanted does not rise to the level of a constitutional violation.  *Id*.; *see also Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) (holding an inmate does not have the right to treatment of his choice).  As such, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of medical intervention implicate medical judgment and do not rise to the level of a constitutional violation.  *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107); *see also Washington v. Westchester Cty. Dep't of Corr.*, No. 13 Civ. 5322 (KPF), 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("The law is clear that the medication a doctor selects to treat the patient's conditions is a medical judgment and does not rise to the level of deliberate indifference."); *Wright*, 694 F. Supp. 2d at 160 ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmates' 'serious' medical needs.") (collecting cases); *Adams v. Smith*, No. 9:15-CV-913 (BKS/DJS), 2018 WL 1363495, at *4 (N.D.N.Y. Mar. 16, 2018) ("Courts have repeatedly rejected medical indifference claims based upon a failure to provide stronger pain medication.") (collecting cases).

Moreover, as set forth in his declaration, Ramineni avers he was not deliberately indifferent to Plaintiff's medical needs and that the care he provided to him was appropriate and reasonable.  (Dkt. No. 30-22 at ¶ 18.)  He opines that "[n]o reasonable physician in my position would have ordered an x-ray of the Plaintiff's ribs when there was no physical evidence implicating the need for such testing."  *Id*.  Ramineni also states "[n]o reasonable physician in my position would believe that the care and treatment I provided Plaintiff violated his federally

protected rights insofar as the care Plaintiff received at Mohawk was entirely in accord with community practice standards." *Id*. at ¶ 19.  Thus, the Court finds no reasonable factfinder could conclude Ramineni acted with the mental state necessary for a deliberate indifference claim and summary judgment is also warranted on this ground.

Lastly, even if Ramineni's medical decisions caused Plaintiff unintended harm, tortious conduct is not actionable under Section 1983.  *See Burroughs v. Petrone*, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) (Hurd, D.J.) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm."); *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) ("[M]ere negligence is not enough to state a claim for deliberate indifference."); *Smith*, 316 F.3d at 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment.").

In light of the foregoing, the Court finds no reasonable factfinder could conclude Ramineni was deliberately indifferent to Plaintiff's serious medical needs.  Therefore, the Court recommends granting summary judgment to Ramineni.

### D.    Koenigsmann and Van Vorst

Plaintiff claims Koenigsmann and Van Vorst were deliberately indifferent to his serious medical needs because they ignored his medical requests and failed to investigate his complaints related to his medical treatment by Ramineni.  (Dkt. No. 1 at 66, *see also* Dkt. No. 34 at 15.) Defendants argue that Koenigsmann and Van Vorst are entitled to summary judgment for lack of

personal involvement and because there is no underlying constitutional violation.  (Dkt. No. 30-9 at 19-22.)

### 1.    Supervisory Liability

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  Personal involvement of a supervisory defendant may be shown in several ways.  In addition to (1) direct participation, a plaintiff may show that:

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)[10] (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

"To succeed on a supervisory liability claim, a plaintiff must 'show an affirmative causal link between the supervisor's inaction and [the plaintiff's] injury.'"  *Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 114 (2d Cir. 2020) (quoting *Poe v. Leonard*, 282 F.3d 123, 140 (2002)).  If an inmate is not subjected to unconstitutional conduct, it necessarily follows that a defendant, sued as a supervisor, could not be held liable.  *See Toole v. Connell*, No. 9:04-CV-

---

[10]  The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the warden's personal involvement even under *Colon*").

0724 (LEK/DEP), 2008 WL 4186334, at *7 (N.D.N.Y. Sept. 10, 2008); *see also Linares v. Mahunik*, No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *11 (N.D.N.Y. Sept. 11, 2006); *see Elek v. Inc. Vill. of Monroe*, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability").

### 2.    Analysis

Inasmuch as this Court finds Ramineni is entitled to summary judgment on the predicate claim of deliberate medical indifference, Plaintiff's supervisory liability claims against Koenigsmann and Van Vorst also fail.  *See Elek*, 815 F. Supp. 2d at 808 ("Absent an underlying constitutional violation, there is no cognizable claim for supervisor liability.") (internal quotation marks and citation omitted); *see also Scott v. Koenigsmann*, No. 9:12-cv-01551 (MAD/RFT), 2014 WL 3956649, at *11 (N.D.N.Y. Aug. 13, 2014) ("[A] plaintiff cannot successfully allege supervisory liability without first establishing that an underlying constitutional violation occurred."); *Ramos v. Artuz*, No. 00 Civ. 0149, 2003 WL 342347, at *11 (S.D.N.Y. Feb. 14, 2003) ("Plaintiff's claim of supervisor liability cannot survive here because . . . there was no constitutional violation.").

Therefore, the Court recommends granting summary judgment to Koenigsmann and Van Vorst.

### E.    Doe Defendants

As noted above, the District Court's initial order reviewing the complaint permitted Plaintiff to proceed with certain claims against the Doe Defendants, provided that Plaintiff "take reasonable steps to ascertain the identity" of the Doe Defendants so as to permit the timely amendment of the complaint and service of process on them.  (Dkt. No. 4 at 45.)  Plaintiff was

advised that the United States Marshals Service cannot effect service on an unidentified

defendant and that if he wishes to pursue claims against the Doe Defendants, he "must take

reasonable steps to ascertain the identity of the defendants." *Id*. Upon learning the identity of

the unnamed defendants, plaintiff must amend his complaint to properly name him or her as a

defendant." *Id*. That order warned: "If plaintiff fails to ascertain the identity of the defendants

so as to permit the timely service of process, all claims against that individual will be

dismissed."[11] *Id*. at 45-46.

Plaintiff commenced this action nearly two years ago and discovery closed on October

16, 2019. (Dkt. Nos. 1, 13, 29.) Upon review of the docket maintained by the Clerk's Office,

Plaintiff never identified the Doe Defendants as directed by the District Court.

Accordingly, the Court recommends dismissing Plaintiff's claims against the Doe

Defendants without prejudice in light of Plaintiff's failure to identify and serve them upon the

completion of discovery. *See Epps v. City of Schenectady*, No. 1:10-CV-1101 (MAD/CFH),

2013 WL 717915, at *4 (N.D.N.Y. Feb. 27, 2013) ("All discovery is complete and thus,

plaintiff's failure to identify the "John Doe" defendant mandates dismissal."); *Burns v. Trombly*,

624 F. Supp. 2d 185, 197-98 (N.D.N.Y. 2008) (collecting cases) (dismissing claims against the

Doe Defendants where after two years of litigation, the *pro se* plaintiff failed to identify the Doe

Defendants); *see, e.g.*, *Sawyer v. Prack*, No. 9:14-CV-1198 (DNH/DEP), 2016 WL 5440596, at

*16 (N.D.N.Y. July 29, 2016) (*sua sponte* recommending dismissal of the claims brought against

the Doe Defendants where it did not appear the plaintiff had taken any steps to ascertain the

---

[11] The order stated that Rule 4 of the Federal Rules of Civil Procedure require that a party be
served within 90 days of issuance of the summons, absent a court order extending that period.
Fed. R. Civ. P. 4(m). The Court's local rules shorten the time for service from 90 days under
Rule 4(m) to 60 days. N.D.N.Y. L.R. 4.1(b).

identities of the unnamed corrections officers), *report-recommendation adopted by* 2016 WL 5415790 (N.D.N.Y. Sept. 28, 2016); *see also Cusamano v. Sobek*, 604 F. Supp. 2d 416, 440 (N.D.N.Y. 2009) (dismissing without prejudice the plaintiff's claims against the Doe Defendants for failure to timely serve and name those individuals); *Mack v. Wood*, No. 9:17-CV-1146 (BKS/ATB), at *4, 2019 WL 4183894 (N.D.N.Y. Sept. 4, 2019) (recommending dismissal of the *pro se* plaintiff's claims against the Doe Defendants without prejudice for failure to identify and serve them upon the completion of discovery), *report-recommendation adopted by* 2019 WL 4183894 (N.D.N.Y. Sept. 4, 2019).

## V.    CONCLUSION

For the reasons stated above, the Court recommends granting summary judgment to Defendants Furgison, Hicks, Ramineni, Koenigsmann, and Van Vorst.  The Court also recommends dismissing Plaintiff's claims against the Doe Defendants without prejudice.  The Court has carefully considered the remaining contentions in Plaintiff's opposition and finds them without legal merit.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's claims against the Doe Defendants be **DISMISSED WITHOUT PREJUDICE**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[12]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: August 3, 2020
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[12]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the
plaintiff was in keeplock because of an altercation with prison
guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with one hour
for recreation. (Affidavit of Anthony Annucci dated Dec. 1,
1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3).
Permission is granted unless prison officials determine that
the inmate's presence at the service would create a threat to
the safety of employees or other inmates. (Schneider Aff. ¶
3). The standard procedure at Green Haven is for the captain's
office to review all requests by inmates in keeplock to attend
religious services. (Schneider Aff. ¶ 3). Written approval is
provided to the inmate if authorization is granted. (Affidavit
of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.")
¶ 5). The inmate must then present the appropriate form to
the gate officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

 **\*2**  On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3

(S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]  In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Marino v. Watts, Not Reported in Fed. Supp. (2018)**

2018 WL 3121612

2018 WL 3121612
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,
v.
Harrell WATTS, et al., Defendants.

Civ. No. 9:12-CV-801 (NAM/DJS)
|
Signed 03/07/2018

**Attorneys and Law Firms**

VINCENT MICHAEL MARINO, 14431-038, FCI FORT
DIX, P.O. Box 2000, Joint Base MDL, New Jersey 08640,
Pro Se.

HON. GRANT C. JAQUITH, Acting United States Attorney,
OF COUNSEL: KAREN FOLSTER LESPERANCE, ESQ.,
Assistant United States Attorney, Northern District of New
York, James T. Foley U.S. Courthouse, 445 Broadway,
Albany, New York 12207, Attorney for Defendants.

**AMENDED REPORT-
RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** This action, brought pursuant to *Bivens v. Six Unknown
Named Agents of the Federal Bureau of Narcotics*, 403 U.S.
388 (1971), returns to the Court on Defendants' Motion for
Summary Judgment. Dkt. No. 133, Defs.' Mot. Summ. J. The
only remaining claims in this action are First Amendment
retaliation claims against Defendants Lucas, Sepanek, and
Schult. Defendants move for summary judgment on these
remaining claims. Plaintiff has opposed Defendants' Motion,
and Defendants have filed a Reply. Dkt. Nos. 139, Pl.'s Resp.,
& 140, Defs.' Reply. After the Court ordered the Defendants
to respond to outstanding discovery requests (Dkt. No. 157),
and Defendants complied (Dkt. No. 158), Plaintiff filed
supplemental papers in opposition to Defendants' Motion.
Dkt. Nos. 162 & 163. For the reasons that follow, the Court
recommends that Defendants' Motion be **granted** and this
action **dismissed**.

**I. BACKGROUND**

**A. Plaintiff's Failure to File a Response
to Defendants' Rule 7.1 Statement**

Pursuant to this District's Local Rules, "[t]he Court shall
deem admitted any properly supported facts set forth in
the Statement of Material Facts that the opposing party
does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). As
required by the Local Rules, Defendants' counsel advised
Plaintiff of the consequences of failing to file a response
to Defendants' Rule 7.1 Statement of Material Facts. Dkt.
No. 133-1. Plaintiff, however, did not file a response to
Defendants' Statement of Material Facts. *See* Pl.'s Resp. &
Dkt. No. 162, Pl.'s Reply Brief. [1] Although a *pro se* litigant
is entitled to a liberal construction of his filings, *see Sykes v.
Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se*
status does not relieve him of his obligation to comply with
the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5,
8-9 (2d Cir. 1995). The Court therefore will deem the facts as
set forth in Defendants' Statement of Material Facts admitted,
to the extent they are properly supported by the record.
Dkt. No. 133-3, Defs.' Rule 7.1 Statement of Material Facts
("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI
Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y.
2013) ("Where the non-movant either does not respond to the
motion or fails to dispute the movant's statement of material
facts, the court may not rely solely on the moving party's
Rule 56.1 statement; rather the court must be satisfied that
the citations to evidence in the record support the movant's
assertions.") (citing *Giannullo v. City of New York*, 322 F.3d
139, 143 n.5 (2d Cir. 2003) ).

[1]     On March 5, 2018 the Clerk's office received
Plaintiffs "Reply Motion In Opposition to
Defendant's Local Rule 7.1 ..." Dkt. No. 163. This
document was in addition to the Plaintiff's Reply
Brief. Dkt. No 162. Dkt. No. 163 violates this
Court's directives in several respects. First, it is
not a properly formulated Rule 7.1 Reply. The
local Rules provide as follows: "The non-movant's
response shall mirror the movant's Statement of
Material Facts by admitting and /or denying each
of the movant's assertions in matching numbered
paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue
arises." N.D.N.Y. L.R. 7.1(a)(3). The Plaintiff's

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

Rule 7.1 reply does not address any of the facts listed in the Defendants Rule 7.1 Statement of Material Facts. Further, Dkt. No. 163 is, in essence, a supplemental reply brief, and when combined with Dkt. No. 162, substantially exceeds the Court-imposed five page limit on this additional brief.

### B. Factual Background

**\*2**  On December 3, 2009, Plaintiff was incarcerated at FCI Ray Brook, when unit officers discovered $2,729.32 of postage stamps, gambling paraphernalia, and a homemade intoxicant in his cell during a routine cell search. Defs.' SMF at ¶¶ 26-27. A disciplinary hearing was held on December 15, 2009, at the conclusion of which Plaintiff was found guilty of several disciplinary violations and sentenced to sixty days in disciplinary segregation, twenty-seven days loss of good time credits, and 180 days restriction on his visiting, telephone, and commissary privileges. *Id.* at ¶ 28. Following the disciplinary hearing, the Special Investigative Supervisor ("SIS") conducted an investigation into the incident, which revealed that Plaintiff's girlfriend had entered into a series of financial transactions with a number of different inmates. *Id.* at ¶ 29. The report concluded that Plaintiff had been running an illegal gambling operation and recommended that he be transferred to another institution in order to "shut down" the operation. *Id.* at ¶ 30.

Defendant Lucas, Plaintiff's case manager, accepted the recommendation of the SIS, as was his standard practice, and completed the necessary paperwork to request a transfer for Plaintiff. *Id.* at ¶ 31. Lucas drafted a Request for Transfer, Form 409. *Id.* at ¶ 33; Dkt. No. 133-10, Decl. of Steven Lucas, dated Aug. 18, 2017, Ex. F ("Form 409"). The transfer request was a "Code 323," which, according to Lucas, means that the inmate "need[s] closer supervision as the result of a disciplinary incident." Dkt. No. 133-4, Lucas Decl. at ¶ 14. In stating the reason for the transfer request, Lucas summarized the findings of the SIS report, and noted that Plaintiff had a previous disciplinary violation in 2007 for operating a gambling operation at USP Canaan. Form 409. Lucas recommended "a transfer to a High security facility no closer to [Plaintiff's] release area of Massachusetts." *Id.* On the Form 409, Lucas indicated that Plaintiff's inmate security level [2] was twenty-four. *Id.* After researching suitable facilities, Lucas identified USP Hazelton and USP Big Sandy as potential facilities to which Plaintiff might be

transferred. Lucas Decl. at ¶ 17. Lucas also completed a new BP-338. [3] *Id.* at ¶ 37.

[2]  Each inmate in the custody of the Federal Bureau of Prisons ("BOP") is assigned a point score, which is used to determine their security classification. Defs.' SMF at ¶¶ 9-11. An inmate's point score, however, is not the sole factor used in determining a security classification; public safety factors and management variables are also considered. *Id.* at ¶ 11. An inmate's security classification is re-assessed at regular intervals throughout the period of incarceration. *Id.* at ¶ 13.

[3]  An Inmate Load and Security Designation Form, or BP-337, is prepared when an inmate first enters federal custody. Defs.' SMF at ¶¶ 7-8. Seven months after the inmate enters federal custody, and annually thereafter, a Custody Classification form, or BP-338, containing updated information relevant to the inmate's security classification, is prepared. *Id.* at ¶¶ 13-14. Additionally, a new BP-338 is issued at any time an event occurs that may affect the inmate's security classification, such as an incident report. *Id.* at ¶ 14.

The Request for Transfer Form was reviewed and approved by the Unit Manager, the Case Management Coordinator, the Assistant Warden, and the Warden, Defendant Schult. *Id.* at ¶ 41. The Request for Transfer Form was then submitted to the Designation and Sentence Computation Center ("DSCC") in Grand Prairie, Texas. *Id.* Once a transfer request is submitted to the DSCC, the determination of whether to approve the request and if approved, what facility the inmate is transferred to, is made solely by the DSCC. *Id.* at ¶¶ 41-42. The staff of the facility submitting the request—in this case, Ray Brook—have no further control over the request after it is submitted. *Id.* at ¶ 42. Plaintiff was transferred out of FCI Ray Brook on February 12, 2010, and arrived at USP Pollock, his new assigned facility, on July 13, 2010. *Id.* at ¶ 43.

**\*3**  The remaining claims in this action are First Amendment retaliation claims arising from an affidavit Plaintiff alleges that he submitted in support of a fellow inmate named McCarroll's civil rights action against a BOP employee named Matteau. Am. Compl. at p. 4. [4] Plaintiff claims that on December 2, 2009, Helms and Poirier [5] discovered the affidavit in Plaintiff's cell during a cell search. *Id.* at pp. 6 & 16. Plaintiff claims that the Defendants intentionally

2018 WL 3121612

retaliated against him based upon this affidavit. *Id.* at pp. 13-15. Plaintiff claims that he experienced the following specific acts of retaliation: [6] (1) Defendants Lucas and Sepanek confiscated his legal work and law books when he was housed in the Special Housing Unit ("SHU") at Ray Brook, *id.* at pp. 34-35; (2) Defendants Lucas and Sepanek falsified his security level from eleven to twenty-four, causing him to be transferred to USP Pollock, which was known to have violent conditions, *id.* at p. 27; and (3) Defendant Schult caused him to be placed in BOP's "Diesel Therapy" program, whereby he was frequently transferred while on route from Ray Brook to Pollock and did not have access to his legal work, *id.* at p. 21.

[4]     Because some paragraphs of the Amended Complaint are not numbered, the Court cites to the pagination assigned by Plaintiff.

[5]     Poirier was dismissed as a Defendant from this action, Dkt. No. 62, and Plaintiff voluntarily discontinued his claims against Helms after he passed away, Dkt. No. 145.

[6]     Plaintiff has alleged other acts of retaliation—including that the incident report filed against him as a result of the cell search was retaliatory—that have been dismissed by the Court. *See* Dkt. No. 49.

## II. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

**\*4** Defendants move for summary judgment on Plaintiff's remaining First Amendment retaliation claims. For the reasons that follow, the Court agrees that Plaintiff's retaliation claims fail as a matter of law and recommends that Defendants' Motion be **granted**. [7]

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 42 of 267

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

7

Defendants have argued that the Court should reconsider its holding allowing Plaintiff's First Amendment retaliation claim to proceed under *Bivens* in light of the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Dkt. No. 133-2, Defs.' Mem. of Law at pp. 9-10. *Ziglar*—as all of the Supreme Court's recent *Bivens* decisions—emphasizes that *Bivens* is a " 'disfavored' judicial activity." 137 S. Ct. at 1857. However, because the Court finds that summary judgment is appropriate on the merits of Plaintiff's First Amendment claims, it declines to revisit the issue of whether a *Bivens* remedy should be implied under the First Amendment.

### A. Legal Standard 8

8

Due to the similarity between *Bivens* and § 1983 actions, "federal courts have typically incorporated § 1983 law into *Bivens* actions." *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such

evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia, Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ).

**\*5** Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

### B. Analysis

Defendants argue that: (1) Plaintiff was transferred to USP Pollock for legitimate non-retaliatory reasons; (2) undisputed evidence shows that Plaintiff's security classification was not falsified; (3) there is no evidence that the Defendants were personally involved in the decision to transfer Plaintiff to USP Pollock or in the manner in which that transfer was conducted; and (4) Plaintiff has not shown that he suffered any injury due to the deprivation of his legal materials. Dkt. No. 133-2, Defs.' Mem. of Law at pp. 2-3.

#### 1. Confiscation and Denial of
#### Access to Legal Work while in SHU

Plaintiff alleges that the Defendants confiscated his legal materials—his Federal Rules of Civil Procedure book, in particular—while he was in the SHU at Ray Brook. Am. Compl. at pp. 34-35. According to Plaintiff, the Defendants specifically told him that the reason they were confiscating his legal materials was the affidavit he had filed against Matteau. *See* Dkt. No. 133-25, Dep. of Vincent Michael Marino, dated

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

Apr. 18, 2017 ("Pl.'s Dep.") at pp. 16-17. Participation in a lawsuit constitutes a protected activity, *see Baskerville v. Blot*, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002), and the intentional destruction of an inmate's property may constitute an adverse action for the purposes of a retaliation claim, *Mateo v. Bristow*, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013).

Plaintiff's claim, however, fails because there is insufficient evidence to conclude that he suffered an adverse action. Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated. Pl.'s Dep. at pp. 71-72, & 85. Furthermore, while Plaintiff claims that Defendants confiscated his Federal Rules of Civil Procedure book, Defendants have produced evidence that inmates in SHU at Ray Brook had access to a basic law library from 8:00 am to 9:00 pm, seven days a week. Dkt. No. 133-23, Decl. of Karen Folster Lesperance, Esq., dated Aug. 18, 2017, Ex. I, at p. 2. Plaintiff has not claimed that he was denied access to legal materials through the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library. The lack of evidence demonstrating that Plaintiff suffered an adverse action is insufficient to withstand summary judgment. Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's retaliation claim based on the confiscation and denial of access to legal materials while he was in the SHU at Ray Brook.

### 2. Falsification of Security Level and Transfer to USP Pollock

Plaintiff alleges that the Defendants falsified his security level and caused him to be transferred to a "facility which had harsher prison conditions such as ... over 16 murders, over 300 stabbings & knife shots." Am. Compl. at p. 27. Based on conversations with the Defendants, Plaintiff asserts that he believes this was out of retaliation for filing the affidavit against Matteau. *See* Pl.'s Dep. at pp. 31-32.

**\*6** Although a transfer to a facility with harsher conditions may constitute an adverse action for the purposes of a retaliation claim, *see Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998), in this case Plaintiff has failed to establish a causal connection between his protected conduct (filing the affidavit) and the Defendants' request for his transfer. "As

a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases). Plaintiff has claimed that certain of the Defendants had conversations with him regarding his placement in SHU and the diesel therapy program in retaliation for his litigation activities, but notably does not allege such conversations regarding his security level and transfer to USP Pollock. While Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment.

Moreover, even if Plaintiff were able to establish a causal connection between his affidavit and Defendants' alleged adverse actions, Defendants have provided significant evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation.

As proof of his claim that Defendants manipulated his security level, Plaintiff compares a BP-338 dated April 27, 2006 where his security level was 11, with a BP-338 dated February 2, 2011 where his security level was 24. *See* Am. Compl. at pp. 47-48. [9] Plaintiff claims that the transfer forms completed by the Defendants contained false information that there were pending drug and criminal enterprise charges against him and that he had been convicted of assaulting a police officer; Plaintiff asserts that these falsifications inflated his security level. Pl.'s Resp. at p. 16.

[9]     Citation is to the pagination assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

Contrary to Plaintiff's claims, Defendant Lucas explains that on the Form 409 he is required to note any discrepancies between the inmate's initial BP-337 and the BP-338 completed at the time of the transfer request. Lucas Decl. at ¶ 22. Lucas noted two discrepancies between the BP-337 and the information available when he was completing the Form 409: (1) the BP-337 referenced pending drug and criminal enterprise charges, which had never been lodged as a detainer; and (2) a traffic stop had been scored as a crime of Serious Violence instead of a crime of Minor Violence. *Id.* at ¶ 23; Form 409. Lucas states that both of these discrepancies would have lowered Plaintiff's point score. Lucas Decl. at ¶

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

24. Lucas further explains that in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. *Id.* at ¶¶ 27-28. Lucas' explanations rebut Plaintiff's assertions that the Defendants manipulated his security level in order to transfer him to a higher security facility.

In any event, Lucas explains that the transfer request was "standard practice" following the recommendation of SIS that Plaintiff be transferred in order to "shut down" his gambling operation. *Id.* at ¶¶ 12-13. Plaintiff was transferred pursuant to Program Statement Number P5100.08, "Inmate Security Designation and Custody Classification" Code 323. Lucas Decl. ¶ 14, Ex. A, Chapt. 7, p. 5. Pursuant to that Code, an inmate may be transferred as a result of documented misconduct, to an institution of greater security. *Id.* In such cases, the inmate may only be transferred to a facility of the same level security if placement at a greater security level institution is not possible or other overriding circumstances exist. *Id.* As evidenced on Plaintiff's Form 409, the basis for the transfer was Plaintiff's misconduct. Lucas Decl., ¶ 16, Ex. F ¶ 3 ("An SIS Investigation has recommended the transfer of inmate Marino from FCI Ray Brook to 'shut down' his illicit gambling operation.... Based on the scale of this gambling operation, and the repetitive nature of these infractions, we recommend a transfer to a High security level facility no closer to his release area of Massachusetts. To do otherwise would be a reward for this type of behavior."). Defendants have demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive.

 **\*7** Plaintiff also contends that Defendants specifically transferred him to USP Pollock because of its dangerousness. Defendants have demonstrated this is not the case. On Plaintiff's Form 409, Defendant Lucas requested transfer to either USP Hazelton or USP Big Sandy. Lucas Decl. ¶ 17, Ex. F. Thus, even if Plaintiff had established a causal connection between his protected activity and the Defendants' decision to request his transfer, the Defendants have shown that they would have requested Plaintiff's transfer to a higher level security facility even in the absence of the protected activity, and that the assignment to USP Pollock was not Defendants' decision. *See Graham v. Henderson*, 89 F.3d at 79.

Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based on the alleged manipulation of his security level. [10]

[10]    Since the issuance of the Court's Original Report-Recommendation and Order, Plaintiff has had the benefit of receiving Defendants' Answers to certain Notices to Admit served by Plaintiff, and being able to make further arguments to the Court. *See* Dkt. No. 158-1, Defs' Objections and Responses to Pl.'s First Set of Requests for Admissions; Dkt. No. 162, Pl.'s Reply Brief. The Court has reviewed and considered these additional documents, but nothing contained therein causes the Court to change its analysis. The Defendants generally deny the admissions sought in the Notices to Admit, and provide additional explanations that are wholly consistent with the Affidavit of Defendant Lucas previously submitted. *See* Dkt. No. 133-4. Plaintiff objects to the Defendants' narrative contained within the Responses to the Notices to Admit, and generally claims that those responses constitute "criminal perjury." Pl.'s Reply Brief at pp. 2-4. Aside from the Plaintiff's general characterizations, Plaintiff again emphasizes that the drug and criminal enterprise charges that are referenced in Form 409 were not pending at the time of the creation that Form. Defendant Lucas responds that the reference to those charges was merely to note discrepancies between the BP-338 form he filled out and the original BP-337 Form. Accordingly, despite these additional submissions, and utilizing the standard of "skepticism and care" mandated by the Second Circuit, the Court again finds that summary judgment is warranted on this First Amendment retaliation claim.

### 3. Placement in Diesel Therapy Program

Plaintiff alleges that the Defendants orchestrated his placement in the "Diesel Therapy" program for eight months, where he was denied access to his legal work. Am. Compl. at p. 26. Plaintiff claims that Defendant Schult told him that placement in the "Diesel Therapy" program was retaliation for his litigation activities. Pl.'s Dep. at p. 17.

With respect to this claim, there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants

had any personal involvement in Plaintiff's placement in the "Diesel Therapy" program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook. As stated by Defendant Lucas, once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request. Lucas Decl. at ¶ 19. "A *Bivens* action lies against a defendant only when the plaintiff can show the defendant's personal involvement in the constitutional violation." *Cohen v. Holder*, 2011 WL 809773, at *2 (E.D.N.Y. Mar. 1, 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* ... a plaintiff must plead that each Government-official defendant, though the official's own individual actions, has violated the Constitution.").

**\*8** Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based upon his placement in the "Diesel Therapy" program.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 133) be **GRANTED** and this action **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [11] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[11]     If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3121612

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 46 of 267

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

2018 WL 1578163
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,

v.

Deborah G. SCHULT, et al., Defendants.

9:12-CV-801 (NAM/DJS)
|
Signed 03/30/2018

## Attorneys and Law Firms

Vincent Michael Marino, 14431-038, FCI Fort Dix, P.O. Box 2000, Joint Base MDL, NJ 08640, pro se.

Hon. Grant C. Jaquith, Acting United States Attorney, Northern District of New York, Karen Folster Lesperance, Assistant United States Attorney, James T. Foley U.S. Courthouse, 445 Broadway, Room 218, Albany, NY 12207, Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Hon. Norman A. Mordue, Senior U.S. District Court Judge

### I. Introduction

**\*1** Plaintiff *pro se* Vincent Michael Marino brought this action pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), alleging violations of his civil rights. (Dkt. No. 52). The only remaining claims are for First Amendment retaliation against Defendants Schult, Sepanek, and Lucas, who at all relevant times were employed at FCI Ray Brook, where Plaintiff was formerly incarcerated. (*See* Dkt. No. 86). Defendants have moved for summary judgment on the remaining claims. (Dkt. No. 133). On December 11, 2017, United States Magistrate Judge Daniel J. Stewart issued a Report-Recommendation and Order, recommending that Defendants' motion be granted and the action dismissed. (Dkt. No. 149). Subsequently, Plaintiff filed objections to the Report-Recommendation, [1] a motion to compel certain discovery and for permission to amend his opposition to summary judgment, and a motion for rejection of the Report-Recommendation, denial of summary judgment, imposition of the sanction of default, and other relief. (Dkt. Nos. 152–154).

[1]    The Court has reviewed Plaintiff's objections to Magistrate Judge Stewart's December 11, 2017 Report-Recommendation, which were based on the outstanding discovery Plaintiff sought in order to respond to Defendants' motion for summary judgment. (Dkt. No. 152). This discovery issue was resolved before the March 7, 2018 Amended Report-Recommendation. (Dkt. Nos. 157, 162–63). Therefore, Plaintiff's objections to the December 11, 2017 Report-Recommendation are not relevant to the March 7, 2018 Amended Report-Recommendation or this decision.

On January 11, 2018, this Court referred Plaintiff's new motions to Magistrate Judge Stewart for decision on non-dispositive issues and/or recommendation on dispositive issues, and held in abeyance the Report-Recommendation and Defendants' motion for summary judgment. (Dkt. No. 155). On January 16, 2018, Plaintiff filed an additional "reply in opposition to Magistrate Judge Stewart's Report-Recommendation and Order," wherein Plaintiff again emphasized the outstanding discovery he needed to oppose Defendants' motion. (Dkt. No. 156). On January 31, 2018, Magistrate Judge Stewart granted Plaintiff's motion to compel, allowed him to submit additional briefing in connection with Defendants' motion for summary judgment, and denied his motion for default judgment. (Dkt. No. 157). Plaintiff then submitted supplemental papers in further opposition to Defendants' motion. (Dkt. Nos. 162–63).

On March 7, 2018, Magistrate Judge Stewart issued an Amended Report Recommendation and Order, which again recommended that Defendants' motion for summary judgment be granted and the action dismissed. (Dkt. No. 164). On March 28, 2018, Plaintiff filed timely objections to the Amended Report-Recommendation. [2] (Dkt. No. 167). For the reasons set forth below, the Amended Report-Recommendation is adopted in its entirety.

[2]    Although Plaintiff's objections were received on March 28, 2018—two days after the March 26, 2018 deadline, they are dated March 20, 2018 and were mailed on March 26, 2018, and therefore, the Court will consider the objections as timely.

### II. Standard of Review

**\*2** This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen*

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    1

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 47 of 267

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

*v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.* "A proper objection is one that identifies the specific portions of the [Report and Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the Report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "To the extent ... that the party makes only conclusory or general arguments ... the Court will review the Report strictly for clear error." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009). "The objections of parties appearing *pro se* are generally accorded leniency and should be construed to raise the strongest arguments that they suggest." *Id.* at 340 (quotations and citation omitted).

Summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re World Trade Center Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In ruling on a summary judgment motion, the court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### III. Discussion

#### a. The Amended Report-Recommendation

In the Amended Report-Recommendation, Magistrate Judge Stewart deemed admitted the facts set forth in Defendants'

Statement of Material Facts, to the extent they were properly supported by the record, based on Plaintiff's failure to file a response to Defendants' Statement. (Dkt. No. 164, p. 2). Magistrate Judge Stewart then recommended that Defendants' motion for summary judgment be granted as to Plaintiff's First Amendment retaliation claims, which alleged that after Plaintiff filed an affidavit in support of a fellow inmate's civil rights action, the Defendants took the following actions against him: 1) the confiscation of legal work and law books while Plaintiff was housed in the Special Housing Unit ("SHU") at FCI Ray Brook; 2) the falsification of Plaintiff's security level from eleven to twenty-four, and consequent transfer to USP Pollock, which was known to have violent conditions; and 3) his placement in so-called "Diesel Therapy," whereby he was in transit for eight months from one facility to another. (*Id.*).

As to the first claim, Magistrate Judge Stewart Recommended summary judgment based on "insufficient evidence to conclude that [Plaintiff] suffered an adverse action." (*Id.*, p. 10). Magistrate Judge Stewart observed that "Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated." (*Id.*). Further, while Plaintiff claimed that Defendants confiscated his Federal Rules of Civil Procedure book, it was noted that Defendants "produced evidence that inmates in SHU at Ray Brook had access to a basic law library from 8:00 am to 9:00 pm, seven days a week," and "Plaintiff has not claimed that he was denied access to legal materials from the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library." (*Id.*).

**\*3** For Plaintiff's second claim based on the alleged manipulation of his security level and his transfer to a different facility, Magistrate Judge Stewart found that Plaintiff failed to establish a causal connection between his protected conduct—filing the affidavit, and Defendants' request for his transfer. (*Id.*, pp. 10–11). Magistrate Judge Stewart noted that "[w]hile Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment." (*Id.*, p. 11). Magistrate Judge Stewart also found that even if Plaintiff were able to establish a causal connection between his affidavit and the alleged adverse actions, Defendants "provided significant

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 48 of 267

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation." (*Id.*, p. 11). Defendants' evidence supporting the increase in Plaintiff's security level included that "in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification." (*Id.*, pp. 11–12). Further, there was evidence that "the transfer request was 'standard practice' following the recommendation of SIS that Plaintiff be transferred in order to 'shut down' his gambling operation." (*Id.*, p. 12). Thus, Magistrate Judge Stewart found that Defendants "demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive." (*Id.*, p. 13). In addition, the evidence showed that Defendants had no personal involvement in choosing the particular facility, USP Pollock, where Plaintiff was transferred. (*Id.*).

For Plaintiff's third claim related to "Diesel Therapy," Magistrate Judge Stewart found that "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (*Id.*, p. 14). Furthermore, Magistrate Judge Stewart noted evidence that "once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request." (*Id.*).

### b. Plaintiff's Objections

As an initial matter, Plaintiff claims for the first time in his objections that he never received Defendants' Statement of Material Facts in support of their motion for summary judgment, which he now seeks to compel. (Dkt. No. 167, p. 1). The Court has considered this claim as an objection to Magistrate Judge Stewart's decision to deemed admitted the facts set forth in Defendants' Statement of Material Facts based on Plaintiff's failure to file a response. (Dkt. No. 164, p. 2).

Contrary to Plaintiff's claim, the record shows that he received Defendants' Statement of Material Facts, along with notice of the consequences of failing to file a response to Defendants' Statement of Material Facts. (Dkt. Nos. 133-1, 133-3, 133-27). In the December 11, 2017 Report-Recommendation, Magistrate Judge Stewart noted

that Plaintiff failed to file a response to Defendants' Statement of Material Facts. (Dkt. No. 149, p. 2). Therefore, under Local Rule 7.1(a)(3), Magistrate Judge Stewart deemed that the facts set forth by Defendants were admitted by Plaintiff, to the extent the facts were properly supported by the record. (*Id.*). Despite that clear notification, Plaintiff never claimed to be missing Defendants' Statement of Material Facts in his objections filed on December 29, 2017. (Dkt. No. 152). Nor did he raise the issue in his motion to compel or letters to the Court thereafter. (Dkt. Nos. 153–54, 156). After Plaintiff obtained additional discovery, Magistrate Judge Stewart permitted Plaintiff to submit a supplemental Rule 7.1 Reply Statement of Material Fact. (Dkt. No. 157). Plaintiff submitted a document entitled "Marino's Reply Motion in Opposition to Defendant's Local Rule 7.1/Statement of Material Fact Motion with Marino's Supportive Affidavit." (Dkt. No. 163). But this document did not specifically address any of the facts listed in Defendants' Statement of Material Facts. Based on Plaintiff's failure to file a proper response, Magistrate Judge Stewart once again, in the Amended Report-Recommendation, deemed admitted Defendants' Statement of Material Facts to the extent they were properly supported by the record. (Dkt. No. 164, p. 2).

After carefully reviewing the issue *de novo*, the Court agrees with Magistrate Judge Stewart's decision because the record shows that Plaintiff received Defendants' Statement of Material Facts, he was warned of the consequences of not responding, and he failed to do so despite multiple opportunities. *See* N.D.N.Y.L.R. 7.1(a)(3). Moreover, Magistrate Judge Stewart only deemed the facts admitted to the extent they were properly supported by the record, and Plaintiff makes no claim that he lacked the record evidence in this case. Indeed, Plaintiff's objections reference such evidence. (*See, e.g.*, Dkt. No. 167, pp. 4–5). Therefore, the Court also denies Plaintiff's request to submit a response to Defendants' Statement of Material Facts.

**\*4** As to the substance of Plaintiff's First Amendment retaliation claims, he does not appear to challenge, with any evidentiary basis, the specific findings made by Magistrate Judge Stewart. Nonetheless, recognizing Plaintiff's *pro se* status, and out of an abundance of caution, the Court has undertaken a *de novo* review. In order to prevail on his retaliation claims, Plaintiff "bears the burden of showing, first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 49 of 267

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

"Because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." *Id.* (quotations and citations omitted). If a plaintiff adduces evidence of protected conduct, an adverse action, and a causal connection, the burden shifts to the defendant to demonstrate he "would have disciplined or transferred him even in the absence of the protected conduct." *Id.* (quotations and citations omitted). In other words, a defendant is entitled to judgment in his favor if he shows that the adverse action "would have been taken based on the proper reasons alone." *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Id.* (quotations and citations omitted).

First, for all three claims, there is no dispute that Plaintiff engaged in protected conduct by filing an affidavit in support of a fellow inmate's civil rights action. However, for Plaintiff's retaliation claim based on the alleged confiscation and denial of access to legal materials, he has failed to adduce any specific evidence of an adverse action. Plaintiff's vague allegations that, while in SHU, he was deprived of his "legal work & legal mail" are insufficient at this stage. (*See* Dkt. No. 52, pp. 21–22; Dkt. No. 167, p. 18). The record also shows that Defendant had access to a law library while in SHU. (*See* Dkt. No. 133-23, p. 3). Moreover, Plaintiff has not adduced evidence of *who* allegedly deprived him of legal materials; he simply testified that "[t]hey lost a lot of it," and "[t]hey destroyed a lot of it." (Dkt. No. 133-25, p. 40). But there is no evidence that Defendants worked at SHU or exercised control over his legal materials there. Thus, Plaintiff has also failed to raise an issue of material fact as to Defendants' personal involvement in the alleged adverse action. *See Hallock v. Bonner*, 567 F. Supp. 2d 334, 338 (N.D.N.Y. 2008) ("[T]o defeat the defendants' motion for summary judgment, the plaintiffs must raise an issue of material fact as to the requisite personal involvement of the named defendants under *Bivens*."). Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

Second, for Plaintiff's retaliation claim based on the alleged manipulation of his security level and his transfer to a different facility, the Court agrees with Magistrate Judge Stewart's finding that Defendants demonstrated that they

would have increased his security level and requested his transfer even in absence of Plaintiff's protected conduct. Plaintiff argues that Defendants put false information in his prison files in order to raise his security level and get him transferred. (Dkt. No. 167, pp. 3–9). But the record shows that Plaintiff's security classification and transfer were driven by his multiple disciplinary incidents for running gambling operations. (*See* Dkt. No. 133-4, ¶¶ 8–16; Dkt. No. 133-7; Dkt. No. 133-8; Dkt. No. 133-9; Dkt. No. 133-10; Dkt. No. 133-20). The allegedly "inaccurate" files submitted by Plaintiff do not show otherwise. (*See* Dkt. No. 167, pp. 15–22). Defendant Lucas explained that in the five years intervening between the two classification forms relied on by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. (Dkt. No. 133-4, ¶¶ 27–28). Moreover, Plaintiff's transfer was specifically recommended by the Special Investigative Supervisor "as a means to 'shut down' Marino's [gambling] operation," and it was "standard practice" for Defendants to follow that recommendation. (Dkt. No. 133-4, ¶¶ 12–13; Dkt. No. 133-9, p. 5). In sum, Defendants have shown that Plaintiff's security classification and transfer would have taken place even if he had never filed an affidavit for a fellow inmate, and no reasonable jury could find otherwise. Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

**\*5** Third, for Plaintiff's retaliation claim based on his alleged placement in so-called "Diesel Therapy," the Court also agrees that Defendants are entitled to summary judgment. Upon review of the record, "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (Dkt. No. 164, p. 14). For example, Plaintiff alleges that Defendant Schult told him that he was going to experience "Diesel Therapy" and that Defendant Sepanek was involved too because all of the Defendants "were conspiring through this whole retaliation." (Dkt. No. 133-25, pp. 72–75). However, the record shows that Defendants requested the transfer based on Plaintiff's disciplinary incidents, and thereafter, they had no control over the request, Plaintiff's transit schedule, or his specific destination. (*See* Dkt. No. 133-4, ¶¶ 16, 19). Thus, Plaintiff's claim cannot survive summary judgment since he has again failed to raise an issue

2018 WL 1578163

of material fact as to Defendants' personal involvement. *See Hallock*, 567 F. Supp. 2d at 338.

Plaintiff also puts forward a hodgepodge of other objections. He correctly asserts that "credibility determinations are jury functions and not those of a Judge," (Dkt. No. 167, p. 2), but Magistrate Judge Stewart made no such credibility determinations. Plaintiff writes that "in ruling on a motion to Dismiss/Summary Judgment Rule 12(b)(6) '[t]he evidence of Marino's Amended Complaint is to be believed and all justifiable inferences are to be drawn in his Marino's favor.' " (*Id.*). But Magistrate Judge Stewart correctly stated the standard of review *for summary judgment.* (Dkt. No. 164, pp. 5–7). Plaintiff also once again takes issue with Defendants' discovery responses, arguing that "they failed to comply with Marino's Discovery Requests using word gymnastics to prevail." (Dkt. No. 167, p. 6). But Magistrate Judge Stewart already resolved this discovery dispute, as discussed above. Finally, Plaintiff rehashes a number of the conclusory allegations from his Amended Complaint. (Dkt. No. 167, pp. 4–5, 11). However, once again, it must be emphasized that "more than conclusory allegations are required to survive a summary judgment motion." *Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In sum, the Court finds no error in the Amended Report-Recommendation based on these general objections.

**IV. Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Stewart's Amended Report-Recommendation (Dkt. No. 164) is **ADOPTED in all respects**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 133) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 52) is **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York and to serve Plaintiff by both regular mail and certified mail, return receipt requested.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1578163

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 51 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

2017 WL 6459525
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rodney FERRER, Plaintiff,

v.

Steven RACETTE, Former Superintendent, [1] Charles
Kelly, Deputy Superintendent of Security, Craig
Goodman, Captain, Andrew Frazier, Sergeant,
Sergeant Livermore, Sergeant, Brian Schlogl,
Corrections Officer, Gregory Beecher, Corrections
Officer, Eric Morin, Corrections Officer, Jeremy
Burch, Corrections Officer, Daniel McClenning,
Corrections Officer, N. Waite, Corrections Officer,
Joshua Jenkins, Corrections Officer, Defendants.

[1]     The Court notes that it granted a stipulated
        motion to dismiss Steven Racette as a
        Defendant in this action on June 21, 2017.
        (Dkt. No. 125.)

9:14-CV-1370 (GTS/DJS)
|
Signed 12/15/2017
|
Filed 12/18/2017

**Attorneys and Law Firms**

LAW OFFICE OF JESSICA M. GORMAN, OF COUNSEL:
JESSICA M. GORMAN, ESQ., P.O. Box 706, Albany, NY
12201, Counsel for Plaintiff.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL: LOUIS
JIM, ESQ. Assistant Attorney General, Attorney General
of the State of New York Counsel for Defendants Kelly,
Goodman Waite, and Jenkins The Capitol Albany, NY
12224-0341.

LIPPES MATHIAS WEXLER FRIEDMAN LLP, OF
COUNSEL: JEFFERY P. MANS, ESQ., Counsel for
Defendants Beecher, Burch, and McClenning 54 State Street,
Suite 1001 Albany, NY 12207.

## DECISION and ORDER

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1**  Currently before the Court, in this prisoner civil rights
action filed by Rodney Ferrer ("Plaintiff") against the eleven
above-captioned employees of Great Meadow Correctional
Facility ("GMCF") in Comstock, New York ("Defendants"),
are the following three motions: (1) Plaintiff's motion
for partial summary judgment against Defendants Beecher,
Burch, and McClenning; (2) Defendants Goodman, Kelly,
Waite, and Jenkins' motion for summary judgment; and
(3) Defendants Beecher, Burch, and McClenning's motion
for partial summary judgment. (Dkt. Nos. 126, 127, 128.)
The Court notes that Plaintiff's claims against Defendant's
Livermore, Frazier, and Morin are not at issue in the three
above-referenced motions. In addition, default judgment on
liability was entered against Defendant Schlogl on November
28, 2016. (Dkt. Nos. 105, 106.) For the reasons set forth
below, Plaintiff's motion for partial summary judgment is
denied; Defendants Goodman, Kelly, Waite, and Jenkins'
motion for summary judgment is granted in part and denied
in part; and Defendants Beecher, Burch, and McClenning's
motion for partial summary judgment is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint
Generally, Plaintiff's Complaint asserts three causes of action.
First, Plaintiff alleges that Defendants Frazier, Schlogl,
Beecher, Morin, Burch, McClenning, Waite, Jenkins, and
Livermore violated his constitutional rights under the Eighth
and Fourteenth Amendment to be free from excessive force
and cruel and unusual punishment. (Dkt. No. 1, at ¶¶ 83-88
[Compl.].) More specifically, Plaintiff alleges that Defendants
Frazier, Schlogl, Beecher, Morin, Burch, McClenning, Waite,
and Jenkins assaulted him, and that Defendant Livermore
both failed to intervene and affirmatively participated in the
assault. (Id.) Second, Plaintiff alleges that Defendants Frazier,
Schlogl, Beecher, Morin, Burch, McClenning, Waite, Jenkins,
and Livermore violated his constitutional rights under the
First Amendment to be free from retaliation for practicing his
religion and speaking about unconstitutional acts committed
against him. (Id. at ¶¶ 89-93.) Third, Plaintiff alleges that
Defendants Goodman, Kelly, and Racette violated his right
under the Eighth Amendment to be free from cruel and
unusual punishment by (a) failing to implement or enforce
appropriate policies to stop and prevent such violations, (b)
failing to adequately supervise or train subordinates, and (c)

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                                    1

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 52 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

failing to take any actions to remedy reported violations. (*Id.* at ¶¶ 94-105.)

**B. Undisputed Material Facts on Plaintiff's Motion for Summary Judgment**

The following facts were asserted and supported with accurate record citations by Plaintiff in his Statement of Material Facts and expressly admitted by Defendants in their response thereto or denied without appropriate record citations. (*Compare* Dkt. No. 126, Attach. 9 [Pl.'s Rule 7.1 Statement] *with* Dkt. No. 131, Attach. 1 [Defs.' Rule 7.1 Resp.].)

1. Plaintiff commenced this action under 42 U.S.C. § 1983 in the Northern District of New York on November 12, 2014.

   *2  2. Defendants Burch, Beecher, and McClenning answered on September 2, 2015.

3. In their Answer, Defendants Burch, Beecher, and McClenning asserted counterclaims against Plaintiff for State law assault and battery.

4. These counterclaims are alleged to have arisen from events occurring in the draft process area of GMCF on November 15, 2011.

5. The counterclaims are not alleged to have arisen from events occurring on any date other than November 15, 2011.

6. Defendant Beecher claims that he has not seen Plaintiff since November 15, 2011.

7. Defendant Burch claims that the only time he interacted with Plaintiff was on November 15, 2011.

8. Defendant McClenning claims that the only time he saw or interacted with Plaintiff was on November 15, 2011.

9. Defendants' counterclaims were brought on September 2, 2015, which is more than one year after November 15, 2011.

10. Plaintiff answered these counterclaims on September 24, 2015, and asserted an affirmative defense that one or more of the counterclaims were barred by the statute of limitations.

**C. Undisputed Material Facts on Defendants Goodman, Kelly, Waite, and Jenkins' Motion for Summary Judgment**

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and expressly admitted by Plaintiff in his response thereto or denied without appropriate record citations. (*Compare* Dkt. No. 127, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 132, Attach. 10 [Pl.'s Rule 7.1 Resp.].)

1. Plaintiff commenced this action on November 12, 2014. With regard to Defendants Goodman, Kelly, Waite, and Jenkins, the Complaint alleges as follows:

   (a) In June 2011, Plaintiff complained in writing to Defendant Kelly, who was the Deputy Superintendent for Security at GMCF, that corrections officers, including Defendant Waite, had been harassing him, threatening to dispose of his mail, and telling other inmates that he was a "rat."

   (b) Plaintiff believed that the officers were acting in retaliation for his earlier complaints.

   (c) This complaint to Defendant Kelly was ineffective.

   (d) In August 2011, staff refused to provide Plaintiff several religious meals, continued harassing him for his religious beliefs, and destroyed his copy of the Quran.

   (e) Around the same time, Defendant Waite assaulted him in an elevator by punching him.

   (f) In a written complaint submitted to GMCF Superintendent Racette in September 2011, Plaintiff claimed that corrections officers, including Defendant Jenkins, had threatened him, made anti-Islamic remarks, refused to provide him with his religious meals, threatened to take his mail, and assaulted him.

   (g) This complaint was also ineffective.

   (h) In September 2011, Defendant Jenkins again assaulted Plaintiff, shoving his face into the corner of an elevator, shoving his hands into Plaintiff's pants and grabbing his testicles, calling him a "piece of shit Muslim," and telling him to "go ahead and do something" so he could rip his "dick off."

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 53 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

(i) Defendant Jenkins then put his finger in Plaintiff's anus, and told Plaintiff that "he better not leave his cell" or Defendant Jenkins or one of the "blue shirts" would "get" Plaintiff.

**\*3** (j) Plaintiff complained in writing to Defendant Kelly about this alleged incident and sent copies of the complaint to Racette and Defendant Goodman.

(k) Shortly thereafter, Defendant Jenkins allegedly confronted Plaintiff and told him in a threatening manner that it was "not over."

(l) Later in September 2011, Plaintiff complained in writing to Defendant Kelly about Defendant Jenkins' latest threat and sent copies of the complaint to Racette and Defendant Goodman.

(m) Defendant Goodman responded to Plaintiff's letter in October 2011, stating that the complaint had been investigated and determined to be without merit, and that Plaintiff was interviewed by a supervisor and refused medical attention after the alleged assault.

(n) In a letter to Racette, which was also sent to Defendants Kelly and Goodman, Plaintiff responded that he had neither been interviewed about the alleged assault nor called for a medical examination, and he requested that Defendant Jenkins and his associates leave him alone.

2. Plaintiff testified at his deposition that the alleged incident relating to Defendant Waite occurred on August 23, 2011.

3. Plaintiff wrote a letter to Racette dated September 2, 2011, in which Plaintiff, *inter alia*, claims that Defendant Waite had assaulted him on August 23, 2011.

4. Plaintiff admitted at his deposition that the alleged incidents concerning Defendant Waite described in the September 2nd letter is the same incident described in the Complaint.

5. Defendant Kelly testified at his deposition that he appears to have assigned Defendant Goodman to investigate the conduct alleged in Plaintiff's September 2nd letter.

6. Defendant Kelly also testified that the individual to which he assigned an investigation "may send it down another level lower" for investigation.

7. Indeed, Defendant Kelly testified that Defendant Goodman had the authority to delegate investigations to Defendant Goodman's subordinates, including Sergeants Scarlott and Williams, even though Defendant Kelly had initially assigned the investigations to Defendant Goodman.

8. Defendant Goodman testified at his deposition that, in response to receiving this letter, he would have assigned a lieutenant to investigate it.

9. Defendant Goodman wrote a memo to Plaintiff, dated October 14, 2011, with the subject line "your letter of complaint 9/2/11."

10. Plaintiff admitted at his deposition that he received this memo.

11. Defendant Goodman's October 14th memo states, in pertinent part, "Your complaint was investigated by a Security Supervisor," and concludes, "I find your complaint to be without merit."

12. Plaintiff further testified at his deposition that the alleged incident relating to Defendant Jenkins occurred on September 12, 2011.

13. Plaintiff wrote a letter to Defendant Kelly dated September 14, 2011, in which Plaintiff, *inter alia*, claims that Defendant Jenkins had assaulted Plaintiff on September 12, 2011.

14. Plaintiff admitted at his deposition that this alleged incident concerning Defendant Jenkins described in the September 14th letter is the same incident described in the Complaint.

15. The record shows that Defendant Kelly assigned Defendant Goodman to investigate the conduct alleged in Plaintiff's September 14th letter.

**\*4** 16. Defendant Goodman then assigned this investigation to Sergeant T. Williams.

17. Defendant Goodman wrote a memo to Plaintiff, dated October 5, 2011, with the subject line "Your letter of complaint 9/14/11."

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 54 of 267

**Ferrer v. Racette, Not Reported in Fed. Supp. (2017)**

2017 WL 6459525

18. Defendant Goodman's October 5th memo states, in pertinent part, "Your letter of complaint written to DSS Kelly was received and investigated by a security supervisor.... Because of your lack of cooperation during this investigation, your refusal to be medically examined, and the evidence obtained. The complaint is without merit and therefore denied."

19. In his Complaint, Plaintiff does not allege that Defendants Goodman, Kelly, Waite, and Jenkins were personally involved in the November 15, 2011, incident. [2]

20. Plaintiff cannot recall filing any grievances relating to the alleged August 2011 incident concerning Defendant Waite.

21. In addition, Plaintiff admitted at his deposition that he did not file a grievance relating to the alleged September 2011 incident concerning Defendant Jenkins.

22. The issues raised by Plaintiff against Defendants Goodman, Kelly, Waite, and Jenkins are proper subjects for a grievance under New York Department of Corrections and Community Supervision ("DOCCS") grievance procedures as outlined at 7 N.Y.C.R.R. § 701.1 *et seq.* [3]

23. Central Office Review Committee ("CORC") staff searched CORC's records for determinations upon grievance appeals brought by Plaintiff. [4]

24. DOCCS records reflect that Plaintiff was incarcerated at GMCF during the time period pertaining to this action.

25. During that time, GMCF had a fully functioning inmate grievance process available. [5]

26. Inmates at GMCF have had full access to CORC by which to appeal from facility-level grievance determinations. [6]

27. Based on an examination of DOCCS records, Plaintiff has filed a number of grievance appeals with CORC; however, none of these appeals concern matters stemming from alleged incidents of harassment, assault, threats, retaliation, and religious discrimination during the period from June 2011 through October 2011. [7]

28. Grievance No. GM-51889-11 (Case Code: "Staff Conduct"/Title: "Assaulted by Escort Officers") was filed on May 3, 2011, before the alleged events of June 2011 through October 2011. [8]

29. Grievance No. FPT-25472-11 (Case Code: "Staff Conduct"/Title: "Assaulted at Great Meadow") was filed on November 22, 2011, after Plaintiff had been transferred to Five Points Correctional Facility.

30. This grievance concerned an incident that occurred at GMCF on November 15, 2011, and did not allege that Defendants Kelly, Goodman, Waite, or Jenkins were in any way involved. [9]

[2]   Plaintiff objects to the extent that this statement suggests any legal (rather than factual) conclusions. This statement is therefore admitted only to the extent it is a factual assertion.

[3]   *See, supra*, note 2 of this Decision and Order.

[4]   Plaintiff admits that the cited Declaration supports this statement but objects because he does not have personal knowledge of CORC staff's actions and because the statements were made in a declaration rather than a deposition or other proceeding where Plaintiff would have been able to question the declarant. (Dkt. No. 132, Attach. 10, at ¶ 23 [Pl.'s Rule 7.1 Statement].) However, because Plaintiff does not cite any evidence contradicting the statement, this fact is deemed admitted. *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiffs Rule 56.1 statement but declined to provide record citations in support).

[5]   *See, supra*, note 4 of this Decision and Order.

[6]   *Id.*

[7]   Plaintiff denies this statement, but fails to cite evidence supporting his denial. The evidence cited by Plaintiff supports the fact that Plaintiff filed an appeal with CORC regarding the grievance of November 22, 2011, but does not contradict Defendant's statement that Plaintiff had not filed appeals regarding the alleged incidents occurring

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 55 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

between June 2011 and October 2011. This fact is therefore deemed admitted. *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319.

[8]  Plaintiff denies this statement, arguing that the exhibit supporting this statement in Ms. Seguin's Declaration extends back to June 1, 2011. (Dkt. No. 132, Attach. 10, at ¶ 28 [Pl.'s Rule 7.1 Resp.].) However, Exhibit A to Ms. Seguin's Declaration does in fact contain the entry mentioned and cited by Defendants regarding a grievance filed on May 3, 2011. (Dkt. No. 127, Attach. 7, at 2 [Seguin Decl.].) Plaintiff's denial is therefore unsupported and this statement is deemed admitted. *See Holtz v. Rockafeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001) (noting that "where the cited materials do not support the factual statement in the Statements, the Court is free to disregard the assertions").

[9]  *See, supra*, note 2 of this Decision and Order.

### D. Undisputed Material Facts on Defendants Beecher, Burch, and McClenning's Motion for Summary Judgment

**\*5**  Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and expressly admitted by Plaintiff in his response thereto or denied without appropriate record citations. (*Compare* Dkt. No. 128, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 132, Attach. 11 [Pl.'s Rule 7.1 Resp.].)

1. Plaintiff is an inmate in the custody of DOCCS, serving an indeterminate sentence of 18 to 21 years based upon his convictions for First Degree robbery, Second Degree assault, and two counts of Third Degree criminal possession of a weapon.

2. Plaintiff was incarcerated at GMCF and housed in the Behavioral Health Unit ("BHU") from approximately April 2011 until the date of the alleged excessive force and retaliation claims on November 15, 2011.

3. At his deposition, Plaintiff testified that, before November 15, 2011, he had no problems with Defendants Beecher, Burch, or McClenning.

4. At his deposition, Plaintiff testified that, before November 15, 2011, he was familiar with Defendant Beecher only to the extent that he had seen him around the BHU on occasion as a relief officer.

5. Before November 15, 2011, Defendant Beecher was not familiar with Plaintiff, and had never interacted with him.

6. At his deposition, Plaintiff testified that, before November 15, 2011, he was familiar with Defendant McClenning only to the extent that Plaintiff knew that Defendant McClenning was the regular officer who worked in the draft area at GMCF.

7. At his deposition, Plaintiff testified that, before November 15, 2011, he was not familiar with Defendant Burch.

8. At their depositions, Defendant Burch and Defendant McClenning testified that they did not know Plaintiff was Muslim.

9. At his deposition, Plaintiff testified that, before November 15, 2011, he had never filed a complaint or grievance against Defendants Beecher, Burch, or McClenning.

10. Plaintiff's grievance dated November 20, 2011, regarding the underlying November 15, 2011, incident at GMCF did not name Defendants Beecher, Burch, or McClenning, and did not include any claim of retaliation. [10]

11. Although Plaintiff alleges various acts of retaliation at GMCF before November 15, 2011, based on his religion and the writing of complaints and grievances, Plaintiff fails to identify a single act of retaliation that involved Defendants Beecher, Burch, or McClenning.

12. At his deposition, Plaintiff testified that he did not know whether anyone informed Defendant Burch or Defendant McClenning, or that either of them were aware, that Plaintiff had filed any complaints or grievances against anyone at GMCF.

13. Plaintiff's sole allegations of retaliation against Defendants Beecher, Burch, and McClenning occurred on November 15, 2011, after he was brought to the GMCF draft area for a transfer from GMCF to another correctional facility.

14. Specifically, Plaintiff alleges that, after he was escorted from the BHU to the draft area by Defendant Morin, he was placed into a draft cell with Inmate Burkett, who had also been housed in the BHU.

2017 WL 6459525

15. Although Plaintiff alleges that Defendant Morin called Plaintiff a "rat" and told Inmate Burkett that "this was his chance to beat [Plaintiff] and that corrections officers would not see anything," and that, as Inmate Burkett threatened to attack Plaintiff for being a "rat" and they argued in the cell, Plaintiff also alleges that a corrections officer, "believed to be" Defendant McClenning, entered the cell and grabbed Inmate Burkett by the collar, and that Defendant Burch entered the cell and physically removed Plaintiff and placed him in a separate draft cell. [11]

**\*6** 16. After Defendant Burch separated Plaintiff from Inmate Burkett and left Plaintiff's draft cell, Plaintiff alleges that Defendant Burch threatened Plaintiff to "keep running his mouth," called him an "Al Qaeda motherfucker," and told him that he better "forget what happened." [12]

17. Plaintiff alleges that Defendant Beecher assaulted him after he arrived in the draft cell area, called Plaintiff out of his draft cell, remarked that "he remembered [him] from the BHU," and "commented that [Plaintiff] liked to write up officers and that he wrote up Defendant Jenkins."

18. Plaintiff alleges that, thereafter various Defendants and unidentified officers assaulted him, and that, during the assault (other than unidentified officers and other non-moving Defendants), only Defendant Burch "yelled that he hated Muslims and would kill [Plaintiff] and spit on him."

19. Plaintiff alleges that "upon information and belief," the assault of November 15, 2011, "was orchestrated as a final act of retaliation for his religion and for his grievances and complaints."

[10]    *See, supra*, note 2 of this Decision and Order.

[11]    Plaintiff admits this fact but asserts that Defendant Burch "grabbed [him], threw him across the bullpen, [ ] kicked him" and "dragged him to another bullpen." (Dkt. No. 132, Attach. 11, at ¶ 18 [Pl.'s Rule 7.1 Resp.].) However, to the extent that Plaintiff desired to set forth additional material facts that he contends are in dispute, he was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs. *See Johnson v.*

*City of Troy*, 14-CV-0817, 2016 WL 5107124, at \*8 n.12 (N.D.N.Y. Sept. 20, 2016) (Suddaby, C.J.).

[12]    *See, supra*, note 11 of this Decision and Order.

**E. Parties' Briefing on the Pending Motions**

**1. Plaintiff's Motion for Partial Summary Judgment**

**a. Plaintiff's Memorandum of Law**

Generally, in his memorandum of law, Plaintiff argues that the counterclaims for assault and battery by Defendants Beecher, Burch, and McClenning should be dismissed because they are barred by the governing statute of limitations. (Dkt. No. 126, Attach. 8, at 5-8 [Pl.'s Mem. of Law].) [13] More specifically, Plaintiff argues that, because these counterclaims were brought under state law, the applicable statute of limitations is New York's one-year statute of limitations. (*Id.* at 6.) Accordingly, Plaintiff argues that Defendants were required to assert their claims for assault and battery no later than November 15, 2012 (one year after the incident at issue), but did not do so until September 2, 2015. (*Id.*) Plaintiff also argues that there is no basis for tolling the statute of limitations on these claims. (*Id.* at 6-7.)

[13]    Page citations refer to the page numbers used on CM/ECF rather than the actual page numbers contained in the respective documents.

**b. Defendants' Opposition Memorandum of Law**

Generally, in their opposition memorandum of law, Defendants concede that New York's one-year statute of limitations applies to their counterclaims, but argue that these counterclaims are not time-barred based on federal and state civil procedure rules. (Dkt. No. 131, at 4-6 [Defs.' Opp'n Mem. of Law].) More specifically, Defendants argue that their counterclaims were compulsory because they arose out of the same transaction as did Plaintiff's claims, and that the New York Civil Practice Law and Rules ("N.Y.C.P.L.R.") state that such related counterclaims would not be barred even if they would have been barred at the time the Complaint was filed. (*Id.* at 4-5.)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 57 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

### 2. Defendants Goodman, Kelly, Waite, and Jenkins' Motion for Summary Judgment

#### a. Defendants' Memorandum of Law

**\*7** Generally, in their memorandum of law, Defendants Goodman, Kelly, Waite, and Jenkins make five arguments. (Dkt. No. 127, Attach. 22, at 8-17 [Defs.' Mem. of Law].) First, Defendants argue that Plaintiff failed to exhaust his available administrative remedies before commencing the present action as required by the Prison Litigation Reform Act of 1995 ("PLRA"). (*Id.* at 8-11.) More specifically, Defendants argue that Plaintiff did not file any grievances related to the alleged violations of his rights during the period between June 2011 and October 2011, and that Plaintiff does not allege that any of these Defendants were involved in the incidents for which he did file grievances. (*Id.* at 10-11.) Defendants argue that Plaintiff's letters reporting the alleged conduct to Superintendent Racette and others do not satisfy the exhaustion requirement because there is no evidence that he appealed the responses related to any of these letters to CORC as required by DOCCS policies. (*Id.* at 11.)

Second, these Defendants argue that Plaintiff's claims against Defendants Waite and Jenkins are barred by the governing statute of limitations. (*Id.* at 12-13.) More specifically, Defendants argue that because the conduct Plaintiff reported occurred on August 23, 2011 (as to Defendant Waite), and on September 12, 2011 (as to Defendant Jenkins), Plaintiff was required to file claims against them by August 23, 2014, and September 12, 2014, respectively, based on the applicable three-year statute of limitations. (*Id.* at 12.) Defendants additionally argue that any instances of verbal threats or harassment after those dates would not serve to make Plaintiff's claims against these Defendants timely, and, even if they did, Plaintiff does not allege that any such incidents occurred after September 2011. (*Id.* at 12-13.)

Third, these Defendants argue that Plaintiff has not alleged or shown that Defendants Goodman and Kelly were personally involved in any of the alleged constitutional violations because they merely assigned their subordinates to investigate Plaintiff's allegations and relied on the conclusions of those subordinates. (*Id.* at 14-15.)

Fourth, these Defendants argue that, to the extent Plaintiff asserts claims for damages against these Defendants in their official capacities, those claims would be barred by the Eleventh Amendment. (*Id.* at 15-16.)

Fifth, and finally, these Defendants argue that they are entitled to qualified immunity as a matter of law because their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. (*Id.* at 16-17.)

#### b. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff makes five arguments. (Dkt. No. 132, Attach. 9, at 8-20 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that the evidence shows that he properly exhausted his administrative remedies against Defendants Goodman, Kelly, and Jenkins under the PLRA. (*Id.* at 8-10.) Specifically, Plaintiff argues that (a) he timely filed a grievance related to the incident of November 15, 2011, (b) he was notified by Defendant Goodman on December 6, 2011, that the investigation into his grievance could not be completed until a pending investigation by the Inspector General was finished, (c) a subsequent response from the superintendent on December 12, 2011, reiterated the conclusion of Defendant Goodman's letter, (d) he appealed that response to CORC on December 16, 2011, and (e) CORC responded on April 25, 2012, upholding the decision to wait until the conclusion of the Inspector General's investigation. (*Id.* at 9.)

Second, Plaintiff concedes that his claims against Defendant Waite are barred by the statute of limitations, but argues that his claims against Defendant Jenkins are not barred. (*Id.* at 10-11.) Specifically, Plaintiff argues that, although Defendant Jenkins did not directly participate in the incident on November 15, 2011, that attack was a continuation of the violations he had been perpetrating against Plaintiff in the previous months based on the statements he alleges that Defendant Beecher made during the incident on November 15, 2011. (*Id.*) Plaintiff argues that, because the incident on November 15, 2011, was in part based on retaliation for his filing of grievances against Defendant Jenkins, Defendant Jenkins' actions were "a continuing wrong" that did not accrue until that date. (*Id.* at 11.)

**\*8** Third, Plaintiff argues that Defendants Goodman and Kelly were personally involved in the incident of November 15, 2011, based on (a) their failure to remedy violations once they learned of them, (b) their failure to act on information

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 58 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

that violations were occurring, (c) their failure to stop or change policies under which violations occurred, and (d) their gross negligence in training or supervising their subordinates who committed the violations. (*Id.* at 11-18.)

Fourth, Plaintiff argues that, because he did not assert any claims against these Defendants in their official capacity, Defendant's Eleventh Amendment argument is not applicable. (*Id.* at 18.)

Fifth, and finally, Plaintiff argues that these Defendants are not entitled to qualified immunity because the nature of the alleged violations of his rights was clearly established to be unconstitutional at the time that they were committed. (*Id.* at 19-20.) Plaintiff argues that the failure to meaningful supervise subordinate officers was also clearly established to be unconstitutional at the time of the alleged violations. (*Id.*)

### c. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make three arguments. (Dkt. No. 136, at 3-7 [Defs.' Reply Mem. of Law].) First, Defendants argue that, even if Plaintiff can show that he exhausted his administrative remedies related to the incident on November 15, 2011, there is no evidence that he exhausted any of his claims related to incidents occurring before that date against these Defendants (who were not involved in the incident of November 15, 2011). (*Id.* at 3-5.) Defendants also argue that the Inspector General's report does not support Plaintiff's claims against these Defendants because that report concerned only the incident of November 15, 2011. (*Id.* at 4-5.)

Second, Defendants argue that the continuing-violation doctrine does not apply to Plaintiff's claims against Defendant Jenkins because Defendant Jenkins' conduct and the incident of November 15, 2011, were separate occurrences. (*Id.* at 5-6.) Defendant also argues that, to the extent claims against Defendants Goodman and Kelly are based on time-barred incidents involving Defendants Waite and Jenkins, those claims are also time-barred. (*Id.* at 6.)

Third, Defendants argue that the authorities that Plaintiff relies on to argue that Defendants Goodman and Kelly were personally involved in the alleged incidents are inapposite. (*Id.* at 6-7.) Specifically, Defendants argue that, unlike the defendants in the cases cited by Plaintiff, Defendants Goodman and Kelly did not directly participate

in unconstitutional conduct nor were they on notice of actual unconstitutional conduct. (*Id.*) Defendants also argue that Plaintiff's reliance on cases discussing municipality liability is erroneous because there is a difference between supervisory liability and municipal liability for the purposes of failing to train or supervise. (*Id.* at 7.)

### 3. Defendants Beecher, Burch, and McClenning's Motion for Partial Summary Judgment

### a. Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants Beecher, Burch, and McClenning argue that Plaintiff has failed to establish a First Amendment retaliation claim against them. (Dkt. No. 128, Attach. 11, at 9-11 [Defs.' Mem. of Law].) Specifically, Defendants argue that they were not involved with Plaintiff or the subject of any grievances filed by him before November 15, 2011, and that there is no evidence that Defendants knew on November 15, 2011, that Plaintiff is a Muslim or that he had filed grievances against other corrections officers. (*Id.* at 10.) Defendants argue that, at the time of the incident. Plaintiff was engaged in a fight with Inmate Burkett and was creating a disturbance, actions that provided a legitimate reason for Defendants' actions in physically separating Plaintiff from Inmate Burkett and moving him to a different cell. (*Id.*) Defendants also argue that Plaintiff failed to state a conspiracy claim and provided no evidence that these Defendants conspired against him or otherwise agreed to retaliate against Plaintiff for his religion or previous grievances. (*Id.* at 10-11.)

### b. Plaintiff's Opposition Memorandum of Law

**\*9** Generally, in his opposition memorandum of law, Plaintiff argues that he sufficiently established a retaliation claim against these Defendants. (Dkt. No. 132, Attach. 9, at 20-22 [Pl.'s Opp'n Mem. of Law].) Specifically, Plaintiff argues that the Defendants' actions during the incident of November 15, 2011, were in retaliation for Plaintiff having previously filed grievances against corrections officers and for his religion. (*Id.* at 21.) Plaintiff also argues that Defendants' motion should be denied because there is a genuine dispute of material fact as to what statements Defendants made about their motive for the use of force and

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 59 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

this evidence is key to determining retaliatory intent. (*Id.* at 22.)

#### c. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants argue that Plaintiff has failed to make any showing that Defendants had prior knowledge about Plaintiff's grievances or his religion, or that their actions on November 15, 2011, were anything other than an effort to control Plaintiff's behavior in the draft area. (Dkt. No. 135, at 4-5 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [14] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[14]    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the

non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

### B. Legal Standard Governing Exhaustion Under the PLRA

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

**\*10** In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7. [15] First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [16] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days

Case 9:18-cv-01067-DNH-TWD Document 37 Filed 08/03/20 Page 60 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

15      *See also Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. March 31, 2010) [citation omitted].

16      The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. This is because certain exceptions exist to the exhaustion requirement. In *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016), the Supreme Court rejected the "special circumstances" exception applied by many circuits, holding that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross*, 136 S. Ct. at 1862; *see Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) ("[T]o the extent that our special circumstances exception established in *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), and *Hemphill*, 380 F.3d at 689-91, permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, in fact, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.") (emphasis in original).

Thus, "post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him." *Mena v. City of New York*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing *Ross*, 136 S. Ct. at 1862). To guide courts in this analysis, the Supreme Court has identified three kinds of circumstances in which an administrative remedy, "although officially on the books," is not "available." *Ross*, 136 S. Ct. at 1859.

**\*11** First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end–with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

### III. ANALYSIS

#### A. Whether the State Law Counterclaims by Defendants Beecher, Burch, and McClenning Are Barred By the Statute of Limitations

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' opposition memorandum of law. (Dkt. No. 131, at 4-5 [Defs.'

Case 9:18-cv-01067-DNH-TWD Document 37 Filed 08/03/20 Page 61 of 267

**Ferrer v. Racette, Not Reported in Fed. Supp. (2017)**

2017 WL 6459525

Opp'n Mem. of Law.].) To those reasons, the Court adds the following analysis.

In response to Plaintiff's argument that Defendants' counterclaims are time-barred, Defendants argue that N.Y.C.P.L.R. § 203(d) permits them to bring those counterclaims, which they assert are compulsory. (Dkt. No. 131, at 4-5 [Defs.' Opp'n Mem. of Law].) Rule 13(a) of the Federal Rules of Civil Procedure defines a compulsory counterclaim as any counterclaim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require the presence of third parties of whom the court cannot acquire jurisdiction," and indicates that the answering party must state any compulsory counterclaim it has against the opposing party in its pleading. Fed. R. Civ. P. 13(a). Rule 13(a) does not state whether those compulsory counterclaims must be timely at the time they are asserted. *Id.* However, N.Y.C.P.L.R. § 203(d) states that, if a counterclaim "arose from the same transactions, occurrences, or series of transactions or occurrences upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed." N.Y.C.P.L.R. § 203(d). The language of Section 203(d) therefore indicates that a defendant would not be barred from asserting compulsory counterclaims in an action even if those counterclaims would otherwise be time-barred if brought in a separate action. *See Curry v. Huntington Copper, LLC,* 12-CV-1673, 2014 WL 4828106, at *2 (N.D.N.Y. Sept. 29, 2014) (Hurd, J.) (noting that N.Y.C.P.L.R. § 203[d] "allows a defendant 'to assert an otherwise untimely claim which arose out of the same transactions alleged in the complaint' ") (quoting *Carlson v. Zimmerman,* 882 N.Y.S.2d 139, 141 [N.Y. App. Div. 2009] ).

Defendants' counterclaims are clearly compulsory according to Fed. R. Civ. P. 13(a) and N.Y.C.P.L.R. § 203(d), because they allege an assault and battery that occurred during the same physical altercation that is the basis for Plaintiff's claims against Defendants Beecher, Burch, and McClenning. (Dkt. No. 1, at 8-14 [Compl.]; Dkt. No. 34, at 6-8 [Answer].) Because, as Plaintiff acknowledges, these counterclaims are based on state law, and because they "arose from the same transactions, occurrences, or series of transactions or occurrences" as Plaintiff's claims, N.Y.C.P.L.R. § 203(d) indicates that Defendants are not barred from asserting these claims in this action despite the fact that they would otherwise be untimely. *See Global Crossing Bandwidth,*

*Inc. v. Locus Telecomm., Inc.,* 632 F. Supp. 2d 224, 247-48 (W.D.N.Y. 2009) (citing cases where federal courts applied Section 203[d] to state law claims, and finding that plaintiff was permitted to assert time-barred claims to offset defendant's counterclaims where the claims arose from the same transactions as the counterclaims); *Am. Stock Exch., LLC v. Mopex, Inc.,* 230 F. Supp. 2d 333, 335 (S.D.N.Y. 2002) (noting that defendant could have asserted relevant claims pursuant to Section 203[d] at the time it filed its original answer and counterclaims even if those claims were otherwise time-barred, but could not do so in an amended answer). Plaintiff's motion for partial summary judgment is therefore denied.

**B. Whether Plaintiff Exhausted His Available Administrative Remedies as to the Claims Against Defendants Goodman, Kelly, Waite, and Jenkins**

**\*12** After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 127, Attach. 22, at 8-11 [Defs.' Mem. of Law]; Dkt. No. 136, at 3-5 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

"The [PRLA] mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross,* 136 S.Ct. at 1854-55 (quoting 42 U.S.C. § 1997e[a] ). As discussed above in Part II.B. of this Decision and Order, the Supreme Court has therefore interpreted the Prison Litigation Reform Act to require exhaustion of administrative remedies in all circumstances so long as those remedies were actually available to the inmate. *Ross,* 136 S.Ct. at 1856-58. Additionally, the inmate must exhaust every claim he raises in a case before a federal court. *See Moreau v. Peterson,* 672 Fed.Appx. 119, 121 (2d Cir. 2017) (finding dismissal of four of six claims was proper because the plaintiff did not file grievances on those four claims); *Shariff v. Coombe,* 655 F. Supp. 2d 274, 287-90 (S.D.N.Y. 2009) (noting that, "in order to maintain a claim in this action, each [p]laintiff must have individually exhausted his administrative remedies with respect to that claim" and dismissing claims for which there was no evidence that grievances had ever been filled related to those specific claims); *Collins v. Goord,* 438 F. Supp. 2d 399, 413-14 (S.D.N.Y. 2006) (dismissing some of the plaintiff's claims because he did not file grievances or appeal any grievances related to those specific claims). "Because failure to exhaust is an affirmative defense, ... defendants bear the initial burden of establishing, by pointing to 'legally

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 62 of 267
Ferrer v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 6459525

sufficient sources' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dept., 788 F.3d 54, 59 (2d Cir. 2015)* (citations omitted). "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability." *Smith v. Kelly, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013)* (Suddaby, J.) (citation omitted).

Both parties agree that DOCCS has an applicable procedure for inmate grievances, which is outlined in 7 NYCRR § 701.5. (Dkt. No. 127, Attach. 22, at 9-10 [Defs.' Mem. of Law]; Dkt. No. 132, Attach. 9, at 9 [Pl.'s Opp'n Mem. of Law].) Additionally, Plaintiff does not allege that the grievance procedure was unavailable to him for the relevant claims against Defendants Goodman, Kelly, Waite, and Jenkins. (Dkt. No. 132, Attach. 9, at 8-10 [Pl.'s Opp'n Mem. of Law].) Instead, Plaintiff argues that the grievance he filed regarding the incident on November 15, 2011, which he appealed to CORC, was sufficient to exhaust his administrative remedies.

The Court agrees with Defendants that whether Plaintiff exhausted his remedies regarding the incident on November 15, 2011, does not answer the question of whether Plaintiff exhausted his remedies regarding the claims asserted against Defendants Goodman, Kelly, Waite, and Jenkins. (Dkt. No. 136, at 3-5 [Defs.' Reply Mem. of Law].) In the grievance regarding the incident on November 15, 2011, Plaintiff alleges he was attacked and assaulted by unnamed corrections officers in the draft processing area at GMCF. (Dkt. No. 127, Attach. 8, at 8.) In his Complaint, Plaintiff identifies the officers involved in that incident as Defendants Morin, McClenning, Burch, Schlogl, Beecher, Frazier, and Livermore. (Dkt. No. 1, at ¶¶ 43-67 [Compl.].) Plaintiff never alleges that Defendants Goodman, Kelly, Waite, or Jenkins participated in the incident on November 15, 2011. The specific mentioning of seven officers other than Defendants Goodman, Kelly, Waite, and Jenkins did not place DOCCS on reasonable notice of his claims against those four Defendants such that they could know of, and investigate, those claims. The grievance regarding the incident on November 15, 2011, therefore does not provide evidence that Plaintiff exhausted his administrative remedies on his specific claims against Defendants Goodman, Kelly, Waite, and Jenkins.

**\*13** Nor does the evidence substantiate that Plaintiff otherwise exhausted his administrative remedies against these Defendants. The conduct that is the basis for Plaintiff's claims against these Defendants occurred before November 2011; however, a list of grievances from the DOCCS database shows only a grievance for assault by an escort officer filed on May 3, 2011, and a grievance related to mail on June 1, 2011. (Dkt. No. 127, Attach. 7, at 2.) However, even the filing of a grievance is not by itself sufficient to exhaust administrative remedies. Rather, DOCCS policy requires an inmate to appeal a denial of his grievance, first to the superintendent, and then to CORC. 7 NYCRR § 701.5. In a declaration dated July 17, 2017, Rachel Seguin, the Assistant Director of the Inmate Grievance Program for DOCCS, stated that Plaintiff had filed appeals with CORC in the past, but that "none of these appeals concern matters stemming from alleged incidents of harassment, assault, threats, retaliation, and religious discrimination during the period from June 2011 through October 2011." (Dkt. No. 127, Attach. 6, at 4-5 [Seguin Decl.].) The evidence submitted by Plaintiff and Defendants does show that Plaintiff wrote letters to Superintendent Racette and Defendant Kelly regarding conduct by Defendants Waite and Jenkins in June and September 2011. (Dkt. No. 132, Attach. 3, at 2; Dkt. No. 123, Attach. 4, at 2-3; Dkt. No. 127, Attach. 14, at 2-7; Dkt. No. 127, Attach. 17, at 2-4.) However, even if these letters were to be construed as grievances (a finding that would be contrary to established law),[17] there is no evidence that Plaintiff appealed the responses (to any of these complaints) to CORC as required by 7 NYCRR § 701.5. Notably, Plaintiff never attempts to argue as much, focusing instead solely on the appeals related to the incident on November 15, 2011. (Dkt. No. 132, Attach. 9, at 9-10 [Pl.'s Opp'n Mem. of Law].)

[17]   *See Nelson v. Rodas*, 01-CV-7887, 2002 WL 31075804, at \*3 (S.D.N.Y. Sept. 17, 2002) ("Courts have repeatedly held that complaint letters to the [DOCCS] Commissioner or the facility Superintendent do not satisfy the PRLA's exhaustion requirements.").

Because Defendants met their initial burden to show that there was an applicable grievance procedure and that Plaintiff failed to avail himself of that procedure, Plaintiff had the burden of providing contrary evidence of exhaustion or unavailability. However, Plaintiff has not provided evidence that he exhausted any claims related to conduct occurring before November 2011, or that the applicable grievance procedures were unavailable to him. Consequently, there is

2017 WL 6459525

no genuine dispute of material fact as to whether Plaintiff failed to exhaust his administrative remedies with regard to any claim against Defendants Goodman, Kelly, Waite, and Jenkins. Defendant's motion for summary judgment on this issue is therefore granted. [18]

[18]     Dismissal for failure to exhaust is ordinarily without prejudice to allow the plaintiff-prisoner a chance to exhaust his administrative remedies and refile the complaint. *Gizewski v. New York State Dept. of Corrs.*, 14-CV-0124, 2016 WL 3661434, at *14 (N.D.N.Y. July 5, 2016) (Suddaby, C.J.). However, the Court finds that the claims against Defendants Goodman, Kelly, Waite, and Jenkins are alternatively invalid for other reasons (as will be discussed in Parts III.C. and III.D. of this Decision and Order), such as the statute of limitations and lack of personal involvement. Because there is an alternative basis for dismissing the claims against these Defendants that cannot be overcome by allowing Plaintiff a chance to exhaust his administrative remedies, the dismissal is with prejudice.

### C. Whether Plaintiff's Claims Against Defendants Waite and Jenkins Are Barred by the Statute of Limitations

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 127, at 12-13 [Defs.' Mem. of Law]; Dkt. No. 136, at 5-6 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

As discussed above in Part III.B. of this Decision and Order, Plaintiff failed to exhaust his administrative remedies as to any claims other than those related to the incident on November 15, 2011. Consequently, Plaintiff is barred from asserting his claims against Defendants Waite or Jenkins for conduct occurring before the incident on November 15, 2011, regardless of whether those claims are also barred by the statute of limitations. However, for the sake of thoroughness, the application of the statute of limitations (and the unavailability of the continuing-violation doctrine) will be discussed as an alternative basis for granting Defendants' motion for summary judgment on this issue.

For claims arising under Section 1983, the statute of limitations is determined by looking to the law of the state

in which the cause of action arose, while the accrual date for the cause of action is a question of federal law. *Wallace v. Kato*, 549 U.S. 384, 385 (2007) (citations omitted). Under New York law, the statute of limitations for a Section 1983 action is three years. *Oakes v. Cooke*, 858 F. Supp. 330, 333 (N.D.N.Y. 1994) (McAvoy, J.) (citing N.Y.C.P.L.R. § 214; *Owens v. Okure*, 488 U.S. 235, 249 [1989] ); *see also Green v. Deputy Superintendent*, 12-CV-0606, 2013 WL 1966383, at *3 (W.D.N.Y. May 7, 2013) ("Plaintiff is advised that the statute of limitations for actions filed under 42 U.S.C. § 1983 is three years."). Under federal law, "[a] [Section] 1983 claim accrues 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Swergold v. Murray*, 667 Fed.Appx. 342, 342-43 (2d Cir. 2016) (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 [2d Cir. 2002] ).

**\*14**   As an initial matter, Plaintiff concedes that the allegations of excessive use of force and retaliation against Defendant Waite are barred by the statute of limitations. (Dkt. No. 132, Attach. 9, at 10 [Pl.'s Opp'n Mem. of Law].) However, he argues that the allegations against Defendant Jenkins are not barred because, although Defendant Jenkins did not participate in the incident on November 15, 2011, that incident was a continuation of his previous alleged violations of Plaintiff's rights. (*Id.*) Because, as Defendants note, the last documented complaint about conduct by Defendant Jenkins occurred in September 2011, Plaintiff's Complaint of November 12, 2014, does not fall within the three-year statute of limitations. (Dkt. No. 127, Attach. 22, at 12 [Defs.' Mem. of Law].) The Court therefore must examine whether the incident on November 15, 2011, was a continuation of Defendant Jenkins' previous conduct such that the claim did not accrue until that date.

The continuing-violation doctrine applies to claims that are "composed of a series of separate acts that collectively constitute one unlawful ... practice." *Washington v. Cty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004). "The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation[ ],' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (citing *Nat'l R. R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 [2002] ).

Plaintiff's argument is unpersuasive. Defendant Jenkins did not participate in the incident on November 15, 2011, a fact that Plaintiff admits. (Dkt. No. 132, Attach. 9, at 10 [Pl.'s

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 64 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

Opp'n Mem. of Law].) Nor does Plaintiff allege or provide any evidence that Defendant Jenkins suggested, persuaded, or in any way caused other Defendants to commit such actions. Plaintiff's theory of a continuing violation relies entirely on the alleged statements by participating Defendants regarding Plaintiff's complaints about Defendant Jenkins' conduct; however, even if true, those allegations do not establish that Defendant Jenkins was involved in the actions of those Defendants. The allegation that other Defendants assaulted Plaintiff in part in retaliation for his complaints against Defendant Jenkins does not mean that their actions can be imputed to Defendant Jenkins. Nor does the pattern of incidents that Plaintiff alleges leading up to, and including, the incident on November 15, 2011, suggest that these actions were "a single wrong" that accrued only after a "threshold amount of mistreatment," rather than discrete acts by different Defendants.

The only case Plaintiff cites in support of his argument is *Laureano v. Goord*, 06-CV-7845, 2007 WL 2826649 (S.D.N.Y. Aug. 31, 2007). (Dkt. No. 132, Attach. 9, at 10-11 [Pl.'n Opp'n Mem. of Law].) However, this case does not support applying the continuing-violation doctrine to Defendant Jenkins' time-barred conduct. In *Laureano*, the court found that the denial of mental health treatment for an ongoing period of time constituted a continuing violation for two reasons: (1) the fact "it would have been unreasonable to expect [plaintiff] [ ] to file suit the first day he was denied mental health treatment, and then bring additional suits on each subsequent day he was denied treatment, in order to preserve his right to have three full years to bring a claim," and (2) the fact that, "because no one day in which he was denied treatment 'can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect as actionable.' " *Laureano*, 2007 WL 2826649, at *4 (citations omitted). Unlike the ongoing failure to provide mental health treatment in *Laureano*, the alleged violations of Plaintiff's rights were discrete acts that each produced their own identifiable harm. Therefore, the discussion in *Laureano* supports this Court's finding that Defendant Jenkins' acts were not part of a continuing violation culminating in the incident on November 15, 2011. Because the Court finds that the continuing-violation doctrine is not applicable and there is no genuine dispute of material fact as to whether Defendant Jenkins was personally involved in the incident of November 15, 2011, summary judgment is granted to Defendants Waite and Jenkins regarding the time-barred claims Plaintiff asserts against them.

## D. Whether Defendants Goodman and Kelly Were Personally Involved in the Alleged Violations

**\*15**  After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 127, Attach. 22 [Defs.' Mem. of Law].) To those reasons, the Court adds the following analysis.

"To establish the liability of a supervisory official under Section 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 346 F.3d 431, 435 (2d Cir. 2003) (citing *Green v. Bauvi*, 46 F.3d 189, 194 [2d Cir. 1995] ). The Second Circuit has identified five ways in which supervisory liability can be established: "(1) actual direct participation in the constitutional violation; (2) failure to remedy a wrong after being informed through a report or appeal; (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue; (4) grossly negligent supervision of subordinates who committed a violation; or (5) failure to act on information indicating that unconstitutional acts were occurring." *Richardson*, 346 F.3d at 435 (quoting *Hernandez v. Keane*, 341, F.3d 137, 145 [2d Cir. 2003] ).

Plaintiff argues that Defendants Goodman and Kelly were personally involved in the violations committed by the other Defendants based on their (a) failure to remedy violations after learning of them, (b) failure to act on information that unconstitutional practices were occurring, (c) creation or continuance of policies or customs under which violations occurred, and (d) gross negligence in training or supervising the subordinate Defendants. (Dkt. No. 132, Attach. 9, at 12 [Pl.'s Opp'n Mem. of Law].)

The majority of the evidence related to Defendants Goodman and Kelly is from incidents that occurred before November 15, 2011; and the letters related to those incidents are the focus of the narrative in Plaintiff's memorandum of law. (Dkt. No. 132, Attach. 9, at 12-16 [Pl.'s Opp'n Mem. of Law].) As discussed above in Part III.B. of this Decision and Order, Plaintiff did not exhaust any claims related to these incidents. Consequently, to the extent that Plaintiff is asserting that Defendants Goodman and Kelly were personally involved in violations for which he has not exhausted his administrative remedies, he is barred from bringing those claims regardless of whether he can establish personal involvement. Additionally, to the extent Plaintiff argues personal involvement in these specific incidents, those

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 65 of 267

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

claims would also be barred by the statute of limitations, because all of these incidents occurred more than three years before the filing of the Complaint on November 12, 2014, and the continuing-violation doctrine is inapplicable. (Dkt. No. 127, Attach. 22, at 15 [Defs.' Mem. of Law].)

With respect to the incident on November 15, 2011, the only evidence of personal involvement by either of these Defendants was a letter dated December 6, 2011, in which Defendant Goodman [19] indicated that an investigation into Plaintiff's grievance could not be completed until the Inspector General finished its investigation into the incident. [20] (Dkt. No. 127, Attach. 8, at 10.) Plaintiff has not adduced evidence that Defendant Goodman's involvement was anything greater than receiving Plaintiff's grievance and responding with a letter indicating that the incident had been referred to the Inspector General for investigation. This very limited role does not establish that Defendant Goodman was personally involved in the incident on November 15, 2011. *See Goris v. Breslin*, 402 Fed.Appx. 582, 584 (2d Cir. 2010) (upholding a grant of summary judgment to defendant based on failure to establish personal involvement where the defendant's involvement was limited to receipt of two letters from the plaintiff, both of which were promptly referred to other individuals for investigation and response); *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (upholding dismissal of a claim against the Department of Corrections Commissioner for lack of personal involvement where that defendant received two letters from the plaintiff, one of which [an appeal from an administrative hearing] he referred to a different defendant for decision and the other of which [a request for a status update] he responded to in order to inform plaintiff that a decision had been made on the subject of the first letter); *McDay v. Bushey*, 14-CV-0997, 2016 WL 6638182, at *4 (N.D.N.Y. Aug. 10, 2016) (Baxter, M.J.) report and recommendation adopted by 2016 WL 6637969 (N.D.N.Y. Nov. 9, 2016) (Sharpe, J.) ("A supervisory official cannot be liable for a constitutional violation merely because he received a grievance or complaint from an inmate and referred the grievance to another individual for investigation.").

[19]    Notably, Plaintiff does not allege that Defendant Kelly was involved at all in the incident on November 9, 2011. In his deposition, Defendant Kelly states that he was away from GMCF on vacation beginning on November 7, 2011, and that he did not return to GMCF after

that time. (Dkt. No. 127, Attach. 11, at 91-92 [Kelly Decl.].) There is no contrary evidence that Defendant Kelly was involved in Plaintiff's grievance related to the incident on November 15, 2011. Consequently, there is no genuine dispute of material fact suggesting Defendant Kelly was personally involved in the incident on November 15, 2011.

[20]    In his deposition, Defendant Goodman stated that he first heard about the incident on November 15, 2011, on the radio as it was occurring, but did not personally respond because it was not his assigned area. (Dkt. No. 127, Attach. 12, at 38-39 [Goodman Decl.].) He later reviewed the watch commander's logbook which contained details of the incident. (*Id.* at 38-41). He also stated that he did not believe he saw photographs or video of Plaintiff after the incident, did not speak with the officers involved about the incident, and did not speak with the Inspector General about the incident. (*Id.* at 41-47.)

**\*16**    Regarding Plaintiff's arguments that Defendants Goodman and Kelly failed to act on information of violations and to remedy those violations, the Inspector General's report, dated February 5, 2014, noted that (a) Defendants Frazier, Livermore, Burch, Scholgl, and Beecher were issued Notices of Discipline related to the incident, (b) Defendants Frazier, Burch, and McClenning were suspended without pay from November 22, 2011, through March 22, 2012, (c) Defendant Livermore was suspended without pay from November 22, 2011, through February 14, 2012, and (d) Defendant Beecher was suspended without pay from January 11, 2012, through July 10, 2012. (Dkt. No. 136, Attach. 4, at 2-3.) This report establishes that, even though Defendant Goodman and Superintendent Racette decided to postpone investigation into the incident until the Inspector General completed their investigation, Plaintiff's complaints regarding the incident were not merely ignored, as the subordinate Defendants involved in the incident were subject to suspensions and sanctions. This is directly contrary to Plaintiff's assertion that "none of the responsible subordinates were disciplined." (Dkt. No. 132, Attach. 9, at 18 [Pl.'s Opp'n Mem. of Law].) Plaintiff has not provided evidence sufficient to create a genuine dispute of material fact regarding whether the supervisors failed to remedy the violations that occurred on November 15, 2011, or failed to act on information that the incident had occurred.

2017 WL 6459525

Regarding Plaintiff's remaining arguments that Defendants Goodman and Kelly created or continued policies allowing violations of his rights and that they were grossly negligent in supervising the involved officers, Plaintiff offers no evidence to support such arguments in relation to the incident on November 15, 2011; his discussion of evidence in support of this argument is comprised of citations to incidents that were either not exhausted or are time-barred. (Dkt. No. 132, Attach. 9, at 12-16 [Pl.'s Opp'n Mem. of Law].) Plaintiff fails to adduce evidence that would create a dispute of material fact as to whether there was any policy or custom that facilitated the violation of constitutional rights, nor does he even suggest what the alleged policy or custom was other than to state that the multiple alleged violations (including time-barred incidents) indicate a "culture at [GMCF][ ] where officers knew they could harm and retaliate against inmates with impunity." (*Id.* at 17). *See also Case v. City of New York*, 233 F. Supp. 3d 372, 400 (S.D.N.Y. 2017) (granting motion to dismiss on failure to show personal involvement where the complaint merely alleged that the defendant had a "central role" in "designing and implementing" policies that facilitated constitutional violations); *Richardson v. Dept. of Corr.*, 10-CV-6137, 2011 WL 710617, at *3 (S.D.N.Y. Feb. 28, 2011) (finding that conclusory allegations that a supervisory defendant "was responsible for implementing" rules that allegedly permitted unconstitutional practices was insufficient to establish personal involvement); *Loeber v. Cnty. of Albany*, 216 F. Supp. 2d 20, 24 (N.D.N.Y. 2002) (Hurd, J.) (dismissing claim for no personal involvement where the plaintiff did not claim that the defendant was involved in the events that were the basis of the alleged violations).

Similarly, Plaintiff fails to cite evidence that would support his argument that Defendants Goodman or Kelly were grossly negligent in supervising the relevant Defendants. The Second Circuit has noted that gross negligence is " 'the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of ... harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.' " *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (quoting *Poe v. Leonard*, 282 F.3d 123, 140 n.14, 146 [2d Cir. 2002] ). The Second Circuit further stated that "[t]he standard for gross negligence is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent similar misconduct." *Raspardo*, 770 F.3d at 117 (citations omitted). In this case, Plaintiff has not provided any evidence

establishing that Defendants Goodman or Kelly were aware of any prior misconduct by the Defendants involved in the incident on November 15, 2011, much less substantial misconduct. Even if this Court considers the complaints for time-barred incidents that involved Defendants Waite and Jenkins, Defendants Goodman and Kelly both testified at their depositions that their process was to review the findings of investigations conducted into those incidents by subordinates and determine whether the investigation had been complete. (Dkt. No. 127, Attach. 11, at 15-16 [Kelly Decl.]; Dkt. No. 127 Attach. 12, at 30-33 [Goodman Decl.].) Because the uncontroverted record evidence establishes that the results of these investigations supported a finding that Plaintiff's allegations were unsubstantiated, these incidents do not serve as evidence that any of the Defendants were engaged in substantial misconduct that would suggest Defendants Goodman and Kelly were grossly negligent in failing to act. Plaintiff has therefore failed to raise a genuine dispute of material fact as to whether Defendants Goodman and Kelly were grossly negligent in supervising the subordinate Defendants.

**\*17** Because there is no genuine dispute of material fact regarding the absence of personal involvement of Defendants Goodman and Kelly in the incident on November 15, 2011, summary judgment is granted to Defendants Goodman and Kelly on this issue.

### E. Whether Defendants Goodman, Kelly, Waite, and Jenkins Are Immune from Suit Based on the Eleventh Amendment and the Doctrine of Qualified Immunity

After carefully considering the matter, the Court answers this question in the negative for the following two reasons.

First, Defendant argues that Plaintiff's claims against Defendants Goodman, Kelly, Waite, and Jenkins are barred by the Eleventh Amendment to the extent that they are asserted against these Defendants in their official capacities. (Dkt. No. 127, Attach. 22, at 15-16 [Defs.' Mem. of Law].) "The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity." *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (citing *Kentucky v. Graham*, 473 U.S. 159, 166-67 [1985] ). However, as Plaintiff argues, there is no indication that he brought his claims against these Defendants in their official capacity (i.e., against the State of New York) rather than in their personal capacities. (Dkt. No. 132, Attach. 9, at 18 [Pl.'s Opp'n Mem. of Law].); *see also Hoit v. Capital Dist. Transp.*

2017 WL 6459525

*Auth.*, 15-CV-0134, 2016 WL 3947613, at *16 (N.D.N.Y. July 19, 2016) (Suddaby, C.J.). Consequently, the Eleventh Amendment is not applicable to this case.

Second, these Defendants argue that they are entitled to qualified immunity. (Dkt. No. 127, Attach. 22, at 16-17 [Defs.' Mem. of Law].) "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 [2001] ). " '[T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' " *Hope*, 536 U.S. at 737 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 [1986] ). The Supreme Court has defined "unnecessary and wanton inflictions of pain" as "those that are 'totally without penological justification.' " *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 [1981] ). Once a violation has been established, a defendant may still be shielded from liability "if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 739 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [1982] ). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he was doing violates that right.' " *Id.*

The question of whether these Defendants are entitled to qualified immunity is moot in light of the Court's findings that Plaintiff failed to exhaust his claims against them and that the claims against these Defendants are largely barred by the statute of limitations. To the extent that Plaintiff's claims against Defendants Goodman or Kelly are related to the incident on November 15, 2011, these Defendants were not personally involved in that incident and therefore Plaintiff cannot sustain claims against them regardless of whether they are entitled to qualified immunity.[21] Defendants' motion on this issue is therefore denied as moot.

[21]   Defendants Beecher, Burch, and McClenning have not sought summary judgment on the basis of qualified immunity. In any event, without deciding the issue, the Court observes that, based on the legal standards outlined above and the evidence presented with the motions, it would not appear that summary judgment would be appropriate as to those Defendants.

### F. Whether Plaintiff Stated a Sufficient Claim of First Amendment Retaliation Against Defendants Beecher, Burch, and McClenning

*18   After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 132, Attach. 9, at 20-22 [Pl.'s Opp'n Mem. of Law].) To those reasons, the Court adds the following analysis.

"In order to state a claim for retaliation in violation of the First Amendment, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gonzalez*, 802 F.3d at 222 (quoting *Garcia v. SUNY Health Scis. Ctr.*, 280 F.3d 98, 106-07 [2d Cir. 2001] ). " 'In order to succeed on a retaliation claim, a plaintiff must establish that he engaged in protected conduct and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline him.' " *Seymore v. Joslyn*, 06-CV-1010, 2009 WL 995620, at *3 (N.D.N.Y. Apr. 14, 2009) (Strom, J.).

Defendants argue that there is no evidence that they knew about Plaintiff's religion or his claims against other officers before November 15, 2011, and that their actions should not be construed as retaliatory because they had a legitimate purpose for using force against Plaintiff: Plaintiff's threatening and antagonistic behavior and disregard for the Defendants' orders necessitated physically removing him to another cell. (Dkt. No. 128, Attach. 11, at 9-11 [Defs.' Mem. of Law]; Dkt. No. 135, at 4-5 [Defs.' Reply Mem. of Law].) However, Plaintiff argues that Defendants Beecher, Burch, and McClenning retaliated against him through their actions on November 15, 2011, because of both the his practice of his religion and his filing of grievances against other corrections officers, notably Defendant Jenkins. (Dkt. No. 132, Attach. 9, at 20-22 [Pl.'s Opp'n Mem. of Law].) Plaintiff cites his own deposition, in which he testified that, on November 15, 2011, Defendant Burch had made comments expressing his dislike for Muslims, and that both Defendant Beecher and Defendant Burch made comments indicating they were aware of the complaints Plaintiff had filed against other corrections officers. (*Id.* at 21.) The temporal proximity between protected activity and adverse action, and the statements made by a defendant regarding his motivation may be factors in determining the existence of a causal connection between a prisoner's protected activity and an adverse action. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y.

**Ferrer v. Racette, Not Reported in Fed. Supp. (2017)**

2017 WL 6459525

2002). Because of the admissible record evidence adduced by Plaintiff, the Court finds that he has created a genuine dispute of material fact as to whether Defendants took adverse action against him because of Plaintiff's protected activity. Defendants' motion for summary judgment on this issue is denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for summary judgment against the counterclaims of Defendants Beecher, Burch, and McClenning (Dkt. No. 126) is **DENIED**; and it is further

**ORDERED** that Defendants Goodman, Kelly, Waite, and Jenkins' motion for summary judgment (Dkt. No. 127) is **GRANTED in part** and **DENIED in part** such that the following claims are **DISMISSED**:

  (a) Plaintiff's First Cause of Action for excessive use of force as against Defendants Waite and Jenkins;

  **\*19** (b) Plaintiff's Second Cause of Action for retaliation as against Defendants Waite and Jenkins;

  (c) Plaintiff's Third Cause of Action against Defendants Kelly and Goodman; and it is further

**ORDERED** that Defendants Beecher, Burch, and McClenning's motion for partial summary judgment (Dkt. No. 128) is **DENIED**; and it is further

**ORDERED** that **SURVIVING** these motions for summary judgment are the following claims:

  (a) Plaintiff's First Cause of Action for excessive use of force as against Defendants Frazier, Beecher, Burch, Morin, and McClenning;

  (b) Plaintiff's First Cause of Action for failure to intervene during the excessive use of force as against Defendant Livermore;

  (c) Plaintiff's Second Cause of Action for retaliation as against Defendants Frazier, Beecher, Burch, Morin, McClenning, and Livermore; and

  (d) Defendants Beecher, Burch, and McClenning's counter-claims for assault and battery; and it is further

**ORDERED** that counsel are direct to appear on **January 16, 2018 at 1:30 pm** in Syracuse, NY, in chambers for a pretrial conference, at which time counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time to begin on **February 26, 2018** with pretrial submissions being due on **February 5, 2018.** Plaintiff is further directed to forward a written settlement demand to Defendants no later than **January 2, 2018**, and the parties are directed to engage in meaningful settlement negotiations before the conference. In the event that counsel feel settlement is unlikely, counsel may file a letter request at least one week before the scheduled conference advising that settlement is not feasible, and the Court will cancel the conference and issue a trial order scheduling trial for February 26, 2018.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6459525

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 2838559
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bernabe ENCARNACION, Plaintiff,

v.

J. SPINNER, et al., Defendants.

9:15-cv-01411 (BKS/ML)
|
Signed 06/01/2020

**Attorneys and Law Firms**

For Plaintiff: Elmer Robert Keach, III, Maria K. Dyson, Law Offices of Elmer Robert Keach, III, PC, One Pine West Plaza, Suite 109, Albany, NY 12208.

For Defendants: Letitia James, Attorney General for the State of New York, Kostas Leris, The Capitol, Albany, New York 12224-0341.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

**\*1** Plaintiff Bernabe Encarnacion, a New York state inmate, brings this civil rights action under 42 U.S.C. § 1983, raising claims arising out of his incarceration at the Upstate and Clinton Correctional Facilities.[1] Following review under 28 U.S.C. § 1915, the following claims survived: (1) Eighth Amendment excessive force claims against Defendants James Spinner, Guy Soucia, and Adam Ripa; (2) Eighth Amendment failure to intervene claim against Defendant Jon Oropallo (3) Eighth Amendment medical indifference claims against Defendants Richard Adams, Vincent Somalis, and Rebecca Waldron; (4) Fourteenth Amendment due process claims against Defendant Spinner, and (5) First Amendment retaliation claims against Defendants Ripa, Adams, and Waldron. (Dkt. No. 10, at 27).[2] Defendants now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 103). The parties have filed responsive briefing. (Dkt. Nos. 124, 130). For the reasons that follow, Defendants' motion is granted in part.

[1] Plaintiff initially proceeded pro se. On November 27, 2017, Plaintiff was appointed counsel. (Dkt. No. 69).

[2] Claims against certain unidentified Doe Defendants survived § 1915 review but were dismissed by Text Order on June 5, 2019. (Dkt. No. 96). Claims also survived against Anthony Annuci, David Rock, and Albert Prack; those claims were dismissed by stipulation on July 9, 2019. (Dkt. No. 98).

**II. RECORD BEFORE THE COURT**

Defendants argue that, with the exception of deposition transcripts, Plaintiff's exhibits, which are "annexed" to Plaintiff's attorney affirmation, "are improperly submitted and should not be deemed as part of the record before the Court." (Dkt. No. 130, at 4). The depositions and other exhibits, however, primarily appear to be records generated in discovery. (Dkt. No. 124, at 2–3).[3] Defendants do not appear to dispute the source or authenticity of the exhibits apparently generated in discovery; Defendants argue that the exhibits should have been authenticated by Plaintiff, not his counsel. (Dkt. No. 130, at 4 n.1). While "attorney affidavits are not part of the record for purposes of a motion for summary judgment," *Hines v. City of Albany*, No. 06-cv-01517, 2011 WL 2620381, at *3, 2011 U.S. Dist. LEXIS 68548, at 10 (N.D.N.Y. July 1, 2011), *aff'd sub nom. Hines v. Albany Police Dep't*, 520 F. App'x 5 (2d Cir. 2013), the Court will consider the attached record evidence in resolving the present motion. *See e.g.*, *Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1044 (2d Cir. 1991) (holding "that the district court has power to interpret the Local Rules as well as the discretion to determine when fairness demands that departure from the Local Rules be excused").

[3] The one exception appears to be the "sample witness statements and assistance forms," which Defendants argue are irrelevant because they relate to a more serious Tier III disciplinary hearing, not the Tier II disciplinary hearing at issue here. (Dkt. No. 130, at 10) (referencing Dkt. Nos. 124-26, 124-27 and 124-28). The Court has not considered those sample forms.

**III. FACTS**[4]

[4] The facts are drawn from the parties' statements of material facts, (Dkt. Nos. 103-40, 126), their

responses thereto, (Dkt. Nos. 126, 130-1), and the evidence attached to the parties' submissions, including Plaintiff's verified complaint. (Dkt. No. 1). The Court has also reviewed the surveillance videos in the record. (*See* Dkt. Nos. 103-9, 124-9). The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

### A. Misbehavior Report for Scratches on Cell Window

**\*2** Plaintiff testified that he speaks "very little English." [5] (Dkt. No. 103-2, at 5). On January 24, 2013, Plaintiff was transferred from another prison to Upstate Correctional Facility ("Upstate"). (Dkt. No. 103-14). Apart from a temporary stint at Attica Correctional Facility ("Attica"), Plaintiff remained at Upstate from January 24, 2013 until September 30, 2013. (Dkt. No. 126, ¶ 1; Dkt. No. 103-13, ¶ 14).

[5]  Plaintiff also testified that he is legally blind, having been diagnosed with muscular atrophia, in late 2015 or 2016, after the events in this case. (Dkt. No. 103-2, at 11, 14, 25-26). The parties dispute the extent of Plaintiff's ability to speak English. (*E.g.*, Dkt. No. 126, ¶ 15); *see also* (Dkt. No. 103-2, at 5; Dkt. No. 103-23, ¶ 14; Dkt. No. 124-4, at 2; Dkt. No. 124-20, at 2; Dkt. No. 124-21, at 2).

On March 11, 2013, Plaintiff was moved to a new cell. (Dkt. No. 103-26, at 1; Dkt. No. 126, ¶ 4). On March 14, 2013, Plaintiff's cell was inspected by Corrections Officer Schrader. (Dkt. No. 124-3). According to the Cell Inventory Checklist, which Plaintiff signed, Plaintiff's cell window was not scratched. (*Id.*; Dkt. No. 124-4, at 14, 20–21). On May 12, 2013, Officer Schrader issued Plaintiff an inmate misbehavior report for allegedly scratching the cell window. (Dkt. No. 103-24, at 1). Plaintiff testified that he was given a copy of the misbehavior report the next day but never in Spanish. (Dkt. No. 103-2, at 110, 111–12). Plaintiff denied the allegations in the report and maintained that the window was scratched when he moved into the cell. (*Id.* at 111; Dkt. No. 124-4, at 11–12).

### B. Disciplinary Hearing Related to Scratches on Cell Window

Plaintiff's disciplinary hearing related to the misbehavior report was initially scheduled for May 23, 2013, with Defendant James Spinner serving as the hearing officer. (Dkt.

No. 126, ¶ 12; Dkt. No. 124-2, at 2). According to Spinner, he had a long conversation with Plaintiff in English before the hearing began, and did not believe that Plaintiff needed an interpreter, but adjourned the hearing to May 28th to give Plaintiff a Spanish-speaking interpreter after Plaintiff requested one. (Dkt. No. 103-23, at 2-3; Dkt. No. 124-4 at 2-3). Spinner did not appoint an assistant for Plaintiff. [6]

[6]  Under New York regulations, "an inmate is only entitled to an assistant at a Tier II disciplinary hearing if the inmate is (1) illiterate or Limited English Case Proficient, (2) 'sensorially disabled' and requires assistance such as a sign language interpreter, or (3) charged with drug use." (Dkt. No. 126, ¶ 14); *see* 7 N.Y.C.R.R. § 251-4.1.

At the hearing, when asked to explain the signed inspection checklist, Plaintiff contended that Officer Schrader had presented him with a blank form with "[j]ust check marks." (Dkt. No. 124-4, at 21–22). However, at an earlier point during the hearing, Plaintiff testified that he signed the form without looking at it. (*Id.* at 8). Plaintiff also contends that he was only shown an English checklist and that no one translated it for him. [7] (*E.g.*, Dkt. No. 126, ¶¶ 5–8). Spinner found Plaintiff guilty of "destroying and damaging state property." (Dkt 124-4, at 25; Dkt. No. 103-23, ¶ 40). Spinner found Plaintiff guilty based on Officer Schrader's testimony, her written report, the cell inspection sheet, and the photographs of Plaintiff's cell window. (Dkt. No. 103-24, at 2–4; Dkt. No. 103-23, ¶ 40; Dkt. No. 124-4, at 25; Dkt. No. 126, ¶¶ 38–39, 46).

[7]  Plaintiff did not testify to this effect at his disciplinary hearing or at his deposition, but the only form in the record is in English. (*See* Dkt. No. 124-3).

 **\*3** Spinner imposed the following penalties: first, Spinner reinstated a sentence stemming from a 2012 incident that had been suspended. (Dkt. No. 126, ¶¶ 40–14; Dkt. No. 124-4, at 24). That sentence included three months of Special Housing Unit ("SHU") confinement, as well as three months' loss of packages, commissary, and phone privileges. (Dkt. No. 126, ¶ 40; Dkt. No. 124-4, at 24). In addition, as a result of the May 12th misbehavior report, Spinner sentenced Plaintiff to 30 days of keeplock, 30 days' loss of packages, 30 days' loss of commissary, and $52 in restitution for the damaged cell window. (Dkt. No. 126, ¶ 45; Dkt. No. 124-4, at 24).

In November 2013, an assistant attorney general in the New York Attorney General's office opined that "a reversal [was] warranted on the grounds that Plaintiff was not afforded a tier assistant," as required for an inmate who is either illiterate or non-English speaking." (Dkt. No. 124-7; *see also* Dkt. No. 103-26, at 2 (charges from March 2013 incident absent from Plaintiff's disciplinary history)).

### C. Alleged May 28, 2013 Excessive Force Incident Following Disciplinary Hearing

According to Plaintiff, after the hearing, while Plaintiff's hands and feet were handcuffed and his face was up against a wall, Spinner, Defendant Guy Soucia, and two other corrections officers jumped on Plaintiff, "thr[e]w [him] against the wall and ... start[ed] hitting" him "all over [his] body." (Dkt. No. 103-2, at 36–39). Because he was facing the wall, Plaintiff could not see who was hitting him. (*Id.* at 41).

Plaintiff testified that he grieved this alleged use of force to the Inmate Grievance Resolution Committee (the "IGRC"). (*Id.* at 55–56, 58). However, according to Defendants—by way of declarations submitted by the New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program staff—no timely record of any grievance from this incident exists, even though Plaintiff filed other unrelated grievances from January 24, 2013 through September 30, 2013, including grievances that post-dated this alleged use of force. (Dkt. No. 103-13, ¶¶ 13–20; Dkt. No. 103-16, ¶¶ 14–20 Dkt. No. 103-20, ¶¶ 11–12).

On July 23, 2013, while temporarily confined at Attica, Plaintiff filed a grievance complaining that he was being improperly confined in the SHU. (Dkt. No. 103-19, at 4; Dkt. No. 126, ¶ 48). In that grievance, Plaintiff complained that his SHU release date was moved from "5/30/13 to 8/30/13 after [Spinner] and three other [corrections officers] beat[ ] me up on 5/28/13 ... without reasons." (Dkt. No. 103-19, at 4; Dkt. No. 126, ¶ 49). That grievance was appealed to the Central Office Review Committee (the "CORC"). (Dkt. No. 103-22, at 1). With respect to Plaintiff's complaint related to the alleged May 28th use of force incident, the CORC responded that the "allegations are untimely and will not be addressed." (*Id.*).

### D. Plaintiff's Time in the SHU

Following the May 28, 2013 hearing Plaintiff testified that he spent 126 days in disciplinary housing.[8] (Dkt. No. 103-2, at 114; Dkt. No. 130-1, ¶ 11). Plaintiff further testified that he

was confined to his cell for 23 hours per day with one hour for recreation but that "[m]any times they did not open the door for [Plaintiff]," and that he was denied recreation the "majority of the time" that he was in disciplinary housing. (Dkt. No. 103-2, at 116). Further, the water in Plaintiff's cell sink and toilet was not always working. (*Id.* at 114–15). Plaintiff further testified that he was denied meals, that "[m]any times, lots of times" he would be served a plate that was empty, (*id.* at 118), or that there was would be spit and "other stuff" on his plate. (*Id.* at 119). Plaintiff further testified that he was generally permitted two showers per week but some weeks was only given one. (*Id.*).

[8]     Defendants claim Plaintiff spent only 122 days in disciplinary housing. (*See* Dkt. No. 130-1, ¶ 11).

### E. Alleged September 30, 2013 Excessive Force and Sexual Assault Incident

**\*4**  On September 30, 2013, Plaintiff was scheduled to be transferred from Upstate to Clinton. (Dkt. No. 126, ¶ 65; Dkt. No. 103-2, at 71). Plaintiff was brought to Upstate's draft room in preparation for transfer. (Dkt. No. 103-9; Dkt. No. 126, ¶ 65). Within the draft room, there is a strip frisk room where prisoners are strip frisked prior to being transferred. (Dkt. No. 124-38, at 42; Dkt. No. 103-9). Diagonally across from the strip frisk room is an ID room where prisoners go to have an updated photograph taken, if necessary, prior to being transferred.[9] (Dkt. No. 126, ¶ 66; Dkt. No. 124-38, at 36–37, 60; Dkt. No. 103-9). There are two holding cells in the draft room: one on the same side of the room as the ID room ("the holding cell next to the ID room") and one across the room from that holding cell. (*Id.*).

[9]     A new photo would be required if the prisoner's appearance had changed since the prior photo had been taken. (Dkt. No. 124-36, at 16–17).

Based upon a surveillance video Defendants produced of the draft room, the process that morning appeared to be as follows: prisoners were taken from the holding cell across from the ID room to a place near the strip frisk room where the prisoners' handcuffs were removed, the prisoners were placed in a BOSS chair near the strip frisk room, brought into the strip frisk room, and then either placed directly into the holding cell next to the ID room or taken to the ID room for an updated photograph before being placed in the holding cell next to the ID room. (*Id.*; Dkt. No. 124-38, at 36–37, 60).

Plaintiff testified to the following events. Plaintiff was going through a "strip inspection" in preparation for the transfer. (Dkt. No. 103-2, at 71). Defendant Adam Ripa "started taking off [Plaintiff's] chains" and handcuffs while "another officer was with him." (*Id.*). All three were standing "next to the sergeant who is the area supervisor."[10] (*Id.*) As Ripa was taking off Plaintiff's handcuffs he told Plaintiff, "I'm going to do you dirty because [Plaintiff has] complaint [sic] against [Ripa]." (*Id.*). Plaintiff had grieved Ripa on March 3, 2013 and testified that he files "a lot of grievances against him and his coworkers." (Dkt. No. 124-1; Dkt. No. 103-2, at 122).

10    Defendant Jon Oropallo was Draft Supervisor that day. (Dkt. No. 103-32, ¶ 7).

After Plaintiff's strip inspection, he was taken to the ID room. (*Id.* at 71). With the door to the ID room open, Ripa and another officer "start[ed] beating" Plaintiff. (*Id.* at 71–72). Ripa struck Plaintiff first "in the stomach" with a "[c]losed fist" while wearing gloves. (*Id.* at 75). Plaintiff testified that if prisoners and staff were "looking they would be able to see" the assault. (*Id.* at 89). Plaintiff could not recall how many times he was hit in the stomach but that "with the first blow" Plaintiff fell to the floor and lost consciousness. (*Id.* at 72, 75). When Plaintiff regained consciousness, his pants and underwear were "halfway by [his] knees." (*Id.* at 72, 76). "As soon as [Plaintiff] recovered consciousness," he felt pain in his buttocks, which he described as though "something was burning [him] in that region." (*Id.* at 77). Plaintiff has no recollection of being raped or sodomized "because [he] was unconscious on the floor."[11] (*Id.* at 78). When he awoke, Plaintiff was on his side as Ripa and the second officer stood in front of him. (*Id.* at 75–76). According to Plaintiff, Oropallo heard Ripa's alleged remark about doing Plaintiff dirty, and he —along with other prisoners and staff—"stood back outside of the ID room watching." (*Id.* at 88–89).

11    In his opposition to summary judgment Plaintiff suggests that he may have been sodomized with an officer's baton. (*See* Dkt. No. 125, at 11, 17).

**\*5** The video of the draft room establishes that Plaintiff was inside the ID room for approximately 90 seconds.[12] (Dkt. No. 103-9, 06:27:18–06:28:47; Dkt. No. 126, ¶¶ 69–70). At approximately 6:19 a.m., a guard unlocks the holding cell across from the ID room; Plaintiff exits that cell and makes his way near the outside of the strip frisk room where he appears to be searched by two corrections officers. (Dkt. No. 103-9, 06:19:07). After that, Plaintiff sits in the BOSS

chair before entering the strip frisk room. (*Id.*, 06:20:04–27; Dkt. No. 124-38, at 47). Plaintiff exits the strip frisk room at approximately 6:27 a.m. (Dkt. No. 103-9, 06:26:48). As Plaintiff emerges from the strip frisk room there appear to be four officers gathered around a desk in the middle of the draft area. (*Id.*, 06:26:48). Plaintiff exits the room along with five officers and another prisoner. (*Id.*, 06:26:54). The video shows a corrections officer open the door to the holding cell next to the ID room for a moment before closing it; an officer wearing gloves then appears to direct Plaintiff, pointing to the ID room. (*Id.*, 06:27:10). Plaintiff enters the ID room at approximately 6:27:18 a.m. with one and possibly another officer, although the video is not clear.[13] (Dkt. No. 126, ¶ 69; 103-9, 06:27:18). While Plaintiff is in the ID room, some movement within the ID room appears to be visible. (*Id.*, 06:27:22–06:28:45). Prisoners can be seen sitting in the holding cell next to the ID room during this time. (*Id.*). Plaintiff exits with a corrections officer's hand on his back at about 6:28:47. (*Id.*, 06:28:47). Plaintiff enters the cell next to the ID room at 06:29:00.[14] (Dkt. No. 126, ¶ 70; Dkt. No. 103-9, 06:29:00). There are several officers in the draft room visible in video. While the outside door of the ID room is not clearly visible on the video, there is no indication of any commotion among any of the officers in the draft room at any time during the time Plaintiff was in the ID room or during the time he was returned to the holding cell from the ID room.

12    The surveillance footage shows four panels depicting different parts of the draft room on September 30th. (Dkt. No. 103-9.). Ripa testified that the outside of the ID room is shown in the lower-left panel (which is just to the left of the holding cell shown in the bottom-right panel). (Dkt. No. 124-38, at 37; Dkt. No. 126, ¶ 68). The outside of the ID room is difficult to make out because of brightness in the video. (Dkt. No. 103-9). The upper-left panel shows the holding cell across from the ID room, and the upper-right panel shows people coming and going from the strip frisk room. (*Id.*).

13    Although Ripa did not identify himself at his deposition as being shown in the surveillance video, he acknowledged that a corrections officer in the video depicted coming out of the strip frisk room was "approximately [his] height", and that the physical description of the officer with his hands on Plaintiff's back after leaving the ID room "looks like" it matches Ripa's physical description.

Encarnacion v. Spinner, Slip Copy (2020)

2020 WL 2838559

*(E.g.,* Dkt. No. 124-38, at 51–52, 64; Dkt. No. 103-9). This officer was wearing gloves, (Dkt. No. 124-38, at 46), and Ripa further testified that "it did not look like" that person was carrying a baton in the surveillance footage. (*Id.* at 68).

14     Plaintiff remained in that cell until 6:50:23, when it appears that Plaintiff, along with two other inmates, was moved to the holding cell on the opposite side of the draft room. (Dkt. No. 103-9, 6:50:23). Plaintiff did not show signs of any distress when he walked across the draft room to the other holding cell. Plaintiff asserts that after he left the ID room, the video shows him walking "in an unsteady manner, and in manner different than he walked into the [ID] room," (Dkt. No. 126, ¶ 70), but there does not appear to be any difference in how Plaintiff is walking in any part of the video, before or after he went to the ID room. *Compare* (Dkt. No. 103-9, 06:20:00 (Plaintiff walking to the strip frisk room) *with* (*id.* at 06:26:46, 06:28:48 (Plaintiff walking to and from ID room) *and* (*id.* at 06:50:23) (Plaintiff walking across the draft room to the holding cell on the other side of the room). Plaintiff walks with a limp as a result of knee surgery that predates the alleged incident. (Dkt. No. 103-2, at 94).

Plaintiff testified that after he was allegedly assaulted, he was returned to "the holding cell"; that other prisoners "saw everything"; and that when Plaintiff returned, they "told [Plaintiff] what happened." (Dkt. No. 103-2, at 82). Plaintiff testified that they could "see through the door because they [were] in front, front to front." (*Id.* at 82–83). It does not appear from the video that inmates in this holding cell, which was *next to the ID room,* could see the ID room. Plaintiff testified that he told them that his "whole body was in pain" and that the witnesses "called [Sergeant Oropallo] and told him how [Plaintiff] was and what they saw." (*Id.* at 82).

**\*6** According to Plaintiff, after Oropallo called to get Plaintiff to the medical unit, an officer wheeled Plaintiff to the facility hospital. (*Id.* at 83–84). The surveillance footage corroborates that Plaintiff was taken in a wheelchair by a nurse and a corrections officer at about 7:35 a.m., approximately one hour after exiting the ID room. (Dkt. No. 103-9, 7:35:30). According to Plaintiff, when he arrived, he reported that the officers had jumped on him and given him "a beat down," and the officer who "wheeled [Plaintiff] in" told the nurse not to report anything," at which point he was

pulled out of the medical wing and "sent back to the draft room." (Dkt. No. 103-2, at 84). The video shows that Plaintiff returned to the draft area about ten minutes after he had left, still in a wheelchair, and put back into one of the holding cells at about 7:45 a.m. (Dkt. No. 103-9, 7:44:44). Although Upstate medical staff cleared Plaintiff to be transferred, (Dkt. No. 126, ¶ 75), no medical records reflect any interaction between Plaintiff and the medical staff that morning. (Dkt. No. 130-1, ¶ 16).

Two prisoners who were in a holding cell with Plaintiff that day provided written statements during a subsequent Inspector General investigation into this incident. (Dkt. Nos. 124-20, 124-21). Neither inmate reported having seen a sexual assault or having been told by Plaintiff that he had been sexually assaulted.

The first witness said that Plaintiff was "escorted to the I.D. room for a new photo" and while Plaintiff was in the ID room, the witness "heard a commotion." (Dkt. No. 124-20, at 1). The witness further stated that he "couldn't see into the I.D. room," that he "wasn't really paying attention," and that Plaintiff was in there for "a few minutes." (*Id.*). The witness further stated that when Plaintiff "came back he told me that his ribs and chest hurt." (*Id.* at 1–2). After Plaintiff told the Sergeant, a nurse came and took him in a wheelchair to medical. (*Id.* at 2). According to that witness, when Plaintiff came back from medical, Plaintiff told him that "they didn't do anything for him in medical." (*Id.*). Five to ten minutes after he returned from medical, Plaintiff was "holding his hand on his chest and ribs." (*Id.*). That witness said that he "didn't see anyone assault or sexually assault" Plaintiff or see "any staff acting inappropriately." (*Id.* at 3).

The second witness's description of how he was in a position to see into the ID room does not appear to be consistent with the video or the procedure followed in the draft room. This witness stated that after he was strip frisked, he was placed in a holding cell "*across* from the holding cell" next to the ID room. (Dkt. No. 124-21, at 1). This witness stated that he "saw an officer escort [Plaintiff] into the ID room" and while in the ID room, he "saw the officer (unknown, unable to describe) swing his arm." (*Id.* at 1–2). The witness stated that he "assume[d] that [the officer] was hitting" Plaintiff but did not see the officer strike him. (*Id.* at 2). This witness stated that Plaintiff "was in the ID room for about fifteen minutes" and that he "didn't see anyone sexually assault" Plaintiff. (*Id.*). According to this witness, after Plaintiff was "done in the ID room," Plaintiff entered the holding cell that the witness

was in and "started complaining that he was hurt" but that he could not recall where Plaintiff was hurt, stating that it was "maybe his chest." (*Id.*). The video, however, establishes that immediately after Plaintiff exited the ID room, he was placed in the holding cell *next to* the ID room and that from there an inmate could not see into the ID room. (Dkt. No. 103-9).

Ripa testified at his deposition that he had no recollection of being in the ID room with Plaintiff. (Dkt. No. 124-38, at 67). He further testified that he has never seen a prisoner assaulted by a corrections officer. (*Id.* at 67–68). Oropallo states that he "did not witness [P]laintiff being assaulted, sexually or otherwise, by any staff at Upstate." (Dkt. No. 103-32, ¶ 21). Instead, Oropallo states that Plaintiff never told him about any assault, that Plaintiff complained of chest pains, that Oropallo contacted medical staff, that a nurse took Plaintiff to medical for evaluation, and that Plaintiff returned to the draft area ten minutes later.[15] (*Id.* ¶¶ 16–21).

[15]    Non-party witness Sergeant Robert Gill also testified that he did not recall seeing Plaintiff sexually or physically assaulted in the draft or ID room on September 30, 2013, and that if he had seen any corrections officer assault Plaintiff, he would have been required to intervene in the moment to protect Plaintiff and that he also would have been required to notify a lieutenant. (Dkt. No. 124-36, at 31–32).

**\*7** As a result of the alleged incident, Plaintiff testified that he suffered the following injuries: rectal bleeding, pain in "the whole body," pain in his jaw, and blood in his "fecal matter." (Dkt. No. 103-2, at 79). Plaintiff had rectal burning for "[a]bout a month or so" and that going to the bathroom was "very painful." (*Id.*). He also had difficulty eating and sleeping. (*Id.* at 81). Plaintiff also suffered chest pains, which he had never before. (*Id.*).

### F. Plaintiff's Arrival at Clinton on September 30th

On the way to Clinton, Plaintiff testified that he complained about "[c]hest pain and pain in the whole entire body" and that the transfer officers "saw what happened." (*Id.* at 85).

### 1. Medical Care

It is undisputed that when Plaintiff arrived at Clinton, he was sent to the emergency room complaining of chest and back

pain. (Dkt. No. 126, ¶ 76; Dkt. No. 103-33, ¶ 9; Dkt. No. 103-34, at 5). Plaintiff testified that he saw Defendant Dr. Richard Adams and "another nurse." (Dkt. No. 103-2, at 95). Plaintiff claims he told Adams what happened and that he had chest pains, but Adams "didn't [take] any notes." (*Id.* at 91, 95). Plaintiff testified that the "only thing [the medical staff] did" that day was check his blood pressure. (*Id.* at 96). Plaintiff testified that once he raised the topic of the assault, "they stop[ped] doing everything." (*Id.*). [16]

[16]    In addition to taking Plaintiff's blood pressure, medical records from that day indicate notations for his pulse rate and his temperature. (Dkt. No. 103-36, at 1). Nurse Fitzgerald also testified, while reviewing the medical record from that visit, that he listened to Plaintiff with a stethoscope and measured his "blood level of oxygen." (Dkt. No. 124-35, at 41). When asked whether the notations on the medical records reflecting these measurements were made up, Plaintiff responded, "I could not answer to that, I don't know what they did" and that they "didn't do any of that." (Dkt. No. 103-2, at 97).

According to the prison medical records, it appears that Plaintiff was first seen by Nurse Robert Fitzgerald, [17] and that Nurse Fitzgerald referred him to Adams. (Dkt. No. 103-34, at 5; Dkt. No. 124-35, at 41–42). The medical records reflect that Plaintiff's temperature, blood pressure, pulse, and breathing were measured. (Dkt. No. 103-34, at 5; Dkt. No. 103-33, at 2). None of the medical or security records generated at Clinton on September 30th reflect that Plaintiff complained about an assault.

[17]    The relevant medical record, dated September 30, 2013, does not state a time at which Nurse Fitzgerald assessed Plaintiff. (*See* Dkt. No. 103-34, at 5).

Adams evaluated Plaintiff in the emergency room and concluded that Plaintiff's heart and lungs were functioning normally and that he should be seen for a follow up for chest pain, if needed. (Dkt. No. 126, ¶ 76; Dkt. No. 103-33, ¶¶ 12–13). Adams states that it was his "assessment" that Plaintiff "appeared to be seeking pain medication with complaints of general pain" without "any specifics as to the cause or extent of his pain." (*Id.* ¶ 14). Adams further states that at no time during this evaluation "did [Plaintiff] allege that he had been physically and sexually assaulted at Upstate." (*Id.*

¶ 16). Nurse Fitzgerald testified that, based on looking at the medical record he generated that day, Plaintiff did not report that he had been assaulted or sexually assaulted because he "would have noted it." (Dkt. No. 124-35, at 45). Adams identified his handwritten notes on the medical records; one such note by Adams states, "No English." (Dkt. No. 103-36, at 5; Dkt. No. 124-34, at 80).

**\*8** Plaintiff testified that after he was evaluated by Adams and the nurse, he was then sent to his cell at Clinton where Defendant Nurse Rebecca Waldron came to interview him. (*Id.* at 97–98). Plaintiff testified that he told Waldron that he "was assaulted and raped ... and she totally disregard[ed] that, she ignored that," saying "I don't care." (*Id.* at 92, 95, 99; Dkt. No. 124-8, at 1). Plaintiff denies that Waldron asked him the general questions about his health and medications that are reflected in a two-page health screening form completed that day. (Dkt. No. 103-2, at 98; Dkt. No. 103-36, at 3–4). According to Plaintiff, Waldron discontinued Naproxen and Neurontin prescriptions as soon as he "report[ed] the assault. Right on the spot she cross[ed] it [off]." [18] (Dkt. No. 103-2, at 124).

[18]     In the grievance dated October 16, 2013, Plaintiff asserted that it was Adams who discontinued the medication. (Dkt. No. 124-31). Waldron states that Adams discontinued the medications "until Plaintiff could be examined by a primary care physician" and that, as a registered nurse she was "not authorized to discontinue an inmate's prescriptions. (Dkt. No. 103-35, ¶ 31–32).

Records reflect that Waldron gave Plaintiff a health screening. (Dkt. No. 126, ¶ 82; Dkt. No. 103-35, ¶¶ 8, 12; Dkt. No. 103-36, at 1–4). During the evaluation, Waldron asked Plaintiff to list every medical problem he had; according to Waldron, and as reflected in the screening form, Plaintiff indicated that his only medical issues were lower back pain, acid reflux, and glaucoma. (Dkt. No. 103-35, ¶¶ 16–17; Dkt. No. 103-36, at 1, 3–4). As part of this evaluation, Plaintiff was asked to list every medication he was taking so that the "primary care physician at Clinton" can "examine the inmate and review his medications" and decide to "either refill the inmate's prescriptions or discontinue them." (Dkt. No. 103-35, ¶¶ 18, 20–22). Plaintiff told Waldron that he was taking five medications, and she referred him to a primary care physician to have his medications reviewed. (Dkt. No. 126, ¶¶ 83–84; Dkt. No. 103-35, ¶¶ 22–23). Waldron states that at no time during this evaluation did Plaintiff allege that

he had been physically or sexually assaulted at Upstate. (Dkt. No. 130-35, at 4).

## 2. Initial Security Interview

After Plaintiff spoke to Waldron on September 30, 2013, he was interviewed by Defendant Sergeant Vincent Samolis. (Dkt. No. 103-2, at 92; Dkt. No. 126, ¶ 85). According to Plaintiff, he told Samolis that he "was attacked physically and sexually" and that he was bleeding "[b]y the anus." (Dkt. No. 103-2, at 92, 100). Somalis "totally disregarded" Plaintiff's claim of assault and told Plaintiff to "write a letter to the deputy of security." (*Id.* at 92–94).

Samolis has submitted a declaration explaining that on September 30th he conducted initial security interviews of the inmates transferring into Clinton, and it was his duty to determine whether the inmates could be placed in general population or needed specialized housing. (Dkt. No. 103-38, ¶¶ 7, 10). Samolis stated that he "filled out an Initial Security Interview form," as he interviewed Plaintiff, and that that the form "required" Samolis to ask Plaintiff "personal questions, such as whether [Plaintiff] ... was a victim of abuse." (*Id.* ¶¶ 9, 13; Dkt. No. 103-39). Samolis stated that at "no time during [his] evaluation of [P]laintiff on September 30, 2013 did he allege that he had been physically and sexually assaulted at Upstate." (Dkt. No. 103-38, ¶ 15). During the interview Somalis gave Plaintiff a Prison Rape Elimination Act ("PREA") orientation packet, which "contained information on how to report sexual abuse of any kind." (Dkt. No. 103-38, ¶ 11; Dkt. No. 126, ¶ 86).

**\*9** Adams, Waldron, and Samolis each stated that this was the first time they had ever had contact with Plaintiff. (Dkt. No. 103-33, ¶ 7; Dkt. No. 103-35, ¶ 7; Dkt. No. 103-38, ¶ 6). Departmental policy and procedure would have required Adams, Samolis, and Waldron to report Plaintiff's alleged complaints of abuse to their superiors. (Dkt. No. 126, ¶ 100).

## G. Dr. Adams' Review of Plaintiff's Prescriptions

The next day, October 1st, Adams reviewed Waldron's request regarding Plaintiff's prescription renewals. (*Id.* ¶ 88). Adams states that he renewed Plaintiff's prescriptions for three medications because they treat acid reflux and glaucoma. (Dkt. No. 103-33 ¶ 25). Adams, however, declined to renew Plaintiff's Naproxen and Neurontin prescriptions. (Dkt. No. 126, ¶ 91). According to Adams, the Naproxen was

not renewed because it can worsen conditions such as acid reflux, which Plaintiff had. (*Id.* ¶ 92; Dkt. No. 103-33, ¶ 26). He further stated that he decided not to renew the Neurontin because in his earlier evaluation of Plaintiff, he found Plaintiff was "seeking pain medication without being able to provide any specifics about the cause or extent of his pain" and that it therefore should not be prescribed until Plaintiff "was fully evaluated by a provider." (Dkt. No. 103-33, ¶ 27).

### H. Letters and Grievances Regarding the Alleged Assault and Discontinuation of Medication

Plaintiff sent letters dated October 10th regarding the alleged September 30th assault to several individuals, including DOCCS officials and United States District Judge Charles Siragusa. (Dkt. Nos. 124-14–18). Judge Siragusa sought follow up from the New York State Attorney General's office on the matter. (Dkt. No. 124-19, at 1–2).

Plaintiff also filed a grievance, dated October 12th, relating to the alleged assault. (Dkt. No. 124-8). In the grievance, Plaintiff stated that he was assaulted, beaten up, and sodomized by Ripa and an officer inside the ID room. (*Id.*). He further stated that the "assaults" "and rape" were witnessed and observed by several officers and inmates, including the area sergeant supervisor and that it was "recorded by the surveillance cameras in the ID room." (*Id.*). He further stated that he was taken in a wheelchair to the emergency room at both Upstate and Clinton and returned "without received [sic] any medical attention or treatments to [his] internal and external injures that [he] sustained." (*Id.*). He further stated that he reported the assault to various employees, including "the transferred [sic] officers," Waldron and "Sgt. Samos III" [19] and that "to date" he has not received "medical attention or treatments to [his] injuries." (*Id.*).

[19]    This presumably refers to Samolis.

Plaintiff filed another grievance dated October 16th complaining that his "pain medication has been discontinued by Dr. Adams." (Dkt. No. 124-31). Plaintiff appears to further state that he was ordered and directed to file sick calls, which he stated that he has "been doing ... every sick call day since then." (*Id.*). He further stated that he requires these medications to control his "chronic back and knee pains caused by a spine disk degenerate disease condition" and that he enclosed a copy of an MRI. (*Id.*).

### I. Investigation of Plaintiff's Sexual Assault Allegation

#### 1. Initiation of the Investigation

**\*10**    On October 17th, Anthony Misercola, a senior investigator in DOCCS's sex crimes unit the Office of Special Investigations [20] ("OSI"), received one of Plaintiff's letters. (Dkt. No. 124-32, at 1; Dkt. No. 103-8, at 21; Dkt. No. 124-33; Dkt. No. 103-29, ¶ 6). Misercola's duties included conducting investigations under PREA. (Dkt. No. 103-8, at 10).

[20]    This entity was formerly called the Office of the Inspector General. (Dkt. No. 126, ¶ 100).

Oropallo provided a statement dated October 18, 2013, stating that on September 30th Plaintiff never made any statements to him about "allegedly being assaulted or sodomized" but that Plaintiff did report "having chest pains." (Dkt. No. 124-11). Oropallo stated that he notified the medical department and that Plaintiff was "escorted via wheelchair to the infirmary for assessment" and that "approximately 10 minutes later [Plaintiff] was escorted back to the draft area and cleared for his transfer." (*Id.*). Oropallo stated that he interviewed "all named staff in this inmate's complaint and all staff have submitted written responses denying all allegations." (*Id.*).

#### 2. Subsequent Evaluation by Clinton Medical Staff

On October 20th, Misercola contacted Lieutenant Martin Snow and requested that Plaintiff "be interviewed by a security supervisor and evaluated by medical." (Dkt. No. 124-32, at 1). Medical records and declarations from medical staff reflect that Plaintiff was brought to medical for an examination. (Dkt. No. 126, ¶ 97; Dkt. No. 103-35, ¶ 36; Dkt. No. 124-32, at 1).

Waldron examined Plaintiff and completed an inmate injury report. (Dkt. No. 126, ¶ 97; Dkt. No. 103-35, ¶ 36; Dkt. No. 103-36, at 9–10). She noted that Plaintiff alleged that he was "sexually assaulted and beat up by Upstate officers on 9/30/13" and that he alleged he had "blood [in his] stool and [was] cough[ing] up blood" since September 30, 2013. (Dkt. No. 103-35, ¶¶ 36–37; Dkt. No. 103-3, at 9; Dkt. No. 124-39, at 55). Waldron apparently examined Plaintiff while he was "in shorts" and noted that there was "no visible blood at this time" and that she would have Plaintiff evaluated by a "provider as a follow up – slip given." (Dkt. No. 103-36, at 9–10). Waldron states that she gave Plaintiff a slip to be seen the next day by Adams. [21]    (Dkt. No. 103-35, ¶ 42).

An Interdepartmental Communication signed by Waldron to a Lieutenant Matott, dated October 20, 2013, states that at no time "during the draft interview" conducted on September 30th did Plaintiff "tell [Waldron] he was sexually assaulted or beat up by Upstate officers." (Dkt. No. 103-37, at 1).

> [21]  Waldron further testified that if a translation service is used when medically evaluating a prisoner, that would be documented. (Dkt. No. 124-39, at 71). During her deposition, Waldron testified that she could not see anything on the document to indicate that a translator was used. (*Id.* at 72).

Plaintiff testified that on October 20th, Waldron did not record all of his symptoms and that she "didn't write anything" except for some writing "in the middle of the page" and that she did not write down everything she observed or that Plaintiff told her. (Dkt. No. 103-2, at 106–08). Plaintiff did not provide specifics as to what Waldron omitted from her description of the alleged sexual assault and beating. (*Id.*).

**\*11** Plaintiff further testified that he did not have bruising on him that day and that he would not have had bleeding, as he reportedly told Waldron, because he had "changed [his] clothes already." (*Id.* at 108). Plaintiff testified that he "went to see [Adams] on the next day" and that "[t]he doctors" interviewed him through a "phone interpreter" and that he was not given any treatment. [22]

> [22]  No records, including Plaintiff's health services referral history, indicate that Plaintiff was seen by Adams or any provider the next day. (*See* Dkt. No. 103-36, at 12).

### 3. Interviews and Review of the Surveillance Footage

On November 5, 2013, Misercola—with the assistance of an interpreter—interviewed Plaintiff as part of his investigation into Plaintiff's alleged assault. (Dkt. No. 124-32, at 1). [23] According to Misercola's report, Plaintiff alleged that he was taken "into the ID room in the draft area at Upstate" where he was "beaten by several unknown officers and rendered unconscious." (*Id.*). When Plaintiff "regained consciousness his pants and underwear were around his ankles." (*Id.*). Misercola's report then states that "as a result," Plaintiff was "placed in a wheelchair and taken to medical for evaluation where he reported the alleged assault and sexual assault" and that Plaintiff "claimed his complaint was ignored and he did

not receive any medical care." (*Id.*). Following Plaintiff's transfer to Clinton, according to the report, Plaintiff said that he "reported the alleged sexual assault to Officers D. Jock, William Nelson and RN Rebecca Waldren [sic]." (*Id.*). The report appears to note that each of those individuals denied that Plaintiff reported the alleged assault to them. (*Id.*).

> [23]  Misercola used an interpreter because Plaintiff said that he does not speak English. (Dkt. No. 124-32, at 1).

The report further states that Plaintiff provided the name of an inmate "as a witness to the alleged sexual and physical assaults." (*Id.*). In addition, the report states that Misercola interviewed several inmates "that were in the same holding cell with inmate Encarnacion" at Upstate." (*Id.* at 2). According to the report, those inmates' statements were "inconsistent with [Plaintiff's] claims." (*Id.*). A witness provided by Plaintiff [24] "denied witnessing any staff physically or sexually assaulting [Plaintiff] in the draft area." (*Id.*). Plaintiff told that inmate "that he was having chest pains and reported that to the sergeant" and, as a result Plaintiff was "taken to medical via wheelchair." (*Id.*). According to the report, the witness stated that Plaintiff "never made any statements about being sexually or physically assaulted." (*Id.*). Misercola interviewed other inmates "assigned to work in Draft"; they "denied witnessing any staff person assaulting any inmate in any way." (*Id.*). Those inmates explained that the draft room is "an open area and there is no way to assault someone without everyone else witnessing it." (*Id.*). Misercola reported interviewing all thirteen prison officers, including Ripa and Oropallo, who were in draft on September 30; each denied "physically or sexually assaulting [Plaintiff]." [25] (*Id.*). The report indicates that Misercola reviewed the surveillance footage. (*Id.*).

> [24]  It is unclear whether this is the same inmate witness that Plaintiff provided described previously because the inmate names are redacted. (*See* Dkt. No. 124-32).

> [25]  It appears Misercola did not interview any of the medical staff at Upstate to whom Plaintiff allegedly first reported the assault. (Dkt. No. 124-32, at 1; *e.g.*, Dkt. No. 103-8, at 25–28, 52, 61, 69–70).

**\*12** Misercola testified that on November 5th, Plaintiff provided a pair of white boxers for DNA testing. (Dkt. No. 103-8, at 96, 126). Plaintiff testified that the boxers had blood on them because, according to him, those were the underpants

he was "wearing the day of the assault" and that blood got on them because after the assault, "they pull[ed] up [Plaintiff's] pants and underpants." (Dkt. No. 103-2, at 109). According to the forensic report, DNA testing on the boxer shorts revealed the presence of blood and seminal fluid. (Dkt. No. 124-30, at 1–2). Miscola testified at his deposition that the underwear had no "John Doe DNA on them." [26] (Dkt. No. 103-8, at 131–32).

[26]    Neither that lab report nor Misercola's notes reflecting the results of that report are in the record.

### 4. The Investigation's Conclusion

Based upon his review of the video and the statements of staff and inmates, Misercola concluded that Plaintiff had not been assaulted by Upstate staff that day. (Dkt. No. 103-29, ¶ 16; Dkt. No. 124-32, at 2). On January 3, 2014, Misercola wrote Plaintiff a misbehavior report "charging him with providing false statements or information to an officer." (Dkt. No. 103-29, ¶ 17; Dkt. No. 124-32, at 2). On January 15th and 16th, a Tier III hearing was held regarding this misbehavior report, and Plaintiff was found guilty. (Dkt. No. 126, ¶¶ 104–05; Dkt. No. 1-1, at 38).

### IV. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

## V. DISCUSSION

### A. Administrative Exhaustion Regarding the Alleged May 28, 2013 Excessive Force Incident

**\*13**    Defendants argue that Plaintiff's May 28, 2013 excessive force claims against Spinner and Soucia following Plaintiff's disciplinary hearing are subject to dismissal because Plaintiff failed to exhaust his administrative remedies and has failed to establish that administrative remedies were unavailable to him. (Dkt No. 103-41, at 5; Dkt. No. 130, at 7–8). Plaintiff contends that he should be excused from exhaustion because his efforts to do so were stymied, (Dkt. No. 125, at 22–25), and alternatively, that the Court should hold an evidentiary hearing on the issue of exhaustion. [27] (*Id.* at 24).

[27]    *See generally Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011).

Under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, —— U.S. ——, 136 S. Ct. 1850, 1854–55, 195 L.Ed.2d 117 (2016). "[E]xhaustion is mandatory under the PLRA and ... unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

2020 WL 2838559

"[T]he PLRA requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). Exhaustion "demands compliance with an agency's deadlines and other critical procedural rules." *Id.* (quoting *Woodford*, 548 U.S. at 90, 126 S.Ct. 2378). "[U]ntimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Id.* (citing *Woodford*, 548 U.S. at 89–90, 126 S.Ct. 2378). Exhaustion is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Thus, Defendants "bear the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)). "[O]nce a defendant has adduced reliable evidence that administrative remedies are available to the plaintiff and that the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability" under *Ross. Ferrer v. Racette*, No. 14-cv-1370, 2017 WL 6459525, at *12, 2017 U.S. Dist. LEXIS 206983, at *35 (N.D.N.Y. Dec. 18, 2017) (citation omitted).

In *Ross*, the Supreme Court explained that:

> [t]he exhaustion requirement hinges on the "availabl[ity]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.... [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

136 S. Ct. at 1858–59 (quoting *Booth v. Churner*, 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)) (citations omitted).

In *Ross*, the Supreme Court highlighted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). First, "an administrative remedy may be unavailable when 'it operates as a simple dead end —with officers unable or consistently unwilling to provide

any relief to aggrieved inmates.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at 123–24 (quoting *Ross*, 136 S. Ct. at 1859). Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

**\*14** In support of their motion, Defendants submit declarations from grievance coordinators, which describe DOCCS's administrative exhaustion process. (Dkt. No. 103-13, at 1–3; Dkt. No. 103-16, at 2–3; Dkt. No. 103-20, at 2–3). Each grievance coordinator states that Plaintiff never filed a grievance for the May 28, 2013 use-of-force incident, (Dkt. No. 103-13, ¶ 20; Dkt. No. 103-20, ¶¶ 13–18), including while Plaintiff was temporarily held at Attica. (Dkt. No. 103-16, ¶¶ 14–20; Dkt. No. 103-20, ¶¶ 13–18). *See* 7 N.Y.C.R.R. § 701.5(a) (explaining that to initiate the exhaustion process, an "inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an inmate grievance complaint form"). Defendants also submit a document showing Plaintiff's extensive grievance-filing history. (Dkt. No. 103-21). With these submissions, Defendants have met their initial burden. *Hubbs*, 788 F.3d at 59; *see also Bennett v. Onua*, No. 09-cv-7227, 2010 WL 2159199, at *3, 2010 U.S. Dist. LEXIS 51986, at *9–10 (S.D.N.Y. May 26, 2010) (finding that the defendants "adequately supported the affirmative defense of failure to exhaust" where "a search of the grievance log records ... did not reveal any record of a grievance" filed by the plaintiff).

The burden shifts to Plaintiff to establish that remedies were unavailable to him. Plaintiff argues that he filed a grievance, but his grievance was ignored. (Dkt. No. 125, at 24–25). For support, Plaintiff cites his deposition testimony that he submitted a grievance about the May 28th incident while in the SHU. (Dkt. No. 103-2, at 55, 58). After sustained questioning on the issue, however, Plaintiff testified that he "always [files grievances] but in this situation was not sure. My first intention was to receive medical attention." (*Id.* at 68). Then, when asked whether it was possible he did not file a grievance over this incident, Plaintiff responded, "That's not correct. I always report." (*Id.*). Plaintiff was also shown a grievance filed on June 11th, (Dkt. No. 103-15; Dkt. No. 103-21, at 2), and dated May 29, 2013 (the day after the alleged assault), relating to a separate incident that allegedly took place on May 12th in which Plaintiff makes no mention of the alleged May 28th incident. (Dkt. No. 103-2, at 61–62).

Plaintiff testified that he did not recall receiving a response to his grievance, and that "they always throw it away, dump it when it's a kind of complaint like this." (*Id.* at 67).

Plaintiff's evidence is insufficient to withstand summary judgment. "[M]ere threadbare allegations that [Plaintiff's] grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances" are insufficient to create a dispute of fact as to whether Plaintiff exhausted his administrative remedies. *See Belile v. Griffin*, No. 11-cv-0092, 2013 WL 1776086, at \*8, 2013 U.S. Dist. LEXIS 47137, at \*26–27 (N.D.N.Y. Feb. 12, 2013), *report and recommendation adopted*, 2013 WL 1291720, 2013 U.S. Dist. LEXIS 43217 (N.D.N.Y. Mar. 27, 2013). Here, Plaintiff does not offer evidence beyond his conclusory testimony to show that he filed a grievance or that anyone tampered with his grievance. *Veloz v. New York*, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004) ("Even assuming [the plaintiff] did submit grievances, he offers no evidence that any particular officer thwarted his attempts to file."). When Plaintiff testified to this allegation and was asked to name who would discard his grievances, he referred to those "who receive the letters and who read the letters." (Dkt. No. 103-2, at 57). *See Nunez v. Goord*, 172 F. Supp. 2d 417, 428–29 (S.D.N.Y. 2001) (granting summary judgment where the plaintiff alleged, in the alternative, that his failure to file grievances was due to "the practice of certain officers" to destroy them or that they were "lost at the Grievances Committee Office" without evidentiary support). Moreover, Plaintiff *did* mention the alleged May 28th incident in his subsequent July 23rd grievance, (Dkt. No. 103-19, at 4; Dkt. No. 103-16, ¶¶ 15–16), at which point the allegations stemming from the alleged May incident were denied as untimely. (Dkt. No. 103-22, at 1).

 **\*15** Finally, Plaintiff points to letters Plaintiff sent to various individuals, including the DOCCS Commissioner, regarding the alleged May 28th incident. (Dkt. No. 125, at 25 (citing Dkt. No. 124-22)). Plaintiff's argument is unavailing and fails to create a genuine material dispute of fact as to whether he properly exhausted and complied with DOCCS's "deadlines and other critical procedural rules." *Woodford*, 548 U.S. 81 at 90, 126 S.Ct. 2378, 165 L.Ed.2d 368. At summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586, 106 S.Ct. 1348. Because Plaintiff has failed to raise a genuine dispute of fact as to whether he exhausted his administrative remedies, his

request for an evidentiary hearing is denied. The Court grants summary judgment on Plaintiff's Eighth Amendment claim against Spinner and Soucia for the alleged May 28th use of force incident.

### B. Procedural Due Process

Defendants move for summary judgment on Plaintiff's procedural due process claim against Spinner, stemming from Plaintiff's May 2013 Tier II hearing regarding the scratched cell window, arguing that the sentence imposed did not implicate a protected liberty interest and that, even if it did, Plaintiff received due process. (Dkt. No. 103-41, at 7–16). Finally, Defendants argue that even if Plaintiff's procedural due process rights were violated, they are entitled to qualified immunity. (*Id.* at 16).

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

As a preliminary matter, Plaintiff had " 'no right to due process [at his hearing] unless a liberty interest' was infringed." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (alteration in original) (quoting *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) (per curiam)). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer*, 364 F.3d at 64 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer*, 364 F.3d at 64 (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)). There is no "bright-line rule as to how

lengthy a SHU confinement will be considered atypical and significant." *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000).

### 1. Sentence Aggregation

It is undisputed that Plaintiff spent at least 122 consecutive days in SHU confinement following the May 2013 hearing.[28] (Dkt. No. 124-6; 130-1, ¶ 11). However, a majority of that sentence stemmed from Spinner's decision to reinstate a prior, unrelated three-month disciplinary sentence that had been suspended. Defendants maintain that the sentences should not be aggregated because: (1) the sentences were imposed by different hearing officers and (2) the hearings related to "completely separate offenses and were conducted at different facilities." (Dkt. No. 103-41, at 9). Plaintiff contends that courts aggregate sentences "even if the hearing officer was not responsible for imposing the previous SHU sentence." (Dkt. No. 125, at 29).

[28]    Plaintiff asserts that he served 126 consecutive days in the SHU. (Dkt. No. 103-2, at 114).

**\*16** The Second Circuit has "suggested" that "separate SHU sentences 'should be aggregated for purposes of the *Sandin* inquiry' when they constitute a sustained period of confinement." *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (quoting *Sims*, 230 F.3d at 23); *see also Sealey v. Giltner*, 197 F.3d 578, 587 (2d Cir. 1999) (finding an officer responsible for 101 aggregated days that a prisoner was confined in SHU even though the officer had only assigned the prisoner to 83 days in SHU); *Gibson v. Rosati*, No. 13-cv-00503, 2017 WL 1534891, at *10–11, 2017 U.S. Dist. LEXIS 35524, at *26 (N.D.N.Y. Mar. 10, 2017) (citing, inter alia, *Giano*, *Sims*, and *Sealy* to reject the defendants' argument that the plaintiff's "sentences should not be considered in the aggregate" because each sentence "stemmed from an unrelated disciplinary hearing involving separate incidents") (quotation marks omitted); *Bunting v. Nagy*, 452 F. Supp. 2d 447, 457 (S.D.N.Y. 2006) (aggregating three sentences, each from unrelated incidents, that resulted in 365 days of consecutive keeplock confinement).

In this case, after finding Plaintiff guilty on May 28, 2013, Defendant Spinner invoked Plaintiff's December 19, 2012 suspended sentence, which included three months of SHU confinement, and imposed an additional sentence, which included thirty days of keeplock. (Dkt. No. 126, ¶¶ 43-44). In accord with this determination, Plaintiff was to serve his

three-months SHU time, and then his thirty-days in keeplock. There is no suggestion that this was not a sustained period of confinement. Thus, the Court finds it appropriate to aggregate Plaintiff's confinement in the SHU to the 122 days that Plaintiff served.

### 2. *Sandin* Inquiry

Next, the Court must consider whether Plaintiff's SHU confinement constituted an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer*, 364 F.3d at 64 (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293). Defendants limit their liberty interest argument to the 30-day keeplock sentence. (Dkt. No. 103-41, at 9–10). Plaintiff argues that "[c]onfinements ... such as Mr. Encarnacion's sentence, have been found to implicate a constitutionally protected liberty interest." (Dkt. No. 125, at 29). Under Second Circuit caselaw, confinement between "101 and 305 days" qualifies as an "intermediate duration" that requires " 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions." *Palmer*, 364 F.3d at 65 (quoting *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000)).

Plaintiff testified to the following conditions during his time in the SHU. Sometimes the toilet and sink in his cell did not work because the guards would turn the water on "as they please[d]," (Dkt. No. 103-2, at 114–15), although most of the time the water was turned on. (*Id.* at 115, 126 S.Ct. 2378). He was permitted showers "[t]wice a week" but that there were weeks during which he was only permitted to shower once. (*Id.* at 119, 126 S.Ct. 2378). Plaintiff did not indicate how many weeks he was only able to shower once. Plaintiff testified that he generally remained in his cell for 23 hours per day with one hour for recreation; however, at the same time Plaintiff testified that he was denied his one hour of recreation time the "majority of the time that [he] was" in the SHU. (*Id.* at 115–116, 126 S.Ct. 2378). *See Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004) (finding allegations that the plaintiff, "for at least part of his confinement, ... was kept in SHU for twenty-four hours a day, was not permitted an hour of daily exercise, and was prevented from showering '*for weeks at a time*' ... could establish conditions in SHU 'far inferior,' to those prevailing in the prison in general" (quoting *Palmer*, 364 F.3d at 66)) (emphasis added).

**\*17** Plaintiff testified that the officers who delivered his food "spit on [his] meals." (Dkt. No. 103-2, at 118). Plaintiff

testified that, "[a]t times," instead of a meal, he was just given an empty plate. (*Id.* at 118, 126 S.Ct. 2378). When asked how many times he was "denied meals," Plaintiff testified "many times, lots of times," and then when asked if he was given "no meal," he testified that he would eat only "the fruit or whatever [on the plate] was sealed" because there was spit on the "food that was open." (*Id.* at 118–119, 126 S.Ct. 2378). *Headley v. Fisher*, No. 06-cv-6331, 2010 WL 2595091, at *4, 2010 U.S. Dist. LEXIS 63836, at *10 (S.D.N.Y. June 28, 2010) ("[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.") (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)). Plaintiff also stated that he was not permitted to have a comb or shaving cream in his cell. (Dkt. No. 103-2, at 119). *Palmer*, 364 F.3d at 66 (considering plaintiff's assertion that he was denied, inter alia, hygienic products in the *Sandin* analysis).[29]

[29]    The parties have not addressed the comparability of these conditions to the normal conditions of SHU confinement, the general population, or administrative confinement. *Kalwasinski v. Morse*, 201 F.3d 103, 107 n.6 (2d Cir. 1999); *see also, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 7, § 302.2(c) (listing "plastic comb" as one of the "toilet articles" to be provided inmates in SHU; *id.*, at § 303 (providing that shaving cream will be "issued only during shower").

Defendants argue that Plaintiff's conclusory allegations are insufficient to establish an atypical or significant hardship. (Dkt. No. 130, at 9). While Plaintiff's allegations are, at times, conclusory and inconsistent, Defendants have not contradicted or otherwise addressed these allegations. Recognizing that "[d]isputes about conditions may not be resolved on summary judgment," and construing the evidence in the light most favorable to the Plaintiff, the Court finds that he has raised genuine questions of material fact as to whether the conditions he experienced in SHU confinement constituted "an atypical and significant hardship." *Palmer*, 364 F.3d at 65 (citing *Wright*, 132 F.3d at 137–38).

### 3. Adequate Process

Defendants argue that Spinner is entitled to summary judgment because he satisfied the requirements of procedural due process. (Dkt. No. 103-41, at 10–16). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004); *see also Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935, (1974). An inmate is entitled to (1) "advance written notice of the charges against him"; (2) "a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence"; (3) "a fair and impartial hearing officer"; and (4) "a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira*, 380 F.3d at 69.

Here, Plaintiff alleges three due process violations during his May 2013 hearing; specifically, Plaintiff alleges that (1) he was "not given assistance," (2) he was denied the right to call witnesses, (3) he was denied the opportunity to present rebuttal evidence, and (4) Spinner was "clearly biased." (Dkt. No. 125, at 31). The Court considers each contention.

#### a. Assistance and Opportunity to Call a Witness

There is no right to counsel at a disciplinary hearing, and "an inmate's right to assistance is limited." *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). The Second Circuit has, however, "held ... that in certain circumstances an inmate will be unable to 'marshal evidence and present a defense,' without some assistance." *Id.* (quoting *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988)). For example, the "inmate might be illiterate, confined to ... SHU, or unable to grasp the complexity of the issues." *Id.* In such circumstances, "an assistant must be assigned to the inmate to act as his *surrogate*—to do what the inmate would have done were he able." *Id.* "[A]ny violations of this qualified right are reviewed for 'harmless error.' " *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009) (quoting *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)).

*18    There is no allegation that an assistant was necessary due to illiteracy, confinement in SHU, or complexity of the issues. Defendants argue that Plaintiff was provided "adequate assistance during his Tier II hearing." (Dkt. No. 103-41, at 11). First, they note that Plaintiff did not "specifically request an assistant or object that he was not provided an assistant before the hearing." (*Id.*). Second, they note that Plaintiff was provided a "Spanish-speaking interpreter who was present during all testimony and acted as [Plaintiff's] assistant throughout the hearing by, *inter alia*,

requesting witnesses and documents on Plaintiff's behalf and translating." (*Id.*). Although Plaintiff testified in his deposition that he requested an assistant, (Dkt. No. 103-2, at 110), he did not state when he made that request or cite to any record evidence reflecting any such request. Plaintiff did not appear to make any such request during the hearing, or raise any objection based on a failure to provide an assistant when he was repeatedly asked if he had any procedural objections. (*See* Dkt. No. 124-4).

The parties dispute Plaintiff's proficiency in English. Although Spinner states that Plaintiff did not need an assistant because Plaintiff "understood English," Plaintiff has adduced evidence indicating that speaks very little English. *See Powell v. Ward*, 487 F. Supp. 917, 932 (S.D.N.Y. 1980) ("Unless Spanish speaking inmates understand and can communicate with the hearing board, they are being denied the due process protections guaranteed in *Wolff*."). While Plaintiff had a Spanish-speaking interpreter at the hearing, Plaintiff asserts that he was not provided with a meaningful opportunity to call a witness. Plaintiff testified that he sought to call the prisoner who had occupied the cell at issue prior to Plaintiff, to testify that the "damage on the window was there before while he was living in that cell [and] [that inmate] had submitted a complaint to be fixed." (Dkt. No. 103-2, at 111).

A prisoner "facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963. However, "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable. *Scott v. Kelly*, 962 F.2d 145, 146 (2d Cir. 1992) "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Id.* at 147 (quoting *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)). If a prisoner "would have been found guilty ... and confined to SHU even if his witnesses had been called, his confinement in SHU must be considered a justified deprivation of liberty, not a deprivation caused by the State's failure to permit him to call those witnesses." *Patterson v. Coughlin*, 905 F.2d 564, 568 (2d Cir. 1990). "The burden is not upon the inmate to prove the official's conduct was

arbitrary and capricious, but upon the official to prove the rationality of the position." *Kingsley*, 937 F.2d at 30–31.

On this record, assuming, as Plaintiff asserts, that he speaks little English, and construing the evidence in the light most favorable to Plaintiff, he has raised a question of fact as to whether the interpreter's assistance was sufficient to effect Plaintiff's right to call witnesses. Based on the transcript of the hearing, it is not apparent whether the interpreter made clear to Spinner that Plaintiff wanted the prior occupant of cell, who presumably would have had firsthand knowledge of the cell's condition, to testify regarding the condition of the cell window. (*See* Dkt. No. 124-4, at 7, 12).

**\*19** At the hearing, the interpreter told Spinner that Plaintiff wanted to call a witness. (Dkt. No. 124-4, at 6). The transcript then reflects the following conversation between Spinner and Plaintiff, as translated by the interpreter: When Spinner asked, "what's [the witness] going to testify to?" Plaintiff said, "he was confined in that cell and he knows it was the last (inaudible)." (*Id.* at 7). Spinner then asked, "what was inside the cell," and Plaintiff (without the interpreter) said, "mirror." (*Id.*) Spinner responded, "[t]he mirror? We are not talking about a mirror," and denied the witness. (*Id.*). Later during the hearing, when Spinner asked whether Plaintiff had "[a]ny other defense or witnesses," Plaintiff said, "No you denying the witness he is (inaudible)." (*Id.* at 10). Plaintiff then requested the "video of when he moved to the cell," and moments later said he would "just assume [sic] have the witness." (*Id.* 10–11). Plaintiff said "[w]ants to know how the window's scratched" and "wants to know about the mirror inside the cell." (*Id.* at 11–12). When Spinner again explained that he is "not here for a mirror," Plaintiff said that both "had a scratch." (*Id.* at 12). Spinner then responded: "Well at this point the only thing I know about is the window and that's why we are here." (*Id.*). Spinner then denied Plaintiff's witness request, explaining that the witness "would have no relevant testimony to the cell window." (*Id.*).

Here, according to Plaintiff, the witness he requested was directly relevant to Plaintiff's claim that the allegation against him was false because the cell window was scratched when he moved in. (Dkt. No. 103-2, at 111). *See Kelly*, 962 F.2d at 147. While a scratch to a mirror inside the cell was not relevant, a scratch on the window would have been relevant. Viewing all of the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff has raised a material issue of fact on his due process claim with respect to assistance and the

opportunity to call a witness.[30] Thus, summary judgment is denied on this issue.

[30]    Plaintiff also argues that during his Tier II hearing he "requested copies of the cell inspection manual." (Dkt. No. 125, at 38). However, when Spinner asked Plaintiff what manual he was requesting, Plaintiff responded, according to the interpreter, that he was requesting a manual "[f]or inspection cells." (Dkt. No. 124-4, at 8). Plaintiff then asserts, without evidentiary support, that the manual "could have revealed prior inspections that showed scratches on the window." (Dkt. No. 125, at 38). Defendants argue that no such manual exists. (Dkt. No. 103-41, at 12). Further, according to the hearing transcript, it appears Plaintiff was provided with a copy of the "cell inventory checklist" albeit in English. (Dkt. No. 124-4, at 8). In any event, this argument is unavailing. *See Rodriguez v. Lindsay*, No. 09-cv-2915, 2011 WL 2601448, at *4, 2011 U.S. Dist. LEXIS 70505, at *10 (E.D.N.Y. June 30, 2011), *aff'd*, 498 F. App'x 70 (2d Cir. 2012) ("The Court has found no authority for the proposition that an inmate is entitled, as a matter of course, to physical or documentary evidence in defending against prison disciplinary charges.").

### b. Bias

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer "is one who does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson*, 905 F.3d at 569–70.

Plaintiff asserts that Spinner's bias "is evident from even a cursory review" of the hearing transcript. (Dkt. No. 125, at 37). The Court disagrees. There is no evidence to suggest that Spinner "decide[d] the disposition of [Plaintiff's hearing] before it was heard." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) (citing *Crooks v. Warne*, 516 F.2d 837, 840 (2d Cir. 1975)). It appears that Spinner decided the case based on the evidence that was presented at the hearing—Officer Schrader's testimony, her written report, the cell inspection sheet signed by Plaintiff, and photos of the cell showing the scratches. (Dkt. No. 124-4, at 25; Dkt. No. 103-23, ¶ 40). The hearing transcript does not reflect a lack of impartiality. Thus,

summary judgment is granted on Plaintiff's due process claim alleging Spinner's bias.

### 4. Qualified Immunity

**\*20**  Defendants argue that, even if Spinner violated Plaintiff's Fourteenth Amendment rights, he is nevertheless entitled to qualified immunity. (Dkt. No. 103-41, at 16). Plaintiff does not respond to this argument apart from passing references in the standard of review section and when discussing Plaintiff's September 30th assault claim. (*See* Dkt. No. 125, at 13, 15–16; *see also* Dkt. No. 130, at 10 (noting that Plaintiff "offered no opposition to [D]efendants' qualified immunity argument")).

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). Defendants devote one parenthetical citation to their qualified immunity argument, stating that "that qualified immunity protects a hearing officer who could reasonably conclude that some evidence supports that officer's prison disciplinary determination." (Dkt. No. 103-41, at 16 (citing *Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992)). The Court disagrees. In *Zavaro*, the court "conclude[d] that [an] inmate's right not to be adjudicated guilty without some evidence to support that finding was clearly established by 1988." 970 F.2d at 1152. Here, however, Plaintiff has not challenged the lack of evidence; he asserts that he was denied the opportunity to call a witness. *Zavaro* does not protect a hearing officer from § 1983 liability whenever "some evidence supports" the guilty determination. Accordingly, the Court rejects this argument.

### C. Excessive Force and Sexual Assault – September 30, 2013

Defendants argue that summary judgment is proper on Plaintiff's excessive force claim against Ripa because "nothing in the record" supports Plaintiff's allegations that he was subjected to excessive force and sexually assaulted on September 30, 2013, "aside from the plaintiff's own contradictory and incomplete testimony" such that "no reasonable person" could credit Plaintiff's testimony. (Dkt. No. 103-41, at 17 (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005))). Plaintiff responds that the credibility dispute between Plaintiff and Ripa "alone justifies" denying summary judgment. (Dkt. No. 125, at 17).

In addition, Plaintiff notes that "a range of circumstantial evidence" supports his claim. (*Id.*).

When a prisoner claims "that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components —one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Id.*; *see also Hudson v. McMillian*, 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). "The subjective component ... requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (internal quotation marks omitted) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). "When prison officials are accused of using excessive force, the 'wantonness' issue turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson*, 503 U.S. at 7, 112 S.Ct. 995). "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.' " *Id.* (quoting *Hudson*, 503 U.S. at 8, 112 S.Ct. 995).

**\*21**  In *Jeffreys*, the Second Circuit explained that, while there were many "material issues of fact," the "inquiry focuse[d] on whether ... upon review of the record as a whole" those material disputes were "*genuine.*" 426 F.3d at 554. That is, "even after drawing inferences in the light most favorable to [the plaintiff], no reasonable jury could have issued a verdict in his favor." *Id.* There, the court held that summary judgment was proper where the plaintiff's testimony "was largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities" such that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *See id.* at 555.

### 1. Evidence Beyond Plaintiff's Testimony

Plaintiff contends that the following evidence supports his allegation: (1) the two witness statements submitted in the course of the investigation into Plaintiff's alleged assault;

(2) the letters dated October 10th that Plaintiff wrote to various officials; (3) the absence of medical records memorializing Plaintiff's visit to Upstate; and (4) a forensic report that detected blood on Plaintiff's underwear. As set forth below, the Court finds that Plaintiff's testimony is largely unsubstantiated.

#### a. The Witness Statements

Plaintiff points to statements provided by two prisoners in the course of the investigation in Plaintiff's alleged assault. (Dkt. Nos. 124-20, 124-21). The first witness "couldn't see into the ID room" and did not "see anyone assault or sexually assault" Plaintiff. (Dkt. No. 124-20, at 1, 3). He stated that he heard a "commotion" while Plaintiff was in the ID room and that Plaintiff returned complaining of pain in his ribs and chest. (*Id.* at 1). However, in the surveillance video, there appears to be no sign of any commotion—and no reaction to that effect from the officers milling around the draft room or the prisoners in the holding cell next to the ID room —while Plaintiff is in the ID room. [31]  (Dkt. No. 103-9, 06:27:18-06:28:47).

[31]  While Plaintiff is in the ID room, a cart rolls into the table in the middle of the draft room. (Dkt. No. 103-9, 6:28:06). The video does not have sound, so it is impossible to assess how loud of a sound that made.

While the second witness testified that he saw an officer, whom he could not identify, "swing his arm" and that he "assume[d] that [the officer] was hitting" Plaintiff, (Dkt. No. 124-21, at 2), the witness's description of how he could have been in a position to see that is not consistent with the video. The witness stated that "when [Plaintiff] was done in the ID room he came into the holding cell I was in." (Dkt. No. 124-21, at 2). The video makes clear, however, that after Plaintiff exited the ID room, he was placed in the holding cell next to the ID room and that from there, the witness could not have seen into the ID room. [32]

[32]  The witness's description is not consistent with the video in several additional respects. First, the witness described that, after his own strip frisk, he was placed in the holding cell *across* from Plaintiff and that, at this point, Plaintiff was "in a cell right next to the ID room." (Dkt. No. 124-21,

at 1) (emphasis added). However, the surveillance video shows that once prisoners exited the strip frisk room, they were placed in the holding cell *next to* the ID room. (*See generally* Dkt. No. 103-9). And, contrary to the witness's statement, Plaintiff was not taken into the ID room from the cell *next to* the ID room; he entered the ID room from the strip frisk room. (Dkt. No. 103-9). Finally, the witness stated that Plaintiff was in the ID room for "about fifteen minutes," but the video shows that Plaintiff was in the ID room for approximately 90 seconds. (*Compare* Dkt. No. 124-21, at 2 *with* Dkt. No. 103-9, 06:27:16-06:28:49).

#### b. Medical Records

**\*22** Plaintiff cites to the absence of medical records reflecting Plaintiff's undisputed trip to the medical unit at Upstate as evidence that Plaintiff's "efforts to report his sexual assault were not taken seriously by anyone at DOCCS." (Dkt. No. 125, at 18–19; Dkt. No. 103-9; Dkt. No. 130-1, ¶¶ 15–16). However, it would be a stretch to find that the absence of a medical record memorializing this ten-minute visit during which he apparently was cleared for transport to Clinton, supports Plaintiff's allegation of a sexual assault.

#### c. Plaintiff's Letters Dated October 10, 2013

Plaintiff further argues that "there is no question that [Plaintiff] complained about" the September 30th assault, pointing to the letters dated October 10, 2013 that Plaintiff sent to various officials. (Dkt. No. 125). While these letters document Plaintiff's complaint, they do not contain evidence beyond the Plaintiff's own claims.

#### d. Forensic Report

Plaintiff also points to the forensic report that showed traces of blood and seminal fluid in his underwear. (Dkt. No. 125, at 20; Dkt. No. 124-30, at 1–2). Miscercola collected the underwear as part of his investigation. (Dkt. No. 103-8, at 126). However, the only evidence suggesting that Plaintiff was actually wearing that underwear on the day of the assault comes from Plaintiff's own deposition testimony. (Dkt. No. 103-2, at 109). Furthermore, Defendants note—and Plaintiff

does not dispute—that the results of the DNA test showed "no John Doe DNA on them." (Dkt. No. 103-8, at 132).

#### 2. Plaintiff's Testimony

Next, the Court must decide whether Plaintiff's testimony is "so replete with inconsistencies and improbabilities" such that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys*, 426 F.3d at 555. The Court finds that it is, for several reasons.

First, as Defendants note, Plaintiff claims that he was struck once in the stomach, "fell down to the floor unconscious," and that when he "recovered consciousness" he had his pants and underwear "by [his] knees," was "picked up" by Ripa and another officer who also "pick[ed] up" [his] pants, felt wetness and "pain in [his] anus," and that he then walked out of the ID room—all in the span of approximately 90 seconds. (Dkt. No. 103-2, at 72–82; Dkt. No. 103-9, 06:27:16–06:28:49). It is highly unlikely that this series of events occurred in such a short span of time.

Plaintiff further testified that all the inmates in the draft room "saw everything" and told Plaintiff "what happened." (Dkt. No. 103-2, at 82). This is inconsistent with the witness statements provided by Plaintiff, neither of which supports that assertion. (Dkt. No. 124-20, at 1).

Plaintiff further testified that staff and other prisoners could see the assault occur because the door to the ID room was open. (Dkt. No. 103-2, at 83, 89). Indeed, the surveillance video appears to show that the door to the ID room was open when Plaintiff was inside, as it appears that movement from within the ID room is visible. (Dkt. No. 103-9, 06: 28:16). This, however, only adds to the improbability of Plaintiff's account. No one in the draft room, including officers standing just a few feet from the ID room's entrance, appear to react to an assault. (*Id.*). [33] The casual pace of the officers moving throughout the draft room does not change while Plaintiff is in the ID room, or while Plaintiff is moved from the ID room to the holding cell. Furthermore, as Defendants also note, Plaintiff exhibits no sign of injury after he exits the ID room. (*Id.* at 06:28:49). He similarly exhibits no sign of injury as he later walks to the holding cell across from the ID room. (*Id.* at 06:50:23).

33    The Court notes that the Defendants and non-party witnesses all deny that they saw any assault or that Plaintiff contemporaneously reported that he had been assaulted. That includes evidence submitted by Samolis, (Dkt. No. 103-38, ¶ 15), Oropoallo, (Dkt. No. 124-11; Dkt. No. 103-32, ¶ 21), Ripa, (Dkt. No. 124-38, at 67–68), non-party witness Sergeant Gill (Dkt. No. 124-36, at 31–32), and the numerous officials and prisoners who were in the draft room that Miserco la interviewed in the course of his investigation. (Dkt. No. 124-32, at 2).

**\*23**  Plaintiff's assertion that he reported a sexual assault upon arriving at Clinton is inconsistent with all of the contemporaneous records at Clinton that day, including the medical record of his visit to the emergency room, (Dkt. No. 103-34, at 5), the medical record from his evaluation later that day, (*id.* at 1), the health screening form documenting his "current health problem[s] or complaint[s]," (*id.* at 3), and the initial screening interview, (Dkt. No. 103-39), none of which reflects that Plaintiff reported either an assault or any of the injuries he attributes to the assault.

Plaintiff contends that the video does not "capture what happened in the minutes that [Plaintiff and Ripa] were in the identification room." (Dkt. No. 125, at 17). To be sure, the video does not show much of what occurred inside the ID room; nevertheless, the Court finds that even drawing all inferences in Plaintiff's favor, in light of the video evidence and the inconsistencies and contradictions in Plaintiff's version of the events, no reasonable person could credit Plaintiff's allegation of assault. *Jeffreys*, 426 F.3d at 555. "[V]iewing the video footage together with the other evidence, no reasonable fact-finder could conclude that [Ripa] used [excessive] force" against Plaintiff. *McKinney v. Dzurenda*, 555 F. App'x 110, 111–12 (2d Cir. 2014) (affirming summary judgment in an excessive force case based upon video evidence); *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (reversing a denial of summary judgment where a "videotape quite clearly contradict[ed] the version of the story told by respondent and adopted by the Court of Appeals"); *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the plaintiff's position would be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Accordingly, summary judgment is granted to Ripa on Plaintiff's Eighth Amendment excessive force claim as to the alleged September 30, 2013 assault.

### D. Failure to Intervene Against Defendant Oropallo

Defendants argue that because Plaintiff fails to establish an underlying constitutional violation—his Eighth Amendment excessive force claim against Ripa—his claim against Oropallo fails as a matter of law. (Dkt. No. 103-41, at 20). The Court agrees.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Kee v. Hasty*, No. 01-cv-2123, 2004 WL 807071, at *26, 2004 U.S. Dist. LEXIS 6385, at *86 (S.D.N.Y. Apr. 14, 2004). For Plaintiff to succeed on his failure to intervene claim, he must show that the officer (1) "observe[d] or ha[d] reason to know" that "excessive force [wa]s being used" and that (2) the officer had "a realistic opportunity to intervene to prevent the harm from occurring." *Branen*, 17 F.3d at 557.

As the Court has concluded that no reasonable factfinder could conclude that Plaintiff was subjected to excessive on September 30, 2013, his failure to intervene claim against Oropallo necessarily fails. *Simcoe v. Gray*, 670 F. App'x 725, 727 (2d Cir. 2016) ("[A]bsent a constitutional violation on the part of any of the officers, [the plaintiff's] failure-to-intervene claim necessarily fails."); *see also Addona v. D'Andrea*, 692 F. App'x 76, 78 n.2 (2d Cir. 2017) ("Because we conclude that the force used was not unreasonable, there was no constitutional violation, and the District Court correctly granted summary judgment on the plaintiff's failure to intervene claim."); *Jackson v. Vill. of Ilion*, No. 6:14-cv-563, 2016 WL 126392, at *8, 2016 U.S. Dist. LEXIS 2794, at *23 (N.D.N.Y. Jan. 11, 2016) (dismissing the plaintiff's failure to intervene claim where "no reasonable juror could conclude" that two individual defendant officers "violated plaintiff's federal constitutional rights"). Thus, summary judgment is granted on Plaintiff's failure to intervene claim against Oropallo.

### E. Retaliation

**\*24**  To establish a First Amendment retaliation claim, the plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). In the prison context, "adverse action" is conduct "that would

deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). This inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

"Once the plaintiff carries his initial burden, 'the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct.' " *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (internal quotation marks omitted)). Because of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated," prisoners' claims of retaliation are examined with "skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

### 1. Defendant Ripa

Defendants argue that summary judgment on Plaintiff's claim that Ripa subjected him to excessive force and sexual assault in retaliation for Plaintiff's filing of grievances against him is warranted because no reasonable jury could find that Ripa sexually assaulted Plaintiff and "[t]hus, plaintiff has failed to demonstrate any adverse action by Ripa." (Dkt. No. 103-41, at 21). The Court agrees. As the Court has concluded that no reasonable factfinder could conclude that Plaintiff was assaulted by Ripa on September 30th, Plaintiff's retaliation claim necessarily fails because he cannot show that he was subject to adverse action. *See Smolen v. Dildine*, No. 11-cv-6434, 2014 WL 3385209, at *7, 2014 U.S. Dist. LEXIS 93318, at *22 (W.D.N.Y. July 9, 2014) (explaining that a prisoner's retaliation claim stemming from an alleged assault failed as to a defendant where the plaintiff "did not come forward with evidence to refute [the defendant's] affidavit"). Thus, summary judgment is granted as to Plaintiff's retaliation claim against Ripa.

### 2. Defendants Adams and Waldron

Plaintiff's retaliation claims against Waldron and Adams—that they discontinued his medication in retaliation for his reports of sexual assault—also fail as a matter of law. For the reasons described above, no reasonable juror could conclude that Plaintiff had been sexually assaulted, and for many of those same reasons, it is questionable whether a reasonable juror could conclude that he had reported that he had been sexually assaulted before his medications were discontinued. *See Smith v. Fischer*, No. 07-cv-1264, 2009 WL 632890, at *8, 2009 U.S. Dist. LEXIS 129478, at *38 (N.D.N.Y. Feb. 2, 2009), *report and recommendation adopted*, 2009 WL 5449125, 2009 U.S. Dist. LEXIS 18153 (N.D.N.Y. Mar. 9, 2009) (dismissing retaliation claim where the alleged adverse action occurred before the plaintiff's protected conduct).

**\*25** Nevertheless, even assuming Plaintiff reported a sexual assault to Waldron and Adams prior to the discontinuation of his medications, his retaliation claim still fails. As to Waldron, Plaintiff does not contest that, as a nurse, she did not have the authority to discontinue his medications. (Dkt. No. 103-35, ¶ 32). Accordingly, she could not have taken the adverse action he alleges.

As for Adams, Plaintiff has failed to raise an issue of fact as to a causal connection. "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). A plaintiff "must aver some 'tangible proof' demonstrating that [his] protected speech animated" the adverse action. *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004) (quoting *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004)). A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011). Here, Plaintiff does not point to any statements by Adams indicating retaliatory intent. *See, e.g.*, *Shariff v. Poole*, 689 F. Supp. 2d 470, 479 (W.D.N.Y. 2010) (explaining that, inter alia, "statements by the defendant regarding his motive" provide support for a causal connection between protected conduct and adverse action (citing *Colon*, 58 F.3d at 872–73)). Further, Plaintiff's evidence "fails to establish" that Adams "had a motive to retaliate arising" from Plaintiff's alleged report of sexual assault at a separate correctional facility. *Hare v. Hayden*, No. 09-cv-3135, 2011 WL 1453789, at *4, 2011 U.S. Dist. LEXIS 40683, at *12–13 (S.D.N.Y. Apr.

14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.").

Moreover, Defendants have established that Adams "had legitimate non-retaliatory reasons" for discontinuing Plaintiff's medications. *Vail v. Lashway,* No. 9:12-cv-1245, 2014 WL 4626490, at *19, 2014 U.S. Dist. LEXIS 129516, at *49 (N.D.N.Y. July 16, 2014), *report and recommendation adopted,* 2014 WL 4626490, 2014 U.S. Dist. LEXIS 128506 at *2 (N.D.N.Y. Sept. 15, 2014). Specifically, Adams stated that he discontinued the Naproxen prescription because "it can aggravate the stomach and worsen" Plaintiff's acid reflux. (Dkt. No. 103-33, ¶ 26). He further stated that he discontinued the Neurontin because it was Adams's "clinical impression" that Plaintiff "was seeking pain medication without being able to provide any specifics about the cause or extent of his pain" and that the Neurontin "should not be prescribed until plaintiff was fully evaluated by a provider." (Dkt. No. 103-33, ¶ 27). *See Graham,* 89 F.3d at 81 ("[The plaintiff's] version of events would be insufficient as a matter of law even if true (even if the defendants were retaliating against protected conduct) if there were proper, non-retaliatory reasons for his punishment."). Thus, summary judgment is granted to Adams and Waldron on Plaintiff's retaliation claims.

### F. Deliberate Indifference to Medical Needs

Defendants Adams, Waldron, and Samolis argue they are entitled to summary judgment on Plaintiff's claim that they denied him treatment for sexual assault. (Dkt. No. 103-41, at 27). To establish "an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir. 2003) (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). "This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* To satisfy the objective prong, "the alleged deprivation must be ... 'sufficiently serious.' " *Chance,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994)). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.* (quoting *Hathaway,* 37 F.3d at 66). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "[N]on-medical personnel may be liable for deliberate indifference to medical needs where a plaintiff demonstrates that such personnel intentionally denied or delayed medical care." *Crandell v. Ross,* 19-cv-6552, 2020 WL 134576, at *4, 2020 U.S. Dist. LEXIS 5484, at *11 (W.D.N.Y. Jan 13, 2020) (quoting *Starling v. Syracuse Police Dep't,* No. 19-cv-1458, 2019 WL 6974731, at *5, 2019 U.S. Dist. LEXIS 218968, at *8 (N.D.N.Y. Dec. 20, 2019), *report and recommendation adopted,* 2020 WL 1140664, 2020 U.S. Dist. LEXIS 40178 (N.D.N.Y. Mar. 9, 2020)).

 *26  Plaintiff's medical indifference claims against Adams, Waldron, and Samolis fail because he cannot establish that he was sexually assaulted, which is his alleged serious medical need. *See Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' " (quoting *Chance,* 143 F.3d at 702)); *see also, e.g., Davidson v. Scully,* 155 F. Supp. 2d 77, 90 (S.D.N.Y. 2001) (granting summary judgment where the plaintiff did "not suffer from a serious medical need to which defendants [were] deliberately indifferent"). Accordingly, summary judgment is granted on Plaintiff's Eighth Amendment medical indifference claims against Adams, Waldron, and Samolis.

### VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is **DENIED** as to Plaintiff's procedural due process claim with respect to assistance and the opportunity to call a witness; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is otherwise **GRANTED** and all causes of action, with the exception of the above-described due process claim, are **DISMISSED with prejudice**; and it is further

2020 WL 2838559

**ORDERED** that Defendants Ripa, Oropallo, Adams, Waldron, Soucia, and Samolis are **DISMISSED** from the case.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 2838559

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2159199
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Donald Mack BENNETT, Plaintiff,

v.

Edith ONUA, Edwin Oduro, and
June Yazzo Liason, Defendants.

No. 09 Civ. 7227(SAS).
|
May 26, 2010.

**Attorneys and Law Firms**

Donald Mack Bennett, Valhalla, NY, pro se.

Robert F. Meehan, Westchester County Attorney, Fay Angela Jones, Senior Assistant Westchester County Attorney, White Plains, NY, for Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

*1 Donald Mack Bennett, presently incarcerated and proceeding pro se, brings this action against Edith Onua, Edwin Oduro, and June Yazzo Liason [1] pursuant to section 1983 of Title 42 of the United States Code. Bennett seeks monetary damages in the amount of $5,000,000 for alleged emotional distress, negligence, deliberate indifference, and medical malpractice. Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(c) for failure to exhaust administrative remedies under 42 U.S.C. § 1197e(a) and failure to state a claim under 42 U.S.C. § 1983. For the reasons stated below, the motion to dismiss is granted.

[1]    Hereinafter, "Defendants."

**II. BACKGROUND** [2]

[2]    The facts recited here are drawn from the Complaint ("Compl."), attached as Ex. A to the Declaration of Fay Angela Jones ("Fay Decl."), Senior Assistant County Attorney.

Bennett was incarcerated at the Westchester County Jail ("WCJ") from February 20, 2009, through February 27, 2009. [3] On February 20, 2009, Bennett was examined by Edwin Odoro, a physician's assistant ("P.A."). [4] At the time of the examination, Bennett had in his possession a hospital discharge paper with all his prescribed medications. [5] During the week of February 20, 2009 until Bennett's court date (on February 27, 2009), he allegedly submitted five "sick-call slips" but was not contacted until Edith Onua, also a P.A., called to tell him she could not prescribe his "life sustaining medication." [6]

[3]    See Compl. Section II–D.

[4]    See id.

[5]    See id.

[6]    Id.

On February 27, 2009, Bennett was taken to court without being given his medication. [7] Bennett subsequently became ill and was taken to Sound Shore Medical Center, where he was treated and released. [8] Bennett claims defendant June Yazzo Liason, also a P.A., purposely informed the WCJ staff that nothing was wrong with him because she is racially biased against him. [9] Bennett further claims that Yazzo denies any grievance he files on the same racially-motivated grounds. [10]

[7]    See id.

[8]    See id. Bennett alleges he had a "massive heart attack, grand mal seizure, and almost had a stroke" and that he "ran blood pressure 196 over 145, heart rate running over 230 beats." Id. Defendants include WCJ documentation of Bennett's lengthy medical problems. See Ex. C to Fay Decl.

[9]    See Compl. Section II–D.

[10]    See id.

**III. APPLICABLE LAW**

**Bennett v. Onua, Not Reported in F.Supp.2d (2010)**

2010 WL 2159199

## A. Rule 12(c)

Under Rule 12(c), after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial.[11] Judgment on the pleadings should be granted if it is clear that the moving party is entitled to judgment as a matter of law.[12] In evaluating a motion for judgment on the pleadings, the court applies the same standard as that applicable to Rule 12(b)(6) motions to dismiss for failure to state a claim.[13] As in the context of a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint"[14] and "draw all reasonable inferences in the plaintiff's favor."[15] Even so, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness."[16] In deciding a motion for judgment on the pleadings, a court may consider

[11]  See Fed.R.Civ.P. 12(c).

[12]  See Burns Int'l. Sec. Servs. v. International Union, 47 F.3d 14, 16 (2d Cir.1995).

[13]  See Patel v. Contemporary Classics, 259 F.3d 123, 126 (2d Cir.2001).

[14]  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 572 (2007). Accord Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir.2009).

[15]  Ofori–Tenkorang v. American Int'l. Group, Inc., 460 F.3d 296, 298 (2d Cir.2006).

[16]  In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir.2007) (quotation omitted).

the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings.[17]

[17]  Prentice v. Apfel, 11 F.Supp.2d 420, 424 (S.D.N.Y.1998) (citing Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993)).

## B. Prison Litigation Reform Act

**\*2**  The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.[18] The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[19] "[A]s long as other forms of relief are obtainable through administrative channels, the provision is applicable even to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings."[20]

[18]  See 42 U.S.C. § 1997e(a) (providing that "no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted"). See also Porter v. Nussle, 534 U.S. 516, 516 (2002).

[19]  Porter, 534 U.S. at 532.

[20]  Booth v. Churner, 532 U.S. 731, 741 (2001) (requiring an inmate to complete the prison administrative process before suing over prison conditions even where the inmate sought only money damages, which could not be recovered through the administrative process).

Failure to exhaust is an absolute bar to an inmate's action in federal court as "[section] 1997e(a) requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all."[21] Failure to exhaust is an affirmative defense, however.[22] As such, plaintiff need not plead exhaustion in the complaint.[23]

[21]  Neal v. Goord, 267 F.3d 116, 122 (2d Cir.2001), rev'd. on other grounds (quotation marks and citation omitted) (emphasis in original).

[22]  See Jenkins v. Haubert, 179 F.3d 19, 28–29 (2d Cir.1999).

[23]  See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 93 of 267
Bennett v. Onua, Not Reported in F.Supp.2d (2010)
2010 WL 2159199

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available [24] to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [25]

[24]    To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738. In some circumstances, the behavior of the defendant may render administrative remedies unavailable. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (remanding case to the district court to determine whether some seemingly available remedies were rendered unavailable by threats made by correction officers).

[25]    *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

When any of the above are present, the affirmative defense of non-exhaustion fails. [26] Where (1) administrative remedies were available to the plaintiff, (2) defendants are not estopped and have not forfeited their non-exhaustion defense, and (3) plaintiff did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged to justify "the prisoner's failure to comply with administrative procedural requirements." [27]

[26]    *See Hemphill,* 380 F.3d at 686.

[27]    *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought' ... does not constitute proper exhaustion." [28]

"[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [29]

[28]    *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005)) (noting that Braham cannot survive *Woodford v. Ngo,* 548 U.S. 81, 94–95 (2006), which states that plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to [prison] staff.").

[29]    *Id.* (quoting *Woodford,* 548 U.S. at 95).

### C. Westchester County Department of Corrections Inmate Grievance Program

The Westchester County Department of Corrections ("WCDOC"), Jail Division, has an established Inmate Grievance Program ("IGP") approved by the New York State Commission on Correction ("NYSCOC") . [30] A "grievance" is defined as "any inmate/detainee complaint relating to any facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility ." [31] In 2009, the IGP allowed inmates to make informal complaints to the Block Officer, who would log such complaint and attempt to resolve them. [32] Grievances that could not be resolved in this manner entered a formal process affording two levels of subsequent appeal. [33]

[30]    *See* Affidavit of Anthony Amicucci ("Amicucci Aff."), Warden of the Westchester County Department of Correction, ¶ 5; *see also* Ex. 1 to Amicucci Aff. (copy of the WCDOC grievance procedures).

[31]    Amicucci Aff. ¶ 8.

[32]    *See id.* ¶ 9.

[33]    *See id.* ¶¶ 11–13. *See also* Westchester County Department of Correction Policy and Procedure, Ex. 1 to Amicucci Aff. at 4 (attached as Ex. E to Fay Deck) (chart showing time schedule for grievance filing and appeal).

## IV. DISCUSSION

### A. Defendants Have Adequately Demonstrated
### Bennett's Failure to Exhaust Administrative Remedies

**\*3** Despite Bennett's claim that he filed a grievance at WCJ that was denied,[34] a search of the grievance log records maintained by WCDOC between February 20 and February 27, 2009 did not reveal any record of a grievance by Bennett concerning his medical care.[35] Bennett claims he informed Warden Amicucci of his grievance.[36] Warden Amicucci states in his sworn affidavit that Bennett never contacted him about any claims.[37] Regardless, notice to a prison official is insufficient.[38] As such, Defendants have adequately supported the affirmative defense of failure to exhaust.

[34]    See Compl. Section IV–F.

[35]    See Amicucci Aff. ¶ 17. Although Bennett completed Complaint Section IV–F, which asks the inmate to describe the grievance claim if one had been made, he also completed Section IV–G, which states, "If you did *not* file a grievance, did you inform any officials of your claim(s)?" Also, in describing "all efforts to appeal [the instant claim] to the highest level of the grievance process," Bennett simply writes that he has "always appeal [sic] and never sign agreeing." Compl. Section IV–F(3). Bennett cannot have appealed if he never filed an initial grievance.

[36]    See Compl. Section IV–G

[37]    See Amicucci Aff. ¶ 18.

[38]    See *Macias,* 495 F.3d at 44.

### B. Bennett Has Not Sufficiently Alleged Facts
### Supporting an Exemption From the Exhaustion
### Requirement

In light of Defendants' affirmative defense of non-exhaustion, the instant motion now presents three issues: (1) whether administrative remedies were available to Bennett, (2) whether Defendants are estopped from asserting exhaustion as a defense, and (3) whether special circumstances excuse Bennett's failure to exhaust administrative remedies. Bennett has not alleged any facts to support an exemption from the exhaustion requirement.

*First,* Bennett does not allege that all available administrative remedies were procedurally unavailable at WCJ. When first processed into WCJ, inmates receive a packet called "The Inmate Rules and Regulations."[39] The Inmate Rules and Regulations advise inmates that grievance forms are available from the correction staff and from the Law Library.[40] Bennett does not allege that these forms were not available to him or that they did not "afford the possibility of some relief for the action complained of."[41]

[39]    See Amicucci Aff. ¶ 6; *see also* Ex. 2 to Amicucci Aff. (copy of the Inmate Rules and Regulations packet).

[40]    See Amicucci Aff. ¶ 6.

[41]    *Booth,* 532 U.S. at 738. Bennett was allegedly familiar with the WCJ grievance process, having filed an unrelated grievance about two years prior to commencing this action. *See* Amicucci Aff ¶ 19; *see also* Ex. 3 to Amicucci Aff. (photocopy of WCJ's log of Bennett's unrelated May 2007 grievance).

*Second,* Bennett does not allege that all available administrative remedies were rendered unavailable by any action of any defendant. *Third,* Bennett does not allege that any defendant ever acted in any way that would estop Defendants from asserting non-exhaustion as a defense, or that any special circumstances exist to justify Bennett's failure to exhaust all possible remedies.

## V. CONCLUSION

Because Defendants have adequately supported the affirmative defense of failure to exhaust and because Bennett has not presented any facts on which this Court could base an exception, his Complaint is dismissed without prejudice. Bennett may file a new action once he has exhausted all remedies, as required by PLRA section 1997e(a). Accordingly, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to close this motion [Docket No. 17] and this case.

SO ORDERED.

2010 WL 2159199

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2159199

---

**End of Document**                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Hall v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 6607600

2018 WL 6607600
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Murray HALL, III, Plaintiff,

v.

Anthony J. ANNUCCI, et al., Defendants.

Civil Action No. 9:17-CV-1069 (GTS/DEP)

|

Signed 11/07/2018

**Attorneys and Law Firms**

FOR PLAINTIFF: MURRAY HALL, III, Pro Se, 93 North Fair Field Drive, Dover, DE 19901.

FOR DEFENDANTS: HON. BARBARA UNDERWOOD, New York State Attorney General, OF COUNSEL: KYLE W. STURGESS, ESQ., Assistant Attorney General, The Capitol, Albany, NY 12224.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** Plaintiff Murray Hall, III, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, against five individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), including the DOCCS Acting Commissioner. The suit was originally filed in the United States District Court for the Eastern District of New York, but was later transferred to this district. Plaintiff's civil rights claims in the action center upon meals served to him that, according to him, were inconsistent with his Islamic religious beliefs, and violated his right to equal protection. Plaintiff claims that while the beliefs of Jewish inmates are accommodated through the provision of a religious diet, Muslim inmates are not accorded the same treatment.

In lieu of answering the complaint, defendants have instead moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's claims based upon his failure to exhaust available administrative remedies before commencing suit. For the reasons set forth below, I recommend that defendants' motion be granted.

I. BACKGROUND [1]

[1]
In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the non-movant's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). The court notes that plaintiff has admitted every fact contained within defendants' Local Rule 7.1(a)(3) Statement of Material Facts. *Compare* Dkt. No. 23-1 *with* Dkt. No. 28 at 6.

Although he has since been released, at the times relevant to his claims plaintiff was a prison inmate entrusted to the custody of the DOCCS and confined in the Greene Correctional Facility ("Greene"), located in Coxsackie, New York. *See generally* Dkt. No. 13. Plaintiff is a member of the Muslim faith. *Id.*

According to plaintiff, he requested that he be provided with a halal meal from the cafeteria at Greene. [2] Dkt. No. 13 at 3. Although plaintiff was apparently offered an alternative entrée, which included a meatless sauce, he believed that the alternative meal was not consistent with the tenets of Islam. *Id.* Plaintiff complained that "if the Jewish inmates get kosher meals, then the Muslim inmates should get [h]ala[l] meals[ ] because the Fourteenth Amendment demand[s] it." [3] *Id.*

[2]
One district court has characterized the Muslim religious dietary requirements as follows:

[T]he Koran dictates that practicing Muslims eat food that is Halal, which means allowed or lawful. The opposite of Halal is Haram, which means prohibited or unlawful. A Halal diet includes fruits, vegetables and all things from the sea. The flesh of herbivorous animals, such as cows, lambs, chickens and turkeys, is Halal if it is slaughtered with the appropriate prayer and in the appropriate manner. Certain items are Haram and cannot be made Halal through ritual slaughter. Examples of such Haram items include pork and all pork by-products, carrion and the flesh of carnivorous animals, such as cat, dog, rat, lion, tiger, and eagle. Intoxicants of all types are also Haram. Halal does not require

Hall v. Annucci, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 97 of 267

2018 WL 6607600

separate preparation and serving facilities after Halal meat is slaughtered according to ritual.

*Cox v. Kralik*, No. 05-CV-5917, 2006 WL 42122, at *1, n.1 (S.D.N.Y. Jan. 6, 2006) (quoting *Abdul–Malik v. Goord*, No. 96-CV-1021, 1997 WL 83402, at *1 (S.D.N.Y. Feb. 27, 1997) ).

3    The Second Circuit has observed that "Kosher meat is prepared in a way that satisfies all the requirements of Halal meat. Hence, Kosher meat is Halal, even though Halal meat is not necessarily Kosher." *Perez v. Westchester Cty. Dept of Corr.*, 587 F.3d 143, 144 n.1 (2d Cir. 2009).

**\*2** On May 3, 2017, plaintiff submitted a grievance, which was ultimately designated as grievance number GNE-9335-17, to the Inmate Grievance Resolution Committee ("IGRC") at Greene. Dkt. No. 13 at 4; *see* Dkt. No. 23-3 at 8. In it, he complained that although inmates of the Jewish faith receive kosher meals, DOCCS "disregard[s] the Muslim[ ] [r]eligious diets." Dkt. No. 23-3 at 8. Plaintiff claimed that he was being forced to violate the tenets of his faith, and stated, *inter alia*, "I want the messhall to give me [h]ala[l] meals and I want this grievance sent to the Central Office." *Id.*

In his grievance, plaintiff noted that he had written to defendant Annucci regarding the lack of halal meals at Greene. Dkt. No 23-3 at 8. By letter dated May 19, 2017, defendant Daniel Martuscelllo, the DOCCS Deputy Commissioner for Administrative Services, responded on defendant Annucci's behalf, stating:

> Please be advised, the [DOCCS] offers an alternative entree on the general confinement menu whenever meat is served. The alternative entree may be a halal chicken patty, sliced cheese, hard boiled eggs, or a meatless sauce/casserole.
>
> You are not being 'forced to eat' non-halal food or starve. Consuming the alternative entrée does not violate the tenets of Islam.

Dkt. No. 28 at 5.

On May 22, 2017, the IGRC denied plaintiff's grievance, and in so doing stated the following:

> The response provided by the Coordinating Chaplain, [defendant] Deacon Y[oung], indicates there is

currently no provision for daily [h]ala[l] meals to be provided to Muslim inmates. Grievant can contact Imam G. to address issues with regard to his religious designation, services etc. This grievance is 'Departmental' in nature and is therefore beyond the purview of the facility Inmate Grievance Program (IGP). Dkt. No. 23-3 at 9.

Dkt. No. 23-3 at 9. On the day he received the IGRC's response, plaintiff appealed the denial to defendant Brandon Smith, the superintendent at Greene. *Id.* Plaintiff received a response from defendant Smith on June 15, 2017, in which Smith stated as follows:

> There is currently no provision to provide daily [h]ala[l] meals. Grievant can contact Imam G. to address issues with regard to his religious designation, services, meals etc. This grievance is 'Departmental' in nature and is therefore beyond the purview of the facility Inmate Grievance Program (IGP).**Grievance will be sent to CORC for final disposition.** Dkt. No. 23-3 at 10 (emphasis added).

Dkt. No. 23-3 at 10. Although defendant Smith's response indicated that plaintiff's grievance was being forwarded to the CORC, on June 19, 2017, plaintiff completed the "appeal statement" contained on defendant Smith's response, indicating that he wanted to receive halal fish and chicken on a daily basis. *Id.*

According to Rachel Seguin, the Assistant Director of the IGP for the DOCCS, as of a least June 1, 2018, plaintiff's grievance was considered to be an "active case," indicating that the CORC still had not yet issued a decision regarding the appeal. Dkt. No. 23-3 at 2-3.

II. PROCEDURAL HISTORY

Plaintiff commenced this action on May 17, 2017 in the United States District Court of the Eastern District

Case 9:18-cv-01067-DNH-TWD Document 37 Filed 08/03/20 Page 98 of 267

Hall v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 6607600

of New York. Dkt. Nos. 1, 2. Named as defendants in plaintiff's complaint are Anthony Annucci, the Acting Commissioner of DOCCS; Daniel Martuscello, the DOCCS Deputy Commissioner for Administrative Services; Jeff McCoy, the DOCCS Deputy Commissioner for Program Services; Brandon Smith, the Superintendent at Greene; and Deacon Young, a Chaplain. [4] The matter was subsequently transferred to this district by order of United States District Judge Margo K. Brodie, issued on September 25, 2017. Dkt. No. 4.

[4]     Plaintiff's papers indicate that the proper spelling of this defendant's name is "Daniel Martuscello," rather than "Daniel Mortuscello," the name under which he was sued. Dkt. No. 28 at 5. The clerk of the court will respectfully be directed to modify the court's records to reflect this change.

**\*3** Following the transfer, Chief United States District Judge Glenn T. Suddaby issued a decision and order on December 15, 2017, in which he granted plaintiff permission to proceed *in forma pauperis* and reviewed his complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 9. In that decision, Chief Judge Suddaby concluded that the complaint was subject to dismissal for plaintiff's failure to state a claim upon which relief could be granted, but nonetheless afforded plaintiff an opportunity to submit an amended pleading. *See generally id.*

Plaintiff availed himself of that opportunity and submitted an amended complaint on February 5, 2018. Dkt. No. 13. Upon reviewing plaintiff's amended complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A, Chief Judge Suddaby concluded that plaintiff had plausibly alleged that all of the defendants, with the exception of defendant John Doe, violated his religious rights under the First Amendment and the RLUIPA, and denied him equal protection in violation of the Fourteenth Amendment. [5] Dkt. No. 14.

[5]     In his decision, Chief Judge Suddaby dismissed plaintiff's damages claim against defendants in their official capacities, and all monetary damage claims under the RLUIPA. Dkt. No. 14 at 9.

In lieu of answering plaintiff's amended complaint, defendants now move seeking the entry of summary judgment, dismissing plaintiff's claims. [6] Dkt. No. 23. In that motion, which was filed on June 1, 2018, defendants assert that plaintiff's claims are procedurally barred based upon his failure to file and pursue to completion an internal grievance

regarding the matters now at issue before commencing suit. *Id.* Plaintiff responded in opposition to defendants' motion on June 18, 2018, Dkt. No. 28, and defendants have since filed a reply in further support of their motion. Dkt. No. 31. Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

[6]     While a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure automatically extends the time under which a defendant must file an answer, there is no parallel rule governing a defendant's obligation to answer a complaint when he files a pre-answer motion for summary judgment pursuant to Rule 56. *Compare* Fed. R. Civ. P. 12(a)(4) *with* Fed. R. Civ. P. 56; *see also* 10A Alan Wright *et al., Federal Practice & Procedure* § 2718 (4th ed.). Most courts have determined that Rule 12(a)(4) operates by analogy to a defendant that has filed a pre-answer summary judgment motion and, therefore, have declined to find a defendant in default by failing to file an answer until after disposition of the motion. *See* Rashidi v. Albright, 818 F. Supp. 1354, 1356 (D. Nev. 1993) ("Although Rule 12 does not specifically allow for a summary judgment motion to toll the running of the period within which a responsive pleading must be filed, by analogy the language would seem to apply[.]"); *but see* Poe v. Cristina Copper Mines, Inc., 15 F.R.D. 85, 87 (D. Del. 1953) (finding that the "extension of time to file a response pleading until determination of a motion for summary judgment is not a definite and fixed right but a matter to be granted or denied under Rule 6(b)"). In this instance, exercising my discretion, I will *sua sponte* order a stay of defendants' time to answer plaintiff's complaint until fourteen days after a final determination is issued with respect to the parties' motions, in the event that the action survives. *Snyder v. Goord,* 05-CV-1284, 2007 WL 957530, at \*5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, J., *adopting report and recommendation by* Peebles, M.J.).

III. DISCUSSION

Hall v. Annucci, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 99 of 267

2018 WL 6607600

A. Legal Standard Governing Summary Judgment Motions

**\*4** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Exhaustion of Administrative Remedies

Defendants contend that plaintiff's claims in this action must be dismissed based upon his failure to fully exhaust his administrative remedies prior to commencement. Dkt. No. 23-4. In opposition, plaintiff counters that he fully exhausted his remedies by writing to, and receiving a response from defendant Annucci whom, plaintiff contends, has authority

that "supercedes [sic] that of the Central Office Review Committee[.]" Dkt. No. 28 at 2, 3, 5.

1. Legal Standard

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

**\*5** In New York, the DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints regarding the conditions of their confinement. *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[7] have up to sixteen days after the grievance is filed to informally resolve the issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 100 of 267

Hall v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 6607600

resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. 7 N.Y.C.R.R. § 701.5(b)(2).

7    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [8] 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii). Importantly, at this step, the superintendent or his designee shall determine if the grievance raises an issue that is departmental or institutional. [9] 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

8    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

9    The relevant regulations provide that a departmental grievance is "a grievance which affects an inmate during his/her confinement at various facilities throughout the department[,]" while an institutional grievance is "a grievance in which the grievant is only affected as long as he/she remains a resident of the facility in which the grievance is filed." 7 N.Y.C.R.R. § 701.2(b), (c).

If it is determined that the subject of the grievance implicates a departmental policy or directive, the superintendent is required to forward the grievance within seven calendar days of his receipt to the Central Office Review Committee ("CORC"), who is required to issue a decision in accordance with the third step. 7 N.Y.C.R.R. § 701.5(c)(3)(ii). At the third and final step of the IGP, the CORC is required to render a written decision within thirty days of receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA.

See Ruggerio v. Cnty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted) ).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); see also Ross, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted) ). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." Ross, 136 S. Ct. at 1859 (quotation marks omitted).

*6    In Ross, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [10] Ross, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." Id. The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

10    According to the Second Circuit, "the three circumstances discussed in Ross do not appear to be exhaustive[.]" Williams, 829 F.3d at 123 n.2.

## 2. Analysis

In this case, plaintiff availed himself of the IGP and initiated the grievance process on May 3, 2017, by his letter which was deemed to represent a grievance. Dkt. No. 23-3 at 8. Before

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 101 of 267

Hall v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 6607600

plaintiff received a response from the IGRC at the first step of the IGP, *see* 7 N.Y.C.R.R. § 701.5(b), he commenced this action May 15, 2017. *See generally* Dkt. No. 1; *see also Taylor v. Racette,* 709 F. App'x. 105, 106 n.1 (2018). Thus, less than two weeks elapsed between the filing of plaintiff's grievance and commencement of this action.

In opposition to the present motion, plaintiff effectively acknowledges that he failed to complete the IGP process before filing suit. *Compare* Dkt. No. 23-1 *with* Dkt. No. 28 at 8. He contends, however, that his failure should be excused, claiming that because his letter to defendant Annucci effectively acted to exhaust his remedies. This sort of circumvention of the IGP has been consistently rejected by courts in this circuit under the PLRA. *See e.g., Hurst v. Mollnow,* No. 16-CV-1062, 2018 WL 4178226, *7 n.9 (N.D.N.Y. Jul. 20, 2018), *report and recommendation adopted by* 2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018); *Chaney v. Vena,* No. 9:15-CV-653, 2017 WL 6756645, at *3 n.3 (N.D.N.Y. Nov. 29, 2017), *report and recommendation adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017); *Rodriguez v. Cross,* No. 15-CV-1079, 2017 WL 2791063, *4 (N.D.N.Y. May 9, 2017), *report and recommendation adopted by* 2017 WL 2790530 (N.D.N.Y. June 27, 2017); *Geer v. Chapman,* No. 9:15-CV-952, 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), *report and recommendation adopted by* 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016); *see Macias v. Zenk,* 495 F.3d 37, 44-45 (2d Cir. 2007) (informal steps, putting officials on "notice" are insufficient to exhaust administrative remedies). [11] Thus, plaintiff's informal letter, even to a high-ranking official such as defendant Annucci, is outside the purview of the IGP, and fails satisfy PLRA's exhaustion requirement. Accordingly, based upon the short period that elapsed between the date of plaintiff's grievance and his commencement of this action, as well plaintiff's clear post-commencement efforts to exhaust, I conclude that plaintiff failed to fully exhaust his administrative remedies before filing suit.

[11] All unreported cases cited to in this report have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions have been deleted for online purposes.]

The only question to be resolved is whether the IGP was unavailable to plaintiff such that he may be excused for his failure to fully exhaust the administrative remedies. [12] *Williams,* 829 F.3d at 123 (quoting *Ross,* 136 S. Ct. at 1858). There is no evidence before the court that would suggest that the IGP operated a "simple dead end," was "incapable of use," or that plaintiff's efforts were thwarted by "machination, misrepresentation, or intimidation." *Id.* To the contrary, the IGP remained fully available to plaintiff and he was able to successfully and timely navigate each step. After plaintiff received a denial from the IGRC at step one, he filed an appeal to the superintendent. Dkt. No. 23-3 at 8, 9. When the superintendent denied his grievance as being "departmental" in nature, although he was not required to, he also filed a timely appeal to the CORC. *Id.* at 10.

[12] Defendants represent to the court that because the "CORC is in the process of rendering a determination on the [p]laintiff's grievance"—a grievance that was filed by plaintiff nearly a year prior to their motion—plaintiff's "administrate remedies relating to his complaint of the absence of halal meals remain unexhausted." Dkt. No. 23-3 at 3. I am not convinced that this position would pass muster in the aftermath of *Williams. See also* 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

**\*7** Accordingly, I find both that plaintiff did not fully comply with the IGP and that the procedures set forth in the IGP remained available to plaintiff at all times.

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 102 of 267

Hall v. Annucci, Not Reported in Fed. Supp. (2018)
2018 WL 6607600

Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this instance, the deficiencies identified in this report are substantive in nature and extend beyond the mere sufficiency of plaintiff's amended complaint. Accordingly, because I find that any amendment that might be offered by plaintiff would be futile, I recommend against granting plaintiff further leave to amend his complaint.

IV. SUMMARY, ORDER, AND RECOMMENDATION

Based upon the record before the court, which firmly establishes that plaintiff failed to exhaust the prescribed grievance process before filing this action, and the lack of evidence showing that administrative remedies under the IGP were unavailable to him at the relevant times, defendants' motion should be granted. Accordingly, it is hereby

ORDERED that the clerk of the court is respectfully directed to modify the court's records to change defendant Daniel Mortuscello's name on the docket to "Daniel Martuscello"; and it is further hereby

ORDERED, that defendants' time to answer or move against plaintiff's complaint in this action is extended until fourteen days after a final determination is issued with respect to defendants' motion, in the event that the action survives; and it is further respectfully

RECOMMENDED that defendants' motion for the entry of summary judgment dismissing plaintiff's complaint based on

his failure to exhaust the available administrative remedies (Dkt. No. 23) be GRANTED in its entirety, and that plaintiff's amended complaint (Dkt. No. 13) be DISMISSED, without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [13] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[13]   If you are proceeding *pro se* and are served with this order, report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order, report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

*8  It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6607600

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Hall v. Annucci, Not Reported in Fed. Supp. (2018)

2018 WL 6605618

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 103 of 267

2018 WL 6605618
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Murray HALL, III, Plaintiff,

v.

Anthony J. ANNUCCI, Comm'r.; Daniel
Martuscello, Dep. Comm'r. for Admin. Servs.,
DOCCS, f/k/a Daniel Mortuscello; Jeff McKoy,
Dep. Comm'r for Program Servs., DOCCS;
Brandon Smith, Super., Greene C.F.; and Deacon
Young, Chaplain, Greene. C.F., Defendants.

9:17-CV-1069 (GTS/DEP)
|
Signed 12/17/2018

**Attorneys and Law Firms**

MURRAY HALL, III, 93 North Fair Field Drive, Dover,
Delaware 19901, Plaintiff, Pro Se.

HON. BARBARA D. UNDERWOOD, OF COUNSEL:
KYLE W. STURGESS, ESQ., Assistant Attorney General,
Attorney General for the State of New York, The Capitol,
Albany, New York 12224, Counsel for Defendants,

**<u>DECISION and ORDER</u>**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Murray Hall, III ("Plaintiff")
against the five above-captioned employees of the New
York State Department of Corrections and Community
Supervision ("Defendants") are (1) Defendants' motion for
summary judgment and (2) United States Magistrate Judge
David E. Peebles' Report-Recommendation recommending
that Defendants' motion be granted. (Dkt. Nos. 23, 32.)
None of the parties have filed objections to the Report-
Recommendation, and the deadline by which to do so has
expired. (*See generally* Docket Sheet.)

After carefully reviewing the relevant papers herein,
including Magistrate Judge Peebles' thorough Report-
Recommendation, the Court can find no clear-error in
the Report-Recommendation.[1] Magistrate Judge Peebles
employed the proper standards, accurately recited the facts,

and reasonably applied the law to those facts. As a result,
the Report-Recommendation is accepted and adopted in its
entirety for the reasons stated therein;[2] Defendants' motion
for summary judgment is granted; and Plaintiff's Amended
Complaint is dismissed in its entirety.

[1] When no objection is made to a report-
recommendation, the Court subjects that report-
recommendation to only a clear error review. Fed.
R. Civ. P. 72(b), Advisory Committee Notes: 1983
Addition. When performing such a "clear error"
review, "the court need only satisfy itself that there
is no clear error on the face of the record in order to
accept the recommendation." *Id.*; *see also Batista
v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1
(S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am
permitted to adopt those sections of [a magistrate
judge's] report to which no specific objection is
made, so long as those sections are not facially
erroneous.") (internal quotation marks omitted).

[2] The Court would add only that an alternative reason
for not affording Plaintiff an opportunity to amend
his pleading before dismissing his action is that he
has already been afforded such an opportunity to
amend (his operative pleading being his *Amended*
Complaint). *See Abascal v. Hilton*, 04-CV-1401,
2008 WL 268366, at \*8 (N.D.N.Y. Jan. 13, 2008)
(Kahn, J., adopting, on *de novo* review, Report-
Recommendation by Lowe, M.J.) ("[G]ranting a
*pro se* plaintiff an opportunity to amend is not
required where the plaintiff has already been given
a chance to amend his pleading."), *aff'd*, 357 F.
App'x 388 (2d Cir. 2009); *see also Bratton v.
Fitzpatrick*, 12-CV-0204, 2012 WL 4754558, at
\*2 & n.2 (N.D.N.Y. Oct. 4, 2012) (Suddaby, J.)
(collecting cases).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-
Recommendation (Dkt. No. 32) is **<u>ACCEPTED</u>** and
**<u>ADOPTED</u>** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 23) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No.
13) is **<u>DISMISSED</u>** in its entirety, and the Clerk of Court shall
enter Judgment for Defendants and close this action.

Hall v. Annucci, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 104 of 267

2018 WL 6605618

The Court certifies that an appeal from this Decision and
Order would not be taken in good faith pursuant 28 U.S.C. §
1915(a)(3).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6605618

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4178226
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith I. HURST, Plaintiff,

v.

A. MOLLNOW and Eisenschmidt, Defendants.

9:16-cv-1062 (DNH/TWD)
|
Signed 07/20/2018

**Attorneys and Law Firms**

KEITH I. HURST, 105 Hunter Ave., #2, Albany, NY 12206,
pro se.

BARBARA D. UNDERWOOD, OF COUNSEL: MARK
G. MITCHELL, ESQ., Attorney General of the State of
New York, The Capitol, Albany, NY 12224, Attorney for
Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**I. INTRODUCTION**

**\*1** This matter was referred for Report and
Recommendation by the Hon. David N. Hurd, United States
District Judge, pursuant to 28 U.S.C. § 636(b) and Northern
District of New York Local Rule ("L.R.") 72.3(c). *Pro se*
Plaintiff Keith I. Hurst, a former inmate in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS"), has commenced this
action pursuant to 42 U.S.C. § 1983 alleging violations of
his civil rights while confined at Washington Correctional
Facility ("Washington"). (Dkt. No. 1.) The sole remaining
claim is Plaintiff's Eighth Amendment excessive force
claim against Defendants A. Mollnow, a Corrections Officer
("C.O.") and Eisenschmidt, a Sergeant ("Sgt."). (Dkt. No. 12.)

Presently pending is Defendants' motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Dkt. No. 41) for Plaintiff's failure to exhaust
administrative remedies before commencing this action. (Dkt.
No. 41-11 at 6-13. [1] ) Defendants also contend, to the extent
Plaintiff's seeks monetary damages against them in their

official capacities, they are entitled to Eleventh Amendment
immunity. (Dkt. No. 41-11 at 13.) Plaintiff filed a response in
opposition to Defendants' motion. (Dkt. No. 57.) Defendants
filed a reply. (Dkt. No. 60.) For reasons that follow, the Court
recommends that Defendants' motion for summary judgment
(Dkt. No. 41) be granted in part and denied in part.

[1]     Page references to documents identified by docket
        number are to the numbers assigned by the CM/
        ECF docketing system maintained by the Clerk's
        Office.

**II. BACKGROUND**

**A. July 1, 2016, Incident**
Plaintiff alleges that on July 1, 2016, while an inmate at
Washington, he was subjected to excessive force by C.O.
Mollnow and Sgt. Eisenschmidt. (Dkt. No. 1 at 4-5.) On
that date, Plaintiff claims he requested to speak to an "area
supervisor" regarding his keeplock status. *Id.* at 4-5. In
response, C.O. Mollnow "pulled the pin on her walkie
talkie" and several officers, including Sgt. Eisenschmidt
responded. *Id.* The officers physically assaulted Plaintiff,
inflicting numerous injuries, while hurling racial epithets at
him. *Id.* Specifically, C.O. Mollnow kicked Plaintiff in the left
side of his face and spit on him while he was on the ground.
(Dkt. Nos. 1 at 5, 41-2 at 86-88.) Sgt. Eisenschmidt punched
Plaintiff in the head, face, and chest, banged his head into
the wall, and choked him. (Dkt. Nos. 1 at 5, 41-2 at 157.)
The assault lasted approximately ten minutes. (Dkt. No. 41-2
at 98-100.) Afterwards, Plaintiff was taken by bus to Sgt.
Eisenschmidt's office. *Id.* There, Sgt. Eisenschmidt punched,
kicked, and choked Plaintiff, and slammed his head against
a wall. *Id.* at 103-104. Plaintiff was then sent to the Special
Housing Unit ("SHU"). *Id.*

**B. Plaintiff's Inmate Misbehavior Reports**
On July 1, 2016, C.O. Mollnow issued Plaintiff two inmate
misbehavior reports for creating a disturbance, harassment,
refusing a direct order, making threats, and being out of place.
(Dkt. No. 1 at 9, 11-12.) As described in those misbehavior
reports, at approximately 1:00 p.m., Plaintiff was "cube
visiting" without permission. (Dkt. No. 41-4 at 5.) When
C.O. Mollnow told Plaintiff that he was not allowed to
cube visit, Plaintiff yelled, "fuck you" and returned to his
cube. *Id.* At Sgt. Eisenschmidt's direction, C.O. Mollnow
told Plaintiff he was keeplocked. *Id.* Plaintiff argued with
C.O. Mollnow about his keeplock status, but returned to his

Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)
2018 WL 4178226

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 106 of 267

cube. *Id.* At approximately 1:20 p.m., Plaintiff approached C.O. Mollnow's desk and resumed arguing about his keeplock status. *Id.* at 6. C.O. Mollnow ordered Plaintiff to leave the desk and return to his cube. *Id.* Plaintiff stepped onto the officer's podium in a threatening manner. *Id.* C.O. Mollnow activated her alarm; Plaintiff ran to his cube. *Id.* A response team arrived; Plaintiff was sent to the SHU. *Id.* No physical force was used in the incident. *Id.* at 5, 6.

**\*2** At two Tier III disciplinary hearings conducted on July 11, 2016, Plaintiff pleaded guilty to two counts of creating a disturbance and was found guilty of all other charges. *Id.* at 7; Dkt. No. 41-2 at 122, 125. He was sentenced to 90 days in the SHU, 90 days loss of recreation, and 90 days loss of good time credits, along with 120 days loss of package, commissary, and telephone privileges. (Dkt. No. 41-2 at 126.) The hearing officer's determinations were affirmed on administrative appeal. (Dkt. No. 41-6 at 1.) On July 15, 2016, Plaintiff was transferred to Upstate Correctional Facility ("Upstate"). (Dkt. No. 41-2 at 142.)

### C. Plaintiff's Grievance

In his verified complaint, [2] Plaintiff declares, "I exhausted all of my administrative remedies, grievance, commissioner, governor, inspector general, special litigation of Washington, D.C." (Dkt. No. 1 at 2.) Plaintiff further states, "I filed grievances to the higher authority & never received a response. The facility of Washington never responded to my grievance." *Id.* at 3.

[2]   The Court finds Plaintiff's complaint was adequately verified under 28 U.S.C. § 1746 by Plaintiff's declaration under penalty of perjury. (Dkt. No. 1.)

At his deposition, Plaintiff testified that on or about July 14, 2016, while confined in the SHU at Washington, he filed a grievance with Inmate Grievance Resolution Committee ("IGRC") regarding the July 1, 2016, assault:

Q: Did you file an inmate grievance with the IGRC about the incident on July 1, 2016?

A: Yeah.

Q: You did? On what date?

A: July 14th or 13th. It was the -- it was before they packed me up.

Q: And that was at Washington Correctional?

A: Yeah.

Q: All right. Where did you put the grievance?

A: In the mailbox.

Q: What did the grievance say?

A: It was on a -- it was on a regular piece of paper and it says that I was assaulted July 1st by several officers and -- the sergeant.

Q: What else?

A: I don't remember what it says.

Q: All right. And you put that in the mailbox at Washington?

A: Yeah. I know it was about my -- the assault.

(Dkt. No. 41-2 at 141.) The next day, on or about July 15, 2016, Plaintiff was transferred to Upstate. *Id.* at 142. Plaintiff testified he never received a response to his grievance that he filed at Washington:

Q: Did you get a response to that [grievance]?

A: I never got a response from it. I contacted the Upstate box -- Inmate Grievance Program to make sure they got my grievance and they said that they never had received it.

Q: All right. So, you put -- you put this grievance in the mailbox at Washington. And then you were transferred to a different facility?

A: Yes, sir.

Q: What date?

A: On the 15th or 16th. I think it was July 15th, when I was transferred out of -- out of there.

Q: Where did you go?

A: Upstate Correctional Facility.

*Id.* Plaintiff further explained, "I filed a grievance on [the July 1, 2016, assault] and they made it disappear. They said they never got it. I wrote a grievance...." *Id.* at 93-94. Plaintiff testified he wrote the Commissioner, the Governor,

and Special Litigations. *Id.* at 94. He "wrote everybody that [ ] could consider a grievance." *Id.*

For example, by letter dated August 14, 2016, Plaintiff sent a letter to the Commissioner, regarding the July 1, 2016, incident:

> I was assaulted by several officers, including a sergeant. I was called racial slurs & repeatedly kicked & punched. The female officer even kicked me in the face, causing my left eye to become blurry & spit on me. They assaulted me for a very long time.... I was beaten on the bus, then I was assaulted in the Sergeant office. He choked me & started banging my head into wall." ... The Sergeant name is "Eisenschmidt" and the female office name is "A. Mollnow.... She also lied on the misbehavior report. I am not letting them get away with this & they should be placed under investigation.... Still heard no response from Inmate Grievance—dated 7.14.16. I hope you could look into this matter & save me from doing unnecessary box time. Do your job.

**\*3** (Dkt. No. 1 at 6.)

Plaintiff testified that he also contacted Upstate's IGRC regarding the status of his grievance:

Q: What response did you get?

A: That Washington never received no grievances from Hurst.

Q: Did you do an appeal to the superintendent?

A: No -- I don't recall. I don't know. I know I -- I filed my grievance with Albany and the Governor.

Q: So, you sent some letters to the Governor?

A: Yeah. To back up the grievance.

Q: All right. And when you say Albany, what do you mean?

A: The Commissioner and I --.

Q: All right. So, you wrote to the Commissioner and you wrote to the Governor?

A: And I wrote the Inspector General and he came about five months later to see me.

(Dkt. No. 41-2 at 143.) Plaintiff admitted he never appealed to the Central Office Review Committee ("CORC"):

Q: Did you appeal to the Central Office Review Committee?

A: I'm saying, if they never received it, how could I appeal it?

*Id.* at 144-45.

During his deposition, Plaintiff confirmed that he never filed a grievance at Upstate regarding the July 1, 2016, incident:

Q: How about when you -- when you got to Upstate on July 15, 2016, did you try putting a grievance in -- filing a grievance there about --

A: No.

Q: -- what had happened at Washington?

A: No. Because I thought it -- my grievance had already -- I thought they already had it. I thought they received it. But after like a month of not hearing nothing from them, I decided to take it upon myself to respond to Upstate grievances, to respond to them because you can't send mail out like that. You got it do it through the Grievance Program.

Q: All right. Am I correct though you could of filed a grievance at Upstate, about something that happened at Washington? Correct?

A: Yes. Because it was -- it was less than twenty-one days that it occurred.

Q: All right. But you didn't -- you didn't do that?

A: No. Because I already did it.

Q: Okay. Do you have a copy of the grievance that you say you filed on July 13 or July 14?

A: No. If I had carbon paper I would of made one, but I didn't have no carbon paper. Usually I do that, but I didn't have carbon paper at the time.

Q: Do you have written proof that you -- you filed that grievance?

A: No. Oh, yeah.

Q: What?

Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 108 of 267

A: I have written proof that I wrote to Albany -- Upstate Inmate Grievance, asking about that grievance and they wrote --

Q: Okay.

A: -- me back saying that they going to contact Washington Correctional Facility and they going to contact me, when they get a response. And when they got a response, they saying that Washington never received a -- a grievance.

*Id.* at 145-47. Plaintiff confirmed he sent a letter to Upstate regarding his grievance:

Q: You're saying that there was a letter from you to Upstate and you said something to the effect, what happened to my grievance at Washington?

A: Yes.

Q: And you said that Upstate wrote back and said we'll look into it?

A: Yeah.

Q: And then eventually, Upstate said there -- nothing was filed?

A: Yeah.

*Id.* at 149. [3]

[3]     Plaintiff did not have a copy of the letters with him at the September 13, 2017, deposition. (Dkt. No. 41-2 at 147.) Plaintiff indicated he would provide copies of the letters to Defendants, provided they were not destroyed in his sister's house fire. *Id.* at 147-48.

**\*4** Defendants have submitted evidence in support of their motion establishing Washington has no record of any grievance filed by Plaintiff regarding the alleged July 1, 2016, incident. (Dkt. No. 41-9 at 2-3.) Matthew L. Waters, Inmate Grievance Program ("IGP") Supervisor, is one of the individuals responsible for keeping records of the grievances filed by inmates at Washington. *Id.* at 2. In his declaration, Waters explains he searched the IGP files to determine if Plaintiff filed any grievance at Washington relating to the alleged July 1, 2016, incident. *Id.* Based upon his search, Waters determined Washington has no record of any grievance filed by Plaintiff relating to any issue connected to

the alleged use of excessive force incident at Washington in July 2016. *Id.* at 2-3.

Defendants have also submitted evidence establishing CORC has no record of an appeal relating to the alleged July 1, 2016, assault. (Dkt. No. 41-8 at 1-2.) Rachel Seguin is the Assistant Director of the DOCCS IGP. *Id.* at 1. In that capacity, she is the custodian of the records maintained by CORC, which is the body that renders final administrative decisions under DOCCS' three-step IGP. *Id.* In her declaration, Seguin explains she searched CORC records and, based upon her search, determined Plaintiff did not file a grievance appeal with CORC related to any issue involving an alleged use of excessive force incident at Washington in July 2016. *Id.* Seguin has attached a computer printout showing that the only CORC appeal filed by Plaintiff was in 2015, concerning an incident at Downstate, and that there are currently no active CORC appeals pending for Plaintiff. *Id.* at 2.

### III. APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c);* *see* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See* *Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

**Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)**
Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 109 of 267

2018 WL 4178226

the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[4] "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

[4]    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**\*5** In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at the point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ...

interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

## IV. PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). While Plaintiff has opposed Defendants' motion, he has failed to respond to Defendants' statement of material as required under L.R. 7.1(a)(3).[5] (Dkt. No. 57.) His response does not mirror Defendants' statement of material facts, nor does Plaintiff specifically admit or deny the statements therein or cite references to evidence in the record supporting of refuting Defendants' statements. *See id.* Where a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a) (3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record,[6] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[7] See *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

[5]    L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[6]    L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, see *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 110 of 267

Hurst v. Molnow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

7    Plaintiff was notified of the consequences of his failure to respond to Defendants' summary judgment motion pursuant to L.R. 56.2. (Dkt. No. 43.)

**\*6** This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V. DISCUSSION

### A. Exhaustion of Administrative Remedies

Defendants argue Plaintiff's excessive force claim arising from the July 1, 2016, incident should be dismissed on the ground that he failed to exhaust his administrative remedies.

### 1. Legal Standard

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) ); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. tit. 7 ("7 NYCRR"), § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3) (ii).

**\*7** Grievances claiming employee harassment, including claims of excessive force, "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. *Id.* § 701.8. [8] The superintendent is required to initiate an in-house investigation by higher

Hurst v. Molnow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. *Id.* § 701.8(d).

8      Section 701.8 has been found applicable to claims of excessive force. *See Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009).

A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent. *Id.* § 701.8(d). The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g).

As set forth above, at each step of the IGP process, a decision must be rendered within a specified time period. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." *Id.* §§ 701.6(g), 701.8(g). Generally, if a plaintiff fails to follow each of the required three step of the above-described IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies and required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.)") (internal quotations and citations omitted) ); *see, e.g., Martin, II v. Niagara Cty. Jail*, No. 05-CV-868 (JTC), 2012 WL 3230435, at *6 (W.D.N.Y. Aug. 6, 2012) (inmate who fails to exhaust his administrative remedies is barred from commencing a federal lawsuit).

Because non-exhaustion is an affirmative defense, Defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95.

## 2. Plaintiff's Failure to Exhaust

Plaintiff has averred that on or about July 14, 2016, he submitted a grievance regarding the July 1, 2016, incident while he was in the SHU at Washington. (Dkt. No. 41-2 at 141-43.) The undisputed record evidence establishes there is no record of this grievance having been filed at Washington or appealed to CORC. (Dkt. Nos. 41-9 at ¶ 9; 41-8 at ¶¶ 3, 4; 41-2 at 143-45.) Therefore, the Court finds Defendants have satisfied their burden of showing that Plaintiff failed to satisfy the exhaustion requirements before commencing this action. *See Woodford*, 548 U.S. at 93. [9]

9      To the extent Plaintiff suggests he "exhausted" his administrative remedies by contacting the Commissioner, Governor, and Inspector General, among others, regarding the July 1, 2016, incident, "[t]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro*, Nos. 14-CV-6606 RJS, 14-CV-6857 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015); *see also Salmon v. Bellinger*, No. 9:14-CV-0827 (LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), *report-recommendation adopted by*, 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017) (collecting cases); *see also Geer v. Chapman*, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."). Thus, Plaintiff's informal complaints, whether written or verbal, outside of the grievance process, are insufficient to exhaust his administrative remedies. *See also Jones*, 549 U.S. at 218 (proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

## 3. Availability of the DOCCS IGP

**\*8** A prisoner's failure to exhaust does not end a court's exhaustion review. While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 112 of 267

Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotations and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and citations omitted).

To guide courts in the "availability" analysis, the Supreme Court has identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. When one of the three circumstances is found, "an inmate's duty to exhaust 'available' remedies does not come into play." *Id.* at 1859. Once a defendant has satisfied the burden of establishing a failure to exhaust, the plaintiff must establish that the IGP was unavailable to him. *See Jones*, 549 U.S. at 216.

The Court finds that the question of availability in this case is governed by *Williams v. Corr. Officer Priatno*, 829 F.3d 118 (2d Cir. 2016), in which the Second Circuit held that the opacity of 7 NYCRR § 708.1(g) rendered the DOCCS IGP procedure unavailable to the plaintiff inmate and found that the plaintiff had exhausted his administrative remedies by giving his grievance to the corrections officer. Defendants' attempt to distinguish *Williams* from the case at bar is unpersuasive. (*See* Dkt. No. 41-11 at 12.)

As in this case, the inmate plaintiff in *Williams* claimed to have drafted a grievance complaining of an assault by corrections officers. *Williams*, 829 F.3d at 120-21. The plaintiff alleged he gave the grievance to a corrections officer for delivery to the IGP office because he was in the SHU. *Id.* Here, Plaintiff testified he placed the grievance in the

mailbox located in the SHU and, in his opposition submission, explains he handed the grievance to a corrections officer to be placed in the SHU mailbox. (Dkt. Nos. 41-2 at 141-43; 57 at 4, 6. [10]) Significantly, the plaintiff in *Williams*, like Plaintiff herein, was transferred to another facility before hearing anything regarding the grievance he had attempted to file. *Id.* As in this case, it was undisputed in *Williams* that the inmate plaintiff never received a response to the unfiled grievance and did not appeal the grievance to CORC under 7 NYCRR § 701.8(g). *Id.* at 125.

[10]    In his opposition submission, Plaintiff states, "Plaintiff is 100% positive that he gave the on duty officer, that was working the special housing unit on July 14, 2016, the inmate grievance envelope to be placed into the facility out-going mailbox. (Dkt. No. 57 at 6.) The Court notes that according to the regulations, inmates in the SHU are instructed to file grievances by giving them to a corrections officer to file on behalf of the inmate. *See* 7 NYCRR § 701.7.

**\*9** The Second Circuit acknowledged in *Williams* that under the DOCCS regulation relevant in both *Williams* and this case, an inmate may appeal a grievance "to the next step" if he does not receive a timely response from the Superintendent. *Williams*, 829 F.3d at 124. The Court concluded, however, that:

> even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]." *Ross*, 136 S. Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

*Id.* (alternations in original). Accepting Williams' allegation that the officer to whom he had given the grievance did not file it, the Court found:

> [u]nder that circumstance, the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies. On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance" would never have been

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 113 of 267

Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)
2018 WL 4178226

triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See. id.* § 701.8(g) ("If the superintendent fails to respond within the required 25 day calendar day time limit the grievant may appeal his/her grievance to CORC.") Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.

*Id.* The Court noted in *Williams* that the obscurity of the regulation was compounded by Williams' transfer to another facility approximately two weeks after having given the grievance to the corrections officer. *Id.* at 126.

Here, Defendants contend Plaintiff has failed to sustain his burden of demonstrating unavailability under *Ross* sufficient to raise a material issue of fact. Specifically, Defendants argue Plaintiff has failed to show that the grievance procedure was so opaque as to render it incapable of use because "the regulations contemplate the very situation Plaintiff allegedly believed he was in—a filed grievance that went unanswered." (Dkt. No. 60 at 5.) In support of their motion, Defendants explain the regulations provide that an inmate who receives no response within the time allotted for response may go directly to the next step of the grievance process. *Id.* (citing 7 NYCRR §§ 701.6(g)(2), 701.8(g)). Thus, after receiving no response from the facility superintendent within 25 days of purportedly submitting his grievance, Plaintiff could have appealed to CORC. *Id.* In short, Defendants argue, "the grievance process provided Plaintiff with a 'clear avenue to proceed.' " *Id.* (quoting *Cicio v. Wenderlich*, 714 F. App'x 96, 97-98 (2d Cir. 2018) (summary order) ("When a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal.") ).[11]

[11]    In *Cicio*, the Second Circuit found that the grievance process in *Cicio's* case was not so opaque that it became "incapable of use." *Cicio*, 714 F. App'x at 97-98 (citing *Ross*, 136 S. Ct. at 1859). In so holding, the Court compared and distinguished Cicio's situation from that of the plaintiff in *Williams. See id.* (*cf. Williams v. Priatno*, 829 F.3d 118, 126 (2d Cir. 2016) (finding that appellate process was too opaque in circumstances where inmate alleged that a prison guard did not file his grievance and the inmate had since been transferred) ). Here, by contrast, the Court finds Plaintiff's circumstances more closely resemble that of the plaintiff in *Williams*. Thus, for the same

reasons, Defendants' reliance on recent rulings by summary order by the Second Circuit are easily distinguishable and inapposite. (*See* Dkt. No. 41-11 at 12.)

**\*10** However, "*Williams* holds that the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Berman v. Drunkin*, No. 9:13-CV-0136 (LEK/DJS), 2017 WL 1215814, at \*8 (N.D.N.Y. Mar. 10, 2017) (emphasis in original), *report and recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017); *see also Juarbe v. Carnegie*, No. 9:15-CV-01485 (MAD/DEP), 2016 WL 6901277, at \*1 (N.D.N.Y. Oct. 7, 2016) ("In *Williams*, the Second Circuit held that when a plaintiff's grievance is both unfiled and unanswered, the regulations do not clearly outline the process to appeal or otherwise exhaust administrative remedies, and therefore, the administrative remedies are unavailable under *Ross*."). Therefore, "[a]s long as [the plaintiff's] grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the Second Circuit's decision in *Williams*[.]" *Juarbe*, 2016 WL 6901277, at \*1.

Here, Plaintiff claims he submitted a grievance at Washington, and the next day he was transferred to Upstate. (Dkt. No. 41-2 at 141-42.) The undisputed evidence demonstrates Washington has no record of Plaintiff's grievance. (Dkt. No. 41-9 at 2-3.) Drawing all inferences in the non-moving party's favor, Plaintiff's grievance was both unfiled and unanswered. In that situation, the Second Circuit has held the procedures "are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Williams*, 829 F.3d at 126 (quoting *Ross*, 136 S. Ct. at 1859). In light of *Williams*, the Court finds material issues of fact as to the availability of the grievance process and whether Plaintiff attempted to exhaust his administrative remedies, precluding summary judgment. *See, e.g., Fann v. Graham*, No. 9:15-CV-1339 (DNH/CFH), 2018 WL 1399331, at \*6 (N.D.N.Y. Jan. 11, 2018) (finding issue of fact as to the availability of administrative remedies where the record suggested the plaintiff submitted grievances, which were unfiled and unanswered), *report and recommendation adopted by* 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018).

Therefore, the Court recommends that Defendants' motion for summary judgment on exhaustion grounds be denied without prejudice and with the opportunity to renew by way of an exhaustion hearing should Defendants request such a hearing.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 114 of 267

Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)

2018 WL 4178226

### B. Official Capacity Claims

The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The immunity granted to the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state, *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006), and, unless waived, bars all money damage claims against state officials acting in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (observing that an inmate-plaintiff's claims for damages against individual corrections department employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity).

Therefore, to the extent Plaintiff seeks monetary damages from C.O. Mollnow and Sgt. Eisenschmidt in their official capacities (*see* Dkt. No. 1 at 2, 15), the Court agrees with Defendants that such claims must be dismissed on Eleventh Amendment grounds. (*See* Dkt. No. 41-11 at 13.)

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be **GRANTED in part and DENIED in part**; and it is further

\*11  **RECOMMENDED** that insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim against Defendants in their official capacities, the motion be **GRANTED**; and it is further

**RECOMMENDED** that insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim against Defendants on exhaustion grounds, the motion be **DENIED without prejudice** to Defendants renewing this argument and requesting an exhaustion hearing, and it is further

\*12  **ORDERED** that the Clerk shall provide Plaintiff with a copy of this Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

\*13  Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [12] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam) ); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

[12]   If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4178226

---

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 115 of 267

Hurst v. Mollnow, Not Reported in Fed. Supp. (2018)

2018 WL 4153926

2018 WL 4153926
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith I. HURST, Plaintiff,

v.

A. MOLLNOW, Correctional Officer, Washington
Correctional Facility; and Eisenschmidt, Sergeant,
Washington Correctional Facility, Defendants.

9:16-CV-1062 (DNH/TWD)
|
Signed August 29, 2018
|
Filed 08/30/2018

**Attorneys and Law Firms**

KEITH I. HURST, 105 Hunter Avenue, #2, Albany, NY
12206, pro se.

BARBARA D. UNDERWOOD, OF COUNSEL: MARK
G. MITCHELL, ESQ., Ass't Attorney General, Attorney
General for the State of New York, The Capitol, Albany, NY
12224, Attorney for Defendants.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

**\*1**  Pro se plaintiff Keith I. Hurst brought this civil rights
action pursuant to 42 U.S.C. § 1983. On July 20, 2018, the
Honorable Thérèse Wiley Dancks, United States Magistrate

Judge, advised by Report-Recommendation that defendants'
motion for summary judgment be granted in part and denied
in part. No objections to the Report-Recommendation were
filed.

Based upon a careful review of the Report-Recommendation,
the Report-Recommendation is accepted in whole. See 28
U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED
in part and DENIED in part;

2. Defendants' motion for summary judgment dismissing
plaintiff's Eighth Amendment excessive force claim against
defendants in their official capacities is GRANTED and those
claims are DISMISSED;

3. Defendants' motion for summary judgment dismissing
plaintiff's Eighth Amendment excessive force claim based on
non-exhaustion is DENIED without prejudice to defendants
renewing this argument and requesting an exhaustion hearing;
and

4. Trial is scheduled for February 5, 2019 in Utica, New York.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4153926

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 116 of 267

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

2017 WL 6756645
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nakia CHANEY, Plaintiff,

v.

Gregory M. VENA, et al., Defendants.

9:15-CV-653 (TJM/ATB)
|
Signed 11/29/2017

**Attorneys and Law Firms**

NAKIA CHANEY, pro se.

JUDITH B. AUMAND, ESQ., for defendants Vena and Bell.

JONATHAN M. BERNSTEIN, for defendant Dagostino.

**REPORT-RECOMMENDATION**

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** This matter has been referred to me for Report-Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In the relevant portion of plaintiff's civil rights complaint, he alleges that defendant D'Agostino refused to provide plaintiff with a suitable mattress to sleep on, while he was incarcerated in the Schenectady County Jail ("SCJ") from October 17, 2014 until May 22, 2015 in violation of his constitutional rights. (Complaint ("Compl.") at 10, 11-12). [1]

[1]    The court will cite to the pages of the complaint as assigned by the court's electronic filing system—CM/ECF.

Presently before the court is a motion for summary judgment filed by Schenectady County Sheriff Dominick D'Agostino. (Dkt. No. 64). Plaintiff has responded in opposition to the motion, defendant D'Agostino has filed a reply, and plaintiff has filed what he has titled a "response" to defendant's memo of law. (Dkt. Nos. 67, 70, 71). For the following reasons, this court finds that the defendant's motion for summary judgment should be granted, and the complaint dismissed in its entirety as against defendant D'Agostino.

**I. Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 U.S. 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

**II. Exhaustion of Administrative Remedies**

**A. Legal Standards**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only

2017 WL 6756645

money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*2** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

Grievance programs and procedures in ***county*** facilities are contained in the regulations governing the New York State Commission of Correction, appearing in the chapter entitled "Minimum Standards and Regulations for Management of County Jails and Penitentiaries," in the part specifically entitled "Grievance Program." N.Y. CODE RULES & REGS. tit.9, §§ 7032.1-7032.11. These regulations specifically provide that the chief administrative officer of the correctional facility shall establish and maintain a formal inmate grievance procedure. *Id.* § 7032.1. The regulations provide that the facility shall maintain grievance forms for the inmates to use and shall make those forms readily available to inmates. *Id.* §§ 7032.4(d), 7032.6. The regulations also provide that instructions for filing a grievance shall be included in the facility rules and regulations as required by section 7002.9(a)(15), and that "[e]ach inmate at any facility shall be advised in writing as to the availability of grievance forms upon admission." *Id.* § 7032.4(b), (c).

An inmate must file his grievance within five days of the date of the conduct giving rise to the complaint. *Id.* § 7032.4(d). The chief administrative officer of the facility designates a staff member to act as a grievance coordinator, and the regulations provide that each grievance shall be fully investigated by an individual who was not personally involved in the circumstances giving rise to the grievance.

*Id.* § 7032.4(e), (f). The regulations specify minimum requirements for the type of information that must be gathered during the investigation of the inmate's grievance. *Id.* § 7032.4 (g)(1)-(g)(4).

The grievance coordinator must issue a written decision within five business days, containing the "facts and reasons underlying the coordinator's determination," and a copy of the determination must be provided to the inmate. *Id.* at 7032.4(i). The plaintiff may appeal an adverse determination to the chief administrative officer or his designee within two business days of receiving the adverse determination. *Id.* § 7032.4 (j). The chief administrative officer renders a decision within five business days, and if the inmate is still not satisfied, he may appeal the adverse decision directly to the Commission of Correction within three business days. *Id.* §§ 7032.4(k), 7032.5.

**\*3** Within three business days after receiving the appeal from the inmate, the chief administrative officer of the facility must mail the appeal to the Commission's Citizens Policy and Complaint Review Council (CPCRC), and the grievance coordinator must provide the inmate with a receipt of mailing. *Id.* § 7032.5(c). The CPCRC has forty-five days within which to issue a written decision. *Id.* § 7032.5(d). In certain circumstances, inmates will be provided assistance at any stage of the proceedings. *Id.* § 7032.9. The chief administrative officer of the facility must keep a centralized record of all grievances, and facility employees are given an orientation on the grievance procedures.[2] *Id.* §§ 7032.10, 7032.11.

[2]       The regulations also provide that if an inmate is released or transferred to another facility prior to the resolution of a grievance, the chief administrative officer "shall cause a determination to be made on such grievance ...", and if the grievance is denied, the chief administrative officer "shall submit the grievance to the [CPCRC] as set forth in section 7032.5 of this Part." 9 NYCRR § 7032.7.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 118 of 267

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake,* ––– U.S. ––––, 136 S.Ct. 1850, 1857, 195 L.Ed.2d 117 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan,* 656 Fed.Appx. 577, 580 (2d Cir. 2016) (quoting *Ross,* ––– U.S. at ––––, 136 S.Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill*—availability and estoppel— are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross,* ––– U.S. at ––––, 136 S.Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles,* 656 Fed.Appx. at 580–81. Defendants bear the burden of proving the affirmative defense of failure to exhaust. *Williams v. Priatno,* 829 F.3d 118, 122 (2d Cir. 2016).

### B. Application

In this case, plaintiff concedes that he did not exhaust his administrative remedies.[3] At the time of his booking into SCJ, plaintiff was given the facility rule book, which contains the instructions for filing grievances. (Def.'s Exs. G, K) (Dkt. Nos. 64-8 at 4 (Booking Sheet), 64-12 at CM/ECF 24-26 (Rule Book) & Ex. M. (Lt. Josua Guerin Aff. ¶¶ 1-5) (Dkt. No. 64-14)). However, plaintiff argues that the Grievance Sergeant "refused to allow the plaintiff to file his grievance...." (Pl.'s Response to Summary Judgment ¶ 2) (Dkt. No. 67). In plaintiff's "Answer to Omnibus Discovery," plaintiff states that his grievance was "refused." (Dkt. No. 64-11 at 5). In the complaint, plaintiff states that he did not file a grievance because he "was repeatedly denied a grievance form because the grievance sergeant claimed another inmate already filed a grievance on [the] issue." (Compl. ¶ 4(b) at 3).

[3]   Although plaintiff states in his complaint that he wrote three letters to defendant D'Agostino, but received no reply, it is well-settled that writing letters to superior officers is not a substitute for proper exhaustion of administrative remedies, both before and after *Ross.* *See*

*McCloud v. Tureglio,* No. 09:07-CV-650, 2008 WL 1772305, at *15 (N.D.N.Y. April 15, 2008) (complaint letters to prison officials did not satisfy exhaustion of grievance process); *Hall v. Bradley,* No. 12-CV-6202, 2015 WL 3964897, at *5 (W.D.N.Y. June 29, 2015) (neither letters to other DOCCS officials, nor conversations with prison officials about the incident satisfy the exhaustion requirement). *See also Rodriguez v. Cross,* No. 15-CV-1079, 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017) (citing (inter alia *Geer v. Chapman,* No. 9:15-CV-952, 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016)), (Rep't-Rec.), *adopted,* 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies.")).

**\*4** In his response to the defendant's summary judgment motion, plaintiff now claims that he did not continue to request a grievance form because the sergeant's "tone" made it clear that he did not wish to continue to discuss the issue, and the sergeant allegedly told plaintiff that the next time he asked for a form, he would be locked in his cell. (Dkt. No. 67 ¶ 13). Plaintiff argues that he "exhausted" his remedies "once he felt threatened by the grievance [sergeant], and "it was determined that plaintiff [would] not receive a grievance." (*Id.* ¶ 16).

Based on *Ross,* the court must now determine whether the grievance process was "available" to plaintiff, given the facts that he has stated.[4] Clearly, the process is technically "available" to plaintiff because there exists a mechanism to file grievances at SCJ. Defendants argue that plaintiff could have filed a grievance, even if one grievance sergeant refused to give plaintiff a grievance form because there are two sergeants in charge of the grievance process, and they work different shifts. The SCJ Inmate Rules and Regulations book confirms that there "is a [Grievance] Sergeant on both active shifts." (Def.'s Ex. J at CM/ECF p.26) (SCJ Rule Book at 34).

[4]     As stated above, "estoppel" based on official action impeding exhaustion, is now part of the "availability" analysis. Therefore, the court will consider both of plaintiff's reasons to excuse his failure to exhaust under the umbrella of "availability."

The fear of retaliation must be "reasonable" to render the grievance procedure "unavailable." *Harrison v. Stallone,* No.

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

9:06-CV-902, 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) (citing *Thomas v. Cassleberry*, No. 03-CV-6394, 2007 WL 1231485, at *1-2, 2007 U.S. Dist. LEXIS 30129, at *3-6 (W.D.N.Y. April 24, 2007)). Plaintiff's statement that the Sergeant's "tone" made plaintiff fear "retaliation," is not a "reasonable" fear of retaliation. If such an allegation rendered the process unavailable, it would be quite simple for inmates to circumvent the grievance procedure by making a conclusory statement that the officer's "tone" was aggressive or threatening. Thus, in itself, plaintiff's allegation that he felt "threatened" by the Sergeant's tone of voice does not excuse plaintiff from completing the grievance process. Plaintiff's claim that the sergeant vaguely threatened to lock plaintiff in "his" cell is also fails to rise to the level of a "reasonable" fear of retaliation. Inmates are always locked in their cells, and plaintiff does not allege that the sergeant made any other "threats" of physical harm or false charges to accompany that statement. Thus, plaintiff's fear of "retaliation" is insufficient to excuse the exhaustion requirement.

Plaintiff's other reason for failing to file a grievance requires more consideration. In his complaint, plaintiff claims that he was denied a grievance "form" because another inmate's grievance raising the mattress issue had been denied. (Compl. ¶ 4(b)). In his answers to defendant's interrogatories, plaintiff states that the Grievance Sergeant did not "accept" his grievance because the other inmate's grievance on the same issue had been denied. (Dkt. No. 64-11 at 2) (Interrogatory Ans. Nos. 8-11). Plaintiff states that he complained to the officers on the unit and to a grievance sergeant whose names plaintiff does not remember. Plaintiff then states that he complained to Grievance Sergeant "Nick named Russia,"[5] and then repeats that his grievance was not "accepted." (*Id.*)

[5]      The court assumes that plaintiff intends to say that the sergeant was "nicknamed" Russia.

  **\*5**  Defendants have attached a copy of the other inmate's grievance to their Reply. (Dkt. No. 70 Ex. A). A review of the grievance shows that in October of 2014, Inmate Tracy Hunter filed a grievance complaining about various issues, including the thickness of the mattresses upon which the inmates were required to sleep. (Dkt. No. 70-1 at 10). Inmate Hunter's grievance was investigated and denied at the facility level as well as by the CPCRC, "sustain[ing] the action taken by the facility administration." (Dkt. No. 70-1 at 3). The letter from the CPCRC is dated March 23, 2015. (*Id.*) The decision of Sergeant Greg Cufari, who signs as the Grievance Coordinator Schenectady County

Sheriff's Department, states in relevant part, that Inmate Hunter complained about the mattresses at the facility because of a law suit "detailing the same complaint ... which is outlined in this grievance." (*Id.* at 4). Sergeant Cufari then states that Inmate Hunter had been at SCJ for almost one year before ever complaining about the mattresses, and it was Sergeant Cufari's opinion that "Inmate Hunter is attempting to follow the same frivolous suit for a quick pay day." (*Id.* at 5).

The SJC Inmate Rule Book states that if the Grievance Sergeant cannot resolve the inmate's problem "informally," after the inmate has discussed the issue with his Floor Officer and his supervisor, "and provided that [the] complaint is a grievable matter, a grievance form ***will be provided*.**" (Dkt. No. 64-12 at 26). After completing the form, the inmate returns the form to the Grievance Sergeant.[6] (*Id.*) It appears that providing the form to the inmate is the responsibility of the Grievance Sergeant, who also makes the determination of whether the problem is grievable.

[6]      In his response to the defendant's motion, plaintiff states that "all grievances are types [sic] up by the grievance sgt. If he decides to give an inmate a grievance at his discretion." (Dkt. No. 67 ¶ 10). The rules are contrary to plaintiff's statement, as is the grievance filed by Inmate Hunter. The Rule Book states that inmates obtain the grievance form from the sergeant, but the inmate completes the form and returns it to the sergeant. Inmate Hunter's grievance is clearly handwritten. (Dkt. No. 70-1 at 6-10). In fact, the form states that it is to be "*(Completed by the grievant)*." (*Id.* at 6) (Italics in original). Plaintiff's apparent inaccuracy or "embellishment" does not change this court's opinion regarding exhaustion.

While it is undisputed that a problem with plaintiff's mattress is a grievable issue, plaintiff claims that his grievance was not "accepted" because he was told that Inmate Hunter's grievance on the same issue had been denied. The court notes that the rationale for the denial of Inmate Hunter's mattress grievance lends itself to supporting plaintiff's allegations. If the officer who investigated Inmate Hunter's grievance believed that the claim was "frivolous," and that the grievance was filed in response to an article that Inmate Hunter read about a law suit against another facility, then it is reasonable to assume that when plaintiff asked about filing a grievance relating to mattresses,[7] he could have been told that it would

2017 WL 6756645

be futile to file the grievance. If the Grievance Sergeant refused to "accept" [8] such a grievance and denied plaintiff the grievance form, then it is arguable that administrative remedies were not "available" to the plaintiff in that situation. The same result was possible regardless of which grievance sergeant plaintiff asked.

[7]     Since the rules specify that an inmate must explain what he wants to grieve so that the Grievance Sergeant can make the determination whether the problem is "grievable," then plaintiff would have to tell the Grievance Sergeant that he wished to file a grievance about his mattress before the Grievance Sergeant gave plaintiff the grievance form.

[8]     Plaintiff uses the words "accept" and "denied," when it is clear that he did not write a grievance. In addition, if the grievance sergeant did not give plaintiff the form, and no grievance was filed, then the grievance was not "denied." However, this court has interpreted plaintiff's statements to mean that he was denied the opportunity to write and file a grievance by the sergeant.

**\*6** The court notes that very recently the Second Circuit has discussed an inmate's claim that administrative remedies were "unavailable" because he was in disciplinary housing and the officers refused to give him grievance forms. *See Kearney v. Gebo*, —— Fed.Appx. ——, 2017 WL 5256820 (2d Cir. Nov. 13, 2017). In *Kearney*, the court held that even if the officers refused to give the plaintiff grievance forms, the New York State regulations expressly allowed grievances to be filed on any kind of paper. Moreover, plaintiff Kearney had written letters of complaint to the Inspector General and to the Commission of Correction, showing that he had both paper and writing implements. *Id.* at ——, 2017 WL 5256820 at \*2. Thus, the court found that the grievance procedure was "available" to Kearney. *Id.*

This case is distinguishable from *Kearney* based on the evidence in the record. SCJ is a County Facility which has its own specific rules for filing grievances, [9] stated in its Rule Book, which rules are consistent with the New York Rules and Regulations cited above. The Grievance Sergeant makes the determination of whether the inmate's problem is "grievable," and only then, is the inmate given a grievance form to complete. The inmate must return the completed form to the Grievance Sergeant who is responsible for collecting the grievances and making the initial determination. (*See*

Def.'s Ex. K, Rule Book at p.34) ("after completing the form, return it to a Grievance Sergeant.... Within five (5) days of the receipt of the grievance, *the Grievance Sergeant shall issue a written determination.*" (emphasis added)).

[9]     New York State Correctional Facilities are governed by Title 7 of the NYCRR, while County Jails are governed by Title 9 of the NYCRR.

If the Grievance Sergeant believed that plaintiff's complaint was "frivolous" because he was already aware of such a claim by Inmate Hunter, he may have refused plaintiff's request for a grievance form and could have told plaintiff that such a claim was not acceptable because it had already been found to be frivolous and denied. Thus, whether the grievance was filed on a grievance form or if plaintiff had written it on any other sheet of paper, the Grievance Sergeant would still have been responsible for collecting the grievance and making the initial determination. [10] If the Grievance Sergeant refused to accept the grievance, the rules do not provide plaintiff with any other option for having the grievance heard.

[10]    The rules also provide that the Grievance Sergeant first attempts to resolve "the problem informally." (Def.'s Ex. K, Rule Book at 34). The rules leave the inmate's grievance completely in the hands of the Grievance Sergeant.

This court is *not* making a finding that the Grievance Sergeant refused plaintiff's grievance or his attempt at obtaining forms to file the grievance. However, plaintiff's allegations and the evidence submitted show that there is a question of fact regarding the "availability" of administrative remedies for plaintiff's grievance. The question of whether plaintiff was misled or impeded by the Grievance Sergeant cannot be decided based on the documents submitted alone. Therefore, this court cannot recommend granting summary judgment in favor of defendant D'Agostino based upon a failure to exhaust.

### III. Personal Involvement

#### A. Legal Standards
Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 121 of 267

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

involved in a constitutional deprivation, and thus be subject to individual liability.

**\*7** A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.,* 811 F.Supp.2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith,* No. 09-CV-1058, 2015 WL 5750136, at \*8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

### B. Application

Defendant D'Agostino has submitted an affidavit in which he states that he never created a policy or custom of providing inmates with inadequate mattresses. (D'Agostino Aff. ¶ 2). Defendant D'Agostino also states that "at no time" while plaintiff was incarcerated at SCJ in 2014 and 2015, was defendant D'Agostino aware that plaintiff did not receive a new mattress or that anyone denied plaintiff a new mattress. (*Id.* ¶ 3). Defendant D'Agostino states that he was not aware that plaintiff had any medical condition or other issue that would have warranted supplying plaintiff with a new mattress, and that the defendant "had no involvement in denying Plaintiff a new mattress or supplying Plaintiff with an alleged inadequate mattress." (*Id.*)

In his complaint, plaintiff alleges that he wrote letters to defendant D'Agostino, but he never received a response. (Compl. at 11-12). Plaintiff further states in his complaint that defendant D'Agostino "need[s]" to inspect the mattresses at his facility and provide mattresses that "he" would sleep on. (Compl. at 14). In his answer to the defendant's interrogatories, plaintiff states that he sent letters to defendant D'Agostino, but adds that he "had direct contact with [D']Agostino during his tour/walk through about the mattress and he told me to talk [to] the floor officer who directed me to the grievance sgt.[ ]...." (Def.'s Ex. J at p.2, ¶ 5). In another document, entitled "Plaintiff's Answer to Omnibus Discovery," plaintiff states that he "spoke" with defendant D'Agostino "as Sgt. Nicknamed Russia refused to accept my grievance." (Def.'s Ex. J at p.3 ¶ 2). In his response to defendant's motion for summary judgment, plaintiff states that defendant D'Agostino should be "held accountable for all incidents within his facility." (Dkt. No. 67 ¶ 15).

Clearly, the plaintiff's statements, implying that defendant D'Agostino must be "held accountable" for the incidents in his facility merely restate the doctrine of respondeat superior, which is not applicable in section 1983 actions. Plaintiff's additional statement that defendant D'Agostino should be inspecting the mattresses at his facility to make sure that they are acceptable is also not sufficient to establish personal involvement by the Sheriff.

**\*8** Even if the court accepts the fact that defendant D'Agostino failed to respond to letters of complaint sent by plaintiff, this conduct alone would still be insufficient to establish personal involvement. *Thompson v. Pallito,* 949 F.Supp.2d 558, 575-76 (D. Vt. 2013) (citing cases). If merely writing an unanswered letter to a superior officer were sufficient to establish personal involvement, it would "contravene the black-letter principle that § 1983 does not allow for respondeat superior liability." *Id. See also Jones v. Rock,* No. 9:12-CV-447, 2013 WL 4804500, at \*16 (N.D.N.Y. Sept. 6, 2013) (letters to superior officers insufficient to establish personal involvement). *Cf. Guillon v. City of New Haven,* 720 F.3d 133, 141 (2d Cir. 2013) (in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), inmates who allege that they sent a complaint or grievance letter to a prison official are entitled to have the court draw that reasonable inference for *pleading purposes*).

Personal involvement will be found if the supervisory official "receives **and** acts on a prisoner's grievance or otherwise

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 122 of 267

2017 WL 6756645

reviews and responds to a prisoner's complaint." *Johnson v. Wright*, 234 F.Supp.2d 352, 363-64 (S.D.N.Y. 2002) (emphasis added) (citing inter alia *Ramos v. Artuz*, No. 00 Civ. 149, 2001 WL 840131, at *8-10 (S.D.N.Y. July 25, 2001) (personal liability established where prison official "sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff")). In addition, personal involvement will be established if the official actually reviews plaintiff's "ongoing" grievance and fails to "remedy the wrong." *See e.g. Sanchez v. Graham*, No. 9:12-CV-1646, 2016 WL 5854551, at *7 (N.D.N.Y. Sept. 12, 2016), (Rep't-Rec.), *adopted*, 2016 WL 5852511 (N.D.N.Y. Oct. 6, 2016); *Young v. Choinski*, 15 F.Supp.4th 172, 192-93 (D. Conn. 2014) (citing inter alia *Vega v. Artus*, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (personal involvement established where an officer reviewed a grievance about an ongoing violation and the supervisor was authorized to remedy the violation directly)).

However, personal involvement will not exist if the superior officer receives a complaint, but delegates the response and/or investigation to a subordinate. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997). In this case, plaintiff claims in his response to defendant's motion that he had "direct contact" with the Sheriff, and that defendant D'Agostino told plaintiff to speak with the floor officer. However, plaintiff has never alleged when this alleged conversation with D'Agostino took place, nor has he ever indicated when he wrote letters to the defendant. Plaintiff only alleges in his complaint that he wrote letters to defendant D'Agostino and had not received any response as of May 15, 2015—shortly before filing the instant complaint. (Compl. at p.12). Such vague allegations are insufficient to establish personal involvement. *See Guillory v. Cuomo*, 616 Fed.Appx. 12, 14 (2d Cir. 2015) (affirming sua sponte dismissal when plaintiff did not allege when and where the letters to defendant Cuomo were sent, what they said, or how they were sent).

Even assuming the truth of plaintiff's statement, defendant D'Agostino's alleged advice to plaintiff to address his issues to the floor officer, is equivalent to referring plaintiff's letter of complaint to a subordinate for investigation. The fact that defendant D'Agostino directed plaintiff to subordinates for obtaining relief does not create personal involvement in the alleged violation that plaintiff was attempting to remedy. *See Smith v. City of New York*, No. 14 Civ. 5927, 2017 WL 2172318, at *8 (S.D.N.Y. May 16, 2017) (granting summary judgment based on a lack of personal involvement because "mere complaints made to supervisory defendants are not

enough to establish supervisory liability) (citing *Faulk v. New York City Dep't of Corrections*, No. 08 Civ. 1668, 2014 WL 239708, at *10 (S.D.N.Y. Jan. 21, 2014) (granting summary judgment where plaintiff alleged only that he spoke to the warden several times about his grievances)).

**\*9** Although plaintiff also states that he "spoke" with defendant D'Agostino, "as" the Sergeant refused to accept plaintiff's grievance, this statement is vague and to conflict with plaintiff prior statement in which he claims that when he spoke to defendant D'Agostino, the Sheriff told plaintiff to speak with the floor officer. (Def.'s Ex. J at 2-3). The fact that plaintiff may have spoken to defendant D'Agostino about his grievance is insufficient to show that defendant D'Agostino was personally involved in violating plaintiff's constitutional rights, given plaintiff's statement that D'Agostino told plaintiff how he needed to go about complaining about his mattress. *Faulk, supra.* Thus, this court finds that plaintiff has failed to allege the requisite personal involvement to sustain a section 1983 action against defendant D'Agostino. [11]

[11]    Because I have found a lack of personal involvement by defendant D'Agostino, I need not address defendant's claim of qualified immunity.

## IV. Cross-Claims

Defendant D'Agostino has moved for dismissal of the cross-claims asserted by defendants Vena and Bell, Niskayuna Police Officers. (*See* Dkt. No. 23, ¶ 52). Defendants Vena and Bell allege that any injuries or damages sustained by plaintiff as a result of the incident described in plaintiff's complaint "were sustained in whole or in part by reason of the negligence and culpable conduct of the co-defendants." (*Id.*) Defendants Vena and Bell also seek apportionment of liability. (*Id.*)

Plaintiff has brought this claim pursuant to 42 U.S.C. § 1983, claiming that defendants violated his federal constitutional rights. [12] Section 1983 does not provide an express right to contribution or indemnification. *Taifer v. Catherines Stores Corp.*, No. 06 Civ. 2976, 2008 WL 7728651, at *3 (S.D.N.Y. May 28, 2008) (citing *Carrion v. City of New York*, No. 01 Civ. 2255, 2002 WL 31107747, at *3 (S.D.N.Y. Sept. 23, 2002) (citations omitted); *Hayden v. Hevesi*, No. 05-CV-0294E, 2007 WL 496369, at *4 (W.D.N.Y. Feb. 12, 2007)). In addition, under New York law, indemnification

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 123 of 267

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6756645

is only available when there is either an express or implied agreement between the parties. *Id.*

12      Plaintiff briefly mentions the New York State Constitution, but the case is essentially brought under section 1983.

In this case, defendant D'Agostino, Sheriff of Schenectady County was named as a defendant in connection with conditions of confinement at SCJ, while defendants Vena and Bell, Niskayuna Police Officers were named in connection with an allegedly unconstitutional search during plaintiff's arrest. (Compl. *generally*). The only remaining claim against defendant D'Agostino was in relation to his claimed denial of a constitutionally adequate mattress. This issue is completely unrelated to the claims against defendants Vena and Bell, and there is certainly no indication of any agreement with these unrelated officers, who do not even work for the same municipality. In addition, defendants Vena and Bell have failed to respond to defendant D'Agostino's motion, notwithstanding the great amount of time that has passed since its filing on June 1, 2017. Thus, the court can only assume that defendants Vena and Bell do not oppose dismissal of their frivolous cross-claims. Based on the law, and the failure of the defendants to oppose defendant D'Agostino motion, this court recommends that any cross-claims filed by defendants Vena and Bell be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant D'Agostino's motion for summary judgment (Dkt. No. 64) be **GRANTED**, and the complaint dismissed in its entirety as against defendant D'Agostino based on a lack of personal involvement, and it is

**RECOMMENDED**, that defendant D'Agostino's motion for summary judgment as relates to cross-claims filed by defendants Vena and Bell (Dkt. No. 64) be **GRANTED**, and any such cross-claims be **DISMISSED.**

 **\*10**  Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6756645

## Footnotes

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 124 of 267

Chaney v. Vena, Not Reported in Fed. Supp. (2017)

2017 WL 6734186

2017 WL 6734186
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nakia CHANEY, Plaintiff,
v.
Gregory M. VENA, et al., Defendants

9:15-CV-653 (TJM/ATB)
|
Signed 12/28/2017
|
Filed 12/29/2017

**Attorneys and Law Firms**

Nakia Chaney, Schnenectady, NY, pro se.

Judith B. Aumand, Burke, Scolamiero Law Firm, Jonathan M. Bernstein, Chelsea E. Manocchi, Goldberg, Segalla Law Firm, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

**\*1**  This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In his Report-Recommendation dated November 29, 2017 (Dkt. No.

92), Magistrate Judge Baxter recommends: (1) that defendant D'Agostino's motion for summary judgment (Dkt. No. 64) be granted, and the complaint dismissed in its entirety as against defendant D'Agostino based on a lack of personal involvement, and (2) that defendant D'Agostino's motion for summary judgment as relates to cross-claims filed by defendants Vena and Bell (Dkt. No. 64) be granted, and any such cross-claims be dismissed. No objections to the Report-Recommendation have been filed, and the time to do so has expired.

**II. DISCUSSION**

After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ACCEPTS** the Report-Recommendation (Dkt. No. 92) for the reasons stated therein. Defendant D'Agostino's motion for summary judgment (Dkt. No. 64) is **GRANTED**, and the complaint is **DISMISSED** in its entirety as against defendant D'Agostino. Further, defendant D'Agostino's motion for summary judgment as relates to cross-claims filed by defendants Vena and Bell (Dkt. No. 64) is **GRANTED**, and any such cross-claims are **DISMISSED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6734186

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)
Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 125 of 267
2017 WL 2791063

2017 WL 2791063
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edy RODRIGUEZ, Plaintiff,
v.
J. CROSS, Sergeant, Clinton
Correctional Facility; et al., Defendants.

No. 15-CV-1079 (GTS/CFH)
|
Signed 05/09/2017

**Attorneys and Law Firms**

Edy Rodriguez, East Elmhurst, NY, pro se.

Ryan E. Manley, Harris, Conway & Donovan, Christopher J. Hummel, New York State Attorney General, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1**  Plaintiff pro se Edy Rodriguez ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that Sergeant ("Sgt.") J. Cross, Sgt. R. Furnia, Correction Officer ("C.O.") G. Falcon, and C.O. J. Roberts (collectively "Defendants") violated his constitutional rights under the First and Eighth Amendments. Dkt. No. 1 ("Compl."). [2]

[2]    On March 27, 2017, this Court granted plaintiff an extension until May 1, 2017 to file a motion to amend his complaint. Dkt. No. 38. The deadline has expired and plaintiff has not filed a motion to amend his complaint.

Presently pending is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(a) for plaintiff's failure to exhaust administrative remedies before commencing this action. Dkt. No. 26. Plaintiff filed a response in opposition to defendants' motion. Dkt. No. 34. Defendants filed a reply. Dkt. No. 39.

**I. Background**

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II(A) infra. At the relevant times giving rise to plaintiff's claims, plaintiff was an inmate incarcerated at Clinton Correctional Facility ("Clinton").

On July 10, 2014, plaintiff wrote a letter to Sgt. Cross "complaining about being harassed" by staff at Clinton. Compl. at 4. Plaintiff further alleges that he was taken out of his cell on July 14, 2014, brought to the second floor of the facility's hospital, and subjected to a "beating" by defendants. Compl. at 4-5. Sgt. Cross grabbed him by the hair; Sgt. Furnia punched him; and C.O. Falcon and C.O. Roberts punched him in the face, back, and neck. Id. at 4. Plaintiff alleges "each one of the blows" he suffered was from the named defendants, as well as other officers he cannot identify by name. Id. at 5-6. After the alleged incident, plaintiff was seen by a nurse with "about ten" officers present in the room, where he admits "having no choice," but to tell the nurse that officers had just beat him up. See Affirmation of Christopher J. Hummel ("Hummel Aff."), Dkt. No. 26-1, Exhibit ("Exh.") A [3] at 59-60. [4]

[3]    Exhibit A to the Affirmation of Christopher J. Hummel is a transcript of plaintiff's deposition, held on September 19, 2016 at Great Meadow Correctional Facility. See Dkt. No. 26-1.

[4]    When citing documents within the record, the Court uses the page numbers generated by CM/ECF.

While at Clinton, plaintiff filed five grievances. See Declaration of Christine Gregory ("Gregory Decl."), Dkt. No. 26-3 Exh. A at 6. Only one grievance was appealed. Declaration of Jeffrey Hale ("Hale Decl."), Dkt. No. 26-2 ¶¶ 12-13. The subject matter of the single appealed grievance does not concern the matter before the Court. Id. ¶ 12. The only grievance filed that is pertinent to the pending motion was filed on July 29, 2014. See Gregory Decl. Exh. B at 8. This grievance alleges that plaintiff suffered "an assault by (C.O.)" and, following the assault, did not receive appropriate

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 126 of 267

medical care. Id. The investigation into the July 29, 2014 grievance concluded that plaintiff saw his medical provider, and medicine was given to him without any further action. Id. at 10. The investigation did not mention anything about an assault. Id.

**\*2** Plaintiff alleges that he filed a grievance regarding the incidents described in his complaint, but an unidentified Sergeant destroyed the grievance. Compl. at 2. He also alleges that he was beaten by correction staff for filing the grievance. Id. Plaintiff also states that he filed a handwritten grievance (not on a grievance form) on July 19, 2014, regarding the July 14, 2014 incident. See Hummel Aff. Exh. A at 93. Plaintiff alleges that he sent a copy of this grievance to his mother and instructed her to send it directly to Clinton "[f]rom outside." Id. at 94. Defendants have no record of this grievance being filed. See Gregory Decl. Exh. A at 6. Plaintiff never inquired further about the July 19, 2014 grievance, but maintains that he has handwritten copies of the grievance since he did not have access to carbon paper when he originally drafted this grievance. See Hummel Aff. Exh. A at 94-95, 96-97. The July 19, 2014 grievance was drafted while plaintiff was in keeplock. Id. at 93.

Plaintiff further alleges, in his response to defendants' motion for summary judgment, that defendants have total control over facility mail and any failure to exhaust administrative remedies occurred because defendants strategically removed grievances from the mailbox to cover up their use of excessive force against plaintiff. See Dkt. No. 34 at 4. Plaintiff further alleges a general belief that there is a pattern of prison officials threatening and retaliating against inmates for filing grievances, thus making administrative remedies unavailable. Id. at 6. Lastly, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or the complaint does not involve staff misconduct. Id. at 8.

## II. Discussion [5]

[5] All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

Plaintiff alleges that defendants retaliated against him in violation of the First Amendment, used excessive force

against him in violation of the Eighth Amendment, and violated his Due Process rights under the First and Fourteenth Amendments. See Compl. at 7. Defendants argue that plaintiff's complaint should be dismissed in its entirety as plaintiff failed to exhaust his administrative remedies with respect to the causes of action outlined in the Complaint. See Defendants' Memorandum of Law, Dkt. No. 26-5 at 3.

### A. Legal Standard For Motions Pursuant to Fed. R. Civ. P. 56(a)

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "In determining whether summary judgment is appropriate, [the Court] will resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Carey, 923 F.2d at 19. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. Partnership, 22 F.3d, 1219, 1224 (2d Cir. 1994).

**\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 U.S. 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

Case 9:18-cv-01067-DNH-TWD Document 37 Filed 08/03/20 Page 127 of 267

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law" ....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

## B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 WL 2708424, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the

Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

*4 Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. Id. at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 128 of 267

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### 1. Application

First, the Court will address whether there is any genuine dispute that plaintiff failed to exhaust his administrative remedies. Courts in the Second Circuit have consistently held that any informal procedures or relief outside of the administrative procedures do not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (holding that regardless of whether prison officials know of plaintiff's complaints in a "substantive sense," procedural exhaustion of remedies must still occur); Ruggiero v. Cty. of Orange, 467 F.3d 170, 177-78 (2d Cir. 2006); Perez v. City of N.Y., No. 14 CIV. 07502(LGS), 2015 WL 3652511, at *4 (S.D.N.Y. June 11, 2015) ("Plaintiff's allegation that he advised others of his grievance does not excuse his failure to exhaust the administrative process.").

Here, subsequent to the alleged events giving rise to the matter before the Court, plaintiff states he and family members contacted the Inspector General's Office to complain about prison conditions and concerns of plaintiff's safety. See Hummel Aff. Exh. A at 89, 90. Such correspondence does not satisfy exhaustion and falls outside of the grievance procedures. See Geer v. Chapman, No. 9:15-CV-952(GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies."); Salmon v. Bellinger, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), report and recommendation adopted by, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016) (holding that letters sent to the Inspector General do not satisfy exhaustion procedures).

**\*5** After the alleged incident of excessive force, plaintiff was seen by a nurse in a room with "about ten" officers present, where he admits "having no choice" but to tell the nurse that the officers had beat him up. Hummel Aff. Exh. A at 59-60. Plaintiff alleges filing grievances on July 19, 2014 and July 29, 2014 that mention the assault. See id. at

93; Gregory Decl. Exh. B at 6, 8-10. Defendants state that there is no record of appeal on any grievances pertaining to the alleged assault. Gregory Decl. ¶ 15. While plaintiff's complaints were aired verbally and in writing, plaintiff failed to utilize the procedures required to exhaust administrative remedies. Timmons v. Schriro, No. 14-CV-6606(RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."). Thus, there is no genuine dispute that plaintiff failed to exhaust administrative remedies.

As a result, the Court must determine whether administrative remedies were in fact available to plaintiff. See Ross, 136 S. Ct. at 1858 ("An inmate ... must exhaust available remedies, but need not exhaust unavailable ones"); Mena v. City of New York, No. 13-cv-2430(RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing Ross, 136 S. Ct. at 1862) ("[T]he lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him."). Plaintiff sets forth three factual arguments as to why administrative remedies were not available to him. First, plaintiff alleges that the grievance procedures were unavailable to him because he was denied access to paper and writing instruments. See Compl. at 3. Next, plaintiff alleges that he was physically beaten when he attempted to take steps to utilize the grievance process. Id. Lastly, plaintiff suggests that he never received a response to his grievance, his mail was tampered with, and his letters were not delivered. See Hummel Aff. Exh. A at 91-92, 94.

### a. Lack of Paper and Pen to
### Complete Grievance Procedures

The third prong of Ross is triggered by plaintiff's argument that he was denied access to pen and paper, as it shows an alleged attempt to stop him from taking part in the grievance process. When a plaintiff-inmate asserts that a defendant-facility withheld pens, courts have granted summary judgment against a plaintiff when "the record does not show that "[p]laintiff indicated to prison officials that he needed a pen so he could file a grievance or that prison officials refused to provide him a pen for this purpose." Mena v. City of N.Y., No. 12 CIV. 6838(GBD), 2013 WL 3580057, at *2 (S.D.N.Y. July 10, 2013). When an inmate argues that a correction officer denies him access to pen or paper, even

2017 WL 2791063

assuming the allegations are true, courts examine whether the inmate was drafting other documents during the same time period, or whether they were able to access materials from other sources. See Williams v. Ramos, No. 13 CV 826(VLB), 2015 WL 864888, at *3 (S.D.N.Y. Feb. 9, 2015) ("It is unclear how plaintiff was able to submit [other] grievances if defendants took his pens and paper and threatened him ... Moreover, when defendants allegedly stole his pens and papers, plaintiff testified he was able to file grievances on his commissary sheet."); Lahoz v. Orange Cty. Jail, No. 08 CIV. 4364(RWS), 2010 WL 1789907, at *3 (S.D.N.Y. Apr. 29, 2010) (stating that an inmate was not deprived of writing materials when he drafted a handwritten letter during the same time period as the grievance process).

Here, the Court notes contradictory statements within the complaint pertaining to plaintiff's access to writing instruments or paper. When prompted as to why facts relating to the complaint were not presented in the grievance program, plaintiff asserts that he was denied a paper or pen. Compl. at 3. However, plaintiff also states that he wrote a grievance, the grievance was destroyed by a Sergeant, and he was beaten in retaliation for writing the grievance. See id. at 2. The only time plaintiff asserts that he was denied a paper and pen was when he was taken to the Special Housing Unit ("SHU")[6] on July 14, 2014 after the alleged incident. See id. at 3; Hummel Aff. Exh. A at 68. In fact, records indicate that plaintiff filed grievances on July 19, July 29, August 4, and November 19 of that same year.[7] Gregory Decl. Exh. A at 6. Plaintiff does not allege any difficulties obtaining a pen and paper after the July 2014 SHU stay, but rather, admits having "a piece of paper that an inmate had and a pen" on at least one occasion. See id. at 94.

[6]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

[7]    Both the August and November grievances are unrelated to the cause of action before the Court. Gregory Decl. Exh. A at 6.

*6  Lastly, in his response to defendants' motion for summary judgment, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or if their complaint does not involve staff misconduct. Dkt. No. 34 at 8. Such general allegations without any factual support are insufficient to show that procedures were unavailable, coupled with the fact that, grievances can and have been submitted by plaintiff on plain paper. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1) ("If this form is not readily available, a complaint may be submitted on plain paper."); see Veloz v. N.Y., 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) (granting summary judgment where plaintiff does not allege that any specific officer thwarted his efforts to timely file a grievance); Hummel Aff. Exh. A at 94.

Even if the Court assumes that plaintiff was denied access to pen and paper while in the SHU, the grievances filed in July 2014 were filed within the twenty-one calendar days required, and his subsequent failure to exhaust administrative remedies regarding those grievances is unaffected by any denial of pen and paper that occurred in the past. Thus, the Court rejects plaintiff's argument as there is no genuine dispute of fact that administrative remedies were unavailable due a lack of writing instruments or paper.

### b. Allegation that Grievance Was Not Received and Mail Tampering

Courts have long held that where an inmate does not receive a response to a written grievance, the inmate must appeal to the next level of review. See Khudan v. Lee, No. 12-cv-8147(RJS), 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing a plaintiff's complaint where plaintiff failed to appeal to the next level of review after not receiving a response to his filed grievance); see also Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming.").

However, recent decisions by courts in the Second Circuit have addressed the availability of administrative remedies when an inmate's grievance is unfiled and unanswered. These

2017 WL 2791063

cases have focused on the second prong of the Ross test, where a grievance process becomes unusable for an inmate. Ross, 136 S. Ct. at 1859. In Williams v. Priatno, the Second Circuit held that when an inmate's grievance is not filed, "the regulations clearly do not describe a mechanism for appealing a grievance." See 829 F.3d at 126. Thus, "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." Id. The Williams ruling relied upon a scenario where an inmate is housed in a SHU and personally gives a grievance to a correction officer, as required by grievance procedures. Id. at 120-21. Additionally, adding to the "opaque" nature of the procedures, the plaintiff in Williams followed up when he did not receive a response after a week, but was subsequently transferred one week later without any resolution or knowledge of his grievance being filed. Williams, 829 F.3d at 120-21. Ultimately, the Williams Court held that "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." Id. at 126.

Here, in his September 19, 2016 deposition, plaintiff sets forth facts suggesting prison staff filtered his mail and "when they [saw] grievances" they were thrown to the side, not delivered, "and were never [ ] seen." See Hummel Aff. Exh. A at 91-92. The grievance that plaintiff allegedly filed on July 19, 2014 was sent to the Clinton grievance office by his mother. Id. at 94. Plaintiff never received a response on the grievance or followed up on the status of the grievance. Id. Without concrete facts, plaintiff states that his grievance was not resolved because "no civilian ... picks up your grievances. It's officers." Id. at 91. Plaintiff's allegations of mail tampering are conclusory and weakened by the fact that other correspondence, including complaints, were sent and received during the general time period material to the issues before the Court. Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) ("Plaintiff makes only a conclusory statement that his mailing was not allowed to leave the facility[,] ... his contention ... is belied by his admission that he was able to send other complaints about the matter to various New York State officials at around the same time."); see Hummel Aff. Exh. A at 89, 94 (providing an example where plaintiff successfully sent legal mail to his mother).

 *7  In plaintiff's response in opposition to defendants' motion for summary judgment, he raises general complaints about defendants having total control over facility mail and defendants strategically removing grievances from the mailbox to cover up their excessive use of force against plaintiff and other inmates. See Dkt. No. 34 at 2. Plaintiff's bare assertions do not excuse exhaustion requirements. Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations. Khudan, 2016 WL 4735364, at *6 (citations omitted) (holding that under Ross, mere stand alone contentions of mail tampering without support and particularity cannot deem administrative remedies unavailable); Veloz, 339 F. Supp. 2d at 516 (holding that summary judgment is proper where the plaintiff contends that officers misplaced his grievances, but offers no evidence to support his claim). In Khudan, the court did not consider or rely upon conclusory allegations when plaintiff attested he "was informed by other [unnamed] inmates that grievances routinely go 'missing.' " Khudan, 2016 WL 4735364, at *6. This is similar to plaintiff's conclusory theory of injustice and displeasure with mail procedures, and other "recurrent pattern[s]" in New York correctional facilities. Dkt. No. 34 at 2, 4; see Khudan, 2016 WL 4735364, at *6 ("Plaintiff's accusations, which 'stand alone' and are 'unsupported,' are insufficient to withstand summary judgment.") (quoting Bolton v. City of N.Y., No. 13-CV-5749(RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015)).

Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU. See, e.g., Juarbe v. Carnegie, No. 9:15-CV-01485(MAD/DEP), 2016 WL 6901277, at *1, 4 (N.D.N.Y. Nov. 23, 2016). This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock. [8] Such a difference in inmate housing supports the notion that, "the Second Circuit's decision hinged on the 'extraordinary circumstances' specific to the case before it." Mena v. City of N.Y., No. 13-CV-2430(RJS), 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (quoting Williams, 829 F.3d at 119); see N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7 (explaining that there are different grievance filing procedures for an inmate housed in the SHU). Inmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are "essentially unknowable" or unavailable. Id. at *5 (quoting Ross v. Blake, 136 S. Ct. at 1859).

[8]      "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3s 189, 192 (2d

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 131 of 267

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

Plaintiff never followed up on the July 19, 2014 grievance. Hummel Aff. Exh. A at 94-95. However, on July 29, 2014, he filed a grievance in the facility that included medical complaints, but also a reference to the alleged assault on July 14, 2014. See Gregory Decl. Exh. B at 8. The Clinton grievance department received and responded to this grievance. Id. This grievance was not appealed. Id. ¶ 15. Even assuming, as the Court must on this motion, that plaintiff's allegations of mail tampering are true, he did not exhaust his administrative remedies when he failed to appeal the July 29, 2014 grievance to the next level of review. The fact that this grievance was subsequently filed and not appealed within close proximity to the July 19, 2014 grievance, coupled with three unrelated grievances filed within the next year, demonstrates that plaintiff's situation does not rise to the level where the grievance process is "opaque," unavailable, or unascertainable. See Hill v. Tisch, No. 02CV3901(DRH/AYS), 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff failed to demonstrate that the grievance "procedures were essentially unknowable"); Gregory Decl. Exh. A at 6.

### c. Allegation that Plaintiff Suffered Retaliation and Physical Beatings

Plaintiff's pleadings also suggest an inquiry under the third prong of Ross, whether "machination, misrepresentation, or intimidation" occurred. See Ross, 136 S. Ct. at 1860. Specifically, plaintiff alleges that he did not comply with the grievance procedures because he was subjected to physical beatings, retaliation, and intimidation after complaining about conditions at Clinton. See Compl. at 3, 4, 7. For these reasons, he believed the grievance procedures were unavailable. See id. at 2-3.

**\*8** Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable. Ross, 136 S. Ct. at 1860 & n.3. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. Salmon, 2016 WL 4411338, at *5. Estoppel is found where "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" occur showing that defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures. Id. at *5 (quoting Amador v. Andrews, 655 F.3d 89, 103 (2d

Cir. 2011)). In Riles, the Second Circuit affirmed a district court's ruling that prison officials' alleged threats did not interfere with exhaustion efforts when plaintiff stated he was threatened "if he pushed the issue," but then subsequently filed a grievance in spite of the alleged threats. See Riles v. Buchanan, 656 Fed.Appx. 577, 581 (2d Cir. 2016) (summary order).

Relying on Ross, courts have carved out factual limitations to the third prong of unavailability concerning fear of retaliation. See, e.g., Aviles v. Tucker, No. 14-CV-08636(NSR), 2016 WL 4619120, at *3-4 (S.D.N.Y. Sept. 1, 2016) (citing Ross, 136 S. Ct. at 1860). In Aviles, the court noted a longstanding rule that general beliefs of retaliation or fears do not excuse the exhaustion requirement. Aviles, 2016 WL 4619120, at *4 (citations omitted). Circumstances that have met the threshold of unavailability by means of intimidation have included widespread beatings with assertions of fear for one's life, in conjunction with the plaintiff withholding all complaints until he was transferred to a different facility. See, e.g., id. (quoting Thomas v. Cassleberry, No. 03-cv-6394L, 2007 WL 1231485, at *2 (W.D.N.Y. Apr. 24, 2007)). Allegations of threats are conclusory where a plaintiff's allegation "does not indicate who threatened him, when he was threatened, or how he was threatened." See Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). In contrast, this Court has denied a summary judgment motion when a plaintiff alleged he was threatened by a specific correction that the officer would "break [plaintiff's] bones," and another specific correction officer threatened to beat plaintiff "a [sic] inch from life" if he filed a grievance. Galberth v. Durkin, No. 914CV115(BKS/ATB), 2016 WL 3910270, at *3 (N.D.N.Y. July 14, 2016).

Here, plaintiff offers conclusory allegations in his complaint that "[he] was beaten" while attempting to access Clinton's grievance program. Compl. at 2, 3. Plaintiff offers no information of when or how he was threatened or beaten after the July 14, 2014 incident. Some instances of threats alleged by plaintiff refer to a time period before he filed a grievance and he does not state how any specific threat or subsequent act of violence impacted his ability to exhaust administrative remedies related to the events that occurred on July 14, 2014. See Aviles, 2016 WL 4619120, at *4 (finding grievance procedures available where plaintiff offers conclusory allegations of fear and does not substantiate what specific fears or past acts preclude him from advancing in grievance procedures); Harrison v. Stallone, No. 9:06-CV-902(LEK/GJD), 2007 WL 2789473, at *5 (N.D.N.Y.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 132 of 267

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement.... If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure.") (citations omitted); see, e.g., Hummel Aff. Ex. A at 58. Much of plaintiff's fear is generalized. For instance, he notes that corrections officers become agitated when they see legal mail and "that's when harassment comes." Hummel Aff. Ex. A at 92. By his own admission, plaintiff denies any actual physical force being used against him that prohibited him from taking part in the grievance program. Hummel Aff. Ex. A at 99; see Salmon, 2016 WL 4411338, at *5 (stating there must be affirmative actions or specific instances of physical assault or threats of retaliation for plaintiff to show unavailability of the grievance process).

 *9  The Court notes that plaintiff directly contradicted allegations in his complaint by statements made in his deposition. While the complaint alleges conclusory instances of being "beaten by staff," plaintiff admits that other than being cut on his face by an inmate in the yard on October 5, 2015, there has not been any other physical force used against him by inmates or correction officers since July 14, 2014. Hummel Aff. Ex. A at 99; Compl. at 3. This statement contradicts plaintiff's allegations of being beaten by staff. See Williams v. Doe, No. 12-CV-1147(HKS), 2016 WL 4804057, at *5 (W.D.N.Y. Sept. 14, 2016) (granting a motion for summary judgment after noting that any triable issue of fact on exhaustion of administrative remedies can be eliminated when plaintiff's prior representations to the court are "flatly contradict[ed]").

Further, this Court finds that plaintiff's failure to follow the grievance procedures cannot be excused by fears or intimidation, when he simultaneously made his complaints known through other means. After the alleged incident, plaintiff was seen by a nurse in a room with "about ten" officers, where he admits "having no choice," but to tell the nurse that they had beaten him. Hummel Aff. Exh. A at 57-58. Plaintiff also aired his complaints and concerns in writing outside of the grievance procedures, clearly identifying his complaints in full substance, including the identification of those who committed acts against him. See, e.g., Hummel Aff. Exh. A at 93; Gregory Decl. Exh. A at 8. Similarly in Johnson v. Fraizer, the Court rejected plaintiff's argument that administrative remedies were unavailable where the plaintiff alleged he was threatened by correction officers but continued to make and send formal complaints to prison officials and other New York State officials. Johnson v. Fraizer, No. 16-

CV-6096 (CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). By plaintiff's own admission, it is clear that he sought to file the initial grievance and tell others about his complaints, which disprove any claim of intimidation or fear of retaliation. Quick v. Omittee, No. 14-CV-1503(TJM/CFH), 2016 WL 5219732, at *4 (N.D.N.Y. Aug. 11, 2016), report and recommendation adopted, No. 914CV1503 (TJM/CFH), 2016 WL 5107125 (N.D.N.Y. Sept. 20, 2016) (holding that fear of physical retaliation or assaults does not deem grievance procedures unavailable when plaintiff continuously sought to file complaints with officials). Like in Quick, where the plaintiff filed formal internal grievances and the grievance procedures were deemed available, here the plaintiff alleges drafting two internal grievances outlining the alleged July 14, 2014 incident. See id. at * 4; Hummel Aff. Exh. at 93; Gregory Decl. Exh. B at 8. Thus, plaintiff has not shown that administrative remedies were unavailable due to intimidation and threats.

In conclusion, the Court finds that defendants have met their burden in showing that there is no genuine issue of material fact as to plaintiff's failure to exhaust administrative remedies. Accordingly, the Court recommends that defendants' motion for summary judgment be granted.

### III. Conclusion

For the reasons stated above, it is hereby

> **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 26) on plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **GRANTED**; and it is further

> **RECOMMENDED** that plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, without prejudice; and it is further

> **ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties in this action, pursuant to local rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F. 2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F. 2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 133 of 267

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2791063

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2791063

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 134 of 267

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2790530

2017 WL 2790530
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Edy RODRIGUEZ, Plaintiff,

v.

J. CROSS, Sergeant, Clinton Corr. Fac.; R.
Furnia, Sergeant, Clinton Corr. Fac.; G. Falcon,
Corr. Officer, Clinton Corr. Fac.; and J. Roberts,
Corr. Officer, Clinton Corr. Fac., Defendants.

9:15-CV-1079 (GTS/CFH)
|
Filed 06/27/2017

**Attorneys and Law Firms**

EDY RODRIGUEZ, No. 8951602009, Anna M. Kross
Center, 18-18 Hazen Street, East Elmhurst, New York 11370,
Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ. Assistant Attorney
General, The Capitol Albany, New York 12224, Attorney
General for the State of New York, Counsel for Defendants.

**DECISION and ORDER**

HON. GLENN T. SUDDABY, Chief United States District
Judge

 **\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Edy Rodriguez ("Plaintiff")
against the four above-captioned employees of the New
York State Department of Corrections and Community
Supervision at Clinton Correctional Facility in Dannemora,
New York ("Defendants"), are Defendants' motion for
summary judgment seeking dismissal of Plaintiff's Complaint
for failure to exhaust his administrative remedies, and United
States Magistrate Judge Christian F. Hummel's Report-
Recommendation recommending that Defendants' motion be
granted and that Plaintiff's Complaint be dismissed in its
entirety without prejudice. [1] (Dkt. Nos. 26, 40.) Plaintiff has
not filed an Objection to the Report-Recommendation despite
having received an extension of the filing deadline, which has
expired. (Dkt. No. 42.)

[1]  The Court notes that Assistant Attorney General
Christopher J. Hummel is of no relation to U.S.
Magistrate Judge Christian F. Hummel.

After carefully reviewing the relevant papers herein,
including Magistrate Judge Hummel's thorough Report-
Recommendation, the Court can find no clear-error in
the Report-Recommendation. [2] Magistrate Judge Hummel
employed the proper standards, accurately recited the facts,
and reasonably applied the law to those facts. (Dkt. No.
40.) As a result, the Report-Recommendation is accepted
and adopted in its entirety for the reasons set forth therein;
Defendants' motion for summary judgment is granted; and
Plaintiff's Complaint is dismissed in its entirety without
prejudice.

[2]  When no objection is made to a report-
recommendation, the Court subjects that report-
recommendation to only a clear error review. Fed.
R. Civ. P. 72(b), Advisory Committee Notes: 1983
Addition. When performing such a "clear error"
review, "the court need only satisfy itself that there
is no clear error on the face of the record in order to
accept the recommendation." *Id.*; *see also Batista
v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1
(S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am
permitted to adopt those sections of [a magistrate
judge's] report to which no specific objection is
made, so long as those sections are not facially
erroneous.") (internal quotation marks omitted).

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Hummel's Report-
Recommendation (Dkt. No. 40) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 26) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
**DISMISSED** in its entirety without prejudice; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment
for Defendants and close this action.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2790530

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 135 of 267

Rodriguez v. Cross, Not Reported in Fed. Supp. (2017)

2017 WL 2790530

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 136 of 267

Johnson v. Fraizer, Not Reported in Fed. Supp. (2016)

2016 WL 7012961

2016 WL 7012961
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Andre A. JOHNSON, Plaintiff,

v.

Correctional Sgt. J. FRAIZER,
Correctional Officer L. DiRienzo and Saj,
Deputy Superintendent, Defendants.

16-CV-6096 CJS

|

Signed 12/01/2016

**Attorneys and Law Firms**

Andre A. Johnson, Attica, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office,
Department of Law, Rochester, NY, for Defendants.

DECISION and ORDER

CHARLES J. SIRAGUSA, United States District Judge

INTRODUCTION

 *1  Andre Johnson ("Plaintiff" or "Johnson"), a prison
inmate in the custody of the New York State Department
of Corrections and Community Services ("DOCCS"), brings
this action pursuant to 42 U.S.C. § 1983, alleging that
Defendants violated his federal constitutional rights by, *inter
alia*, retaliating against him and violating his procedural due
process rights. Now before the Court is Defendants' motion
to dismiss the Amended Complaint, for failure to exhaust
administrative remedies. The application is granted.

BACKGROUND

The operative pleading in this action is Plaintiff's Amended
Complaint. Generally, the Amended Complaint alleges that,
at Livingston Correctional Facility ("Livingston"), after
Plaintiff filed complaints against defendant Corrections
Sergeant Fraizer ("Fraizer"), Fraizer conspired with
defendant Corrections Officer L. DiRienzo ("DiRienzo"),
who filed false misbehavior reports against him; and that
thereafter, defendant Deputy Superintendent Saj ("Saj")

conducted a disciplinary hearing in which he violated
Plaintiff's right to procedural due process. According to
the pleading, Saj found Plaintiff guilty of the disciplinary
infractions and sentenced him to period of confinement in the
Special Housing Unit ("SHU").

The Amended Complaint contains certain allegations
regarding Plaintiff's attempts to exhaust his administrative
remedies before commencing this action. In pertinent part, the
pleading makes the following statements, which are listed in
the order in which they appear:

> That because of the retaliatory actions
> of the Defendants the Plaintiff was also
> deprived of his rights to appeal the
> disposition of the Tier II hearing.

***

> That because of the Defendants
> retaliatory actions the Plaintiff has
> been harassed, threats made towards
> his life, has been subjected to unfair
> and impartial hearings[.]

***

> The Plaintiff has exhausted his
> administrative remedies before filing
> this claim, by filing formal complaints
> to the Governor of the State of New
> York, to the Acting Commissioner
> of D.O.C.C.S., to the Superintendent
> of Livingston Correctional Facility,
> as well as [the] Grievance Office of
> Livingston Correctional Facility, and
> the Internal Affairs bureau to no avail.

Amended Complaint. However, the amended pleading also
indicates that the alleged constitutional violations occurred in

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Johnson v. Fraizer, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 137 of 267

2016 WL 7012961

mid– and late-January, 2016, and that Plaintiff commenced this action a mere three weeks later, on February 17, 2016. As an aside, Plaintiff's contention in the Amended Complaint, that he exhausted his administrative remedies before commencing this action, is at odds with his statements in the original Complaint. Specifically, in the original Complaint, which was filed less than a month prior to the Amended Complaint, and which was sworn to by Plaintiff under penalty of perjury, he stated that he neither grieved his claims, nor appealed any adverse decision concerning the grievance process. Further, in response to the question, on the form complaint that Plaintiff used to draft the original complaint, "If you did not exhaust your administrative remedies, state why you did not do so," Plaintiff wrote, "N/A." [1]

[1]    "A statement in a withdrawn complaint that is superseded by an amended complaint without the statement is no longer a conclusive judicial admission[, though] the factfinder may very well find that such a contradictory statement reduces the credibility of the witness[.]" *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 32 (2d Cir. 2002) overruled on other grounds by *Slayton v. Am. Exp. Co.*, 460 F.3d 215 (2d Cir. 2006).

**\*2** On September 30, 2016, Defendants filed the subject motion to dismiss the Amended Complaint, for failure to exhaust administrative remedies. Defendants contend that the allegations in the Amended Complaint establish that Plaintiff failed to exhaust his administrative remedies before commencing this action. In that regard, Defendants point out that while Plaintiff claims that he took certain actions, such as sending complaints to the Governor of the State of New York, such actions do not amount to exhaustion under the PLRA:

> In the matter before the Court, the complaint states that Plaintiff did not file a grievance, appeal to the superintendent and then appeal to [the Central Office Review Committee] ["]CORC["], as he is required to do. Instead, Plaintiff claims to have simply written a letter to various different agencies, waited approximately ten days, and then filed suit. ... He simply refused to wait for the relevant decisions to come down and appeal

them; instead he attempted to file his grievance and appeals all at the same time. [2]

Defendants further contend that while the Amended Complaint alleges that Plaintiff was "deprived of his rights to appeal the disposition of the Tier II hearing," it "provides no further explanation." [3]

[2]    Def. Memo of Law [#30-1] at pp. 3-4.

[3]    Def. Memo of Law [#30-1] at p. 1.

In opposition to Defendants' motion to dismiss, Plaintiff filed a response [#33], which makes the following arguments: 1) on January 29, 2016, Plaintiff "filed an appeal" of his convictions at the Tier III disciplinary hearing, but "said Appeal was not allowed to leave the Facility"; 2) the results of the tier disciplinary hearing could not be "grieved" through the IGP; 3) Plaintiff was not required to exhaust his administrative remedies because in this action he is seeking only money damages.

Because Plaintiff is a *pro se* inmate, the Court also takes judicial notice of the fact that the instant lawsuit is not the only one that he has filed in this Court concerning the events in this action. [4]    For example, on June 20, 2016, Plaintiff filed an action, entitled "*Johnson v. Annucci, et al.*," 16-CV-6417 CJS, in which he refers to some of the same events about which he complains in this action. Particularly, in the Amended Complaint [#7] in that action, Plaintiff clarifies, somewhat, his cryptic statement, in the amended complaint, that he was "deprived" of the right to appeal, as well as the related statement, made in response to Defendants' motion to dismiss this action, that he attempted to appeal his disciplinary conviction, but the appeal was "not allowed to leave the facility":

> [O]n January 29, 2016, the Plaintiff submitted his appeal while being confined in S.H.U. at the Livingston Correctional Facility, by placing in the hands of the 11-to-7 officer on duty said appeal in a "stamped envelope" addressed to the Office of the Director of the Special Housing/ Inmate Disciplinary in Albany N.Y.

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 138 of 267

Johnson v. Fraizer, Not Reported in Fed. Supp. (2016)

2016 WL 7012961

Also, sending a copy of the appeal to the office of the Governor of the State of New York. The Defendants refused to allow any and all legal correspondence of the Plaintiff to leave the facility in an attempt to hid[e] the misconduct of Officials[.]

16-CV-6417, Docket No. [#7] at p. 5

4    "In deciding a motion to dismiss a *pro se* complaint, it is appropriate to consider certain materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Davis v. Jackson*, Case No. 15-CV-5359 (KMK), 2016 WL 5720811 at *4 (S.D.N.Y. Sep. 30, 2016) (citation and internal quotation marks omitted).

PRINCIPLES OF LAW

**\*3** At the outset, since Johnson is proceeding *pro se*, his papers "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (citation omitted). The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires prison inmates to exhaust such administrative remedies "as are available" before commencing an action "with respect to prison conditions under [42 U.S.C. §] 1983." "The PLRA requires proper exhaustion, which means using all steps that the prison grievance system holds out, and doing so properly (so that the prison grievance system addresses the issues on the merits. Untimely or otherwise procedurally defective administrative grievances or appeals fail to satisfy PLRA's exhaustion requirements." *Riles v. Buchanan*, —— Fed. Appx. ——, 2016 WL 4572321 at *1 (2d Cir. Sep. 1, 2016) (citations and internal quotation marks omitted).

However, the PLRA exhaustion requirement may be excused where administrative remedies are not "available," and there are at least three circumstances under which such remedies may be considered unavailable:

> First, an administrative remedy may be unavailable when it operates as a simple dead end—with officers unable

or consistently unwilling to provide any relief to aggrieved inmates. Second, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In other words, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. Third, an administrative remedy may be unavailable when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Williams v. Correction Officer Priatno*, 829 F.3d 118, 123–24 (2d Cir. 2016) (quoting *Ross v. Blake*, —— U.S. ——, 136 S.Ct. 1850, 1859-1860 (2016); internal quotation marks omitted).

"Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings." *Geer v. Chapman*, No. 915CV952GLSATB, 2016 WL 6091699, at *3 (N.D.N.Y. Sept. 26, 2016) (citing *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004)), report and recommendation adopted, No. 915CV952GLSATB, 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016).

For retaliation claims, an New York State inmate must exhaust his administrative remedies by utilizing New York's three-tiered Inmate Grievance Program ("IGP") procedures:

> DOC[C]S' Inmate Grievance Program ("IGP") has a regular three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent

Johnson v. Fraizer, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 139 of 267

2016 WL 7012961

to the Central Officer Review Committee ("CORC").

*Quezada v. Ercole*, No. 09CIV2832DLC, 2011 WL 3251811, at *4 (S.D.N.Y. July 29, 2011) (citing *Espinal v. Goord*, 554 F.3d 216, 224 (2d Cir. 2009)).

On the other hand, an inmate exhausts a procedural due process claim, arising from a prison disciplinary hearing, by completing the disciplinary administrative appeal process. *See, Davis v. Jackson*, 2016 WL 5720811 at * 7 (Noting that the filing of an administrative appeal from a disciplinary hearing is "the proper mode of exhaustion" for a procedural due process claim arising from the disciplinary hearing).

**\*4** Where the inmate is asserting both retaliation claims and procedural due process claims, he must separately exhaust both types of claim, using the procedure appropriate to each type of claim. *See, Davis v. Jackson*, 2016 WL 5720811 at * 7 (Observing that filing an administrative appeal from an underlying disciplinary proceeding was "an inappropriate means of exhaustion for Plaintiff's retaliation claims.") (collecting cases); *see also, Washington v. Chaboty*, No. 09 CIV. 9199 PGG, 2015 WL 1439348, at *7 (S.D.N.Y. Mar. 30, 2015) ("In certain circumstances, however, courts have deemed a disciplinary appeal inadequate to exhaust a claim under the PLRA. Inmate Grievance Program exhaustion has been required, for example, where an inmate alleges retaliation, including retaliation based on the filing of an allegedly false misbehavior report.") (citation omitted).

The PLRA's exhaustion requirement is an affirmative defense, not a jurisdictional requirement:

> The Second Circuit has made clear that, in this context, "administrative exhaustion is not a jurisdictional predicate," but rather, "an affirmative defense." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004). Accordingly, "defendants bear the burden of proof[,] and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003)[.]

*France v. Cty. of Westchester*, No. 12-CV-5576 (KMK), 2016 WL 1270259, at *4 (S.D.N.Y. Mar. 30, 2016) (additional citations omitted). Consequently, as Defendants admit, dismissal under Rule 12 for failure to exhaust administrative remedies is only appropriate where such failure is "clear"

from the face of the complaint. On this point, the Second Circuit recently stated:

> Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement. Accordingly, inmates are not required to specially plead or demonstrate exhaustion in their complaints. However, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement.

*Williams v. Correction Officer Priatno*, 829 F.3d at 122 (citations omitted).

## DISCUSSION

Defendants contend that the action should be dismissed pursuant to Fed. R. Civ. P. 12, because it is evident from the face of Johnson's Amended Complaint [#17] that he failed to exhaust his administrative remedies before commencing this action. The Court agrees with Defendants that, to the extent that Plaintiff maintains that he did not need to exhaust his administrative remedies because he is seeking money damages in this action, his argument lacks merit. Similarly, Plaintiff's argument that his disciplinary conviction is a "non-*grievable* issue" is, while true, irrelevant; although such convictions cannot be "grieved" through the IGP, they can be, and must be, administratively exhausted through the appeals process, as discussed above. Additionally, Plaintiff obviously understood that fact, since he claims that he attempted to exhaust his procedural due process claim by appealing his disciplinary conviction.

The Court also tends to agree with Defendants' argument that, since Plaintiff filed this action a mere three weeks after the events at issue, it is probable that he simply skipped the grievance/appeal stage and came directly to Federal Court. Certainly, Plaintiff's original Complaint in this action tends to support such a view.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 140 of 267
Johnson v. Fraizer, Not Reported in Fed. Supp. (2016)
2016 WL 7012961

In opposition to Defendants' arguments, Plaintiff is essentially left with two contentions. First, he states that he attempted to mail an appeal of his disciplinary conviction, but unidentified persons prevented the envelope from leaving Livingston. Indeed, Plaintiff even more broadly states, "The Defendants refused to allow *any and all legal correspondence* of the Plaintiff to leave the facility in an attempt to hid[e] the misconduct of Officials[.]" (emphasis added). The Court liberally construes such statements to mean that the administrative appeals process was not "available" to Plaintiff, because corrections staff "thwarted" his efforts. However, Plaintiff's contention on this point is not plausible, and therefore need not be accepted as true.[5] First and foremost, Plaintiff makes only a conclusory statement that his mailing was not allowed to leave the facility, without offering any explanation for why he believes that. Meanwhile, his contention that *all* of his legal mail was similarly purloined is belied by his admission that he was able to send other complaints about the matter to various New York State officials at around the same time. Plaintiff offers no explanation for why Livingston staff would prevent him from mailing that particular appeal, but allow him to mail out all his other complaints, including the original complaint in this action.

[5]    In *Williams v. Priatno,* 829 F.3d at 124, n. 3, the Second Circuit explained why it found an SHU inmate's contention, that a corrections officer never filed his grievance, to be plausible. Here, there is no such supporting facts to make Johnson's contention plausible. Instead, there is evidence tending to refute his assertion.

 **5** Lastly, Plaintiff claims that Livingston staff harassed him and threatened his life, after he filed other grievances. The Court liberally construes this statement as an argument that the IGP procedures were not "available" to him, due to threats

from corrections staff. However, the Court does not find this allegation plausible. To begin with, the allegation itself is entirely conclusory, since it does not indicate who threatened him, when he was threatened, or how he was threatened. Moreover, the alleged threats clearly did not dissuade Plaintiff from making and sending a wide variety of other complaints about Livingston staff to New York State officials, including officials at Livingston. *See*, Amended Complaint ("The Plaintiff has exhausted his administrative remedies before filing this claim, by filing formal complaints to the Governor of the State of New York, to the Acting Commissioner of D.O.C.C.S., to the Superintendent of Livingston Correctional Facility, as well as [the] Grievance Office of Livingston Correctional Facility, and the Internal Affairs bureau to no avail."); *see also, Riles v. Buchanan,* 2016 WL 4572321 at *3 ("Nor did DOC officials' alleged threats of retaliation interfere with his exhaustion efforts....He was not deterred from exhausting; he simply did not exhaust in accordance with the procedures.").

For all of these reasons, the Court finds that it is clear, from the face of Plaintiff's Amended Complaint, that he failed to exhaust his administrative remedies before commencing this action, in violation of 42 U.S.C. § 1997e(a).

## CONCLUSION

Defendants' motion to dismiss [#30] is granted, and this action is dismissed without prejudice. The Clerk of the Court is directed to close this action.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7012961

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by SAELI v. CHAUTAUQUA COUNTY, NY, 2nd Cir., July 24, 2020

2020 WL 3547049
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Samuel J. SAELI, Plaintiff,

v.

CHAUTAUQUA COUNTY, N.Y., et al., Defendants.

17-CV-6221 (CJS)
|
Signed 06/30/2020

**Attorneys and Law Firms**

Samuel James Saeli, Elmira, NY, pro se.

Michael P. McClaren, Shannon Brae O'Neill, Webster Szanyi, LLP, Buffalo, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, United States District Judge

INTRODUCTION

**\*1** This action arises out of a series of events that occurred in September 2016, when *pro se* Plaintiff Samuel J. Saeli was being held as a pretrial detainee in the Chautauqua County Jail. The matter is presently before the Court on Defendants' Motion for Summary Judgment on Saeli's excessive force claim against Defendants Genther and Steenburn for an incident occurring on September 24, 2016, and his *Monell* claim against Defendant Chautauqua County for the implementation of an unduly painful handcuffing policy. Mot. Summ. J., Apr. 9, 2019, ECF No. 52. For the reasons stated below, Defendants' motion [ECF No. 52] is granted and the Clerk of Court is directed to close this case.

FACTUAL BACKGROUND [1]

[1]   The facts that follow were culled from "Defendants' Statement of Undisputed Material Facts" and "Plaintiff's Statement of Disputed

Facts." Defs.' Statement, Apr. 9, 2019, ECF No. 52-4; Pl.'s Statement, May 8, 2019, ECF No. 61.

Saeli was booked at the Chautauqua County Jail on August 17, 2016. Defs.' Statement, ¶ 5, Apr. 9, 2019, ECF No. 52-4. On September 24, 2016, a corrections officer noticed water pooling on the floor outside of Saeli's cell while Saeli's shower was running. Defs.' Statement at ¶ 24–25. The officer called out to Saeli, and then called for back-up. Defs.' Statement at ¶ 27–28. Several officers, including Defendants Genther and Steenburn, responded to the call for back-up. Defs.' Statement at ¶ 28. Saeli was ordered to get out of the shower and get dressed, and several officers entered Saeli's cell to handcuff him. Defs.' Statement at ¶ 30, 32. Defendants Genther and Steenburn handcuffed Saeli, though the manner in which they did so is in dispute. Defs.' Statement at ¶ 33; Pl.'s Statement, ¶ 32, May 8, 2019, ECF No. 61. As a result of the incident, Saeli was found guilty at a disciplinary hearing of failing to obey the officers' orders to get out of the shower and get dressed. Defs.' Statement at ¶ 35; Pl.'s Statement at ¶ 35. He was issued a verbal reprimand. *Id.*

PROCEDURAL BACKGROUND

Saeli filed his original complaint and a motion to proceed *in forma pauperis* in this Court on April 11, 2017 against over a dozen defendants. Compl., Apr. 11, 2017, ECF No. 1; Mot., Apr. 11, 2017, ECF No. 2. In his complaint, Saeli sought relief under 42 U.S.C. § 1983 for numerous alleged violations of his Fourteenth Amendment rights during his pre-trial detainment at the Chautauqua County Jail. *Id.* In July 2017, Saeli filed a second complaint under case number 17-CV-6443, which included the same claims and against the same defendants. Order, 1, Oct. 18, 2017, ECF No. 3. Because the second complaint also alleged additional conditions of confinement and retaliation claims, and had five additional defendants, this court construed the 17-CV-6443 complaint as an amended complaint in the present action. *Id.* at 2. Thereafter, the Court granted Saeli's motion to proceed *in forma pauperis*, screened the amended complaint under 28 U.S.C. §§ 1915(e) and 1915A, and granted Saeli leave to file a second amended complaint.

**\*2** Saeli filed his second amended complaint on November 11, 2017, against the present Defendants: Chautauqua County, and Corrections Officers Genther and Steenburn. Am. Compl, Nov. 11, 2017, ECF No. 6. The Court screened Saeli's second amended complaint under 28 U.S.C. §§ 1915(e) and 1915A, and permitted Saeli to proceed with his excessive force

Saeli v. Chautauqua County, N.Y., Slip Copy (2020)
Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 142 of 267

2020 WL 3547049

claim against Officers Genther and Steenburn for an incident occurring on September 24, 2016, as well as his *Monell* claim against Chautauqua County for an unduly painful handcuffing policy. Order, 4–5, Sept. 6, 2018, ECF No. 11.

Now before the Court is Defendants' motion for summary judgment on both of Saeli's excessive force claims. Consistent with the Second Circuit's mandate in *Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001), at the same time that Defendants served their summary judgment motion papers on Saeli, they also served a document entitled "IMPORTANT NOTICE TO PRO SE LITIGANTS" advising Saeli of the consequences of failing to adequately respond to the motion for summary judgment. Certificate of Service, Apr. 9, 2019, ECF No. 57.

## SUMMARY JUDGMENT STANDARD

It is well settled that summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party moving for summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "A party asserting that a fact ... cannot be genuinely disputed must support that assertion by ... citing to particular parts of materials in the record...." Fed.R.Civ.P. 56(c)(1).

Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The Court treats the papers of *pro se* plaintiffs such as Saeli "with special solicitude, mindful that they must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Telesford v. Wenderlich*, No. 16-CV-6130 CJS, 2018 WL 4853667, at *5 (W.D.N.Y. Oct. 5, 2018) (quoting *Cicio v. Wenderlich*, 714 F. App'x 96, 97 (2d Cir. 2018)). Nevertheless, the non-movant cannot oppose a properly-supported summary judgment motion with bald assertions that are not supported by the record. *See, Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999). Rather, the non-movant must support its assertion that a fact is genuinely disputed by citing to particular parts of the record or showing that the materials

cited by the movant are inadmissible or do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1).

Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## DISCUSSION

Saeli claims that "[a]s a result of the amount of force used by [Defendants Genther and Steenburn during the September 24, 2016 incident], [Saeli] did suffer injuries to his back, shoulders and permanent damage to [his] right hand and wrist, which includes loss of strength and dexterity to [his] right hand." Am. Compl. at 9. Saeli also presents a *Monell* claim against Defendant Chautauqua County, arguing that the county's handcuffing policy "is designed to inflict pain, discomfort, torture and abuse" of the individuals in custody of the Sheriff. Am. Compl. at 2.

**\*3** In response, Defendants argue that Saeli failed to exhaust his administrative remedies with respect to both his excessive force claim against Defendants Genther and Steenburn and his *Monell* claim against the County, that medical records show no causally-related injury, and that Defendants Genther and Steenburn are entitled to the defense of qualified immunity. Defs.' Mem. of Law, 2—16, Apr. 9, 2019, ECF No. 52-5. Defendants also argue that Saeli's *Monell* claim must be dismissed because he fails to establish a constitutional violation. *Id.* at 16.

Because Saeli's excessive force and *Monell* claims fail on exhaustion grounds, the Court need not reach the merits. *Feaster v. U.S. Bureau of Prisons*, 37 F. App'x 15, 17 (2d Cir. 2002).

Saeli failed to exhaust his administrative remedies.

42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The

exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Hence, pursuant to § 1997e(a), Saeli was required to exhaust his administrative remedies for both his excessive force and his *Monell* claims.

Significantly, a prisoner is required to exhaust only those administrative remedies that are "available." The Supreme Court has identified three circumstances "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). An administrative remedy is not "available": (1) when the remedy operates as a dead end, (2) when the process is "so opaque that it becomes, practically speaking, incapable of use," and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–1860.

As the Second Circuit has stated, "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citing *Snider v. Melindez*, 199 F.3d 108, 114 (2d Cir. 1999)). Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing that a grievance process exists and applies to the underlying dispute. *Id.* "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact." *Id.* (citing *Hemphill v. New York*, 380 F.3d 680, 687–88 (2d Cir. 2004)).

In the instant case, the Defendants have satisfied their burden to show that a grievance process exists and applies to Saeli's claims. Chautauqua County Jail's grievance procedure is undisputed, and Saeli's extensive use of the process (described below) demonstrates his familiarity with it. As detailed in the Chautauqua County Jail Inmate Handbook, the grievance process is as follows:

> Attempt to resolve your complaint ... with your housing officer. If the housing officer cannot resolve your complaint ... the shift supervisor [ ] will decide if your complaint warrants filing a grievance or can be otherwise resolved. If the complaint cannot be resolved, the shift

supervisor will contact the grievance coordinator and you will be issued a grievance. The grievance must be filed with the grievance coordinator within 5 days of the date of the act or occurrence that caused the complaint....

**\*4** After the grievance is filed, the allegations will be investigated by an impartial party and a written determination will be returned to you within 5 business days. You have 2 business days to appeal the original determination with the jail captain or his designee. The jail captain will issue a written determination within 5 business days of the appeal.

If you wish to appeal a grievance denial by the jail captain, you must do so within 3 business days of the jail captain's written determination. You must appeal to the State Commission of Correction by indicating you wish to do so on the grievance form. The grievance coordinator will mail the appeal within 3 business days of your indication to the Commission's Citizen's Policy and Complaint Review Council. The Review Council shall issue a written determination to the appeal within 45 business days after it has been mailed.

Defs.' Decl., Ex. E, 30, Apr. 9, 2019, ECF No. 55-5.

It is also undisputed that during his time at the jail, Saeli utilized the foregoing grievance process to file approximately 21 grievances, and appealed 13 of them. Def. Statement at ¶ 18; Pl. Statement at ¶ 18. Saeli filed grievances related to his housing assignments, temperature in his unit, maltreatment by other inmates, shower conditions, conditions in his cell, the size of his meal portions, and failure to get his newspaper delivered. Defs.' Decl., Ex. G, Apr. 9, 2019, ECF No. 55-7. Saeli also filed a series of grievances in 2017 that alleged he was being harassed and retaliated against by corrections officers for filing grievances. Defs.' Decl., Ex. G at 29–42, 85–86. The harassment and retaliation grievances were denied because Saeli did not include specific names or instances of harassment. *Id.* Then, in 2018, Saeli filed a grievance claiming a specific officer singled him out to intimidate and harass him, and another grievance that a different officer violated his constitutional rights by confiscating his property. Defs.' Decl., Ex. G at 100–136. After investigation, those claims were found to be unsubstantiated, too. *Id.*

There is no record of a grievance filed regarding the September 24, 2016 incident, or about the handcuffing process at the Chautauqua County Jail to which Saeli was

subjected in connection with such incident. Saeli admits that he did not follow the jail's grievance process against Defendants Genther and Steenburn, but claims it was because he "was denied access to the jail's grievance program." Pl.'s Mem., 8, May 8, 2019, ECF No. 61-1. Specifically, Saeli claims that he attempted to file a grievance, but that an individual he identifies as Officer Fuller told him not to. Saeli alleges that he feared Officer Fuller would retaliate if he filed a grievance. As evidence, Saeli points to an unsigned informal grievance form in his handwriting, dated September 25, 2016, which describes the September 24, 2016 incident in conclusory fashion, and details several other, unrelated complaints. Pl.'s Ex. C, 7, May 8, 2019, ECF No. 62-6.

At his 50-h hearing on March 15, 2018, Saeli described his exchange with Officer Fuller as follows:

> SAELI: After the September 24[th] incident, I tried to file a grievance. I filled it out. I gave it to Lieutenant Fuller, who was making the rounds at that time. He looked at it, and he said, don't hand that in. So I thought, you know, I don't want to upset him, I don't want to be retaliated against or anything. I took it back, and I wrote a letter to the New York State Commission of Corrections about the incident and what happened....

> **\*5** ATTORNEY: What made you think [filing the grievance would upset Lieutenant Fuller]?

> SAELI: Just by the way – just by the manner in what he said. He looked at it, and he said, don't hand that in. I got a little fearful of actually filing the grievance ...

> ATTORNEY: So he at no point threatened you or anything like that, correct?

> SAELI: No....

> ATTORNEY: What made you nervous?

> SAELI: I've never seen anybody reject a grievance before.... It was just kind of, like, just you know, don't file it, don't do anything with it, kind of like, or else.

> ATTORNEY: But he never said that, correct?

> SAELI: No.

Tr., 67:7–71:17, June 14, 2019, ECF No. 66-5.

In addition to arguing that an administrative remedy was "unavailable" due to his fear of retaliation by Officer Fuller,

Saeli also argues that he pursued all administrative remedies by sending a letter about the incident to the New York State Commission of Corrections. Pl.'s Ex. D, 9–14, May 8, 2019, ECF No. 62-6. In that letter, Saeli complained about several things, including the manner in which he was handcuffed and shackled on August 29, 2016, his movement out of a privileged housing unit to a hospital unit within the jail on September 19, 2016, and the September 24, 2016 incident involving Defendants Genther and Steenburn, which Saeli mistakenly dated as September 30, 2016. *Id.*

Saeli's letter to the Commission was investigated by the Chautauqua County Sheriff's Office on November 21, 2016. Pl.'s Ex. B, 3–7, May 8, 2019, ECF No. 62. As part of the investigation, the investigating officers collected a supporting deposition from Saeli. Pl.'s Ex. B at 5–6. Following the investigation by the Sheriff's Office, the complaint was closed and a copy was provided to the jail captain. Pl.'s Ex. B at 4. On November 22, 2016, Saeli sent a letter to "Undersheriff Holder" informing him of the investigation and of the injuries the September 24 incident caused to his arms, hands and wrists, and asking that Undersheriff Holder "have someone take pictures of my cuts and bruises for the [record]." Pl.'s Ex. B at 7.

The Court finds no merit in Plaintiff's argument that he did not file a grievance because he was afraid of retaliation by Officer Fuller. On its face, Plaintiff's claim is inconsistent with the fact that he proceeded to send a letter to the State Corrections Commission, participated in the Sheriff's Office investigation into the incident in November 2016, wrote a letter to the Undersheriff about the incident, filed the instant action, and filed a series of other grievances against other corrections officers, all while still an inmate at the Chautauqua County Jail. Moreover, "[a] general fear of retaliation is not an exception to the PLRA's exhaustion requirement." *Rodriguez v. Westchester Cty. Jail Corr. Dep't, Assoc.*, No. 98 CIV.2743 RPP, 2002 WL 1933953, at *3 (S.D.N.Y. Aug. 21, 2002) (citing *Hines v. Valhalla Cty. Corr. Facility*, No. 0C CIV.6935(SAS), 2002 WL 1822740, at *3 (S.D.N.Y. Aug. 8, 2002)). Viewing Saeli's exchange with Officer Fuller in a light most favorable to Saeli, Officer Fuller's comment – "don't file that" – without more does not rise to the level of "thwarting" Saeli from taking advantage of a grievance process through intimidation.

**\*6** In addition, Saeli's letter to the State Corrections Commission does not excuse him from his failure to follow the particular steps of the grievance process. The Supreme

Court has specifically addressed the importance of following each individual step in the grievance process to satisfy 42 U.S.C. § 1997e(a):

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).... Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

*Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006) (internal quotation marks and citations omitted) (emphasis in the original). With respect to Saeli's excessive force claim, his failure to file a grievance denied the jail the opportunity to fully and fairly adjudicate the claim.

With respect to his *Monell* claim, Saeli argues that he was told by jail officials "that the method of handcuffing individuals is not grievable and although I was denied a grievance for this claim, I did write to the New York State Commission of Corrections promptly and directly." Am. Compl. at 6. As indicated above, proper exhaustion "demands

compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 91. Moreover, to meet his burden under Fed.R. 56(c)(1), Saeli must point to particular parts of the record to rebut Defendants' showing that he failed to follow the jail's grievance process. Saeli's conclusory assertion that he was told the handcuffing offense is not grievable, without further elaboration on the names or circumstances of the statement, is not sufficient to meet his burden. *See, e.g., Bennett v. James*, 737 F. Supp.2d 219, 226 (S.D.N.Y. 2010) (finding plaintiff failed to exhaust where "[h]e provides no information as to who ... misinformed him – or where and when these alleged interactions took place.").

Accordingly, the Court finds that Saeli failed to properly exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a) and may not pursue this action.

CONCLUSION

For the reasons stated above, it is hereby

ORDERED that Defendants' motion for summary judgment [ECF No. 52] is granted with respect to all remaining claims, and the Clerk of Court is directed to close this case.

In addition, the Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 3547049

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1724573
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dwaine GRAY, Plaintiff,

v.

Doctor KANG LEE, Defendant.

No. 9:13–cv–258 (GLS/DEP).
|
Signed April 15, 2015.

**Attorneys and Law Firms**

Dwaine Gray, Malone, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, The Capitol, Christopher W. Hall, Assistant
Attorney General, of Counsel, Albany, NY, for the Defendant.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Dwaine Gray commenced this action
against defendant Doctor Kang Lee,[1] pursuant to 42 U.S.C.
§ 1983, alleging that Lee was deliberately indifferent to
Gray's serious medical needs in violation of the Eighth
Amendment.[2] (*See generally* Compl., Dkt. No. 1.)

[1] Gray also named Ms. Vonda L. Johnson as
a defendant, (Compl.), but she has since been
dismissed from this action, (Dkt. No. 10 at 6–7, 9).

[2] In his complaint, Gray also asserted claims under
the Americans with Disabilities Act, 42 U.S.C.
§§ 12101–12213, and the Rehabilitation Act, 29
U.S.C. §§ 701–796*l*, (Compl.), but those claims
have been dismissed, (Dkt. No. 10 at 5–6, 9).

On August 12, 2014, Lee filed a motion for summary
judgment, (Dkt. No. 32), which Gray opposed, (Dkt. No. 40).
In a Report and Recommendation (R & R) issued on March 9,
2015, Magistrate Judge David E. Peebles recommended that
Lee's motion for summary judgment be granted and Gray's

remaining Eighth Amendment claim be dismissed. (Dkt. No.
43.) Pending are Gray's objections to the R & R. (Dkt. No.
44.) For the reasons that follow, the R & R is adopted in its
entirety.

### II. *Background*[3]

[3] Gray specifically objects to Judge Peebles'
recommendation that the court deem admitted
all properly supported facts contained in Lee's
statement of material facts. (Dkt. No. 43 at 3 n. 1;
Dkt. No. 44 at 2.) The court reviews this portion
of the R & R *de novo. See Almonte v. N.Y. State
Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL
149049, at *3, *5 (N.D.N.Y. Jan.18, 2006). Under
this District's Local Rules, the moving party must
submit a statement of material facts, which "set[s]
forth, in numbered paragraphs, each material fact
about which the moving party contends there
is no genuine issue." N.D.N.Y. L.R. 7.1(a)(3).
The opposing party must file a response to the
statement of material facts, which must "mirror
the movant's [s]tatement of [m]aterial [f]acts by
admitting and/or denying each of the movant's
assertions in matching numbered paragraphs." *Id.*
If the opposing party fails to comply, "[t]he
[c]ourt shall deem admitted any properly supported
facts set forth in the [s]tatement of [m]aterial
[f]acts that the opposing party does not specifically
controvert," and, where the opposing party is *pro
se,* the moving party must advise the pro se litigant
about the consequences of his failure to respond.
*Id.* Here, while Gray filed a response opposing
Lee's summary judgment motion, (Dkt. No. 40), he
did not file anything that even remotely resembles
a response to Lee's statement of material facts,
despite receiving notice of the consequences of his
failure to do so, (Dkt. No. 32 at 3). In his defense,
Gray argues that he "submitted various pieces of
evidence annexed to his opposition to summary
judgment, showing that [Lee]' s narrative was self-
serving," and that he "introduced to the [c]ourt
documentary evidence that [Lee] obviously did not
have a planned course of medical treatment, as
[Lee] routinely came to contradictory conclusions,
and would often ignore [Gray's] needs." (Dkt. No.
44 at 2.) However, "a district court has no duty

to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding pro se," and an individual's pro se status does not relieve him of the ramifications associated with the failure to comply with the court's local rules. *Davis v. City of Syracuse,* No. 5:12–CV–0276, 2015 WL 1413362, at *12 (N.D.N.Y. Mar.27, 2015). Therefore, the court adopts Judge Peebles' recommendation to deem admitted all properly supported facts set forth in Lee's statement of material facts. Accordingly, unless otherwise noted, the facts are not in dispute.

Gray is an inmate in the custody of the Department of Corrections and Community Supervision (DOCCS), and, during the time relevant to his claims, was incarcerated at Clinton Correctional Facility. (Def .'s Statement of Material Facts (SMF) ¶¶ 1, 9, Dkt. No. 32, Attach. 1.) Prior to entering Clinton, Gray suffered a shoulder injury, for which he was prescribed Naproxen. (*Id.* ¶ 8.) After arriving at Clinton in or around April 2012, Gray met with Lee, a clinical physician, who asked Gray if he wished to continue taking Naproxen. (*Id.* ¶¶ 3, 10.) Gray declined the medication, claiming that it did not work. (*Id.* ¶ 10.) One month later, Lee again met with Gray, at which time Gray complained of continued shoulder pain and requested stronger pain medication. (*Id.* ¶ 11.) Lee obliged Gray's request and prescribed Flexeril, a muscle relaxer used to relieve acute pain, but not suitable for long-term use. (*Id.* ¶¶ 11, 12.)

Over the Summer of 2012, Gray frequently met with medical staff, including Lee and various nurses at Clinton. (*Id.* ¶¶ 13–17.) During these meetings, Gray continued to complain of pain in his right shoulder, reiterated his refusal of Naproxen, and requested stronger pain medications-including a continuation of Flexeril and/or a narcotic analgesic. (*Id.* ¶¶ 13–17.) Also during those examinations, Lee consistently found that Gray had a good range of motion in his shoulder, despite Gray's complaints that he was unable to move it. (*Id.* ¶¶ 15, 16.)

At the end of September 2012, Lee ordered an x-ray of Gray's right shoulder, which was completed in early October. (*Id.* ¶¶ 18, 19.) Lee discussed the results with Gray, which indicated that there was "early osteoporosis ... present" and "a large spur arising from the inferior aspect of the acromion," ordered a magnetic resonance imaging (MRI) for further testing, and prescribed Motrin for Gray's pain. (*Id.* ¶¶ 19, 20; Dkt. No. 32, Attach. 2 at 4.) The MRI was completed in January 2013, and, once the radiologist's report was received, Lee referred

Gray to an orthopedic specialist, as the MRI suggested that Gray may have a tendon tear. (Def.'s SMF ¶¶ 21, 23, 24.) During the time that Gray was waiting for his consultation with the specialist, Gray continued to meet with medical staff at Clinton, and Lee continued to prescribe Motrin for Gray's pain. (*Id.* ¶ 25.) Ultimately, in April 2013, Gray was transferred to Franklin Correctional Facility, where he now resides, and whose medical staff is now charged with his care. (*Id.* ¶ 26.)

## III. *Standard of Review*

 *2 Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at *45.

## IV. *Discussion*

In his R & R, Judge Peebles recommended dismissal of Gray's Eighth Amendment deliberate indifference claim. (Dkt. No. 43 at 12–21.) Specifically, Judge Peebles first noted that Gray failed to satisfy the objective requirement of this cause of action because Gray's medical records reflect that he was provided with frequent treatment, and, therefore, "no reasonable factfinder could conclude that ... Lee's treatment of [Gray]'s shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious." (*Id.* at 16–19.) Judge Peebles further reasoned that, given the extensive treatment that Gray received, including frequent examinations, prescriptions for pain medications, x-rays, MRI testing, and referrals to orthopedic specialists, Gray also failed to prove the subjective component of a deliberate indifference claim. (*Id.* at 19–20.)

Here, Gray raises several objections to the R & R. First, Gray specifically objects to Judge Peebles' findings that Gray received consistent and adequate medical care and that Lee

did not act with deliberate indifference. (Dkt. No. 44 at 3–6.) Gray argues that Lee "often times came to different conclusions based on the same medical information" and failed to comply with both "accepted medical practice" and DOCCS policy by prescribing Motrin for long periods of time, which caused Gray stomach pains. [4] (*Id.*) The court reviews these objections *de novo. See Almonte,* 2006 WL 149049, at \*3, \*5.

[4] The court notes that this is the first time that Gray has incorporated Lee's long-term prescription of Motrin as part of his Eighth Amendment claim. Indeed, both his complaint and response to Lee's motion for summary judgment are devoid of these allegations. (*See generally* Compl.; Dkt. No. 40.)

A prisoner's claim that he was provided insufficient medical care is analyzed under the Eighth Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble,* 429 U.S. 97, 101–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104 (internal quotation marks and citation omitted). "To show that he has been subjected to cruel and unusual punishment, a prisoner must satisfy a standard that includes both objective and subjective components." *Taylor v. Goorde,* 548 F. App'x 696, 697–98 (2d Cir.2013). The objective component asks whether the prisoner was actually deprived of adequate medical care and whether the denial in care was "sufficiently serious." *Id.* at 698 (internal quotation marks and citation omitted). The subjective component concerns the defendant's mental state, and requires a showing that the defendant acted "with deliberate indifference to inmate health"-"a mental state equivalent to subjective recklessness," which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006).

**\*3** Here, Gray has failed to satisfy both the objective and subjective components. In short, because Gray was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist, he was not actually deprived of adequate treatment-the objective component-and, further, this extensive treatment and care is evidence that Lee did not act with deliberate indifference-the subjective component. The fact that Gray was not prescribed the precise pain medication of his choosing is of no moment; " 'a prisoner does not have the right to choose his medical

treatment as long as he receives adequate treatment.' " *Hanrahan v. Mennon,* 470 F. App'x 32, 33 (2d Cir.2012) (quoting *Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011)). Similarly, Gray's contentions that Lee violated DOCCS policy and "accepted medical practice" by prescribing Motrin for long-term use are equally without merit. First, a failure to comply with DOCCS policy directives or regulations is not a constitutional violation. *See Sanders v. Gifford,* No. 9:11–CV–0326, 2014 WL 5662775, at \*4 (N.D.N.Y. Nov.4, 2014). Second, Gray alleges, at best, a negligence or medical malpractice claim, which also does not give rise to an Eighth Amendment violation. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). Accordingly, the court adopts Judge Peebles' findings that Gray was provided with adequate medical care, and that Lee did not act with deliberate indifference.

Second, Gray objects to Judge Peebles' findings of fact that Gray "could not be in severe pain because he worked at the Clinton ... mess hall" and that Gray ultimately "secured a less strenuous work detail at the facility mess hall for reasons other than [his] severe pain." (Dkt. No. 44 at 3 (referring to Dkt. No. 43 at 16–17, 16 n. 4).) Because these proposed findings of fact are not central, or even particularly relevant, to Judge Peebles' ultimate recommendation to dismiss Gray's complaint, the court construes these as general objections, which warrant review only for clear error. *See Almonte,* 2006 WL 149049, at \*4–5.

At the outset of his analysis, Judge Peebles noted that the undisputed facts did not support a finding that Gray's pain was severe. (Dkt. No. 43 at 16–17.) Judge Peebles observed that Gray's continued work as a server in the mess hall, and his testimony that he was relieved of certain work duties not because of his injury, but because he was friendly with the corrections officer who assigned job responsibilities, undermined his claims of severe pain. (*Id.* at 16 n. 4.) These facts, however, were but a few of the facts that Judge Peebles considered in determining that Gray's pain was not severe. (*Id.* at 16–17 (noting that Gray's medical records also did not support a finding of severe pain, as medical personnel often discerned no acute distress, and further noting that Gray's voluntary discontinuation of Naproxen also belied his claims of severe pain).) In any event, notwithstanding the severity, or lack thereof, of Gray's pain, Judge Peebles concluded that Gray's claim should be dismissed because he was provided with adequate medical care. (*Id.* at 16–19.) Accordingly, the court finds no clear error in either this portion of the R & R or the remainder of the R & R, and it is adopted in its entirety.

**\*4** Finally, the court notes that, in his objections to the R & R, Gray takes issue with Judge Peebles' denial of his motion to appoint counsel, arguing that, had he been appointed counsel, "summary judgment would not have been granted," and the failure to appoint counsel "may even rise to a violation of [Gray]'s right to Equal Protection." (Dkt. No. 44 at 6–7.) However, Gray's motion to appoint counsel was denied before the R & R was even issued, (Dkt.Nos.35, 37), and, therefore, Gray's dissatisfaction with the disposition of his motion to appoint counsel cannot appropriately be construed as an objection to the R & R at all. To the extent that Gray seeks to renew his motion to appoint counsel in his objections, that request is denied.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge David E. Peebles' March 9, 2015 Report and Recommendation (Dkt. No. 43) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Lee's motion for summary judgment (Dkt. No. 32) is **GRANTED;** and it is further

**ORDERED** that Gray's complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Gray's renewed motion to appoint counsel (Dkt. No. 44 at 6–7) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

In this civil rights action, commenced pursuant to 42 U.S.C. § 1983, *pro se* plaintiff Dwaine Gray, a New York State prisoner, alleges that defendant Dr. Kang Lee, a prison physician, was deliberately indifferent to his serious medical needs by failing to provide him with proper pain medication and treatment for a shoulder injury suffered prior to his arrival at the correctional facility where defendant Lee was employed during the relevant time period. As relief, Gray seeks recovery of compensatory damages in the amount of $300,000, as well as injunctive relief directing the defendant to refer him for outside orthopedic consultation and prescribe for him appropriate pain medication.

Now that discovery in the action is closed, defendant has moved for summary judgment dismissing plaintiff's claim against him. In his motion, defendant Lee argues that plaintiff's claim represents little more than his disagreement with the course of treatment prescribed. For the reasons set forth below, I recommend that defendant's motion be granted.

### I. *BACKGROUND* [1]

[1]   Although plaintiff has opposed defendant's motion for summary judgment, he did not file a response to defendant Lee's statement of undisputed material facts, submitted pursuant to rule 7.1(a)(3) of the local rules of practice for this court. By its terms, local rule 7.1 provides, in part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug.22, 2010)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Svc. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997)* (McAvoy, J.). The deference owed to *pro se* litigants, however does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998)* (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011)* (Mordue, J.). Here,

because plaintiff was warned of the consequences of failing to properly respond to defendant's statement of undisputed material facts, *Dkt. No. 32 at 3,* and he has failed to do so, I recommend that the court deem the facts contained in defendant Lee's statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). As to any facts not contained in defendant's statement of undisputed material facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generallyDkt. No. 1.* While he is currently confined elsewhere, at the times relevant to his claims in this action, Gray was incarcerated at the Clinton Correctional Facility ("Clinton") located in Dannemora, New York. *Id.*

 **\*5** In January 2012, while detained at the Westchester County Jail, Gray slipped and fell in the shower, injuring his right shoulder. *Dkt. No. 1 at 4; Dkt. No. 32–2 at 1.* Plaintiff entered into DOCCS's custody two months later, on or about March 2, 2012, and was initially designated to the Downstate Correctional Facility ("Downstate"). *Dkt. No. 32–3 at 16,* 20. On March 16, 2012, while Gray was at Downstate, an x-ray taken of his right shoulder revealed "no fracture, dislocation, soft tissue calcification or significant arthritic change. Large enthesophyte extending from anteroinferior port of acromium measuring about 1.5 cm."*Id.* at 20; *Dkt. No. 32–2 at 57.* The impression stated on the x-ray report by the attending roentgenologist was "NO ACUTE BONE INJURY IDENTIFIED RIGHT SHOULDER STUDY. NO DJD. LARGE ENTHESOPHYTE EXTENDING FROM INFERIOR PORTION OF ACROMIUM. THIS CAN CONTRIBUTE TO SHOULDER IMPINGEMENT SYNDROME IN PROPER CLINICAL SETTING. NO PRIOR STUDY." *Dkt. No. 32–2 at 57.* According to the plaintiff's health records, a physician at Downstate met with Gray on March 20, 2012, at which time he discussed the x-ray results with plaintiff and prescribed 500 milligrams of Naproxen twice daily for thirty days. [2] *Dkt. No. 32–2 at 55; Dkt. No. 32–3 at 20–21*

[2]    Naproxen is a non-steroidal anti-inflammatory drug used to treat pain and inflammation associated with various medical conditions. *Dorland's Illustrated Medical Dictionary,* 1251 (31st ed.2007).

Plaintiff was transferred into Clinton on April 10, 2012. *Dkt. No. 32–3 at 19.* While at Clinton, his medical care was overseen by defendant Kang Lee, M.D., a prison physician employed at that facility. *Dkt. No. 32–2 at 1.*

Defendant Lee first met with Gray on April 13, 2012. *Dkt. No. 32–2 at 3,* 5–52. Plaintiff refused defendant Lee's offer to continue Naproxen at that time because, according to plaintiff, it did not help his pain. *Dkt. No. 32–2 at 3; Dkt. No. 32–2 at 51.*

Defendant Lee met with plaintiff again on May 31, 2012. *Dkt. No. 322 at 3,* 50. During that visit, plaintiff continued to complain of right shoulder pain. *Id.* Defendant Lee observed that Gray had a good range of motion and responded to his request for stronger pain medication with a short term prescription of Flexeril (cyclobenzaprine), a muscle relaxer commonly used to relieve skeletal muscle spasms and pain associated with acute musculoskeletal conditions. *Id.; see also Dorland's Illustrated Medical Dictionary,* 463, 725. During subsequent meetings with facility nurses on June 3, 2012 and June 26, 2012, Gray persisted in his refusal of Naproxen and indicated a desired to continue receiving Flexeril instead. *Dkt. No. 321 at 3; Dkt. No. 32–2 at 3,* 49.

On June 29, 2012, defendant Lee examined plaintiff's shoulder, again finding good range of motion. *Dkt. No. 32–2 at 3,* 48. According to defendant Lee, during this appointment, plaintiff requested a prescription for a narcotic analgesic. *Id.* Discerning no need for it, defendant Lee denied plaintiff's request. *Id.*

Plaintiff was next seen by defendant Lee on August 13, 2012. *Dkt. No. 32–2 at 4,* 47. At that time, despite plaintiff's claim that he could not move his right shoulder, defendant Lee continued to find that he had a good range of motion. *Id.*

 **\*6** During plaintiff's visit with medical staff at Clinton on September 4, 2012, he was not in acute distress, did not ask for pain medicine, and was observed having full range of motion in his right shoulder. *Dkt. No. 32–2 at 4,* 46. On September 8, 2012, medical personnel attended to plaintiff for complaints about a twisted ankle, and notes from that visit do not include

any indication that plaintiff complained of shoulder pain or requested pain medication. *Id.*

On September 29, 2012, defendant Lee ordered a second x-ray of Gray's right shoulder. *Dkt. No. 32–2 at 4,* 45. The x-ray, which was taken on October 4, 2012, was interpreted by the attending radiologist as follows:

> EARLY OSTEOPOROSIS IS PRESENT AT THE GLENOHUMERAL JOINT. THERE IS A LARGE SPUR ARISING FROM THE INFERIOR ASPECT OF THE ACROMION. THIS MAY CONTRIBUTE TO IMPINGEMENT. CONSIDER CORRELATION WITH MRI EXAM.

*Id.* at 70. During his appointment with plaintiff on October 15, 2012, defendant Lee discussed the results of the x-ray and prescribed Motrin for plaintiff's pain. *Id.* at 4, 44.

Defendant Lee met with plaintiff again on November 8, 2012, at which time he referred Gray for magnetic resonance imaging ("MRI") testing. *Dkt. No. 32–2 at 4,* 42. The MRI testing, conducted on January 11, 2013, resulted in the following findings, rendered by the attending radiologist:

> FINDINGS: Abnormal signal is present in the anterior aspect of the supraspinatus portion of the rotator cuff tendon consistent with a tear. There is also a suggestion of extension to the center portion of the supraspinatus tendon. Abnormal signal in the subscapularis portion of the rotator cuff tendon suggests a tear. Glenoid labrum is intact. There is abnormal signal in the superolateral aspect of the head of the right humerus consistent with bone edema. The acromioclavicular joint is intact.

> IMPRESSION: FINDINGS SUGGESTING A TEAR TO THE ANTERIOR ASPECT OF THE SUPRASPINATUS PORTION OF THE ROTATOR CUFF TENDON. THESE ABNORMALITIES ARE LOCATED ADJACENT TO PROMINENT CORTICAL SPUR ON THE UNDERSURFACE OF THE RIGHT ACROMION. POSSIBLE SUBSCAPULARIS TENDON TEAR.

*Dkt. No. 32–2 at 72.*

After receiving the MRI report, defendant Lee commenced the process for referring the plaintiff to an outside orthopedic specialist on January 31, 2013. *Dkt. No. 32–2 at 5,* 38, 73–74. While Gray awaited his orthopedic consultation, he met with medical staff at Clinton on several occasions, and defendant Lee continued to prescribe Motrin for plaintiff's pain. *Dkt. No. 32–2 at 5,* 33–37.

Plaintiff was transferred out of Clinton and into the Franklin Correctional Facility on April 25, 2013. *Dkt. No. 32–2 at 5; Dkt. No. 32–3 at 31.* At that point, defendant Lee's responsibility for plaintiff's medical treatment was transferred to the medical staff at the new facility. *Dkt. No. 32–2 at 5.*

In general, plaintiff does not dispute the above-described facts. Instead, plaintiff complains that defendant Lee swiftly terminated each appointment without undertaking any examination of him and failed to refer him to an outside specialist. *See, e.g., Dkt. No. 1 at 5–6* ("Upon seeing [defendant Lee in April 2012,] I explained that I try to move my arm, my statement to him was it hurts whenever I try to move it, he then summoned for the officer that for [sic] me to leave.... Upon seeing him, never once did he look in my medical records, all he did was ask me my name, then he said that I'm done.... [Defendant] Lee acted deliberately to deny treatment, and or [sic] to make specialty care[ ] referrals[.]"); *Dkt. No. 32–3 at 50* ("[E]very time I went to [defendant Lee's] office, it was like maybe 30 seconds, I'd been there for 30 seconds."); *Dkt. No. 40 at 3* ("[Defendant Lee] routinely ignored [plaintiff]'s complaints and medical needs and provided only cursory examinations without reviewing his medical file.").

## II. *PROCEDURAL HISTORY*

 **\*7** Plaintiff commenced this action on or about March 8, 2013. *Dkt. No. 1.* Although plaintiff's complaint names two defendants, Dr. Kang Lee and Ms. Vonda L. Johnson, the medical supervisor at Clinton, the claims asserted against defendant Johnson were dismissed by Chief Judge Gary L. Sharpe in a decision and order dated September 13, 2013. *Id.* at 1–2; *Dkt. No. 10.* Judge Sharpe's order, issued pursuant to 28 U.S.C. §§ 1915(e) and 1915A, also granted plaintiff's application to proceed in the action *in forma pauperis* and dismissed plaintiff's claims asserted under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.,* and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, without prejudice. *Dkt. No. 10 at 8–9.*

Plaintiff's Eighth Amendment deliberate medical indifference claim asserted against defendant Lee survived Judge Sharpe's initial order, and is the subject of defendant Lee's pending motion for summary judgment, filed on August 12, 2014. *Dkt. No. 10 at 9; Dkt. No. 32.* In his motion, defendant Lee argues that no reasonable factfinder could conclude he was deliberately indifferent to plaintiff's serious medical needs. *See generally Dkt. No. 32–4.* Plaintiff responded in opposition to defendant's motion on September 26, 2014. *Dkt. No. 40.*

Defendant's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

**\*8** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiff's Deliberate Medical Indifference Claim*

In his complaint, plaintiff alleges that defendant Lee was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, by failing to conduct a full examination, refer him to outside specialist, and prescribe pain medication. *See generally Dkt. No. 1.* Defendant Lee, however, contends that his care and treatment of plaintiff was appropriate, and no reasonable factfinder could conclude otherwise based on the record evidence. *See generally Dkt. No. 32–4.*

#### 1. *Legal Standard Governing Deliberate Medical Indifference Claims*

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255,

2015 WL 1724573

268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

**\*9** *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain ." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J .); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40). [3]

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### 2. *Analysis*

Addressing first the objective element of the governing test, I note that the record evidence demonstrates defendant Lee and other DOCCS medical personnel at Clinton provided plaintiff with frequent treatment for his shoulder condition. *Dkt. No. 32–2 at 33–57.* Plaintiff's medical records, while indicating complaints of pain, do not support his claims that he suffered severe pain, and indeed, in some instances, medical personnel treating plaintiff discerned no acute distress. *See, e.g., id.* at 46. Moreover, despite plaintiff's allegations that he suffered severe pain, the evidence before the court reflects that he was able to work as a server in the facility mess hall for three hours per day, seven days a week, from approximately June 2012 until August of that year, when he began ASAT programing. *Dkt. No. 32–2 at 33–37.* In his job at the mess hall, plaintiff would fill pitchers with water, clean the tables, or disburse bread to inmates. [4] *Id.* at 34. The record also reflects that plaintiff voluntarily discontinued taking the pain medication Naproxen in or about the beginning of June 2012. *Dkt. No. 32–2 at 51; Dkt. No. 32–3 at 21.* At that time, rather than ignoring plaintiff's complaints of pain altogether, defendant Lee provided a prescription for

Flexeril, a muscle relaxer, for two weeks. *Dkt. No. 32–3 at 23*. Thereafter, plaintiff was prescribed Percocet, an analgesic comprised of oxycodone hydrochloride and acetaminophen, and over-the-counter medications for his pain. *Dkt. No. 32–2 at 33–47; Dorland's Illustrated Medical Dictionary*, 1377, 1429. Defendant Lee also thereafter ordered repeat x-rays of plaintiff's shoulder in September 2012, and ordered an MRI in January 2013, based on the x-ray results. *Id.* at 42, 45, 77–78. Based upon these circumstances, it is doubtful that a reasonable factfinder could conclude that defendant Lee did not provide plaintiff with consistent and appropriate care.

4    At his deposition in connection with this matter, plaintiff first stated that he was removed from "table top" duty, involving filling water pitchers and cleaning table tops, due to the pain in his shoulder. *Dkt. No. 32–3 at 34*. Later, however, plaintiff testified that he began disbursing the bread not "because [his] shoulder was hurting him," but because he knew the corrections officer assigning jobs. *Id.* at 42.

**\*10** Even if the court assumes, for purposes of this motion, that plaintiff's allegations are true, including that defendant Lee's examinations of plaintiff were superficial and short in duration, and that defendant Lee failed to prescribe the pain medication plaintiff requested, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was inadequate or, to the extent it could be construed as inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what diagnostic techniques—including x-rays and MRIs —and treatments should be administered to an inmate are "classic example[s] of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). In this case, plaintiff's claim is based on his desire to be examined in a specific manner and provided specific pain medications. This constitutes a disagreement regarding the course of treatment, which does not give rise to a constitutional right or sustain a claim under section 1983. *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970) (citation omitted).

As described above, plaintiff's medical records reflect that he was seen by defendant Lee on four occasions between April 2012 and August 2012, before defendant Lee ordered

x-rays of plaintiff's shoulder in September 2012. *Dkt. No. 32–2 at 45,* 47, 48, 50, 52. In between his visits with defendant Lee, other medical personnel at Clinton monitored plaintiff's shoulder condition. *Id.* at 33–57. When a provider callout was requested, defendant Lee timely responded with an examination of plaintiff. *Id.* at 4749. Within six months of plaintiff's arrival at Clinton, and because plaintiff's pain persisted, defendant Lee ordered x-rays, thereafter ordered MRI testing, and then initiated a process for referral of the plaintiff to a specialist. *Id.* at 38, 45, 73–74, 77–78. Under these circumstances, even taking into consideration plaintiff's allegations, I find that no reasonable factfinder could conclude that defendant Lee's treatment of plaintiff's shoulder condition was sufficiently serious to satisfy a deliberate medical indifference claim under the Eighth Amendment.

Similarly, based on defendant Lee's declaration submitted in support of the pending motion and the treatment afforded plaintiff by defendant Lee as documented in plaintiff's medical records, I find that no reasonable factfinder could conclude that defendant Lee acted with deliberate indifference to a serious medical condition. The record reflects that on each occasion he was seen by defendant Lee, plaintiff's range of motion was observed and medication consistent with defendant Lee's professional judgment was prescribed. *Dkt. No. 32–2 at 47,* 48, 50, 52. When plaintiff's shoulder pain persisted, a new x-ray was ordered and, based upon the findings of that x-ray, MRI testing was arranged. *Id.* at 45, 77–78. Upon receipt and review of the MRI report, defendant Lee referred Gray to an outside orthopedic specialist. *Id.* at 38, 73–74. Simply stated, based upon a careful review of the record, I find nothing to suggest that defendant Lee turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

**\*11** Accordingly, because I find that the record evidence does not reflect a genuine dispute of material fact with respect to either the objective or subjective element of plaintiff's medical indifference claim, I recommend defendant Lee's motion for summary judgment be granted.[5]

5    Plaintiff's response in opposition to defendant Lee's summary judgment motion reflects his belief defendant Lee was negligent in providing him with treatment and liable for medical malpractice. *See generallyDkt. No. 40*. For example, in his memorandum of law, plaintiff states the following:

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 155 of 267
Gray v. Kang Lee, Not Reported in F.Supp.3d (2015)
2015 WL 1724573

It is clear from Plaintiff's original claim, his response above and comprehensive exhibits that he presents a viable claim that Dr. Lee did not use reasonable care or best judgment in applying the knowledge and skill ordinarily possessed by practitioners in the field and that he deviated from accepted standards of medical practice, and that deviation was the proximate or aggravating cause of the injuries or damage to Petitioner.

*Dkt. No. 40 at 8–9*. Claims of negligence and medical malpractice, however, are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ( "[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke,* No. 87–CV–7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct.21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983."). Accordingly, I recommend that, to the extent plaintiff's complaint could be construed as asserting state law negligence and medical malpractice claims, the court declines to exercise supplemental jurisdiction over those claims in the event my recommendation is accepted and plaintiff's federal claim against defendant Lee is dismissed.

IV. *SUMMARY AND RECOMMENDATION*

Based upon a careful review of the evidence now before the court, including excerpts of plaintiff's medical records and the transcript of plaintiff's deposition, I conclude that no reasonable factfinder could find plaintiff can satisfy either the objective or subjective element of the governing test for establishing a deliberate medical indifference claim under the Eighth Amendment. Accordingly, it is therefore respectfully

RECOMMENDED that defendant Lee's motion for summary judgment (*Dkt. No. 32* ) be GRANTED, and that plaintiff's remaining deliberate indifference claim be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed March 9, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1724573

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Nowinski v. Rao, Not Reported in Fed. Supp. (2018)

2018 WL 2303780

2018 WL 2303780
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Spencer NOWINSKI, Plaintiff,

v.

M.D. RAO, R.H.S. Administrator Eileen Dinisio,
M.D. Kooi, Mthulisi Nyoni, R.N. D. Graft, M.D.
Carl Koenigsmann, and M.D. Dolan, Defendants.

6:14-CV-06559 (MAT)
|
Signed 05/21/2018

**Attorneys and Law Firms**

Spencer Nowinski, Romulus, NY, pro se.

Bernard F. Sheehan, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

HON. MICHAEL A. TELESCA, United States District Judge

**I. Introduction**

**\*1** *Pro se* plaintiff Spencer Nowinski("Plaintiff"), a prisoner
currently incarcerated at the Five Points Correctional Facility
("Five Points"), commenced the instant action on September
24, 2014, alleging a violation of his Eight Amendment rights
pursuant to 42 U.S.C. § 1983 ("§ 1983"). Currently pending
before the Court is a motion for summary judgment (Docket
No. 50) filed by defendants M.D. Rao ("Dr. Rao"), R.H.S.
Administrator Eileen Dinisio ("Administrator Dinisio"),
M.D. Kooi ("Dr. Kooi"), Mthulisi Nyoni ("PT Nyoni"), R.N.
D. Graft ("PA Graf" [1]), M.D. Carl J. Koenigsmann ("Dr.
Koenigsmann"), and M.D. Dolan ("Dr. Dolan") (collectively
"Defendants"). For the reasons discussed below, the Court
grants the pending summary judgment motion and orders that
the case be closed.

[1]    The record reflects that the individual referred to by
Plaintiff as "R.N. D. Graft" is actually physician's
assistant ("PA") Deborah Graf. The Court has
accordingly referred to her PA Graf.

**II. Factual Background**

The following facts are taken from the statement of facts,
declarations, and exhibits submitted by Defendants, as well
as the docket in this matter. Plaintiff did not submit any
papers in opposition to Defendants' motion, despite having
been specifically warned of the repercussions of failing to
do so. Accordingly, this Court has accepted Defendants' Rule
56 Statement of Undisputed Facts (which was submitted
in accordance with the Local Rules of Civil Procedure) as
undisputed "to the extent that [the facts set forth therein] are
supported by admissible evidence and are not controverted
by the record." *Brooks v. Piecuch*, 245 F. Supp. 3d 431, 434
(W.D.N.Y. 2017).

Plaintiff's complaint alleges that, sometime in 2002, he tore
his anterior cruciate ligament ("ACL"). In February 2002,
Plaintiff was arrested and jailed in the Cattaraugus County
Jail, where he complained about his knee injury. Over the next
nine years of incarceration, Plaintiff alleges that he was given
various forms of treatment, including knee surgery in 2003
and multiple prescriptions for pain medication. Nevertheless,
Plaintiff contends, his knee pain continued to increase over
time.

In 2011 and 2012, Plaintiff was housed at the Attica
Correctional Facility ("Attica"). During this time, because
of Plaintiff's ongoing complaints and his history of knee
pain, it was recommended that Plaintiff under a total knee
replacement. Dr. Rao, who is now retired but was at that time
employed by the New York State Department of Corrections
and Community Supervision ("DOCCS") and assigned to
Attica, reviewed this recommendation, which was ultimately
approved by DOCCS officials in Albany.

On October 26, 2011, Plaintiff underwent a total knee
replacement of his right knee. Tissues and bone fragments
taken during the surgery indicated that the condition of
his right knee was consistent with arthritis. Plaintiff stayed
in the hospital until October 31, 2011, whereafter he was
returned to Attica. To help with post-surgery pain, Plaintiff
was prescribed Tylenol with codeine.

**\*2** Plaintiff was discharged to his cell in good condition
on November 1, 2011. Dr. Rao saw Plaintiff on November
14, 2011. Plaintiff indicated he was in pain, so Dr. Rao
renewed his pain medication for an additional five days.
Plaintiff requested follow-up for his knee surgery, and Dr.
Rao informed Plaintiff that he was waiting for a note from
the physician who had performed the surgery. Beyond that,
Dr. Rao indicated that he was not able to answer questions

about the surgery because he was not an orthopedic surgeon. Plaintiff claims to have sent letters to Dr. Rao, but Dr. Rao does not recall receiving such letters. Dr. Rao noted in the system that Plaintiff had requested to see a doctor to follow up on his surgery.

Registered Nurse Eileen Drankhan ("Nurse Drankhan"), who was employed by DOCCS at Attica, saw Plaintiff on November 28, 2011. She noted that Plaintiff was ambulating without difficulty and that he had returned his crutches. Plaintiff told Nurse Drankhan that he was able to walk "okay," but that he was not bending his right knee much. Nurse Drankhan encouraged Plaintiff to bend his knee and gave him 12 packs of ibuprofen. She also instructed him regarding simple exercises he could do to increase his knee's range of motion and minimize his pain.

Plaintiff was next seen by Attica medical staff on March 20, 2012, after he was involved in an altercation with another inmate. No complaints about his knee were noted at that time.

On July 1, 2012, Plaintiff sent a letter to Dr. Koenigsmann, DOCCS Chief Medical Officer, complaining about the medical department at Attica. Plaintiff's letter was referred to Administrator Dinisio, who was at time a regional health services administrator for DOCCS. Administrator Dinisio investigated Plaintiff's complaint and discovered that Plaintiff had recently been evaluated by his primary care provider, that he had been able to ambulate without difficult following his surgery, and that he had an appointment scheduled for July 30, 2012. Administrator Dinisio sent Plaintiff a letter setting forth those facts and encouraging him to discuss his concerns with his primary care provider.

On July 30, 2012, Plaintiff was seen by Attica medical staff and complained that his knee was not bending well and was slightly swollen. Plaintiff was given Motrin and was put on callout for a physician to review.

PA Graf then saw Plaintiff on September 11, 2012. Plaintiff told PA Graf that he had not received physical therapy after his knee surgery, that he was not experiencing relief from nonsteroidal anti-inflammatory drugs ("NSAIDs"), and that he was unable to ambulate short distances or climb stairs. PA Graf noted that Plaintiff's right knee had limited flexion and that his gait was antalgic. She referred Plaintiff to physical therapy and prescribed him Voltaren, which is an anti-inflammatory medication, for his pain and swelling.

Dr. Rao reviewed PA Graf's referral for physical therapy, which was subsequently approved by DOCCS officials in Albany. An initial physical therapy session was scheduled for September 24, 2012. However, prior to that date, Plaintiff was transferred to the Auburn Correctional Facility ("Auburn").

On October 1, 2012, shortly after his transfer to Auburn, Plaintiff was seen on sick call. Plaintiff reported that he had swelling in his right knee and that he was waiting for physical therapy. Based on this report, Dr. Kooi, who was at that time the Facility Health Services Director at Auburn, recommended that Plaintiff be scheduled for physical therapy, and an initial physical therapy appointment was scheduled for October 18, 2012.

PT Nyoni, a licensed physical therapist, saw Plaintiff on October 18, 2012. PT Nyoni would eventually see Plaintiff for physical therapy for his knee 16 times in 2012 and 2013, with Plaintiff failing to report for his physical therapy appointments on five occasions. The goals of this physical therapy were for Plaintiff to decrease his pain, improve his gait, increase his range of motion, and increase the strength in his legs. PT Nyoni employed a variety of techniques in treating Plaintiff, including the use of moist heat, range of motion exercises, and manipulation of Plaintiff's knee.

**\*3** Dr. Dolan, who was a DOCCS physician assigned to Auburn during the relevant time period, first saw Plaintiff on November 19, 2012. Plaintiff complained of right knee pain and a poor range of motion following his surgery. Dr. Dolan saw Plaintiff again one week later. Dr. Dolan noted that Plaintiff had started physical therapy on October 18, 2012, and that he had had four physical therapy sessions scheduled with two no-shows. Dr. Dolan further noted that Plaintiff's right knee had poor strength and a poor range of motion and that there signs of atrophy in his right leg. Based on Plaintiff's complaints of pain, Dr. Dolan ordered an x-ray to see whether Plaintiff's knee appliance might be loose. Dr. Dolan noted that Plaintiff should see him again after the x-ray was performed. An x-ray of Plaintiff's knee was taken on November 30, 2012, and showed that his knee prosthesis was in place without subsidence or loosening.

Dr. Dolan saw Plaintiff again on March 20, 2013. Plaintiff noted that Plaintiff's physical therapy had been somewhat irregular since his surgery and that he had a limited range of motion and pain in his right knee. Dr. Dolan suspected that there might be adhesions in Plaintiff's knee that were affecting his range of motion. Dr. Dolan recommended

Nowinski v. Rao, Not Reported in Fed. Supp. (2018)
Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 158 of 267
2018 WL 2303780

further physical therapy for Plaintiff, which was approved by DOCCS officials in Albany. Dr. Dolan further noted that it might ultimately be necessary for an orthopedic surgeon to manipulate Plaintiff's knee under anesthesia to address possible adhesions. Dr. Dolan ordered additional x-rays and blood tests of Plaintiff, and prescribed acetaminophen for his pain. Dr. Dolan did not refuse to refer Plaintiff to a specialist, but instead felt that physical therapy should be tried first, to see if Plaintiff's range of motion could be improved.

Three months later, in June 2013, PT Nyoni recommended that Plaintiff see a physician because he was showing minimal improvement in his range of motion through physical therapy. Dr. Kooi saw Plaintiff on June 27, 2013. Dr. Kooi noted that Plaintiff could walk but occasionally had a limp. Based on PT Nyoni's notes and recommendation and his own evaluation of Plaintiff, Dr. Kooi then referred Plaintiff for a consultation with an orthopedic surgeon, and the referral was approved by DOCCS officials in Albany. Dr. Kooi also prescribed Plaintiff Naprosyn for his pain.

Dr. Kooi saw Plaintiff again on July 12, 2013. Dr. Kooi discontinued the Naprosyn and prescribed Neurontin for pain. He further advised Plaintiff to be active to help with his numbness and range of motion. On August 23, 2013, Dr. Kooi saw Plaintiff and increased his Neurontin dosage from 300 mg to 600 mg.

Plaintiff was seen by orthopedic surgeon Dr. Eldridge Anderson ("Dr. Anderson") on September 10, 2013. Dr. Anderson indicated that Plaintiff should continue with physical therapy and that a consultation with a revision specialist might be appropriate.

Dr. Kooi saw Plaintiff on September 12, 2013. He discussed Dr. Anderson's findings and recommendations with Plaintiff. Plaintiff indicated that he did not believe further physical therapy would be helpful.

On January 17, 2014, Plaintiff was seen by orthopedic surgeon Dr. Mitchell Rubinovich ("Dr. Rubinovich") to discuss possible revision surgery. That same day, Dr. Rubinovich sent a letter to Dr. Daniel Weinstock ("Dr. Weinstock"), a DOCCS physician at Auburn, in which he recommended that Plaintiff be provided a cane. Dr. Rubinovich also indicated that he wanted to further review Plaintiff's imaging results and to discuss the matter with his medical partner. Dr. Rubinovich stated that he would contact Dr. Weinstock after he spoke with his partner.

Dr. Weinstock called Dr. Rubinovich's office on February 10, 2014, and was told that Dr. Rubinovich had been away for two weeks, but would be returning on February 17, 2014, and would call Dr. Weinstock back. Dr. Weinstock subsequently reported on March 3, 2014 that no revision surgery was possible at that time and that Plaintiff should be considered and evaluated for a cane.

**\*4** Dr. Kooi saw Plaintiff on April 3, 2014. Dr. Kooi approved the recommendation that Plaintiff be given a cane and ordered a cane for Plaintiff. Plaintiff received his cane on April 8, 2014. Dr. Kooi subsequently approved Plaintiff's permit for a cane on at least three occasions.

Plaintiff was thereafter transferred to Five Points. He ultimately had knee revision surgery on November 17, 2016. Additional physical therapy was recommended by an orthopedic surgeon, but Plaintiff refused to attend. Plaintiff has been given a handicapped cell with shower access and has a permit to walk with a cane.

## III. Discussion

### A. Legal Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court will grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *See Scott v. Harris*, 550 U.S. 372, 378 (2007), citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). A party opposing a motion for summary judgment " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87).

### B. Failure to Exhaust Administrative Remedies

Nowinski v. Rao, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 159 of 267

2018 WL 2303780

As a threshold matter, Defendants contend that Plaintiff failed to exhaust his administrative remedies with respect to all of his claims related to events in 2011, 2012, "early 2013," and after August 20, 2013. The Court agrees.

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [§ 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). DOCCS "maintains a three-tiered administrative review and appeals system for prisoner grievances." Torres v. Carry, 672 F. Supp. 2d 338, 343 (S.D.N.Y. 2009). In particular, "[f]irst, an inmate may file an inmate grievance complaint form or a written grievance, if forms are not available, with the Inmate Grievance Resolution Committee ("IGRC"). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. Finally, [DOCCS] permits an inmate to appeal the superintendent's written decision to the CORC [Central Office Review Committee]." Id. (internal citations omitted). An inmate must exhaust all three levels of review before he or she can bring a claim under § 1983. Moreover, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." Ruggiero v. Cty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006).

**\*5** In this case, DOCCS has submitted uncontroverted evidence that Plaintiff fully exhausted only one grievance related to his medical care following his knee surgery. That grievance was filed on August 20, 2013. The IGRC investigated and granted Plaintiff's grievance to the extent that it agreed his future health care needs should be tended to in a timely fashion. Plaintiff appealed to the superintendent, who agreed with the findings of the IGRC and noted that Plaintiff had an upcoming appointment with an orthopedic surgeon. Plaintiff appealed to CORC, and on February 12, 2014, CORC issued a decision granting Plaintiff's request in part. In particular, CORC found that Plaintiff's complaints regarding his medical concerns in 2011, 2012, and "early 2013" were untimely. CORC further found that, with respect to the timely aspects of Plaintiff's grievance, there was no evidence to substantiate any claims of improper medical care or malfeasance by DOCCS staff. CORC encouraged Plaintiff to address his medical concerns via sick call.

CORC's conclusion that Plaintiff failed to timely grieve his complaints from 2011, 2012, and early 2013 is well-founded. Under DOCCS' system for inmate grievances, grievances

must be filed "within 21 calendar days of an alleged occurrence." N.Y. Comp. Codes R. & Regs. § 701.5. In this case, Plaintiff did not file his grievance until August 20, 2013. Accordingly, his complaints related to any events occurring before July 30, 2013 were untimely. Plaintiff therefore failed to exhaust his administrative remedies with respect to such complaints.

Plaintiff also failed to exhaust his administrative remedies as to events occurring after August 20, 2013, the date of the only grievance he appealed to completion. Plaintiff never filed a grievance related to these later events, and under the PLRA, may not maintain a § 1983 claim based upon them. Moreover, there is no evidence in the record from which the Court could conclude that Plaintiff was unable to comply with DOCCS' grievance procedures. To the contrary, the fact that Plaintiff filed and appealed to completion his August 20, 2013 grievance demonstrates that grievance procedures were available to him. Accordingly, to the extent Plaintiff's claims are based on events occurring before July 30, 2013 or after August 20, 2013, Defendants are entitled to judgment in their favor.

### C. Plaintiff Cannot Show a Violation of His Eight Amendment Rights

Plaintiff's claims are based on his Eight Amendment right to be free from cruel and unusual punishment. "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). However, the Second Circuit has made it clear that "not every lapse in medical care is a constitutional wrong." Id. Instead, to demonstrate an Eighth Amendment violation, Plaintiff is required to meet two separate requirements. "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." Id. (internal quotation omitted). Determining whether a deprivation was objectively serious in turn involves two inquiries: "The first inquiry is whether the prisoner was actually deprived of adequate medical care.... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." Id. at 279-80.

The second requirement to show an Eighth Amendment deprivation of medical care claim "is subjective: the charged official must act with a sufficiently culpable state of mind."

Nowinski v. Rao, Not Reported in Fed. Supp. (2018)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 160 of 267

2018 WL 2303780

*Id.* at 280. In particular, "[i]n medical-treatment cases not arising from emergency situations," the party claiming a constitutional violation must show that a defendant "acted with deliberate indifference to inmate health." *Id.*

In this case, even taking into account events before July 30, 2013 and after August 20, 2013, it is clear that no rational factfinder could hold that either of these requirements were met. Turning to the first requirement, there is simply no evidence that Plaintiff was deprived of adequate medical care. To the contrary, the record shows that Plaintiff was provided with extensive care for his knee problems, including multiple surgeries, physical therapy, medication, and accommodations such as a cane and a handicapped cell. *See Gray v. Kang Lee*, No. 9:13-CV-258 GLS/DEP, 2015 WL 1724573, at *3 (N.D.N.Y. Apr. 15, 2015) (prisoner could not satisfy objective requirement where he was "frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist").

**\*6** With respect to the second, subjective requirement, once again there is no evidence from which a rational factfinder could hold in Plaintiff's favor. It is apparent that Defendants made reasonable efforts to provide Plaintiff with appropriate medical care. The medical staff at both Attica and Auburn took Plaintiff's knee complaints seriously, providing him with a wide variety of pain medications, referring him for physical therapy, and seeking the advice of outside orthopedic surgeons. Plaintiff's disagreement with his providers' medical judgment regarding the advisability of ongoing physical therapy is insufficient to demonstrate deliberate indifference to his medical needs. *See Green v. Khrisnaswamy*, 134 Fed.Appx. 465, 466 (2d Cir. 2005). Nor is Plaintiff's belief that he should have been prescribed stronger pain medication

evidence of a culpable state mind by Defendants. "While prisoners have a right to medical care, they do not have a right to chose a specific type of treatment. Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment." *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (internal citations omitted).

Based on the record, Plaintiff is unable to "demonstrate that any of the Defendants was aware of but consciously disregarded a substantial risk to his health." *Day v. Lantz*, 360 Fed.Appx. 237, 239 (2d Cir. 2010). To the contrary, the record in this case shows that Plaintiff's providers actively attempted to address Plaintiff's medical concerns. As such, summary judgment in favor of Defendants as to all of Plaintiff's claims is warranted.

### III. Conclusion

For the reasons set forth above, the Court grants Defendants' motion for summary judgment (Docket No. 50). The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *See Coppedge v. United States*, 369 U.S. 438 (1962). The Clerk of the Court is instructed to enter judgment in favor of Defendants and to close the case.

**ALL OF THE ABOVE IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 2303780

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 161 of 267
Washington v. Westchester County Dept. of Correction, Not Reported in F.Supp.3d (2014)
2014 WL 1778410

2014 WL 1778410
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Darrell WASHINGTON, Plaintiff,

v.

WESTCHESTER COUNTY DEPT. OF
CORRECTION, et al., Defendants.

No. 13 Civ. 5322(KPF).
|
Signed April 25, 2014.

*OPINION AND ORDER*

KATHERINE POLK FAILLA, District Judge. [1]

[1]
 Doug Giannantonio, a third-year student at Columbia Law School and an intern in my Chambers, provided substantial assistance in researching and drafting this Opinion.

**\*1** In early 2013, Plaintiff Darrell Washington, who is proceeding *pro se* and is currently incarcerated, received medical treatment for a severe bacterial infection he experienced while incarcerated at the Westchester County Jail. On July 29, 2013, Plaintiff initiated this action under 42 U.S.C. § 1983 against Defendants Westchester County Department of Correction and Correct Care Solutions, LLC, alleging deliberate indifference to his medical needs in violation of the Eighth Amendment. Defendants now move to dismiss the Complaint for failure to state a claim. For the reasons discussed herein, that motion is granted in part, and Plaintiff is granted leave to file an amended complaint within 30 days.

**BACKGROUND** [2]

[2]
 The facts alleged herein are drawn from Plaintiff's Complaint ("Compl." (Dkt.# 2)), and are assumed true for the purposes of this Opinion. For convenience, Defendants' opening brief in support of the instant motion (Dkt.# 15) will be referred to as "Def. Br."; Plaintiff's opposition affirmation

(Dkt.# 23) as "Pl. Opp."; and Defendants' reply brief (Dkt.# 24) as "Def. Reply."

Prior to the filing of Defendants' motion to dismiss, Plaintiff submitted to the Court what he alleges to be the relevant medical records. (Dkt.# 9, 10). However, those materials were not submitted along with the Complaint; they were not referred to in the Complaint; and they were not submitted in connection with the briefing of this motion. Accordingly, the Court may not consider these documents in the context of a motion to dismiss. *See generally Kalyanaram v. American Ass'n of University Professors at New York Institute of Technology, Inc.,* 742 F.3d 42, 44 n. 1 (2d Cir.2014) (discussing circumstances under which courts can consider outside materials in resolving motions to dismiss). Yet to the extent the Court is permitted to review all papers submitted by a *pro se* plaintiff in order to raise the strongest arguments these papers suggest, the Court has reviewed these records, and notes that they facially support the factual allegations discussed herein.

**A. Plaintiff's Incarceration and MRSA Infection**
Plaintiff was arrested on or about January 23, 2013. (Compl.3). Prior to his arrest, Plaintiff had been prescribed a medication called Doxycycline, as well as an ointment, "for MRSA." (*Id.*) . [3] Accordingly, at the time Plaintiff was arrested, he had on his person both the Doxycycline and "some type of ointment." (*Id.*). Plaintiff does not actually allege that he had a MRSA infection prior to his incarceration, or that he suffered any symptoms of that infection, only that he had been prescribed and was taking medication "for MRSA." (*Id.*). [4]

[3]
 MRSA is an acronym for Methicillin-resistant Staphylococcus aureus, a bacterium that can cause serious infections.

[4]
 Plaintiff alleges in opposition that he "did not enter the facility with the deadly disease," and that he "caught" MRSA while at the Jail. (Pl.Opp.1–3). This statement is facially contradictory with Plaintiff's allegation in the Complaint that he was undergoing treatment for MRSA prior to his incarceration. The Court ordinarily may not consider factual allegations contained in opposition papers to a motion to dismiss unless they are consistent with those contained in the complaint.

See *Friedl v. City of New York,* 210 F.3d 79, 83–84 (2d Cir.2000). This is not the case here, and for this reason, the Court disregards the inconsistent factual allegations in Plaintiff's opposition papers.

During the relevant time period, Plaintiff was incarcerated at the Westchester County Jail (the "Jail"), in Valhalla, New York. (Compl.3). The Jail is operated by Defendant Westchester County Department of Correction (the "County"). Defendant Correct Care Solutions, LLC ("Correct Care") provides medical care to prisoners at the Jail.

According to Plaintiff, upon his arrival at the Jail on January 23, 2013, Plaintiff informed a correctional officer and a doctor on staff that Plaintiff was on medication for MRSA. (Compl.3). The doctor informed Plaintiff that he could no longer take his prescribed medications, but that Plaintiff would be prescribed new medication. (*Id.*). In fact, Plaintiff was never prescribed any new medication, and the Doxycycline and ointment were locked up with Plaintiff's property at the Jail. (*Id.*).

On or about March 17, 2013, Plaintiff developed a large lump on his leg. (Compl.3). The lump worsened and "turned into a 2 inch hole." (*Id.*). Plaintiff's leg was "[highly] infected," and he "was in a lot of pain." (*Id.*). In response to Plaintiff's complaint, a doctor performed a blood test, measured the size of the lump, and placed Plaintiff in quarantine for approximately one week. (*Id.*).

The diagnostic test results subsequently revealed that Plaintiff was infected with MRSA. (Compl.3). Accordingly, a doctor prescribed antibiotics and painkillers to Plaintiff, which he took for approximately three weeks. (*Id.*). Plaintiff does not take issue with his medical treatment in connection with his March 2013 infection, but avers that he "feel[s] the doctors [at the Jail] are hiding something." (*Id.*).

**\*2** Plaintiff alleges that his medical issues are ongoing due to "the medication/MRSA." (Compl.5). Perhaps relatedly, Plaintiff contends that on or about June 14, 2013, he developed "a very bad rash" on his arm. (*Id.* at 3). It is unclear, however, whether this "bad rash" is related in any way to Plaintiff's MRSA infection; Plaintiff does not provide any further details about this rash or its treatment.

**B. The Instant Action**
On June 19, 2013, Plaintiff served a Notice of Claim, dated June 14, 2013, on the Westchester County Attorney, indicating that Plaintiff planned to pursue a claim against the County and Correct Care under Section 50–e of the New York General Municipal Law. (Def. Br. 3; Dkt. # 18–1 at 2–3). The Westchester County Attorney subsequently rejected Plaintiff's Notice of Claim as untimely. (Def. Br. 3; Dkt. # 18–1 at 1, 4).

On July 29, 2013, Plaintiff initiated the instant action against Defendants (Dkt.# 2), seeking $1 million in damages to "pay for any further medical bills and also for pain and suffering." (Compl.5). The allegations contained in Plaintiff's Complaint mirror those in his previously-filed Notice of Claim. (Def. Br. 3; *compare* Compl. 3, *with* Dkt. # 18–1 at 2).

To date, Plaintiff concededly has not filed a grievance with the Jail—or with any other jail, prison, or correctional facility—for improper medical treatment in relation to the events described in the Complaint. (Compl.4). Instead, Plaintiff contends that he does not know whether the Jail has a grievance procedure and "do[es]n[']t know how to file a grievance." (Compl.4).

The case was assigned to the undersigned on August 6, 2013. Pursuant to the briefing schedule set forth at the October 23, 2013 pre-motion conference (Dkt. # 11), Defendants moved to dismiss on November 22, 2013 (Dkt.# 13). Plaintiff filed his opposition on December 17, 2013 (Dkt.# 23), and the motion was fully briefed as of the filing of Defendants' reply on December 24, 2013 (Dkt.# 24). The Court now considers Defendants' motion to dismiss.

**DISCUSSION**

**A. Applicable Law**
When considering a motion under Rule 12(b)(6), the Court should "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." Fed.R.Civ.P. 12(b)(6); *Faber v. Metropolitan Life,* 648 F.3d 98, 104 (2d Cir.2011) (internal quotation marks omitted) (quoting *Selevan v. N.Y. Thruway Auth.,* 548 F.3d 82, 88 (2d Cir.2009)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from

conceivable to plausible." (internal quotation marks omitted) (citing *Twombly,* 550 U.S. at 570)). The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Hennenman,* 517 F.3d 140, 149 (2d Cir.2008) (quoting *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002)).

**\*3** "[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)); *accord McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). That said, the liberal pleading standard accorded to *pro se* litigants "is not without limits, and all normal rules of pleading are not absolutely suspended." *Stinson v.. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980).

### B. Analysis

Plaintiff alleges that his Eighth Amendment rights were violated when Defendants acted with deliberate indifference to his serious medical needs. He brings this claim under Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Plaintiff's claim is best understood as a claim for two separate instances of alleged deliberate indifference to serious medical need: first, Defendants' decision to discontinue Plaintiff's medications upon his admission into the Jail, and second, Defendants' treatment of Plaintiff's leg infection in March 2013.

### 1. Defendant County's Affirmative Defense of Exhaustion Is Denied Without Prejudice

Preliminarily, the County raises, as an affirmative defense, Plaintiff's failure to exhaust his administrative remedies, in violation of the Prison Litigation Reform Act of 1995 ("PLRA"), Pub.L. No. 104–134, Title VIII, § 803(d), 110 Stat. 1321–71 (1996) (codified as amended at 42 U.S.C. § 1997e). The PLRA requires prisoners to exhaust all "available" administrative remedies prior to filing a claim in federal court. Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court

has held that this requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (internal citation omitted); *see also Cruz v. Jordan,* 80 F.Supp.2d 109, 111 (S.D.N.Y.1999) ("I hold that an action alleging deliberate indifference to medical needs is an action 'brought with respect to prison conditions,' requiring exhaustion[.]").

The purpose of the exhaustion requirement is to promote efficiency by reducing the quantity and improving the quality of prisoner litigation. *Porter,* 534 U.S. at 516; *see also Woodford v. Ngo,* 548 U.S. 81, 89 (2006) ("Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." (internal citation omitted)). Further, "[e]xhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's] procedures.' " *Woodford,* 548 U.S. at 89 (internal citation omitted).

**\*4** The Second Circuit has held that there are three exceptions to the PLRA's "mandatory" exhaustion requirement:

> [W]hen (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such [a] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In light of this case law, Plaintiff's admitted failure to exhaust his administrative remedies is not dispositive. (*See* Compl. 4). Instead, the Court must determine whether, as relevant here, those administrative remedies were available to Plaintiff in

the first place. Plaintiff contends that he did not know how to file a grievance. (*Id.*). Courts within this District are uniform in holding that "[administrative] remedies are not available where prisoners are not informed of their existence." *Smith v. City of New York,* No. 12 Civ. 3303(CM), 2013 WL 5434144, at \*8 (S.D.N.Y. Sept. 26, 2013) (internal citation omitted); *see also Rivera v. New York City,* No. 12 Civ. 760(DLC), 2013 WL 6061759, at \*4–5 (S.D.N.Y. Nov. 18, 2013) (same).

Specifically, "[a]n institution keeps an inmate ignorant of the grievance procedure [and thus administrative remedies are 'unavailable'] when correctional officials either fail to inform him of the procedure altogether or fail to provide him with access to materials which could otherwise educate him about the use of that process." *Arnold v. Goetz,* 245 F.Supp.2d 527, 538 (S.D.N.Y.2003) (internal citation omitted). At the same time, however, " 'correctional officials are entitled to the benefit of § 1997e(a) as long as the institution has made a reasonable, good faith effort to make the grievance procedure available to inmates; an inmate may not close his eyes to what he reasonably should have known.' " *Id.* at 537–38 (internal citation omitted). The availability of those remedies is adjudged not by whether the Plaintiff was unaware of them, but instead by whether " 'a similarly situated individual of ordinary firmness' " would have deemed them available. *Hemphill v. New York,* 380 F.3d 680, 688 (2d Cir.2004) (internal citation omitted). This is a question of fact. *Arnold,* 245 F.Supp.2d at 538.

The record here is devoid of any facts from which such a determination could be made. Most cases in this District considering the topic have explored, in detail, whether the correctional officers provided the inmate with a handbook explaining the grievance procedure, and whether officers explained the grievance procedure prior to the alleged incident; the record before the Court is—understandably, at this procedural juncture—silent as to this information. *See, e.g., Smith,* 2013 WL 5434144, at \*10 ("Receipt of such a handbook generally indicates that the inmates were informed of the grievance procedure so as to make that procedure 'available' to them. It alone is not, however, dispositive." (internal citation omitted)); *Arnold,* 245 F.Supp.2d at 539 ("The defendants allege that the 'behavior booklet' provided to an inmate upon his 'entrance to the corrections system' outlines the available grievance procedures." (internal citation omitted)).

 **\*5** Failure to comply with the PLRA's exhaustion requirement is an affirmative defense, on which the defendant

bears the burden of proof. *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999); *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 196 (S.D.N.Y.2000). The County has failed to carry its burden on this affirmative defense; however, its claim in this regard is denied without prejudice to raising such a defense at a later date, upon a more complete record. [5] *See Arnold,* 245 F.Supp.2d at 538– 39 ("Since the nonmoving party is proceeding *pro se,* we are obligated to resolve existing doubts in the plaintiff's favor and to read his [ ] Complaint as raising the strongest argument it suggests (namely, that his lack of sufficient knowledge about the procedure is attributable to correctional officials rather than to himself. Giving the plaintiff the benefit of the doubt in this manner despite his failure to clarify his statements comports with the principle that the defendants bear the burden of proving that he failed to satisfy the PLRA's exhaustion requirement.").

[5]     Though the Court does not reach this issue here, it notes that Defendant Correct Care has not also raised the affirmative defense of Plaintiff's failure to comply with the PLRA's exhaustion requirement and, for that reason, may have forfeited this defense. *See Arnold,* 245 F.Supp.2d at 532 (noting that failure to exhaust is an affirmative defense and thus " 'may be waived by a defendant, or forfeited by failure to raise the defense' " (internal citation omitted)).

## 2. The Complaint Fails to Allege Defendants' Deliberate Indifference to a Serious Medical Need

The Court next turns to the merits of Plaintiff's constitutional claim. To sufficiently plead a violation of the Eighth Amendment for deliberate indifference to a serious medical need, a plaintiff must allege that (i) the alleged deprivation results in a serious medical condition; and (ii) the defendant, in depriving plaintiff of medical treatment, acted with deliberate indifference. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

### a. Plaintiff Has Alleged a Serious Medical Condition

A serious medical condition requires the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal citation omitted); *see also Jones v. Vives,* 523 F. App'x 48, 49 (2d Cir.2013) (summary order).

Defendants do not dispute that MRSA constitutes a serious medical condition that may produce death, degeneration, or extreme pain. (Def.Br.7). *See generally Gaines v. Armor Health Care, Inc.,* No. 12 Civ. 5663(JS)(WDW), 2013 WL 6410311, at *5 (E.D.N.Y. Dec. 9, 2013)* (noting that MRSA was a sufficiently serious medical condition); *McNulty v. Yaneka,* No. 11 Civ. 8320(ER), 2013 WL 684448, at *7 n. 2 (S.D.N.Y. Feb. 25, 2013) (same). Accordingly, Plaintiff has satisfied the first element of his Eighth Amendment claim.

### b. Plaintiff Has Failed to Allege that Defendants Acted with the Requisite Deliberate Indifference

#### i. Applicable Law

Plaintiff must also allege, however, that Defendants acted with "a sufficiently culpable state of mind," equivalent to criminal recklessness. *Hathaway,* 99 F.3d at 553 (internal citation omitted); *see also Cole v. Fischer,* 416 F. App'x 111, 113 (2d Cir.2011) (summary order). Such a state of mind " 'entails something more than mere negligence[, but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Hathaway,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)).

*6 Mere allegations of medical malpractice are generally insufficient to state a claim of deliberate indifference to a serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 105–06 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Rather, " 'the charged official must act or fail to act while *actually aware* of a substantial risk that serious inmate harm will result.' " *Bell v. Jendell,* No. 12 Civ. 6666(KMK), 2013 WL 5863561, at *4 (S.D.N.Y. Oct. 31, 2013) (quoting *Salahuddin,* 467 F.3d at 280) (emphasis in *Bell*); *see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Similarly, "not every lapse in medical care is a constitutional wrong." *Salahuddin,* 467 F.3d at 279 (internal citation omitted). A constitutional wrong requires deliberate indifference, and it is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to

deliberate indifference. *See Ross v. Correct Care Solutions LLC,* No. 11 Civ. 8542(DLC), 2013 WL 5018838, at *4 (S.D.N.Y. Sept. 13, 2013) (" '[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.' " (internal citation omitted)). Lastly, the law is clear that the medication a doctor selects to treat the patient's conditions is a medical judgment and does not rise to the level of deliberate indifference. *Thomas v. Westchester Cnty.,* No. 12 Civ. 6718(CS), 2013 WL 3357171, at *5 (S.D.N.Y. July 3, 2013) ("treating pain with over-the-counter, as opposed to prescription, medication is a disagreement over treatment that does not rise to the level of deliberate indifference" (internal citation omitted)); *see also Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking." (internal citation omitted)).

#### ii. The January 2013 Suspension of Medication

Plaintiff's first claim of deliberate indifference stems from his allegation that he had been prescribed medication for MRSA at the time of his arrest, but that Defendants discontinued those medications and failed to prescribe him new ones, despite their promise to do so. (Compl.3). Plaintiff does not allege that he was suffering from any symptoms of a MRSA infection at the time, nor that he had actually been diagnosed as having MRSA (as opposed to being prescribed medications for the condition, perhaps prophylactically). However, within weeks of Defendants' decision to cease Plaintiff's medication and failure to prescribe new medication, Plaintiff developed a large lump that resulted from a MRSA infection. Accordingly, Plaintiff contends that he should have been prescribed new medication for treatment of MRSA long before the March 17 incident.

*7 Delay in providing medication can rise to the level of deliberate indifference, but only where a plaintiff's allegations indicate that the defendants, for instance, "deliberately delayed care as a form of punishment, ignored a life-threatening and fast-degenerating condition for [a period of time], or delayed major surgery for over two years." *Demata v. New York State Correctional Dep't of Health Servs.,* 198 F.3d 233 (2d Cir.1999) (internal citations omitted); *cf. Ross,* 2013 WL 5018838, at *5 (denying motion to dismiss a deliberate-indifference claim where defendant "was informed about [the plaintiff's] sleep apnea" but *"deliberately refused*

to provide him with medical treatment ... on account of his prior complaint and lawsuits" (emphasis added)).

Plaintiff fails to allege any facts demonstrating that Defendants deliberately withheld his medication as a form of punishment, or discontinued his medication while being aware that serious, life-threatening consequences could result therefrom. Instead, Plaintiff's allegations indicate that Defendants agreed to prescribe him new medication, but simply failed to do so; this is insufficient to state a claim for deliberate indifference. *See Ferguson v. Cai,* No. 11 Civ. 6181(PAE), 2012 WL 2865474, at *6 (S.D.N.Y. July 12, 2012) (dismissing Eighth Amendment claim where plaintiff failed to allege that the defendant "actually disregarded any such known risks," but simply that the defendant " 'forgot to call,' " which fell "well short of the high threshold for deliberate indifference"); *Bell,* 2013 WL 5863561, at *4–6 (same); *Baskerville v. Blot,* 224 F.Supp.2d 723, 735–36 (S.D.N.Y.2002) (dismissing claim based on prison nurse's "failure to obtain a refill of [plaintiff's] ... medication" where plaintiff's "assertions [did] not show that [the nurse] acted intentionally to withhold from him his prescribed medication or was in any way responsible for the delay in obtaining a refill").

In short, Plaintiff has failed to plead deliberate indifference in connection with the discontinuance of his medications, and Defendants' motion to dismiss as to this claim must be granted. The remaining issue, however, is whether such dismissal should be with or without prejudice. Here, too, the Court must construe the record as broadly in favor of Plaintiff's claims as the facts will permit. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (" 'A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " (internal citation omitted)). After reviewing the record, the Court concludes that more particularized pleading—specifically, if Plaintiff were able to allege more details concerning (a) whether he was diagnosed with MRSA prior to his incarceration; (b) whether he was in pain or exhibited symptoms of a MRSA infection at the time of his arrest; (c) whether Defendants were aware that Plaintiff had MRSA and had symptoms of MRSA at the time of his incarceration; and (d) whether Defendants ignored such symptoms or deliberately withheld medication—could cure the deficiencies in Plaintiff's Complaint. Accordingly, Defendants' motion to dismiss is granted without prejudice, and Plaintiff is granted leave to file an amended complaint.

*See Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795–96 (2d Cir.1999) (granting leave to amend a *pro se* complaint where "a liberal reading of the complaint [indicates] that a valid claim might be stated' " (citation omitted)). [6]

[6]    Plaintiff does not allege whether the doctor's decision to discontinue his medication was the result of any official policy or practice, such that liability would attach for the County. Section 1983 " 'extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.' " *Okin v. Village of Cornwall–on–Hudson Police Dep't.,* 577 F.3d 415, 439 (2d Cir.2009) (internal citation omitted). Because the Court is permitting Plaintiff to amend his complaint with regard to his Eighth Amendment claim, and because Defendants failed to brief this issue or move upon this ground in their motion to dismiss, the Court declines to reach the issue of whether the Complaint adequately states a claim for municipal liability against the County.

### iii. The March 2013 MRSA Infection

**\*8** Plaintiff also fails to plead sufficiently that Defendants acted with the requisite state of mind with respect to Plaintiff's March 2013 MRSA infection. Plaintiff avers that a large lump was present on his leg on or about March 17, 2013, and that Jail medical staff responded immediately by conducting a blood testing, placing Plaintiff in quarantine, and prescribing him antibiotics and pain medication. (Compl.3). Critically, Plaintiff's only complaint with the treatment of his March infection is his belief that there were "hiding something" from him. (*Id.*). This does not rise to the level of deliberate indifference, rather, Plaintiff's Complaint paints a picture of an attentive medical staff responding proactively to Plaintiff's infection.

As an initial matter, medical providers have wide discretion in treating inmate patients and their determinations "are given a 'presumption of correctness.' " *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311–12 (S.D.N.Y.2001) (internal citation omitted). Here, Plaintiff does not indicate that he was denied medically necessary treatment, or even that he disagrees with the medical treatment he received. Rather, Plaintiff simply alleges that he distrusts the doctors. It is well-settled that a mere disagreement between the inmate and doctor concerning the appropriate treatment or medication does not constitute

deliberate indifference. *See Hill,* 657 F.3d at 123 (a "prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment" (internal citation omitted)); *Crique v. Magill,* No. 12 Civ. 3345(PAC) (GWG), 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("The mere fact that an inmate feels that he did not receive adequate attention ... does not constitute deliberate indifference." (internal citation omitted)). Simply put, a doctor's determination of the appropriate treatment is a medical judgment and does not in and of itself amount to deliberate indifference or a violation of the Eighth Amendment.

Plaintiff similarly does not allege any facts related to the rash he developed in June 2013 and, more specifically, whether it was related to his MRSA infection, much less does he plead facts indicative of deliberate indifference to his medical needs. Plaintiff does not plausibly allege that Defendants acted with the requisite state of mind necessary to demonstrate deliberate indifference to a serious medical need. Defendants' motion to dismiss as to this claim must also be granted.

Again, the Court must consider whether the dismissal should be with or without prejudice. "Although pro se plaintiffs are generally given leave to amend a deficient complaint, a district court may deny leave to amend when amendment would be futile because the problem with the claim 'is substantive and better pleading will not cure it.' " *Thomas v. Westchester Cnty.,* 12 Civ. 6718(CS), 2013 WL 3357171, at *7 (S.D.N.Y. July 3, 2013) (quoting *Cuoco,* 222 F.3d at 112). Plaintiff's allegations establish that Defendants responded expeditiously and appropriately to his MRSA infection; additional allegations would not change this fact. Plaintiff's claim in connection with his March 2013 MRSA infection is dismissed with prejudice.

### 3. Plaintiff's State Law Claims Are Dismissed as to Defendant County

**\*9** Plaintiff's allegations could also conceivably be construed as state-law tort claims for medical negligence. However, Plaintiff indisputably did not comply with the requirements of Section 50–e of the New York General Municipal Law, and his state law claims brought against Defendant County must be dismissed for that reason.[7]

[7]    N.Y. Gen. Mun. Law § 50–e states in relevant part:
       In any case founded upon tort where a notice of claim is required by law as a condition

precedent to the commencement of an action or special proceeding against a public corporation, as defined in the general construction law, or any officer, appointee or employee thereof, the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises.

"[I]n a federal court, state notice-of-claim statutes apply to state-law claims." *Hardy v. N.Y.C. Health & Hosp. Corp.,* 164 F .3d 789, 793 (2d Cir.1999) (internal citations omitted). Section 50–e "has been described by both the New York Court of Appeals and the Second Circuit as a 'condition precedent' as opposed to a 'statute of limitations.' " *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co., Inc.,* No. 13 Civ. 6705(DLC), 2014 WL 241739, at *9 (S.D.N.Y. Jan. 22, 2014) (internal citations omitted). "Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." *Dingle v. City of New York,* 728 F.Supp.2d 332, 348–49 (S.D.N.Y.2010) (internal citation omitted). "The burden is on the plaintiff to demonstrate compliance with the Notice of Claim requirement." *Horvath v. Daniel,* 423 F.Supp.2d 421, 423 (S.D.N.Y.2006) (internal citation omitted).

The Westchester County Attorney rejected Plaintiff's Notice of Claim as untimely, and the Court is unable to excuse or overlook Plaintiff's failure to comply with Section 50–e. Accordingly, Defendant County's motion to dismiss Plaintiff's New York State law claims is granted.[8]

[8]    Defendant Correct Care has not moved to dismiss the New York State law claims brought against it; accordingly, those remain.

### CONCLUSION

For the reasons discussed herein, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate Docket Entry 13.

Specifically, Defendant County's motion is DENIED without prejudice with respect to the County's affirmative defense for failure to exhaust administrative remedies.

Defendant County's motion is GRANTED with prejudice with respect to Plaintiff's New York State law claims.

Defendants' motion is GRANTED with prejudice with respect to Plaintiff's Eighth Amendment claim relating to his March 2013 MRSA infection.

Defendants' motion is GRANTED without prejudice with respect to Plaintiff's Eighth Amendment claim relating to Defendants' decision to discontinue his medication in January 2013. Plaintiff is granted leave to file an amended complaint within 30 days from the date of this Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1778410

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 169 of 267

Adams v. Smith, Not Reported in Fed. Supp. (2018)
2018 WL 1363495

2018 WL 1363495
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, III, Plaintiff,
v.
Nancy SMITH, et al., Defendants.

9:15-CV-913 (BKS/DJS)
|
Signed 03/16/2018

**Attorneys and Law Firms**

Robert Adams, III, 07-B-1611, Wende Correctional Facility, P.O. Box 1187, Alden, NY 14004, Plaintiff, pro se

Keith J. Starlin, Esq., Hon. Eric T. Schneiderman, Office of New York State Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge

**I. INTRODUCTION**

 **\*1**  Plaintiff pro se Robert Adams, III brought this action under 42 U.S.C. § 1983 alleging that Defendants Vijay Kumar Mandalaywala, M.D. and Nurse Administrator Nancy Smith were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, while he was confined at Upstate Correctional Facility. (Dkt. Nos. 1, 73). On June 9, 2017, Defendants filed a motion for summary judgment. (Dkt. No. 115). Plaintiff opposed the motion (Dkt. Nos. 124, 125). On December 5, 2017, United States Magistrate Judge Daniel J. Stewart issued a Report-Recommendation and Order ("R & R") recommending that the Court grant Defendants' motion for summary judgment and dismiss this action. (Dkt. No. 134). After thoroughly reviewing the facts and the law, Magistrate Judge Stewart found that even if Plaintiff satisfied the first prong of the deliberate indifference analysis by showing that his medical need was sufficiently serious, he failed to present evidence showing that Defendants acted with a sufficiently culpable statement mind. (Dkt. No. 134). Specifically, Magistrate Judge Stewart noted that "[a] disagreement about the proper course of treatment is insufficient to establish a deliberate indifference claim." [1] (Dkt. No. 134, at 13). Magistrate Judge Stewart informed the

parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections and that the failure to object would preclude appellate review. (Dkt. No. 134, at 14). Plaintiff filed objections to the R & R on December 21, 2018. (Dkt. No. 138).

[1]     As Magistrate Judge Stewart decided the motion for summary judgment on the merits, he did not address Plaintiff's alleged failure to exhaust his administrative remedies or whether Defendants were personally involved in the alleged deprivation. (Dkt. No. 134, at 9–10).

**II. BACKGROUND**

The Court presumes the parties' familiarity with Plaintiff's factual allegations which are thoroughly set forth in the R & R. (Dkt. No. 134, at 2–9). Plaintiff's deliberate indifference claim arises from his confinement at Upstate from February 1, 2013 to April 25, 2013.

Plaintiff claims that on or about January 2013, while he was confined at Sing Sing Correctional Facility, he began suffering severe back pain following an assault. (Dkt. No. 124-2, at 1). X-rays revealed "involuntary muscle spasms and a straightened lordosis." (Id.). On January 25, 2013, a nurse at Sing Sing advised Plaintiff that he would be referred to physical therapy and receive a thirty-day prescription for Baclofen, a muscle relaxant. (Id. at 3). Plaintiff received Baclofen twice a day from January 25, 2013 through January 30, 2013. (Id.).

On January 31, 2013, prior to his transfer to Upstate, a facility nurse completed a "Medication Administration Form" indicating that Plaintiff had received Baclofen at 8:00 a.m. that day and that Baclofen had been ordered on January 25, 2013 "thru" February 23, 2013. (Dkt. No. 124-2, at 4; Dkt. No. 124-4, at 17). Plaintiff contends this form is used "to apprise a transferred inmate's receiving facility, of his/her prescription medication" and that the nurse who completed it placed it in his Ambulatory Health Record, which went with him to Upstate. (Dkt. No. 124-2, at 5).

 **\*2**  On February 1, 2013, Plaintiff arrived at Upstate, where a nurse "medically screened him." (Dkt. No. 124-2, at 6). Plaintiff reported "his diagnosed conditions (spasms)" and that he had been prescribed Baclofen and was to receive physical therapy. (Id. at 6). Plaintiff claims that when he asked the nurse making medication rounds that night for his medication because he was in "extreme physical pain,

2018 WL 1363495

suffering from muscle spasms," the nurse replied that he had no medications for Plaintiff and advised him to sign up for sick call. (Dkt. No.73, ¶ 24).

On February 6, 2013, Dr. Mandalaywala, whom Plaintiff contends was his primary care physician at Upstate, conducted an initial review of Plaintiff's medical records. (Dkt. No. 115, 9, ¶ 8). The parties dispute whether the medical records Dr. Mandalaywala reviewed that day included any indication that Plaintiff had been prescribed Baclofen. (*Id.*, at ¶¶ 22 and 24; Dkt. No. 138, at 8–9; Dkt. No. 124-4, at 17). In his declaration, Dr. Mandalaywala states that he "decided the best course of treatment for plaintiff at that time, in regard to his reported back symptoms, was for him to continue activity," mitigate pain with "a non-prescription pain reliever" (Tylenol), and attend physical therapy. (Dkt. No. 115-9, ¶ 22).

Plaintiff continued to complain, via sick call, to nurses he spoke with at the facility, and in a February 11, 2013 letter to the nurse administrator, Nurse Administrator Smith, of his extreme physical pain and muscle spasms, that he needed Baclofen, and that the non-prescription pain relievers that he had been given at the facility were "ineffective." (Dkt. No. 124-2, at 6–8; Dkt. No. 115-12, ¶ 26). Nurse Administrator Smith responded the next day that Plaintiff "need[ed] to sign up for sick call" and that Baclofen was "approved for short course only" and noted that he was scheduled for physical therapy and had "access to pain medication daily on sick call." (Dkt. No. 115-13, at 3).

On February 24, 2013, Plaintiff "engaged Defendant Smith in a conversation regarding the systematic deprivation of his prescription pain medication," told her that he was in constant pain, and requested a tube of muscle cream. (Dkt. No. 124-2, at 12). Nurse Administrator Smith denied his request for muscle cream and told him: "This is the Box, not a massage parlor; I'm not here to 'cater' to you. If you are in pain, sign up for sick call; I'm not giving you any relaxants; you don't need it." (*Id.*). In response to Plaintiff's complaints of pain, Defendant Smith said: "if you keep crying like a girl, I'll give you some ESTROGEN; you should've thought about your pain, before you did what you did, to come to the Box." (*Id.*).

Despite multiple sick call visits, complaints of pain, spasms, and leg numbness, Plaintiff received only non-prescription pain medication and physical therapy during the entirely of his time at Upstate (February 1, 2013 to April 25, 2013).

## III. STANDARD OF REVIEW

This Court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F.Supp.3d 223, 228-29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

## IV. DISCUSSION

### A. Procedural and Factual Objections

Plaintiff contends that his response to Defendants' statement of material facts, while imperfect, nonetheless clearly sets forth his arguments in opposition to Defendants' motion and was properly supported by citations to the evidence in the record, and asserts that Magistrate Judge Stewart improperly "disregard[ed] plaintiffs [sic] sworn statements," including his affidavit. (Dkt. No. 138, at 3). Magistrate Judge Stewart noted that Plaintiff's response was "inconsistent" with Local Rule 7.1(a)(3), (Dkt. No. 134, at 3 n.2), but nonetheless considered Plaintiff's arguments as well as Plaintiff's Second Amended Complaint, and deposition testimony. (Dkt. No. 134, at 2–9) (referring to the factual assertions in the Second Amended Complaint, Plaintiff's deposition, and Plaintiff's arguments). The Court has recounted the sworn statements in Plaintiff's affidavit, supra, but concludes, for the reasons that follow, that they fail to raise a material issue of fact.

**\*3** The Court has reviewed all of Plaintiff's specific factual objections de novo.[2] Based upon the evidence in the record, the Court credits the following objections and finds as follows: Defendant Mandalaywala was, as Plaintiff asserts, Plaintiff's primary care physician and decision-maker during his confinement at Upstate. (Dkt. No. 138, at 5–8; Dkt. No. 124-5). Defendant Mandalaywala was aware of and discontinued Plaintiff's prescription for Baclofen. (Dkt. No. 138, at 8; Dkt. No. 124-4, at 11, 17).

[2]    Plaintiff also objects to Magistrate Judge Stewart's failure to bind Defendant Smith to her "Rule 36 F.R.C.P. Admissions." (Dkt. No. 138, at 12; Dkt. No. 124-5, 22–40). This appears to refer to a Decision and Order issued by Magistrate Judge Stewart on April 12, 2017 concerning a discovery issue. (Dkt. No. 104). In it, Magistrate Judge Stewart granted Defendant Smith's motion

Case 9:18-cv-01067-DNH-TWD Document 37 Filed 08/03/20 Page 171 of 267

Adams v. Smith, Not Reported in Fed. Supp. (2018)

2018 WL 1363495

to withdraw her admissions to Plaintiff's notices to admit. (Dkt. No. 104, at 40). Plaintiff did not appeal that Order, and here is no indication that Magistrate Judge Stewart overlooked any of Defendant Smith's remaining admissions.

The Court rejects Plaintiff's assertion that Magistrate Judge Stewart incorporated the Declaration of Valerie Monroe into the R & R. (Dkt. No. 138, at 26). Magistrate Judge Stewart specifically excluded the Monroe Declaration at Plaintiff's request. (Dkt. No. 134 n.3).

After considering the remainder of Plaintiff's factual and procedural objections, the Court has found them to be unsupported or immaterial to the legal issues pending before the Court. With the minor exceptions set forth above, and any additions contained in Section II., the Court therefore adopts and incorporates into this decision the thorough recitation of facts set forth in the Report-Recommendation.

**B. Objections to Legal Analysis**

Plaintiff asserts that Defendants Dr. Mandalaywala and Nurse Administrator Smith failed to give him Baclofen, despite an existing prescription, thus causing him extreme pain. To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The standard for deliberate indifference includes an objective component and a subjective component. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

"The objective component requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.' " *Id.* (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Subjectively, the official charged with deliberate indifference must act with a "sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). "That is, the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

It is well established that "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." *Id.* at 123. For this reason, "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). The "essential test is one of medical necessity and not one simply of desirability." *Id.* (quoting *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)).

**\*4** Plaintiff avers that Dr. Mandalaywala and Nurse Administrator Smith refused to provide him with Baclofen, despite having a prescription for it from another facility, that the non-prescription medication they provided was ineffective, and that, as a result, he suffered extreme pain. Courts have repeatedly rejected medical indifference claims based upon a failure to provide stronger pain medication. *See, e.g.*, *Rush v. Fischer*, 09 Civ. 9918, 2011 WL 6747392, at \*3, 2011 U.S. Dist. LEXIS 148080, at \*8 (S.D.N.Y. Dec. 23, 2011) ("The decision to prescribe one form of pain medication in place of another does not constitute deliberate indifference to a prisoner's serious medical needs."); *Harris v. Westchester Cty Med. Ctr.*, No. 08 Civ. 1128 (RJH), 2011 WL 2637429, at \*3, 2011 U.S. Dist. LEXIS 72566, \*9 (S.D.N.Y. July 6, 2011) ("The failure to provide stronger pain medication does not constitute deliberate indifference."); *Wright v. Genovese*, 694 F.Supp.2d 137, 160 (N.D.N.Y. 2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."); *Veloz v. New York*, 339 F.Supp.2d 505, 525 (S.D.N.Y. 2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment").

Here, Plaintiff fails to raise a question of fact indicating that Dr. Mandalaywala knew that his prescribed course of treatment—physical therapy and non-prescription pain medication—was medically inadequate, or that he had in improper motive in not continuing Plaintiff's Baclofen prescription. That Dr. Mandalaywala differed with the Sing Sing medical providers as to the proper course of treatment for Plaintiff is not evidence of deliberate indifference. "Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 172 of 267

Adams v. Smith, Not Reported in Fed. Supp. (2018)

2018 WL 1363495

a constitutional claim of deliberate indifference." *Cole v. Goord*, No. 04 CIV. 8906GEL, 2009 WL 1181295, at *8 n.9, 2009 U.S. Dist. LEXIS 37088, at *23 n.9 (S.D.N.Y. Apr. 30, 2009), *aff'd*, 379 Fed.Appx. 28 (2d Cir. 2010) (citing *Estelle v. Gamble*, 429 U.S. 97, 97, 97 (S.Ct. 285, 50 L.Ed.2d 251 1976)).

Nor does the evidence before the Court raise a question of fact as to whether Nurse Administrator Smith acted with a sufficiently culpable mind in refusing to provide Baclofen or in failing to "refer[ ] the matter" to Dr. Mandalaywala. (Dkt. No. 138, at 18–19). Even crediting Plaintiff's assertion that on February 24, 2013, in response to his complaints of extreme pain, spasms, and paresthesia and request for Baclofen, Nurse Administrator Smith told him that he did not "need" Baclofen, she would not give him "any relaxants" and that he "should've thought about [his] pain, before [he] did what [he] did, to come to the Box," (Dkt. No. 124-2, at 12; Dkt. No. 73, ¶ 82), no reasonable fact finder could conclude that she was deliberately indifferent to Plaintiff's medical needs on the basis that she failed to procure Plaintiff's preferred medication. Indeed, even under Plaintiff's version of the facts, subjectively, Nurse Administrator Smith, relying on the course of treatment Dr. Mandalaywala had recommended, [3] did not believe that Plaintiff needed a muscle relaxant. *See Veloz*, 339 F.Supp.2d at 525 (finding medical providers' decision not to prescribe stronger pain medication than Tylenol to address prisoner's back condition did not state a claim for deliberate indifference, explaining that "[t]he Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to disagreement over the appropriateness of a particular prescription plan."); *Hill*, 657 F.3d at 123 ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking."). The Court has considered Plaintiff's remaining objections and finds them without merit. Accordingly, the Court concludes that there are no material issues of fact requiring trial and that Defendants are entitled to summary judgment.

[3]     Nurse Administrator Smith states that she did not "examine or treat Plaintiff while he was housed at Upstate." (Dkt. No. 115-12, ¶ 26). In her declaration, she avers that when she received

Plaintiff's February 11, 2013 letter concerning a prescription for Baclofen, she, as was her practice when receiving an inmate letter, would have requested "that the nurse caring for the inmate ... provide pertinent information, so that [she can respond] to the inmate." (*Id.*, at ¶ 27). In her declaration, Nurse Administrator Smith outlines Plaintiff's medical records, including his complaint of "LBP [lower back pain] chronic," the recommendation for physical therapy, and Dr. Mandalaywala's determination not to issue any "new orders," or prescription medication, (*id.* at ¶¶ 38–39), and states that she based her response to Plaintiff's letter—denying his request for Baclofen —on the information in his medical records. (*Id.* at ¶ 42). Further, although Nurse Administrator Smith states she has "no memory of having ever personally spoken with plaintiff," (*id.* at ¶ 58), assuming, as Plaintiff asserts, that they spoke on February 24, 2013, she would have been aware of his medical record, and that his current treatment plan did not contain a prescription for a muscle relaxant.

## V. CONCLUSION

**\*5 ORDERED** that Magistrate Judge Stewart's Report-Recommendation (Dkt. No. 134) is **ADOPTED** in all respects; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 115) is **GRANTED** and this action is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close this case; and it is further

**ORDERED** that the Clerk serve this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2018 WL 1363495

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    4

2008 WL 4186334
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lawrence TOOLE, Plaintiff,

v.

Susan A. CONNELL, et al., Defendant.

No. 9:04–CV–0724 (LEK/DEP).
|
Sept. 10, 2008.

**Attorneys and Law Firms**

Lawrence Toole, pro se.

Hon. Andrew Cuomo, New York State Attorney General, David L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report–Recommendation filed on August 1, 2008, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report–Rec. (Dkt. No. 62).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report–Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report–Recommendation. Furthermore, after examining the record, the Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 62) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion for summary judgment (Dkt. No. 53) is **GRANTED;** and it is further

**ORDERED,** that the remaining claims contained within the Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Lawrence Toole, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint, plaintiff alleges that 1) he was sexually harassed by Corrections Officer Prusinowski; 2) the remaining defendants failed to fulfill their responsibilities to investigate and remediate the constitutional deprivation associated with that sexual harassment, including by their failure to properly address his grievances concerning the matter; and 3) a misbehavior report was issued against him in retaliation for complaining of the sexual harassment, all in violation of his constitutional rights.

Having already succeeded in securing dismissal of plaintiff's sexual harassment claim against defendant Prusinowski, based upon a finding that the factual allegations offered in support of that cause of action, even if proven, do not rise to a level sufficient to establish an Eighth Amendment violation, defendants now move for summary judgment in their favor dismissing the balance of plaintiff's complaint as a matter of law. In their motion, defendants assert that because the underlying sexual harassment did not rise to a level of constitutional significance, there can be no corresponding liability on the part of the other defendants for failing to investigate the matter and remedy the claimed harassment. Noting that plaintiff has no constitutional right of access to the internal prison grievance process, and that the record is lacking in any evidence linking the issuance of the disputed misbehavior report—authored by an individual who is not a party to the action—to plaintiff's efforts to obtain redress for

2008 WL 4186334

Corrections Officer Prusinowski's behavior, defendants seek dismissal of plaintiff's remaining claims.

**\*2** Having carefully reviewed the record now before the court, considered in light of the arguments raised by the defendants and in plaintiff's opposition to their motion, I conclude that no reasonable factfinder could determine that plaintiff's constitutional rights were abridged based upon the acts complained of in his complaint. Accordingly, I therefore recommend that defendants' motion be granted.

I. *BACKGROUND* [1]

[1]　In light of the procedural posture of the case, the record now before the court has been interpreted in a light most favorable to the plaintiff, as a non-moving party, with all inferences drawn, and ambiguities resolved, in his favor. *See Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005).

At the times relevant to his complaint plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and designated to the Oneida Correctional Facility ("Oneida"). *See generally* Complaint (Dkt. No. 1). On February 5, 2004, while confined within a dormitory unit at Oneida, plaintiff awoke to someone, later identified as Corrections Officer H. Prusinowski, shaking his buttocks and standing over him, smiling. [2] Complaint (Dkt. No. 1) Exh. A. Defendant Prusinowski, who according to Toole at the time was acting in a sexually provocative manner, asked the plaintiff to accompany him to the laundry room, ostensibly to engage in sexual activity. *Id.* After being asked by plaintiff to leave his cell, defendant Prusinowski stated, "you don't know what you're missing," and left the area. *Id.* In his complaint, plaintiff alleges that Officer Prusinowski had previously appeared in Toole's cube on February 3, 2004, and again on February 4, 2004, in an intoxicated condition "seeking homosexual liaison." *Id.* Following the February 5, 2004 incident plaintiff attempted to apprise the area supervisor of the situation, but was directed by defendant Prusinowski to "get the f__　__k away from the desk." *Id.*

[2]　While Corrections Officer Prusinowski was initially sued as C. Prusinowski, a subsequent application by plaintiff to amend his complaint to identify the intended defendant as H. Prusinowski was granted on March 1, 2005. Dkt. No. 10.

On February 20, 2004 plaintiff filed a grievance with the Inmate Grievance Resolution Committee ("IGRC") at Oneida, claiming that defendant Prusinowski had sexually harassed him on February 3, 4, and 5, 2004. Complaint (Dkt. No. 1) Exh. A. In addition to detailing his encounters with defendant Prusinowski, in that grievance plaintiff also complained that his attempt to report the February 5, 2004 incident to the desk sergeant had been unsuccessful, and asserted that defendant Prusinowski had arranged to have Toole transferred to a different prison dormitory unit on February 6, 2004. [3] *Id.*

[3]　That transfer was later rescinded. Complaint (Dkt. No. 1) Exh. A.

Because Toole's grievance alleged harassment by a staff member, it bypassed the IGRC stage of the normal grievance process and was forwarded directly to the superintendent's office for a determination. Debejian Decl. (Dkt. No. 53–7) ¶ 6. Toole's grievance was subsequently denied by Oneida Superintendent Connell on March 12, 2004. Complaint (Dkt. No. 1) Exh. B. As a basis for her determination, defendant Connell relied principally upon Prusinowski's denial of having engaged in any inappropriate behavior and the lack of any evidence tending to independently substantiate Toole's allegations. *Id.*

Plaintiff appealed the denial of his grievance to the Central Office Review Committee ("CORC"). Complaint (Dkt. No. 1) Exhs. B, C. By decision dated April 14, 2004, Toole's appeal was "unanimously denied with clarification." In its decision the CORC found that the sexual harassment complaint was properly investigated at the facility level, and that substantiation of plaintiff's allegations was lacking. [4] *Id.* Exh. C.

[4]　The CORC decision also noted that DOCS Directive No. 4040 precludes the taking of any action in reprisal for an inmate having resorted to the grievance process, and advised the plaintiff that he was free to "write to anyone he wishes regarding the instant grievance." Complaint (DKt. No. 1) Exh. C.

**\*3** Plaintiff was issued an inmate misbehavior report on March 13, 2004 by Corrections Sergeant J. Allison, accusing him of lying regarding the February 5, 2004 incident in violation of prison rules . [5] *Id.* Exh. D. In that misbehavior report, Sergeant Allison alleged that as the desk supervisor to

whom plaintiff allegedly tried to complain, he did not observe either any attempt on the part of plaintiff to lodge a complaint or defendant Prusinowski making the statement which the plaintiff now attributes to him, adding that Toole "was not at the desk, but in a doorway." Complaint (Dkt. No. 1) Exh. D. A disciplinary hearing was convened by Corrections Lieutenant Santos on March 19, 2004 to address the charge set forth in the March 13, 2004 misbehavior report. Deposition Transcript of Lawrence Toole (Dkt. No. 53–10) Exh. A at 19–20. Upon learning from defendant Debejian that the charge was related to a grievance filed by the plaintiff regarding Corrections Officer Prusinowski, Lt. Santos adjourned the hearing. *Id.* at 13–14; *see also* Debejian Decl. (Dkt. No. 53–7) ¶ 11. The hearing was never reconvened, and the disciplinary charge against the plaintiff arising from the incident was eventually dismissed. Deposition Transcript of Lawrence Tool (Dkt. No. 53–10) Exh. A at 12.

5      Although the misbehavior report also charged the plaintiff with harassing employees, that accusation was not pursued. Deposition Transcript of Lawrence Toole (Dkt. No. 53–10) Exh. A at 12.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on June 23, 2004. Dkt. No. 1. Listed as defendants in plaintiff's complaint are Oneida Superintendent Susan A. Connell; IGS David DeBejian; Corrections Officer Prusinowski; and K. Bellamy, the Assistant Director of New York's Inmate Grievance Program. Although plaintiff's claims are less than artfully stated, they appear to include his assertions that 1) he was subjected to cruel and unusual punishment, in violation of the Eighth Amendment, based upon defendant Prusinowski's actions; 2) the remaining defendants are implicated in that constitutional violation based upon their awareness of the relevant events and failure to conduct a proper investigation and remediate the violation; 3) plaintiff's rights were violated based upon defendants' failure to properly process and address his inmate grievance concerning the sexual harassment allegations; and 4) the defendants unlawfully retaliated against him, in violation of his First Amendment rights, by arranging for the issuance of a misbehavior report in retaliation for his complaint regarding the matter.

As their initial response to plaintiff's complaint, defendants Connell, Debejian and Bellamy moved to dismiss his claims for failure to satisfy the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. Dkt. No. 13. Defendant Prusinowksi filed a separate motion

seeking dismissal of the sexual harassment claims against him for failure to state a legally cognizable claim that Toole's constitutional rights were violated by his conduct. Dkt. No. 18.

By order filed March 20, 2006, acting upon a report issued by me recommending that relief, District Judge Lawrence E. Kahn granted defendant Prusinowski's motion to dismiss plaintiff's sexual harassment claim against him. Dkt. No. 29. Defendants' companion motion to dismiss the complaint, however, was denied based upon the court's finding that while not a model of clarity, plaintiff's complaint sufficiently apprised the defendants of the nature of plaintiff's claims to permit a meaningful investigation of those claims and formulation of a defense. *Id.* at 2.

**\*4** Following the close of pretrial discovery, defendants have now moved seeking the entry of summary judgment dismissing the remaining portions of plaintiff's complaint. Dkt. No. 53. In their motion, defendants argue that because the court has already determined that plaintiff's allegations against defendant Prusinowski, even if true, are nonetheless insufficient to support a finding of sexual harassment, none of the remaining defendants can be held accountable for constitutional deprivations based upon that conduct. Defendants further submit that plaintiff cannot maintain a cognizable constitutional claim bottomed upon their alleged failure to properly process and address his grievance regarding the matter, and additionally assert that because none of them was involved in the issuance of the misbehavior report upon which plaintiff's retaliation claim is predicated, they bear no liability for any alleged retaliation. Plaintiff has since submitted papers in opposition to defendants' motion. Dkt. No. 59.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Thus, " 'the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.' " *Jeffreys,* 426 F.3d at 553 (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-

movant'] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted).

**B.** *Retaliation*

When liberally construed, plaintiff's complaint could be deemed to include a retaliation cause of action. The potential retaliation claim discerned from plaintiff's allegations stems from the issuance by Corrections Sergeant James Allison of the March 12, 2004 misbehavior report, and plaintiff's contention that it was prompted by his having complained of Corrections Officer Prusinowski's actions towards him. Defendants seek dismissal of this claim, citing the lack of evidence suggesting their involvement in the issuance of that disciplinary charge.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F .3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the

2008 WL 4186334

proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*6** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See Abascal v. Hilton,* No. 04–CV–1401, 2008 WL 268366, at \*10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D .J. and Lowe, M.J.).

In support of their motion, defendants have submitted a declaration from Corrections Sergeant Allison, the author of the misbehavior report in issue, in which he states that the decision to issue the charge was his, and his alone, and was based upon his own personal observations and determination that plaintiff had committed one or more disciplinary infractions. *See* Allison Decl. (Dkt. No. 53–4) ¶ 4. In addition, defendants Connell and Prusinowski have submitted declarations attesting to their official duties and responsibilities as DOCS employees, and expressly disavowing any involvement in the issuance of the misbehavior report by Sergeant Allison. [6] *See* Connell Decl. (Dkt. No. 53–6) ¶ 9; Prusinowski Decl. (Dkt. No. 53–9) ¶ 3. In response to these submissions, plaintiff has cited no evidence linking the issuance of that report to the remaining defendants in the action.

[6]    The record contains no evidence even remotely tending to suggest that defendants DeBejian, the IGS at Oneida, or Bellamy, the DOCS Assistant Director of the Inmate Grievance Program, were in any way involved in the issuance of the misbehavior report.

It may be that plaintiff's retaliation claim, particularly as against Oneida Superintendent Connell, is predicated upon the defendants' positions as supervisors, and his assertion that in light of their positions they should be held accountable for any retaliation committed by Corrections Sergeant Allison. It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor—there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways; 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). None of these circumstances apply in this instance, based upon the evidence now before the court. [7]

[7]    When liberally construed, plaintiff's complaint could be considered to contain a claim of retaliation based on his transfer from one dormitory to another upon being made aware of his intentions to pursue his sexual harassment claims. *See* Complaint (Dkt. No. 1) Exh. A. Based on the record before the court, however, no reasonable factfinder could conclude that this transfer amounted to adverse action, particularly in light of the fact that the transfer was rescinded a short time after plaintiff was moved and there being no proof in the record that plaintiff lost any privileges or suffered any negative consequences as a result of the transfer. *Contrast Walker v. Pataro,* No. 99 CIV. 4607, 2002 WL 664040, at \*8 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J), *adopted,* Dkt. No. 50 (S.D.N.Y. Oct. 2,

2002) (Daniels, D.J.) (considering inmate's transfer from one housing unit to another an adverse action given that the transfer resulted in prisoner losing his prison job). Accordingly, any retaliation claim stemming from plaintiff's threatened dormitory transfer must also fail.

**\*7** Having carefully reviewed the record, I find no evidence from which a reasonable factfinder could conclude that any of the defendants were personally involved in the issuance of the misbehavior report forming the underpinnings of plaintiff's retaliation claim. I therefore recommend dismissal of that claim as a matter of law.

### C. *Failure To Investigate*

In an argument which also implicates personal involvement, at least tangentially, defendants assert that based upon the court's earlier finding that Corrections Officer Prusinowski's actions did not rise to a level of constitutional significance, any claim against the remaining defendants based upon their failure to investigate his allegations of unlawful harassment also fails to state a constitutional claim.

Undeniably, where a supervisory employee knows or reasonably should know of the existence of facts revealing a constitutional deprivation and, by virtue of his or her failure to properly investigate and remediate the matter, perpetuates or fails to prevent additional constitutional violations despite authority to do so, that defendant may face liability under section 1983. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (indicating that supervisory liability was proper where "an official has actual or constructive notice of unconstitutional practices" by his or her subordinates "and demonstrates gross negligence or deliberate indifference by failing to act"). This principle applies equally to claims of sexual harassment; accordingly, a supervisory prison official who fails to address and take appropriate remedial actions, upon finding the existence of actionable sexual harassment of a prison inmate, bears legal responsibility for a resulting violation of the inmate's Eighth Amendment rights. *See Doe v. Barrett,* No. 3:01–CV–519, 2006 WL 3741825, at \*8–9 (D.Conn., Dec. 19, 2006); *Safadi v. Almanzar,* No. 98 Civ. 7995, 2000 WL 1738403, at \*3 (S.D.N.Y. Nov. 22, 2000). The mere failure to investigate an allegation of unconstitutional activity, without more, however, does not provide a basis for finding liability under section 1983. *Wingate v. Horn,* No. 05–Civ.2001, 2007 WL 30100, at \*6 (S.D.N.Y. Jan. 4, 2007) (citing cases).

In this instance, the court has already determined that Officer Prusinowski's actions, however boorish or offensive they may have been, if substantiated, did not rise to a level of constitutional significance. It logically follows, based upon that finding, that neither could the defendants now accused of failing to investigate and remediate that conduct, already found not to be actionable under section 1983, be held liable for a constitutional deprivation. *See Linares v. Mahunik,* No. 05 Civ. 625, 2006 WL 2595200, at \*11 (N.D.N.Y. Sept. 11, 2006) (Sharpe, D.J. and Treece, M.J.) (holding plaintiff could not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation"). I therefore recommend dismissal of plaintiff's failure to investigate claims against the defendants.

### D. *Failure To Process Plaintiff's Grievance*

**\*8** In a related but arguably distinct claim, plaintiff contends that his constitutional rights were violated based upon the defendants' failure to properly process and investigate his grievance regarding defendant Prusinowski's actions. This claim is asserted against defendant David Debejian, the Inmate Grievance Supervisor at Oneida; defendant Connell, the Superintendent at Oneida; and defendant Bellamy, the Assistant Director of the DOCS Inmate Grievance Program. Defendants also seek dismissal of this claim as a matter of law.

Since New York's inmate grievance program ("IGP"), provides a vehicle to permit inmates to seek internal remedial action within the relevant prison facility before commencing legal action complaining of their conditions of confinement, *see* 7 N.Y.C.R.R. § 701 *et. seq.* (setting forth the stages of the inmate grievance resolution process); *see also Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347 (S.D.N.Y.2002) (requiring New York State prison inmates to avail themselves of the DOCS IGP three step administrative process for the resolution of grievances), and allows them to satisfy their exhaustion requirement under 42 U.S.C. § 1997e, in order to bring an action such as this. *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S .D.N.Y.2004) (An inmate must first exhaust administrative remedies that are available before he may file an action in federal court). It is well-established, however, that a prison inmate has no constitutional right of access to such an internal grievance process. *Rhodes v. Hoy,* No. 05–CV–836, 2007 WL 1343649, at \*6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi,* No. 01 CV0285, 2005 WL 1174088, at

*3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[P]articipation in an inmate grievance process is not a constitutionally protected right.") (citations omitted). Accordingly, plaintiff's allegations to the effect that the defendants failed to afford him an adequate investigation and remedial action under section 1983 response to his grievance, provides no basis for finding liability against them. *Cancel v. Goord*, No. 00. CIV.2042, 2001 WL 303713, at *3 (S.D .N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under section 1983). I therefore recommend dismissal of this remaining claim against the defendants, as a matter of law, based upon the lack of any underlying constitutional obligation on their part to afford plaintiff meaningful access to the internal grievance procedure, and to investigate and properly determine any such grievance.

IV. *SUMMARY AND RECOMMENDATION*

Pivotal to the plaintiff's claims in this case are actions of Corrections Officer Prusinowski, characterized by him as constituting unlawful sexual harassment, but already found by the court not to rise to a level of constitutional significance, and defendants' alleged failure to properly address and remediate those actions. In light of the court's finding that Corrections Officer Prusinowski's actions, as alleged by the plaintiff, did not constitute cruel and unusual punishment or otherwise result in a cognizable unconstitutional deprivation, and the fact that the Constitution does not guarantee him access to the internal grievance process, I recommend dismissal of plaintiff's claims.

*9 To the extent that plaintiff has also asserted a retaliation cause of action claiming that the issuance by Correction Sergeant Allison, who is not a party to the action, of a misbehavior report accusing Toole of misconduct was motivated by plaintiff's filing of a grievance concerning Corrections Officer Prusinowski's actions, plaintiff has offered no evidence from which a reasonable factfinder could determine that the defendants were involved in, or in any way prompted, the issuance of that misbehavior report. Plaintiff's retaliation claim is therefore also subject to dismissal as a matter of law. It is therefore hereby

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 53) be GRANTED, and that the remaining claims contained within the plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

The Clerk of the Court is directed to serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4186334

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2595200
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jorge LINARES, Plaintiff,
v.
David MAHUNIK, John Burge, and
Kenneth McLaughlin, Defendants.

No. 9:05-CV-625 (GLS/RFT).
|
Sept. 11, 2006.

**Attorneys and Law Firms**

Jorge Linares, Malone, New York, Pro Se.

Hon. Eliot J. Spitzer, New York Attorney General, Albany, NY, Maria Moran, Assistant Attorney General, for Defendants.

### ORDER

GARY L. SHARPE, District Judge.

 *1 The above-captioned matter comes before this court following a Report-Recommendation issued by Magistrate Judge Randolf F. Treece on August 10, 2006. Despite the passage of ten days, no objections have been filed. Having reviewed the Report-Recommendation for clear error, *see Almonte v. N.Y. State Div. of Parole,* 9:04-CV-484, 2006 WL 149049 (N.D.N.Y. Jan. 18, 2006),* and finding none, the court adopts Judge Treece's Report-Recommendation in its entirety.

**WHEREFORE,** it is hereby

**ORDERED,** that the Report-Recommendation filed on August 10, 2006 is **ACCEPTED** in its entirety for the reasons stated therein, and it is further

**ORDERED,** that defendants' motion to dismiss (Dkt. No. 22) is **GRANTED IN PART AND DENIED IN PART,** and it is further

**ORDERED,** that defendants' motion to dismiss based on all the claims against the defendants in their official capacities is **GRANTED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on plaintiff's First Amendment free exercise of religion claim is **GRANTED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on plaintiff's First Amendment access to the law library claim is **GRANTED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on plaintiff's First Amendment retaliation claim against Defendant Mahunik is **DENIED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on plaintiff's supervisory liability claim for retaliation against Defendant Burge is **DENIED,** and it is further

**ORDERED,** that defendants' motion to dismiss based on plaintiff's failure to investigate claim against Defendant McLaughlin is **GRANTED,** and it is further

**ORDERED,** that defendants Mahunik and Burge submit answers to the Amended Complaint within twenty (20) days of the filing of this order, and it is further

**ORDERED,** that the Clerk of the Court provide a copy of this Order to the parties by regular mail.

RANDOLPH F. TREECE, Magistrate Judge.

### REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff Jorge Linares brings a civil action pursuant to 42 U.S.C. § 1983, alleging denial of his right to participate in a religious service, denial of access to the law library, and retaliation, all in violation of the First Amendment, as well as failure to supervise and failure to investigate. Dkt. No. 9, Am. Compl.; Dkt. No. 23, Pl.'s Mem. of Law at pp. 1-7. Defendants David Mahunik, Corrections Officer ("C.O.") at Auburn Correctional Facility ("Auburn"), John Burge, Superintendent at Auburn, and Kenneth McLaughlin, Director of Operations at the Inspector General's Office, bring this Motion to Dismiss. Dkt. No. 22. Plaintiff opposes the Motion. Dkt. No. 23.[1] For the reasons to follow, it is recommended that the Motion to Dismiss be **granted in part and denied in part.**

Linares v. Mahunik, Not Reported in F.Supp.2d (2006)

2006 WL 2595200

1    Although Plaintiff's Response to the Motion was untimely when submitted on February 15, 2006, because it was due on January 17, 2006, this Court, nevertheless, reviewed the Response and has accepted it for filing. *See* Dkt. Nos. 22 & 23.

## I. FACTS [2]

2    The Court notes that Plaintiff did not set forth each allegation in separately numbered paragraphs. *See* Am. Comp l. at § II.

The following facts are derived from the Amended Complaint, which, on a motion to dismiss, must be taken as true. *See infra* Part II.A. Plaintiff arrived at the Auburn Correctional Facility on August 24, 2004. Am. Compl. at § II. During November and December 2004, Plaintiff's cell was searched numerous times and no contraband was found. *Id.* at p. 4. On January 19, 2005, [3] Plaintiff's cell was searched once again and his cell was left in disarray with his criminal case papers placed on his bed. *Id.*

3    Although Plaintiff provides a date of January 19, 2004, for this incident, Plaintiff did not arrive at Auburn until August of 2004 and therefore, the year 2005 will be reflected for the events described by Plaintiff subsequent to and including this incident.

*2    On January 21, 2005, Plaintiff was singled out for a pat frisk and was surrounded by twelve (12) officers and two (2) sergeants. *Id.* During the frisk, Plaintiff's criminal case was discussed by one of the sergeants. *Id.* Defendant Mahunik was present at the incident. *Id.* Plaintiff reported the incident to a civilian staff member who in turn relayed the information regarding the incident to the Deputy Superintendent. *Id.* Plaintiff was told that the harassment would cease and that he should not file a grievance. *Id.* at pp. 4-5. Even though no grievance was filed, Plaintiff continued to be harassed by Mahunik. *Id.* at p. 5.

On April 16, 2005, Plaintiff was attending a Catholic Choir callout when Defendant Mahunik abruptly cancelled the callout. *Id.* Then, on April 17, 2005, Plaintiff was supposed to attend a callout for the law library but was denied entry by Mahunik. *Id.* That same afternoon, Mahunik, along with Sergeant Gardner and Officer Banks, arrived at Plaintiff's cell and ordered him to submit to a pat frisk. *Id.* During that time, Mahunik entered Plaintiff's cell and placed a weapon

inside the cell. *Id.* Mahunik proceeded to announce that he had found the weapon and that he had previously been provided information by an informant that a weapon would be found in Plaintiff's cell. *Id.* Plaintiff's cell was searched once again and a body cavity search was performed on Plaintiff. *Id.* No other contraband was found. *Id.*

On April 18, 2005, a misbehavior report was filed against Plaintiff for violation of the rule against possessing weapons. *Id .* at p. 6. Plaintiff was assigned an assistant but the assistant failed to interview the requested witnesses and obtain copies of the paperwork Plaintiff requested. *Id.* Plaintiff refused to sign the form that the assistant had completed his duties. *Id.* On April 21, 2005, a Superintendent's Hearing was held in regards to the rule violation. *Id.* Plaintiff pled not guilty and explained to the hearing officer that Mahunik had placed the weapon in his cell. *Id.* Plaintiff also sought to have several witnesses testify as to the harassment by Mahunik against Plaintiff. *Id.* After six people had testified, on April 28, 2005, Plaintiff was found not guilty. *Id.* at pp. 6-7. The reasoning given by the hearing officer was that there was "prior antipathy" between Mahunik and Plaintiff "as exemplified by the canceling of Catholic Choir callout ... on 4/16/05 and denial of [Plaintiff's] entrance to the law library per callout on ... 4/17/05." *Id.* at p. 7. Additionally, the hearing officer stated that there were credibility issues with the confidential informant. *Id .*

On April 27, 2005, Mahunik returned to Plaintiff's cell and announced that he believed another knife was in the cell. *Id.* Because of the events that had occurred, Plaintiff filed two grievances, one for intentionally placing a weapon in his cell and another for threatening to place another weapon in the cell. On May 3, 2005, Plaintiff was approached by Mahunik who informed Plaintiff that he should not attend his law library callout and that he should cease filing grievances against him, otherwise there would be consequences. *Id.* at pp. 7-8. The same day, Plaintiff submitted a complaint to the Deputy Superintendent of Programs Ronald Nelson regarding Mahunik. *Id.* at p. 8. That complaint is being investigated. *Id.*

*3    On April 29, 2005, Superintendent Burge rendered his decision on Plaintiff's first grievance and found that there was no evidence to support the allegations and there was no merit to Plaintiff's complaint. *Id.* Plaintiff received this response on May 3, 2005, and on the same day filed an appeal to the Central Office Review Committee ("CORC") attaching the decision from Plaintiff's hearing to the CORC. *Id.* Burge rendered his decision as to the second grievance on May 5,

2005, and again stated there was no evidence to support the allegations. *Id.* Plaintiff appealed the decision to the CORC on May 16, 2005. *Id.*

In addition to filing the complaint and grievances, Plaintiff filed another complaint with the Inspector General's Office. *Id.* at pp. 8-9. The first letter sent by Plaintiff was on April 21, 2005, with a follow up letter sent on May 5, 2005. *Id.* at p. 9. Defendant McLaughlin is the Director of Operations at the Inspector General's Office. *Id.* By memorandum, McLaughlin referred the complaint to Defendant Burge, thus, no independent investigation was conducted by the Inspector General's Office. [4] *Id.*

[4]    At this juncture, the results of the referral to Defendant Burge are unknown.

On May 16, 2005, Plaintiff received a response to the complaint filed with Ronald Nelson by Captain Gummerson. *Id.* The response stated that Mahunik was interviewed and denied the allegation. *Id* . Plaintiff was further told to relay any concerns to Lieutenant Easterbrock. *Id.* On May 14 and 16, 2005, Plaintiff continued to be harassed by Mahunik. *Id.*

## II. DISCUSSION

### A. Motion to Dismiss Standard

Upon a motion to dismiss pursuant to *Fed.R.Civ.P.* 12(b) (6), a court may dismiss a complaint "only if 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Equal Employment Opportunity Comm'n v. Staten Island Sav. Bank,* 207 F.3d 144, 148 (2d Cir.2000) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) & citing *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 171 (2d Cir.1998)); *see also Green v. New York State Dep't of Corr. Serv. et al.,* 2003 WL 22169779, at * 1 (N.D.N.Y. Aug. 27, 2003). Furthermore, "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citations omitted). However, the court need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations. *Papasan v. Allain,* 478 U.S. 265, 286 (1986). Nevertheless, "[i]n assessing the legal sufficiency of a claim [under 12(b)(6) ],

the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference ... and documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference." *Green,* 2003 WL 22169779, at * 1 (internal quotation marks and citations omitted) (alterations in original).

**\*4** Moreover, pleadings submitted by *pro se* litigants "should be 'construed liberally,' " and a complaint "should not be dismissed unless 'it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations.' " *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (internal citations omitted). A "dismissal on the pleadings is *never* warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Id.* at 128.

### B. Non-Compliance with
### Federal Rules of Civil Procedure

Defendants assert that Plaintiff's Amended Complaint fails to comply with *Fed.R.Civ.P.* 8 and 10. Dkt. No. 22, Defs.' Mem. of Law at pp. 2-3.

*FED.R.CIV.P.* 8(a) states in part that "[a] pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Fed.R.Civ.P.* 8(a)(2). This Rule also requires that "[e]ach averment of a pleading shall be simple, concise, and direct." *FED.R.CIV.P.* 8(e). Thus, "[u]nder the Rules' liberal pleading standards, a plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.' " *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

If a complaint fails to comply with the requirements set forth under *FED. R. CIV. P.* 8, a district court has the power, either by motion or *sua sponte,* "to dismiss the complaint or to strike such parts as are redundant or immaterial." *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) (citing *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988)). Dismissal of a plaintiff's complaint should only be "reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo,* 861 F.2d at 42 (citation

omitted). While the mere fact that a plaintiff is proceeding *pro se* should not inhibit a court from dismissing a complaint under this Rule if warranted, *Jones v. Ocwen Fed. Bank,* 147 F.Supp.2d 219, 223-24 (S.D.N.Y.2001) (citing *Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995)), it is generally accepted that pleadings drafted by *pro ses* are not held to the same standards as those drafted by counsel, and, as a matter of policy, *pro se* pleadings are to be construed liberally with a "lenient eye," *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Fleming v. Untied States,* 146 F.3d 88, 90 (2d Cir.1998); *Boddie v. Schneider,* 105 F.3d 857, 860 (2d Cir.1997).

Additionally, if a court dismisses a plaintiff's complaint under this Rule, the court should generally afford plaintiff an opportunity to amend the complaint, especially "when the complaint states a claim that is on its face nonfrivolous." *Simmons v. Abruzzo,* 49 F.3d at 87. It is within the court's discretion whether to grant or deny leave to amend but the court must adhere to the standard set forth under FED.R.CIV.P. 15(a). *Salahuddin v. Cuomo,* 861 F.2d at 42. Nevertheless, a court may "dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible[ .]" *Id.* (citations omitted).

**\*5** Furthermore, FED.R.CIV.P. 10 states in part that "[a]ll averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances[.] ... Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth." **Fed.R.Civ.P.** 10(b). The intent of this Rule is so that one can easily identify numbered paragraphs by which to make reference to the pleading. *Flores v. Graphtex,* 189 F.R.D. 54, 55 (N.D.N.Y.1999) (citation omitted). If the complaint does not conform to the requirements set forth within **Fed.R.Civ.P.** 10, it "presents [a] far too ... heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of a plaintiff's claims, and may properly be dismissed by the Court." *Id.* (quoting *Gonzales v. Wing* 167 F.R.D. 352, 355 (N.D.N.Y.1996)).

In this case, Plaintiff filed his Original Complaint on May 23, 2005, and amended his Complaint as of right on August 10, 2005. Dkt. Nos. 1 & 9. Instead of submitting an answer,

Defendants brought this Motion to Dismiss on December 8, 2005. [5] Dkt. No. 22. Within this Motion, Defendants assert that dismissal of the Amended Complaint is warranted due to the fact that Plaintiff has failed to comply with FED.R.CIV.P. 8 & 10. Defs.' Mem. of Law at pp. 2-3.

[5]     Upon the filing of the Amended Complaint, Defendants' sought an extension of time to answer. Dkt. Nos. 13, Defs.' Lt., dated Oct. 26, 2005, & 17, Defs.' Lt., dated Nov. 15, 2005. Defendants were granted an extension and were directed to file their answer by December 9, 2005, thus, the filing of the Motion to Dismiss was timely. Dkt. Nos. 14, Order, dated Oct. 27, 2005, & 18, Order, dated Nov. 16, 2005.

Plaintiff, when submitting his Amended Complaint, utilized a form typically given to prisoners who wish to file a complaint under 42 U .S.C. § 1983. Am. Compl. Section II of the form asks plaintiffs to submit a "Statement of Claim." An explanation is provided as to what should be contained within this section:

> State here as briefly as possible the *facts* of your case. Describe how each defendant is involved. Also include the names of any other persons involved, dates and places of events. You may cite Constitutional Amendments you alleged were violated, but do not give any legal arguments or cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Use as much space as you need. (Attach additional sheet if necessary).

*Id.* at § II (emphasis in original). Plaintiff's "Statement of Claim" consists of approximately six pages of narrative as to events of which Plaintiff complains. *Id.* Although Plaintiff includes numerous paragraphs within this Section, they are not numbered and each paragraph includes several sentences. *Id.*

Nevertheless, the events described are clear enough that the nature of Plaintiff's claims can be deciphered. *Id.* The Second

2006 WL 2595200

Circuit has held that a plaintiff's complaint should not be dismissed unless "the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo,* 861 F.2d at 42. This is not the case here. Read liberally, Plaintiff's Amended Complaint alleges several causes of action. *See supra* Part I. Plaintiff's failure to number his paragraphs amounts to nothing more than a technical but harmless violation of the Federal Rules, and thus, absent any prejudice to Defendants, is an improper basis for dismissal. *Phillips v. Girdich,* 408 F.3d 124, 125 & 128 (2d Cir .2005) (holding that harmless violations of the Federal Rules of Civil Procedure pleading requirements, especially Rule 10, should be excused since such technical pleading irregularities "neither undermine the purpose of notice pleading nor prejudice the adverse party").

**\*6** Thus, it is recommended that Defendants' Motion to Dismiss be **denied** for failing to comply with the Federal Rules.

### C. Eleventh Amendment

Plaintiff brings suit against all Defendants in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks monetary damages against these Defendants in their individual and official capacities. *Id.* at § III. Defendants state that the Eleventh Amendment bars suit against the Defendants for monetary damages in their official capacities. Defs.' Mem. of Law at p. 2.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, Defendants cannot be sued in their official capacities in a claim for money damages. However, Linares may seek damages from Defendants in their individual capacities.

### D. First Amendment Claims

#### 1. Religious Service

Plaintiff claims that his callout to attend the Catholic Choir was cancelled by Defendant Mahunik on April 16, 2005. Am. Compl. at p. 5 & 7; Pl.'s Mem. of Law at p. 2.

Prisoners have a constitutional right to participate in congregate religious services. *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989). Although a prisoner does retain this right, it is not absolute. Thus, "a threshold question is whether the alleged state action in question substantially burdens that right." *Wagnoon v. Gatson,* 2001 WL 709276, at \* 7 (S.D.N.Y. June 25, 2001) (citing *Gill v. DeFrank,* 2000 WL 897152, at \*1 (S.D.N.Y. July 6, 2000); *Troy v. Kuhlman,* 1999 WL 825622, at \* 15 (S.D.N.Y. Oct. 15, 1999); & *Boomer v. Irvin,* 963 F.Supp. 227, 231 (W.D.N .Y.1997)). "A substantial burden constitutes more than a mere inconvenience, but rather involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs ." *Id.* (citing *Gill v. DeFrank,* 2000 WL 897152, at \*1).

Courts in this Circuit have held, and the Second Circuit has affirmed, that "missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion." *Gill v. Defrank,* 2000 WL 897152, at \* 2, *aff'd* 8 Fed Appx. 35 (2d Cir. Apr. 16, 2001); *see also Wagnoon v. Gatson,* 2001 WL 709276, at \* 8 (dismissing the free exercise claim on a motion to dismiss); *Troy v. Kuhlmann,* 1999 WL 825622, at \* 15; *Boomer v. Irvin,* 963 F.Supp. at 230-31.

**\*7** In this case, Plaintiff had a callout to attend Catholic Choir. Am. Compl. at pp. 5 & 7; Pl.'s Mem. of Law at p. 2. It is not clear whether such was an actual religious service or ancillary to a religious service, such as choir practice. In any event, even if it were to constitute a religious service, cancellation of his callout to attend the Catholic Choir occurred only one time. Thus, as this is not considered to be a substantial burden, the claim must fail.

Therefore, it is recommended that the Motion to Dismiss be **granted** on the religious service claim.

### 2. Law Library Access

Plaintiff claims that on April 17, 2005, Defendant Mahunik prevented him from attending his law library callout. Am. Compl. at pp. 5 & 7; Pl.'s Mem. of Law at p. 3.

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds).* However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354. Thus, to prove an actual injury, a plaintiff "must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials." *Murray v. Michael,* 2005 WL 2204985, at *16 (N.D.N.Y. Sept. 7, 2005) (citing *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998)); *see also Ramirez v. Holmes,* 921 F.Supp. 204, 207 (S.D.N.Y.1996) (stating that if a plaintiff alleges he was actually denied access to the law library, the plaintiff "must allege that the deprivation proximately caused some prejudice or denial of a legal claim" (citations omitted)).

In addition, under a First Amendment challenge on a law library claim, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Odom v. Poirier,* 2004 WL 2884409, at *8 (S.D.N.Y. Dec. 10, 2004) (quoting *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) & citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

**\*8** Here, Plaintiff, in his Amended Complaint, claims he was prevented from using the law library on his callout by Defendant Mahunik on one solitary occasion. However, Plaintiff has not alleged how any non-frivolous legal claims he may have been pursuing were frustrated or impeded due to the actions of Defendant Mahunik nor has he shown how he would be prejudiced in any way from not having access to the law library on that particular day. Furthermore, Plaintiff does not assert that he was in fact pursuing or intending to initiate any type of legal claim on the date Plaintiff states he was denied access to the law library. Even if there was malicious intent by Defendant Mahunik when he prevented Plaintiff from accessing the law library, Plaintiff cannot show he was prejudiced. *Ramirez v. Holmes,* 921 F.Supp. at 207 (citing *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995) for the proposition that the complaint was dismissed "where allegations did not show how denial of access, even if done deliberately and maliciously, 'materially prejudiced a pending legal action or one that [the plaintiff] sought to file in the courts' " (alteration in original) & *Derrick v. Melendez,* 1992 WL 373474 (S.D.N.Y. Dec. 2, 1992) for a similar notion in that a complaint was dismissed even though there were allegations of a retaliatory motive because there was no "mention of prejudice from isolated incident denying plaintiff use of legal text"). Thus, Plaintiff's access to the law library claim cannot stand as he has failed to show an "actual injury." *Id.* (dismissing the complaint on a motion to dismiss where the court found that a single incident of denial of use of the prison law library did not violate constitutional rights and plaintiff had not alleged any prejudice resulting from the one incident). Moreover, this one-time denial could be viewed as a mere delay. This delay does not rise to the level of a constitutional violation.

Therefore, it is recommended that the Motion to Dismiss be **granted** as to the law library claim.

### 3. Retaliation

Plaintiff claims that he was retaliated against by Defendant Mahunik for filing two grievances. Am. Compl. at pp. 5-8; Pl.'s Mem. of Law at pp. 3-4.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds*

by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). There must also be a "causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

**\*9** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at \*5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, in terms of what constitutes an adverse action, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.* If the plaintiff can carry that burden, the defendants may still defeat the claim if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994); *Wheeler v. Goord,* 2005 WL 2180451, at \*9 (N.D.N.Y. Aug. 29, 2005).

The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). In this respect, the Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original).

Here, Plaintiff filed his first grievance on April 17, 2005, regarding the law library callout denied to him by Defendant Mahunik. Dkt. No. 23, Linares Affirm., Ex. B, Grievance, dated Apr. 17, 2005. This grievance was reviewed by Superintendent Burge on April 29, 2005, who found that the complaint was investigated, that there was no evidence to support the claim, and that the accused staff member denied the misconduct.[6] *Id.,* Ex. B, Superintendent's Review, dated Apr. 29, 2005. Defendant Burge denied the grievance. *Id.* Plaintiff appealed to the Central Office Review Committee ("CORC"), which denied Plaintiff's grievance and upheld the Superintendent's determination based on the same reasoning. *Id.,* Ex. B, CORC Review, dated June 1, 2005. In fact, the CORC noted that the facility records indicated that Plaintiff did not attend the law library call "because he had a visit." *Id.*

6    The results of the Inmate Grievance Resolution Committee's ("IGRC") investigation were not provided to this

**\*10** Plaintiff filed his second grievance on April 27, 2005, stating that Defendant Mahunik threatened him by claiming he found another knife in Plaintiff's cell, and asking that the verbal harassment cease. *Id.,* Ex. C., Grievance, dated Apr. 27, 2005. Plaintiff stated the threat occurred after Mahunik had testified at a hearing based upon a misbehavior report filed against Plaintiff by Mahunik. *Id.* On May 5, 2005, Superintendent Burge denied the grievance stating that the complaint was investigated, there was no evidence to support the claim, and the accused staff member denied the misconduct.[7] *Id.,* Ex. C, Superintendent's Review, dated May 5, 2005. Plaintiff appealed to the CORC and on June 22, 2005, the CORC denied Plaintiff's grievance and upheld the Superintendent's determination, once again based on the same reasoning. *Id.,* Ex. C, CORC Review, dated June 22, 2005.

7    The results of the IGRC investigation were not provided to this Court.

Since filing of grievances is constitutionally protected conduct, *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citing *Franco v. Kelly,* 854 F.2d at 589); *Wheeler v. Goord,* 2005 WL 2180451, at *9,* Plaintiff would next have to show the filing of the grievance was a substantial and motivating factor for any adverse action taken and that there was a causal connection. The following events occurred after the filing of both grievances which are in proximity to the filings: 1) on April 18, 2005, a misbehavior report was issued to Plaintiff for violating the Department of Correctional Services ("DOCS") rule against having a weapon, which came as a result of a cell search on the previous day conducted by Mahunik, and after a hearing, Plaintiff was found not guilty of the charge; 2) on April 27, 2005, Defendant Mahunik "stated in a threatening manner" in front of Plaintiff's cell that he believed another knife was in Plaintiff's cell; and 3) on May 3, 2005, Mahunik verbally threatened Plaintiff and told him not to attend the law library callout or write any more grievances. Pl.'s Mem. of Law at pp. 5-8; Linares Affirm., Ex. C., Grievance, dated Apr. 27, 2005.

At this juncture, it is possible that the April 17, 2005 grievance could have been a substantial or motivating factor for the adverse action taken, the issuing of a misbehavior report on April 18, and that there was a connection between the filing of the grievance against Mahunik and the misbehavior report written the next day due to the temporal proximity of filing of the grievance and the search of the cell as well as the issuance of the misbehavior report. Plaintiff was also found not guilty, another factor which could also infer an improper retaliatory motive.

Turning to the other incidents, it is also possible that the grievances filed on April 17 and 27, 2005, could be considered a substantial and motivating factor for the threats allegedly occurring on April 27, 2005, and May 3, 2005. The temporal proximity of the threats to the filing of the grievances provides some circumstantial evidence of a retaliatory intent. *See, e.g. Baskerville v. Blot,* 224 F.Supp.2d 723, 733 n. 6 (S.D.N.Y.2002). Furthermore, the threats could be viewed as adverse actions as they may deter a similarly situated inmate of ordinary firmness from exercising his constitutional rights.

**\*11** Taking the threats in conjunction with the misbehavior report issued, Plaintiff raises at least a "colorable suspicion of retaliation" entitling him to at least some discovery

on the issue. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (describing three methods of pleading retaliation, each requiring separate analysis). Moreover, because of the stage of the litigation and the nature of this Motion, Defendants have not been permitted to put forth any evidence or provide an explanation that they would have taken the same action in the absence of the Linares's filing of the grievance. Consequently, Plaintiff has alleged a retaliation claim thus far.

Therefore, it is recommended that the Motion to Dismiss be **denied** as to the retaliation claims.

### E. Supervisory Liability

Plaintiff states that Superintendent Burge is liable because he denied Plaintiff's grievances regarding Defendant Mahunik's conduct and that he did not remedy the situation with Defendant Mahunik. Am. Compl. at p. 8; Pl.'s Mem. of Law at pp. 4-5.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Hernandez v. Keane,* 341 F .3d 137, 144 (2d Cir.2003) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). " 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144-45 (2d Cir.2003) (quoting *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)) (alterations in original). However, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information

indicating that unconstitutional acts were occurring.

*Id.* at 145 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)) (further citations omitted).

Here, Plaintiff does not allege that Defendant Burge was personally involved in any of the alleged violations. Am. Compl. at p. 8; Pl.'s Mem. of Law at pp. 4-5. Plaintiff generally alleges that Burge did not remedy the situation with Mahunik after being informed of the law library incident and retaliation claims through the grievance process. Am. Compl. at p. 8; Pl.'s Mem. of Law at pp. 4-5. In regards to the law library claim, Plaintiff cannot sustain a supervisory liability claim as there was no wrong for Burge to remedy since there is no constitutional violation. *See supra* Part II.D.2. However, as Plaintiff's retaliation claims are still viable at this stage, it is possible that Burge may be liable for failing to remedy that wrong. *See supra* Part II.D.3.

**\*12** Therefore, it is recommended that the Motion to Dismiss be **denied** as to the surviving retaliation claims.

### F. Failure to Investigate

Plaintiff claims that Defendant McLaughlin, of the Inspector General's Office, failed to conduct a separate investigation into Plaintiff's complaints regarding Defendant Mahunik, and instead referred them to Defendant Burge. Am. Compl. at pp. 8-9.

A "plaintiff does not have a constitutional right to an investigation [,]" unless the omission or inadequacy of the investigation itself resulted in a deprivation of a constitutional right. *Faison v. Hash,* 2004 WL 944523, at \*2 (W.D.N.Y. Apr. 23, 2004) (citing *Malloy v. City of New York,* 1996 WL 648872 at \*2 (S.D.N.Y. Nov. 7, 1996) ("holding that warden's alleged failure to investigate assault by correctional officer did not give rise to constitutional violation, where plaintiff failed to show that warden could have anticipated or had other direct involvement in the assault") & *Gomez v. Whitney,* 757 F.2d 1005 (9th Cir.1985) (holding that plaintiff's claim of inadequate investigation that did not cause a deprivation of a constitutional right does not state a claim under § 1983)); *see also Scher v. Chief Postal Inspector,* 973 F.2d 682, 683 (8th Cir.1992) (stating that there was no constitutional right to have a plaintiff's complaints regarding mail tampering

investigated). This premise also applies to investigation of grievances as there is no federal right to have them properly administered unless some liberty interest is involved. *Faison v. Hash,* 2004 WL 944523, at \*3 (citing *Jones v. North Carolina Prisoners Labor Union,* 433 U.S. 119 (1977); *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir.1994); *Ramirez v. Holmes,* 921 F.Supp. at 208; & *Sandin v. Conner,* 515 U.S. 472, 474 (1995)).

In this case, Defendant McLaughlin, although not conducting an investigation himself, still referred that duty to Defendant Burge. Even so, Plaintiff has no constitutional right to an investigation. Additionally, the only way Plaintiff would have that right is if the omission or inadequacy of the investigation itself resulted in a deprivation of a constitutional right. Here, the omission or inadequacy of an investigation would not result in a deprivation of any of Plaintiff's constitutional rights. Plaintiff merely seeks to have some sort of disciplinary action taken against Defendants Mahunik and Burge through the complaint sent to Defendant McLaughlin .[8] Pl.'s Mem. of Law at p. 5.

[8]   Additionally, Plaintiff does not allege any personal involvement by Defendant McLaughlin nor can he claim supervisory liability as he does not state whom McLaughlin supervises. *See* Am. Compl. Thus, alternatively, dismissal would be recommended on this ground.

Therefore, it is recommended that the Motion to Dismiss be **granted.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion to Dismiss (Dkt. No. 22) be **GRANTED IN PART** and **DENIED IN PART,** consistent with this opinion in the following manner:

   1. Defendant's request for dismissal pursuant to Federal Rules of Civil Procedure 8 and 10 is **denied.**

   2. All claims against Defendants in their official capacities are **dismissed.**

   **\*13** 3. Plaintiff's First Amendment claim based upon free exercise is **dismissed.**

2006 WL 2595200

4. Plaintiff's First Amendment claim based upon access to the law library is **dismissed.**

5. Plaintiff's First Amendment claims against Defendant Mahunik based on retaliation remain intact.

6. Plaintiff's supervisory liability claim relating to the retaliation claims against Defendant Burge remains intact; Plaintiff's supervisory claim against Defendant Burge for access to the law library is **dismissed.**

7. Plaintiff's failure to investigate claim against McLaughlin is **dismissed;** and it is further **RECOMMENDED,** that should the above be adopted by the District Judge, Defendants Mahunik and Burge shall submit an answer to the Amended Complaint within twenty (20) days of the District Judge's decision on this Report-Recommendation; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2595200

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 190 of 267

2014 WL 3956649
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Robert D. SCOTT, Plaintiff,
v.
Carl KOENIGSMANN, M.D., Chief Medical Officer;
New York State Department of Corrections, In
Official and Individual Capacity, Defendants.

No. 9:12–cv–01551 (MAD/RFT).
|
Signed Aug. 13, 2014.

**Attorneys and Law Firms**

Robert D. Scott, Batavia, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Adrienne J. Kerwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

 **\*1** *Pro se* plaintiff, Robert D. Scott, ("Scott"), a former
inmate of the New York State Department of Corrections
and Community Supervision ("DOCCS"), brought this civil
rights action pursuant to 42 U.S.C. § 1983, alleging violations
of his First and Eighth Amendment rights. Dkt. No. 7.
Plaintiff's claims arose between 2009 and 2012, while he
was in the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS") as an
inmate in the Gowanda Correctional Facility ("Gowanda
C.F.") and Mid–State Correctional Facility ("Mid–State
C.F."). Specifically, Plaintiff's amended complaint contains
the following claims: (1) medical staff at Mid–State C.F.
violated his First Amendment rights by threatening to take
away his pain medication if he continued to file grievances;
(2) that Plaintiff was transferred to Gowanda C.F. in
retaliation for filing grievances; (3) that medical staff at
Gowanda C.F. provided constitutionally inadequate medical
care; and (4) that Defendant Koenigsmann was aware of
these violations and was deliberately indifferent by failing to
remedy Plaintiff's issues. *See generally* Dkt. No. 7.

On July 16, 2014, Magistrate Judge Treece issued a Report–
Recommendation and Order recommending that Defendants'
motion to dismiss be granted in part and denied in part.
*See* Dkt. No. 41. Neither party objected to Magistrate Judge
Baxter's recommendation nor asked for an extension of time
to do so.

When a party files specific objections to a magistrate judge's
report-recommendation, the district court makes a *de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b)(1). However, when a party
files "[g]eneral or conclusory objections or objections which
merely recite the same arguments [that he presented] to the
magistrate judge," the court reviews those recommendations
for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011
WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and
footnote omitted). After the appropriate review, "the court
may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's
report and recommendation, even when that litigant is
proceeding *pro se,* waives any challenge to the report on
appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003)
(holding that, "[a]s a rule, a party's failure to object to
any purported error or omission in a magistrate judge's
report waives further judicial review of the point" (citation
omitted)). A *pro se* litigant must be given notice of this rule;
notice is sufficient if it informs the litigant that the failure
to timely object will result in the waiver of further judicial
review and cites pertinent statutory and civil rules authority.
*See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small
v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d
Cir.1989) (holding that a *pro se* party's failure to object to
a report and recommendation does not waive his right to
appellate review unless the report explicitly states that failure
to object will preclude appellate review and specifically cites
28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of
the Federal Rules of Civil Procedure).

 **\*2** A motion to dismiss for failure to state a claim pursuant
to Rule 12(b)(6) of the Federal Rules of Civil Procedure
tests the legal sufficiency of the party's claim for relief.
*See Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007)
(citation omitted). In considering the legal sufficiency, a court
must accept as true all well-pleaded facts in the pleading
and draw all reasonable inferences in the pleader's favor.

*See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a) (2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly,* 550 U.S.] at 557, 127 S.Ct. 1955, 167 L.Ed.2d 929). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed[,]" *id.* at 570.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (qquoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

**\*3** In the present matter, Magistrate Judge Treece provided plaintiff adequate notice that he was required to file objections to the ReportRecommendation and Order, and specifically informed him that failure to object to any portion of the report would preclude his right to appellate review. *See* Dkt. No. 41. Specifically, Magistrate Judge Treece informed plaintiff that **"FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e)." *See id.* Magistrate Judge Treece clearly provided Plaintiff with sufficient notice of the consequences of failing to object to the Report–Recommendation and Order.

Having carefully reviewed the July 16, 2014 Report–Recommendation and Order, the Court finds that Magistrate Judge Treece correctly determined that the Court should grant in part and deny in part Defendants' motion to dismiss. Specifically, the Court finds that Magistrate Judge Treece correctly determined that Defendant DOCCS should be dismissed because it is not subject to suit under section 1983 and that Plaintiff's claims against Defendant Koenigsmann in his official capacity seeking monetary damages are barred by the Eleventh Amendment. *See* Dkt. No. 41 at 8–9. Further, the Court finds that the recommendation correctly determined that Defendants' motion should be granted with respect to Plaintiff's claims against Defendant Koenigsmann regarding the medical care he received between 2003 and February 6, 2012, because Defendant Koenigsmann properly responded to Plaintiff's complaints. *See id.* at 13–14. Moreover, the amended complaint plausibly alleges Defendant Koenigsmann's personal involvement in the allegedly inadequate medical care complained of in Plaintiff's June 20 and August 1, 2012 letters. *See id.* at 15–16. Finally, Magistrate Judge Treece correctly determined that Defendant failed to allege a plausible claim of retaliation against Defendant Koenigsmann. *See id.* at 18–20.

Wherefore, the Court hereby

**ORDERS** that Magistrate Judge Treece's July 16, 2014 Report–Recommendation and Order is **ADOPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 23) is **GRANTED in part and DENIED in part;** and the Court further

ORDERS that Defendant's motion to dismiss with respect to all of Plaintiff's claims against Defendant DOCCS is **GRANTED,** and that DOCCS is **DISMISSED** from this action; and the Court further

ORDERS that Defendant's motion to dismiss is **GRANTED** with respect to Plaintiff's claims for monetary relief against Defendant Koenigsmann in his official capacity; and the Court further

ORDERS that Defendant's motion to dismiss is **GRANTED** with respect to Plaintiff's claims against Defendant Koenigsmann, arising out of his treatment, medical or otherwise, at OCF and Mid–State between 2003 and February 6, 2012; and the Court further

**\*4** ORDERS that Defendant's motion to dismiss is **GRANTED** with respect to Plaintiff's retaliation claims; and the Court further

ORDERS that Defendant's motion to dismiss is **DENIED** with respect to Plaintiff's claims that defendant Koenigsmann was deliberately indifferent to the allegedly inadequate medical are Plaintiff received between February 7, 2012 and October 24, 2012 at Mid–State C.F. and Gowanda C.F.; and the Court further

ORDERS that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

ROBERT SCOTT, Plaintiff,

—v—

CARL KOENIGSMANN, M.D., *Chief Medical Officer, In Official and Individual Capacity,* NEW YORK DEPARTMENT OF CORRECTIONS, [1] Defendant.

[1] In April 2011, the Department of Correctional Services ("DOCS") and the Division of Parole were merged into one entity, now referred to as the Department of Corrections and Community Services ("DOCCS"). Accordingly, we substitute DOCCS in place of DOCS throughout this Report–Recommendation and Order.

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Robert Scott brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging violations of his First and Eighth Amendment rights. Dkt. No. 7, Am. Compl. Defendants move for dismissal, pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds, *inter alia,* that Plaintiff has failed to state a claim, and Plaintiff's claims against Defendants in their official capacities are barred by principles of sovereign immunity. Dkt. Nos. 23, Defs.' Mot. to Dismiss, & 23–1, Defs.' Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 40, Pl.'s Opp'n. We recommend that Defendants' Motion to Dismiss be **GRANTED** in part and **DENIED** in part, in accordance with our analysis below.

# I. STANDARD OF REVIEW

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) *(overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint* ' may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus. ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

**\*5** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-

pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. at 697 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. at 679–80.

With this standard in tow, we consider the plausibility of Plaintiff's Amended Complaint.

## II. DISCUSSION

### A. Background

Plaintiff first came under the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS") in 2003. Am. Compl. at ¶ 7. Due to an industrial accident in 1983, Plaintiff is unable to do physical labor for the "remainder of his life." *Id.* Plaintiff has extensive and chronic back problems which include, *inter alia,* muscle spasms, neuropathy, and small calcium bodies in his hips which lodge in his hip joint and cause near blackout-level pain and collapse. *See, e .g., id.* at ¶ 8. Between 2003 and 2009, DOCCS provided "basic medical services for plaintiff. Including: mild muscle relaxers for the muscle spasms; and, appropriate pain medication, [and] medical restrictions." *Id.*

**\*6** However, in 2009, Plaintiff was transferred to Gowanda Correctional Facility ("GCF"); where he was "proclaimed[ ] medically cured[,]" his pain medication was taken away, his medical/work restrictions were lifted, and Plaintiff was ordered to work in the facility's kitchen. *Id.* at ¶ 9. Working in the kitchen caused further injury to Plaintiff's back. *Id.* at ¶ 10.

In January of 2010, Plaintiff was moved to Oneida Correctional Facility ("OCF"); by that time he "could no longer walk, or sleep for any period of time," however, OCF staff worked with Plaintiff to provide "medical rehabilitation." *Id.* at ¶¶ 13–14. Plaintiff received a series of MRIs, as well as a consultation with an orthopedic surgeon, "who stated: plaintiff's neck is close to needing surgery, middle and lower not yet, and plaintiff should be very concerned about his neck: Recommended Pain Management Services [sic]." *Id.* at ¶ 16. OCF's doctors sent Plaintiff to State University Upstate Pain Management ("Upstate Pain Management") where a series of three caudal blocks were done and a pain management program began to be developed; "[w]ith the Caudal Blocks the pain management medication began decreasing a[t] a moderate rate ." *Id.* at ¶ 17.

In August 2011, Plaintiff was moved to Mid–State Correctional Facility ("Mid–State"), where his medication was immediately cut in half even though his medication had just been cut by 1/3, and he was still awaiting the provision of two more caudal blocks in his mid-back. *Id.* at ¶ 18. On September 2, 2011, Plaintiff returned to Upstate Pain Management where he was informed that altering the specialist's pain management program can create a "cascade effect," permanent chronic pain, extreme spasms, and even cripple Plaintiff. *Id.* at ¶ 20.

On September 1, 2011, Plaintiff wrote a letter to Defendant Koenigsmann, DOCCS' Chief Medical Officer. In his letter

2014 WL 3956649

to Defendant Koenigsmann, Plaintiff noted: (1) his history of back problems; (2) that while at OCF he had requested his medication be reduced by one-third; (3) that he had been transferred from OCF to Mid–State; (4) that once at Mid–State his pain medication was again reduced by half; (5) that although one was ordered, he had not yet received his TENS unit; and (6) that he would like his pain medication to be increased. *Id.* at ¶ 22 & Ex. G, Lt., dated Sep. 1, 2011. [2]

[2]    The Court deems incorporated into Plaintiff's Amended Complaint those Exhibits which Plaintiff makes reference to, and or relies upon, in his Amended Complaint. *See Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007).

On September 13, 2011, Plaintiff received a letter from DOCCS' Regional Health Services Administrator, Peter Bogarski, notifying Plaintiff that Dr. Koenigsmann asked him to respond to Plaintiff's letter, that the Division of Health Services investigated his complaint, and that a TENS unit was ordered and on its way. *Id.* at ¶ 23 & Ex. H, Lt., dated Sep. 13, 2011.

On December 2, 2011, Plaintiff received another letter from Peter Bogarski stating that Dr. Koenigsmann asked him to respond to Plaintiff's earlier letter. [3] *Id.* at ¶ 25 & Ex. I., Lt., dated Dec. 2, 2011. Bogarski informed Plaintiff that his concerns with regard to the healthcare he was receiving at Mid–State were investigated and his medical records had been reviewed. Additionally, Bogarski informed Plaintiff that his TENS unit was being processed and that he was currently receiving Robaxin, Neurontin, Ultram, and Elavil for pain management. *Id.* at Ex. I.

[3]    Plaintiff fails to identify what he stated in the letter he sent to Dr. Koenigsmann prompting this response.

 *7  On February 6, 2012, Plaintiff wrote to Defendant Koenigsmann, explaining that he still had not received his TENS unit, that "[h]is medicine was cut by 2/3rds, or completely taken away, along with access to the New York State appointed Specialists." *Id.* at ¶ 26. On March 14, 2012, Plaintiff received another letter from Peter Bogarski stating that Dr. Koenigsmann asked him to respond to Plaintiff's earlier letter. *Id.* at ¶ 27 & Ex K, Lt ., dated Mar. 14, 2012. Bogarski noted that an investigation had been conducted, Plaintiff had received his TENS unit on March 6, 2012, and that Plaintiff's medications are ordered by his primary care

provider and any changes in those medications would have to be discussed with the primary care provider. *Id.* at Ex. K.

On April 20, Plaintiff again wrote to Defendant Koenigsmann, notifying him that he recently filed a grievance regarding receiving replacement batteries and pads for his TENS unit, and that he was told "that if [he] file[d] another grievance [he] w[ould] lose what little pain management medicine [he is] now receiving." *Id.* at ¶ 28 & Ex. L, Lt., dated Apr. 20, 2012. Plaintiff also wrote that he had suffered other "small abuse" such as having his medication crushed, and asking why the directions of his specialists were not being followed—such as his neurologists indication that taking away his pain medication would only lead to "DEEPER CHRONIC PAIN." *Id.* at Ex. L. [4]

[4]    It is unclear whether Plaintiff received a response to this letter.

On June 20, 2012, Plaintiff was transferred back to GCF, where he arrived on June 25. Am. Compl. at ¶ 29. On July 9, 2012, Plaintiff's medical restrictions were significantly reduced from the restrictions that were in-place at OCF. *Id.* at ¶ 33 & Exs. N–P, Medical Restriction Forms. Additionally, Plaintiff's pain medication had not been renewed. *Id.* at ¶ 34. On August 1, 2012, Plaintiff again wrote to Defendant Koenigsmann, alerting him to the fact that his medical restrictions had been "terminated," that Plaintiff was informed that Defendant Koenigsmann had ordered that his muscle relaxers be terminated, that a nurse had told him that his pain medication would be stopped altogether on August 9, 2012, and asking Defendant Koenigsmann to reinstate his medical restrictions, muscle relaxers, and leave his present pain management prescriptions in place. *Id.* at ¶ 34 & Ex. Q, Lt., Dated Aug. 1, 2012. [5]

[5]    It is unclear whether Plaintiff received a response to this letter.

### B. Analysis

Construed liberally, Plaintiff's Amended Complaint can be interpreted to allege that (1) medical staff at MSCF violated his First Amendment rights by threatening to take away his pain medication if he continued to file grievances; (2) that Plaintiff was transferred to GCF in retaliation for filing grievances; (3) that medical staff at GCF provided constitutionally inadequate medical care; and (4) that

Defendant Koenigsmann was aware of these violations and was deliberately indifferent by failing to remedy Plaintiff's issues. [6] *See generally* Am. Compl. Defendants argue that Plaintiff's claims are legally insufficient and are barred, in part, by the doctrine of sovereign immunity. *See generally* Defs.' Mem. of Law.

[6]     Plaintiff refers to his claims against Defendant Koenigsmann as a "BREACH OF DUTY TO PROTECT," Am. Compl. at ¶ 37. However, Plaintiff's claims against Defendant Koenigsmann are more appropriately characterized as claims sounding in supervisory liability. *See infra* Part II.B.3.

### 1. Defendant DOCCS

**\*8** The DOCCS is a state entity, and as such is not is not a "person" pursuant to § 1983; therefore, Plaintiff cannot state a cause of action against DOCCS pursuant to § 1983. *See Scott v. Coughlin,* 1990 WL 108383, at *4–5 (S.D.N.Y. July 26, 1990)* (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), for the proposition that New York's Department of Corrections was an "arm of the state" and as such, not a "person" for purposes of § 1983).

Accordingly, we recommend that Defendants' Motion to Dismiss be **GRANTED** with respect to Plaintiff's claims against Defendant DOCCS, and that Defendant DOCCS be **DISMISSED** from this action.

### 2. Sovereign Immunity

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State School*

*& Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540.

**\*9** Here, Plaintiff seeks declaratory and monetary relief from Defendant Koenigsmann. *See* Am. Compl. at ¶¶ 40–42. Accordingly, we recommend that Defendants' Motion to Dismiss be **GRANTED** with respect to Plaintiff's requests for monetary relief against Defendant Koenigsmann in his official capacity.

### 3. Deliberate Medical Indifference

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress

of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain ." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*10** In the instant case, Plaintiff does not allege that Defendant Koenigsmann personally provided care to him. *See generally* Am. Compl. Yet, it is well established that the "personal involvement of defendants in alleged constitutional deprivation[ ] is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d at 874 & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Second Circuit has determined that:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted). Moreover, a plaintiff cannot successfully allege supervisory liability without first establishing that an underlying constitutional violation occurred. *See Alston v. Bendheim,* 672 F.Supp.2d 378, 388 (S.D.N.Y.2009) (citing *Ramos v. Artuz,* 2002 U.S. Dist. LEXIS 25678, at \*30 (S.D.N.Y. Aug. 27, 2002), for the proposition that "[t]he failure to state a claim for an underlying constitutional violation forecloses supervisory liability .").

In the instant case, it is clear that Plaintiff has sufficiently alleged that he suffered from an objectively sufficiently

serious medical condition—namely, severe and chronically disabling back pain. See *Jordan v. Rabinowitz*, 2010 WL 4810229, at *6 (N.D.N.Y. Aug.24, 2010) (collecting cases for the proposition that severe long-lasting back pain constitutes a serious medical need); *see also Rodriguez v. Smith*, 2011 WL 4479689, at *5 (N.D.N.Y. Aug.19, 2011) (collecting additional similar cases).

Construed liberally, Plaintiff alleges that between 2003 and 2012 personnel at GCF and Mid–State, under the supervision and control of Defendant Koenigsmann, acted with deliberate indifference toward his chronic back condition. [7] Specifically, Plaintiff alleges that: (1) while at GCF between 2009 and January of 2010, he was declared "cured," his medical restrictions were lifted, and he suffered additional injuries after being forced to work in the kitchen which were ignored by GCF medical personnel. Am. Compl. at ¶¶ 9–10; (2) upon his transfer from OCF to Mid–State in August of 2011 through June 20, 2012, he was denied proper pain medication and did not receive his TENS unit, *id.* at ¶¶ 22–23 & 25–29; and (3) upon his transfer from Mid–State to GCF on June 25, 2012, his medical restrictions and pain medication were significantly reduced and/or terminated, *id.* at ¶¶ 29 & 33–34.

[7]    Plaintiff also includes information about treatment he received at OCF and "Wendy Correctional" during this time period. Am. Compl. at ¶ 8. However, Plaintiff acknowledges that between his initial inception into DOCCS' custody in 2003 and his transfer from OCF to GCF in 2009, he was provided with "quality basic medical services[,]" including: treatment by a neurologist, x-rays, "mild muscle relaxers for the muscle spasms; ... appropriate pain medication, [and] medical restrictions." *See id.* at ¶¶ 8–9, & Exs. A– B. Likewise, Plaintiff also concedes that while at OCF between January of 2010 and August of 2011, medical personnel worked with him to provide medical rehabilitation, which purportedly included a series of MRIs, a consultation with an orthopedic surgeon, and various forms of pain management medication. *Id.* at ¶¶ 13–14 & 16–17. Given these acknowledgments, and Plaintiff's failure to allege that he was ever denied treatment or provided inadequate treatment while at OCF, Plaintiff has failed to plausibly establish an underlying claim for deliberate medical indifference regarding the care he received at OCF. *See Harrington v. Mid–*

*State Corr. Facility*, 2010 WL 3522520, at *11 (N.D.N.Y. May 21, 2010) (finding that defendant doctors' "actions of referring [plaintiff's] care to a specialist, more familiar with the intricacies of [plaintiff's] subjective symptoms, belies any claims of deliberate indifference. Referring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions.") (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986)). Accordingly, Plaintiff cannot maintain a cause of action against Defendant Koenigsmann based on a theory of supervisory liability for any medical care he received at OCF or Wendy Correctional. *See Alston v. Bendheim*, 672 F.Supp.2d at 388. Furthermore, as demonstrated *infra*, even if Plaintiff had plausibly alleged that he received inadequate care at OCF or Wendy Correctional during these periods, it is apparent from the face of Plaintiff's Amended Complaint that Defendant Koenigsmann properly responded to, and thus was not deliberately indifferent toward, Plaintiff's treatment at all times between 2003 and February 6, 2012.

**\*11**   To begin with, Plaintiff's only allegations tying Defendant Koenigsmann to the care he received between 2003 and February 6, 2012, came *via* three letters Plaintiff wrote to Defendant Koenigsmann during this period. *See* Am. Compl. at ¶¶ 22, 25–26, & Ex. G. However, it is clear from the allegations of the Amended Complaint, as well as the documents Plaintiff attached to and referenced therein, that Defendant Koenigsmann properly delegated the responsibility of responding to Plaintiff's letters to Peter Bogarski, his subordinate. *See* Am. Compl. at ¶¶ 22–23, 25– 27, & Exs. G, H, I, & K. Likewise, it is clear from Defendant Bogarski's responses to Plaintiff, that in each instance an investigation was conducted and Bogarski concluded that Plaintiff's medical needs were being addressed by facility staff. *Id.* at Exs. H, I, & K.

Prison supervisors cannot be deemed personally involved based simply on a response to a complaint. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997). "It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement." *Silvagnoli v. Fischer*, 2010 WL 1063849, at *8 (N.D.N.Y. Mar.1, 2010) (citing *Smart v. Goord*, 441 F.Supp.2d 631, 642–43 (S.D.N.Y.2006)). "The same is true if the only involvement of the supervisory official

is to refer the inmate's complaint to the appropriate staff for investigation." *Id.* (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)). Likewise, a supervisor who reasonably responds to an inmate's complaint by assigning a subordinate to conduct an investigation and respond cannot be found to have been deliberately indifferent to that prisoners complaints. *See Silvagnoli v. Fischer,* 2010 WL 1063849, at *8; *see also Mandell v. Goord,* 2009 WL 3123029, at *13 (N.D.N.Y. Sept.29, 2009) (citing *Burns v. Trombly,* 2008 WL 2003804, at *13 (N.D.N.Y. May 7, 2008), for the proposition that "supervisors are permitted to delegate responsibility for handing grievances to subordinates and may properly rely on the determinations that those subordinates make; such reliance, standing alone, is similarly insufficient to show that the supervisor failed to remedy the alleged misconduct"). Thus, regardless of whether Plaintiff received constitutionally inadequate medical care during the period between 2003 and February 6, 2012, it is clear from the allegations contained in the Amended Complaint that Defendant Koenigsmann properly responded to Plaintiff's complaints, and therefore, Plaintiff has failed to establish that Defendant Koenigsmann acted with deliberate indifference with regard to these alleged Eighth Amendment violations.

Accordingly, we recommend that Defendants' Motion to Dismiss be **GRANTED** with respect to Plaintiff's claims against Defendant Koenigsmann regarding the medical care he received between 2003 and February 6, 2012.

**\*12** Plaintiff next wrote to Defendant Koenigsmann on April 20, 2012, from Mid–State, complaining that his pain medication had been reduced in contravention of his neurologist's caution that such an action would cause Plaintiff "DEEPER CHRONIC PAIN." Am. Compl. at Ex. L.[8] Additionally, on August 1, 2012, more than a month after his transfer from Mid–State to GCF, Plaintiff wrote Defendant Koenigsmann, notifying him, *inter alia,* that: Plaintiff's medical restrictions had been terminated "putting [him] at risk of losing the last 30% use of [his] back and legs"; Plaintiff was told by an unidentified person that Defendant Koenigsmann had ordered that his muscle relaxers be discontinued; and, that he feared that "Dr. Bengeil w[ould] be terminating [his] pain management in whole on August 9, 2012." Am. Compl. at Ex. Q. Plaintiff pled with Defendant Koenigsmann to "[r]eturn [his] medical restrictions and muscle relaxers, and leave what little pain management I have alone." *Id.* Additionally, it is also plausible to infer that the letters Plaintiff sent to Defendant Koenigsmann on August 1 and April 20 were

sufficient to alert him to the fact that Plaintiff suffered from an objectively serious medical need—*i.e.,* his chronic back condition. *See id.* at Exs. L & Q.

[8]     We deal separately with the allegations, made by Plaintiff in his April 20 letter, that in retaliation for filing a grievance regarding pads and a battery for his TENS unit, medical staff at Mid–State threatened to take away his pain medication. *See infra* Part II.B.4.

Crucially, it is unclear what, if any, action Defendant Koenigsmann took in response to Plaintiff's June 20 and August 1 letters. Given the special solicitude afforded to *pro se* plaintiffs, the allegations above are sufficient to plausibly allege that Defendant Koenigsmann was on notice that the medical care Plaintiff was receiving at Mid–State between February and June of 2012, and at GCF between June and August of 2012, was constitutionally inadequate. *See Castro v. Heath,* 2013 WL 5354241, at *8 (N.D.N.Y. Sept.23, 2013) (MAD/DEP) (quoting *Grullon v. City of New Haven,* 720 F.3d 133, 141 (2d Cir. June 19, 2013), for the proposition that for purposes of a motion to dismiss, plaintiffs within the Second Circuit that allege they sent a written complaint to a supervisor are "entitled to have the court draw the reasonable inference ... that the [official] in fact received the Letter, read it, and became aware of the alleged conditions of which [the inmate] complained."); *see also Castro v. Heath,* 2013 WL 5354241, at *8 (finding that plaintiff sufficiently stated personal involvement on behalf of a supervisory official where "[t]he only allegation against defendant ... in plaintiff's complaint is that plaintiff sent defendant a grievance complaining that the Greene medical staff was not adequately responding to plaintiff's ear infection"). And, while it may ultimately be shown that the alleged deficiencies Plaintiff complained of were nothing more than in-actionable disagreements between Plaintiff and his doctors as to the appropriate course of medical treatment, at this early stage, to make such a call would be premature. *See Cole v. Artuz,* 2000 WL 760749, at *6 (noting that although mere negligence or a disagreement over the course of treatment between a prisoner and his doctor are not actionable under § 1983, "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case") (quoting *Chance v. Armstrong,* 143 F.3d at 703) (alteration in original).

**\*13** Therefore, we recommend that Defendants' Motion to Dismiss be **DENIED** as to Plaintiff's claim that Defendant Koenigsmann was personally involved in the allegedly

2014 WL 3956649

inadequate medical care he complained of in his June 20 and August 1, 2012 letters.

### 4. Retaliation

Plaintiff alleges that in retaliation for filing grievances, medical personnel at Mid–State threatened to take away his pain medication and had him transferred back to GCF— a prison where he had allegedly previously endured harsh treatment from the medical staff. *See* Am. Compl. at ¶¶ 28 & 29.

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is *"de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis,* 320 F.3d at 353).

**\*14** On April 20, 2012, Plaintiff stated the following in a letter to Defendant Koenigsmann:

> a couple of weeks ago, I filed a grievance in regards to receiving batteries and pads for my TENS unit. This week, I was told that if I file another grievance I will loose [sic] what little pain management medicine I am now receiving .... 100% of my medication was crushed for a couple days to make the point clear.

Am. Compl. Ex. L.

Plaintiff further informed Defendant Koenigsmann that his neurologist and pain management specialists have "stated time and time again, don't take the medication away, it creates DEEPER CHRONIC PAIN." *Id.* Like Plaintiff's August 1, 2012 letter, it is unclear from the face of the Complaint what action, if any, Defendant Koenigsmann took in response to this letter. *See supra* Part II.B.3.

However, it is clear that filing grievances is a protected activity. *See Jones v. Coughlin,* 45 F.3d at 679–80. Additionally, it is plausible that a specific threat to take away medication for chronic pain, if made to a reasonable prisoner of ordinary firmness, would likely prevent that prisoner from exercising their First Amendment right to file grievances. *See Barrington v. New York,* 806 F.Supp.2d 730, 745–46 (S.D.N.Y.2011) (surveying cases for the proposition that allegations of a direct and specific threat can be sufficient to establish a retaliation claim). Lastly, Petitioner's allegations that he was told that these threats were a direct result of the grievances he filed "a few weeks" before with regard to replacement batteries and pads for his TENS unit, is more than sufficient to establish that the adverse action was causally related to the protected exercise. *See Colon v. Coughlin,* 58 F.3d at 872–73.

Notwithstanding the fact that Plaintiff has plausibly alleged an underlying constitutional violation, and that Defendant Koenigsmann was aware of this act of retaliation through Plaintiff's April 20, 2012 letter, *see Castro v. Heath,* 2013 WL 5354241, at *8, Plaintiff has nonetheless failed to establish that Defendant Koenigsmann was personally involved in the alleged retaliation. Plaintiff's letter to Defendant Koenigsmann makes no reference to any ongoing acts of retaliation; Defendant Koenigsmann cannot be found liable simply because he was notified after-the-fact about a single act of retaliation. *Rahman v. Fisher,* 607 F.Supp.2d 580, 585 (S.D.N.Y.2009) (noting that "[a]fter the fact notice of a violation of an inmate's rights is insufficient to establish a supervisor's liability for the violation. Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it").

**\*15** Next, Plaintiff alleges that in June of 2012, he was transferred to GCF in further retaliation for filing grievances, an action which Plaintiff ostensibly considers adverse because

of the severe conditions he had allegedly experienced during his first stay at GCF between 2009 and 2010. See Am. Compl. at ¶¶ 9–13 & 29; *see also* Dkt. No. 40, Pl.'s Opp'n, at p. 3.[9] However, we need not endeavor to determine whether these allegations are sufficient to allege a claim for retaliation because Plaintiff fails to allege that he ever made Defendant Koenigsmann aware of the alleged transfer, or the alleged motivation behind his transfer. Indeed, according to the Amended Complaint, after his April 20 letter, Plaintiff did not write to Defendant Koenigsmann again until August 1, 2012. Am. Compl. at ¶ 34. Crucially, Plaintiff's August 1 letter does not mention his transfer, nor allege that he was transferred for retaliatory reasons. *Id.* at Ex. Q. Therefore, Plaintiff has failed to allege that Defendant Koenigsmann either knew of, or was deliberately indifferent to, the alleged retaliatory act.

[9]     The exact dates Plaintiff was previously incarcerated at GCF are unclear.

Accordingly, we recommend that Defendants' Motion to Dismiss be **GRANTED** with respect to Plaintiff's retaliation claims against Defendant Koenigsmann.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 23) be **GRANTED** in part and DENIED in part as follows:

1. **GRANTED** with respect to all of Plaintiff's claims against Defendant DOCCS, and that DOCCS be **DISMISSED** from this action;

2. **GRANTED** with respect to Plaintiff's claims for monetary relief against Defendant Koenigsmann in his official capacity;

3. **GRANTED** with respect to Plaintiff's claims against Defendant Koenigsmann, arising out of his treatment, medical or otherwise, at OCF and Mid–State between 2003 and February 6, 2012;

4. **GRANTED** with respect to Plaintiff's retaliation claims;

5. **DENIED** with respect to Plaintiff's claims that Defendant Koenigsmann was deliberately indifferent to

the allegedly inadequate medical care Plaintiff received between February 7, 2012 and October 24, 2012 at Mid–State and GCF; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT*

*WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: July 16, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3956649

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Pearson v. Callahan, U.S., January 21, 2009

2003 WL 342347
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Hector RAMOS, Plaintiff,

v.

Christopher ARTUZ, Superintendent,
Larry Zwillinger, Regional Health Services
Administrator, Dr. Norman H. Selwin,
Medical Director, Dr. Harry Mamis, primary
provider, Byron Rodas, R.P.A. Defendants.

No. 00 Civ. 0149(LTS)(H.
|
Feb. 14, 2003.

**Synopsis**

Inmate brought § 1983 action against state prison physicians, alleging failure to provide adequate medical treatment. Defendants moved for summary judgment. Adopting the report and recommendation of Henry Pitman, United States Magistrate Judge, the District Court, Swain, J., held that defendants were not deliberately indifferent to inmate's back problems.

Motion granted.

West Headnotes (7)

**[1]    United States Magistrate Judges** 🔑 **Plain error, clear error, and manifest injustice review**

To accept report and recommendation of magistrate judge to which no timely objection has been made, district court need only satisfy itself that there is no clear error on record. 28 U.S.C.A. § 636(b)(1)(C).

**[2]    Prisons** 🔑 **Particular Conditions and Treatments**

**Sentencing and Punishment** 🔑 **Medical care and treatment**

State prisoner's primary care physician was not deliberately indifferent to his post-accident claims of back pain; physician provided appropriate, though unsuccessful, treatment, was not required to be empathetic, and was not responsible for delays in carrying out his non-critical care instructions. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[3]    Prisons** 🔑 **Particular Conditions and Treatments**

**Sentencing and Punishment** 🔑 **Medical care and treatment**

State prison's medical director was not deliberately indifferent to medical needs of prisoner suffering from back pain, though he failed to assign new primary care physician after current physician's care proved to be ineffective, absent showing that current physician was deliberately indifferent. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**[4]    Prisons** 🔑 **Particular Conditions and Treatments**

**Sentencing and Punishment** 🔑 **Medical care and treatment**

Prison medical director's alleged verbal abuse or harassment of prisoner for asserting grievances against inmate's primary care physician did not constitute deliberate indifference to prisoner's medical needs. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

11 Cases that cite this headnote

**[5]    Civil Rights** 🔑 **Persons Liable in General**

Defendant must be personally involved in commission of constitutional violation in order to incur § 1983 liability. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

[6]   **Civil Rights** 🔑 Criminal law enforcement; prisons

Prison administrator who exercised no supervisory authority over prison physicians could not be held liable under § 1983 for physicians' allegedly deliberate indifference to inmate's medical needs. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[7]   **Civil Rights** 🔑 Prisons, jails, and their officers; parole and probation officers

State prison physicians were entitled to qualified immunity from § 1983 liability based on allegedly deliberate indifference to inmate's medical needs; any deficiency in physicians' treatment of inmate's back injury was not so blatant that their putatively illegal conduct should have been obvious to them. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

*MEMORANDUM ORDER ADOPTING REPORT AND RECOMMENDATION*

SWAIN, J.

**\*1** On August 27, 2002, Magistrate Judge Henry Pitman issued a Report and Recommendation ("Report") recommending that the Court grant the Defendants' motion for summary judgment. No objections to the Report have been filed.

[1]   In reviewing a report and recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C.A. § 636(b)(1)(C) (West 2002). To accept the report and recommendation of a magistrate judge to which no timely objection has been made, a district court " 'need only satisfy itself that there is no clear error on the record.' " *Johnson v. Reno,* 143 F.Supp.2d 389, 391 (S.D.N.Y.2001) (citation omitted). *See also Bryant v. New York State Dep't of Corr. Serv.,* 146 F.Supp.2d 422, 424–25 (S.D.N.Y.2001) (court may

accept those portions of report to which no written objection has been made, so long as they are "not facially erroneous").

The Court has reviewed thoroughly Magistrate Judge Pitman's well-reasoned Report and has determined that there is no clear error on the face of the record. The Court adopts the Report for the reasons stated therein. Accordingly, Defendants' motion for summary judgment is granted.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

Magistrate Judge Pitman's Report follows.

SO ORDERED.

I. *Introduction*

PITMAN, Magistrate J.

Plaintiff *pro se,* an incarcerated inmate in the custody of the New York State Department of Correctional Services, brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants failed to provide him with adequate medical treatment for severe lower back pain, causing him to suffer pain and numbness in his left leg and to have difficulty sleeping.

In a report and recommendation dated March 2, 2001, I recommended that (1) the complaint be dismissed in its entirety to the extent that it could be construed to assert claims against the defendants in their official capacities; (2) the complaint be dismissed to the extent it asserts state law claims against the defendants; (3) the complaint be dismissed in its entirety as to defendant Artuz; (4) plaintiff's claim of deliberate indifference be dismissed against Rodas, and (5) defendants' motion to dismiss as to defendants Dr. Mamis, Dr. Selwin and Mr. Zwillinger be denied. That report and recommendation was subsequently adopted by the Honorable Laura Taylor Swain on July 25, 2001.

The three remaining defendants—Dr. Mamis, Dr. Selwin and Mr. Zwillinger—now move for summary judgment arguing that (1) there is no evidence in the record that is sufficient to create a genuine issue of fact that they were deliberately indifferent to plaintiff's back problems and (2) they are

entitled to qualified immunity. For the reasons set forth below, I respectfully recommend that their motion be granted.

## II. *Facts*

**\*2** The record in this case establishes the following facts.

The events giving rise to this action began on February 2, 1997. At that time, plaintiff was working as a porter at Green Haven Correctional Facility (Exhibit A to the Declaration of Assistant Attorney General Melinda Chester–Spitzer, dated December 20, 2001 ("Chester–Spitzer Dec."), at 41). After mopping an area, plaintiff claims that he bent over to pick up a bucket of water and that as he was lifting the bucket he felt a sharp pain in his lower back (Chester–Spitzer Dec., Ex. A at 45–47). Plaintiff states that after the incident, he laid down on his bunk for a while, and that when he later got up, he could not stand up straight (Chester–Spitzer Dec., Ex. A at 46).

On the day after the claimed incident, plaintiff consulted with a nurse at the prison infirmary and was told to apply warm compresses to the affected area. Plaintiff testified that he complied with this direction but that the treatment was ineffective (Chester–Spitzer Dec., Ex. A at 49, Ex. D at D 131).

Since the treatment prescribed by the nurse did not provide any relief, plaintiff met with Dr. Harry Mamis, a staff physician at Green Haven, on or about February 10, 1997 (Chester–Spitzer Dec., Ex. A at 50, Ex. C & 6, Ex. D at D 131). Dr. Mamis performed a physical examination of plaintiff and concluded that plaintiff suffered a "lumbar strain or sprain," a condition which can cause significant discomfort, but does not endanger a patient's health or safety (Chester–Spitzer Dec., Ex. C & 7, Ex. D at D 131). In addition to directing plaintiff to return for a follow-up visit, Dr. Mamis prescribed anti-inflammatory pain medication and Percoset, a muscle relaxant. Dr. Mamis also issued a nine-day "no work" permit, as well as permission for plaintiff to receive his meals in his cell so that he would not have to walk to the mess hall (Chester–Spitzer Dec ., Ex. A at 50–52, Ex. C & 9). When plaintiff subsequently had an allergic reaction to the Percoset, Dr. Mamis discontinued the Percoset and instead prescribed Naprosyn and Flexaril; plaintiff claimed that neither medication was effective at reducing his pain (ChesterSpitzer Dec., Ex. A at 50–52, Ex. D at D 131).

Over the following months, Dr. Mamis continued to treat plaintiff for his complaints of back pain. Plaintiff's medical records indicate that he saw Dr. Mamis on February 10, 13,

17, 18, 26 and April 3, 1997 (Chester–Spitzer Dec., Ex. D at D 124, 128–31). Dr. Mamis issued plaintiff several permits that allowed him to receive meals in his cell and provided plaintiff with a back brace (Chester–Spitzer Dec., Ex. C & 10). Dr. Mamis also referred plaintiff to Dr. Shreedahanan, an "outside" musculoskeletal specialist (Chester–Spitzer Dec., Ex. a at 53). Dr. Shreedahanan ordered X–Rays of plaintiff's back in March 1997; the radiologist's report concerning those X-rays stated:

> Radiographic examination of the dorsal spine shows normal vertebral body alignment and curvature. The bodies, arches, and pedicles are intact and the intervertebral disc spaces are well maintained. No compression fractures, bone destruction or significant arthritic changes are seen.

**\*3** (Chester–Spitzer Dec. Ex. D at D 127). Plaintiff also received physical therapy twice a week during the spring of 1997 (ChesterSpitzer Dec., Ex. A at 55).

Plaintiff complained to the medical staff at Green Haven that none of the foregoing treatments had relieved his pain, and Dr. Mamis arranged for plaintiff to undergo a Magnetic Resonance Imaging ("MRI") on July 14, 1997 (Chester–Spitzer Dec., Ex. C & 11). The report of the MRI testing revealed no abnormalities that could account for plaintiff's pain:

> Examination MRI of lumbar spine performed in axial and sagittal imaging planes was performed. The study was performed utilizing multiple imaging sequences.
>
> The examination demonstrated that the lumbar vertebral bodies were of normal size. The intervertebral disc spaces are well maintained. There is no evidence of disc herniation or protrusion. The visualized portions of the conus medularis and the cauda equina were unremarkable. The neural foramina were patent.
>
> CONCLUSION: UNREMARKABLE EXAMINATION.

(Chester–Spitzer Dec., Ex. D at D 287).

Plaintiff continued to complain of pain during the latter half of 1997, and Dr. Mamis continued to prescribe physical therapy at the rate of two to three sessions per week (Chester–Spitzer Dec., Ex. C & 12, Ex. D at D 103–09). Since plaintiff was continuing to complain of severe pain, Dr. Mamis ordered an electromyogram study ("EMG") of plaintiff in December 1997 (Chester–Spitzer Dec., Ex. C & 12). The results of the EMG were "normal study" with "no electrical evidence of radiculopathy or neuropathy," *i.e.,* no nerve damage (Chester–Spitzer Dec., Ex. C & 12, Ex. D at D 283).

In January 1998, plaintiff fell while descending some stairs at Green Haven (Chester–Spitzer Dec., Ex. A at 77–78). He was taken to the infirmary the following day where he was seen by Dr. Selwin (Chester–Spitzer Dec., Ex. A at 84–86). This was the only instance that Dr. Selwin saw plaintiff professionally (Chester–Spitzer Dec., Ex. E & 10). Dr. Selwin examined plaintiff's neck, provided him with a cervical collar, prescribed Ultram and Flexaril and admitted plaintiff to the infirmary for a twenty-four hour observation period (Chester–Spitzer Dec., Ex. A at 87, Ex. E & 11). Plaintiff was discharged the following day after admitting to Dr. Selwin that he was "moving around better" (Chester–Spitzer Dec., Ex. D at D 98).

In January 1998, despite a course of treatment that included physical therapy sessions, application of moist heat, ultrasound massages and back exercises, plaintiff was still complaining of severe back pain (Chester–Spitzer Dec., Ex. C & 15). As part of his continuing effort to solve the problem, Dr. Mamis then arranged for plaintiff to be seen by Dr. Jonathan Moldover, an outside specialist in pain management and the former Chief Physiatrist at Green Haven (Chester–Spitzer Dec., Ex. C & 15, Ex. D at D 281).

Shortly before Dr. Moldover actually examined plaintiff, Dr. Mamis ordered another set of X-rays, this time of plaintiff's pelvic area (Chester–Spitzer Dec., Ex. C & 16). The radiologist's report concerning these X-rays states:

   **\*4** Radiographic examination of the pelvis shows no fracture, dislocation, or any other bone or joint abnormality.

   Normal pelvis.

   Exam sacrum in 2 views shows normal alignment and curvature. There is no fracture or other osseous abnormality. The L5–S1 disc space is narrowed.

   IMP: NO ABNORMALITY SACRUM. NARROWED

   L5–S1 DISC SPACE COULD INDICATE

   DEGENERATIVE DISCOGENIC CHANGE AT

   LUMBOSACRAL JUNCTION.

   NO PRIOR STUDY.

(Chester–Spitzer Dec., Ex. D at D 92).

In March 1998, plaintiff complained of problems sleeping due to pain, and Dr. Mamis prescribed Elavil to address the problem (Chester–Spitzer Dec., Ex. C & 14).

Dr. Moldover examined plaintiff on or about March 27, 1998. Dr. Moldover recommended that plaintiff continue to be prescribed Elavil, Motrin and Ultram, that plaintiff practice flexion exercises and that plaintiff be provided with a cane [1] (Chester–Spitzer Dec ., Ex. C & 17, Ex. D at D 281).

[1]   At his deposition, plaintiff testified that Dr. Moldover also recommended "fluoroscopic surgery" and facet injections (Chester–Spitzer Dec., Ex. A at 115). The Consultant Report signed by Dr. Moldover contains no such recommendations (ChesterSpitzer Dec., Ex. D at D 281).

In April 1998, plaintiff requested a wheelchair, claiming that he was in too much pain to walk (Chester–Spitzer Dec., Ex. C & 18). After consulting with Drs. Moldover and Selwin, Dr. Mamis denied plaintiff's request, in large part on the recommendation of Dr. Moldover. Dr. Moldover believed, and Dr. Mamis concurred, that if plaintiff were given a wheelchair and stopped moving under his own power, his condition would actually worsen (Chester–Spitzer Dec., Ex. C & 19).

On April 15, 1998, plaintiff saw Dr. Mamis again. Prior to that date, plaintiff had been moved off an "Honor Block" in order to be relocated to housing that would not require him to climb stairs (*see* Chester–Spitzer Dec., Ex. D at D 88). One of the consequences of the move was that plaintiff's new housing had a "spring bed" instead of a flat steel bed; the spring bed aggravated plaintiff's back condition (Complaint at 10, para. 1). When Dr. Mamis first learned of this change during the April 15 visit, he ordered that plaintiff be provided with a flat steel bed (Chester–Spitzer Dec., Ex. C & & 31–32). In addition, Dr. Mamis's notes for the April 15, 1998 visit record that plaintiff "states he is slowly improving, doing exercises

2003 WL 342347

prescribed by Dr. Moldover" (Chester–Spitzer Dec., Ex. D at D 87).

Although Dr. Mamis ordered that plaintiff be provided with a flat steel bed in April 1998, his order was not implemented by Green Haven's Movement and Control Unit until August 1998 (Chester–Spitzer Dec., Ex. A at 120, Ex. C & & 32–33). Dr. Mamis has stated that he has no control over the implementation of his orders by the Movement and Control Unit (Chester–Spitzer Dec., Ex. C & 33); petitioner has submitted no evidence to the contrary.

Dr. Moldover saw plaintiff again on May 11, 1998 and recommended that plaintiff receive facet injections (ChesterSpitzer Dec., Ex. C & 21, Ex. D at D 277). Facet injection treatment is designed to reduce inflammation in the spine and consists of injecting anti-inflammatory steroidal medication into the area surrounding the spine. Dr. Moldover recommended this course of treatment because none of the other treatments plaintiff had undergone had been successful (Chester–Spitzer Dec., Ex. C & 21). Dr. Mamis also consulted with another physician, Dr. Galeno, who concurred in the recommendation that plaintiff be given facet injections (Chester–Spitzer Dec., Ex. C & 22).

**\*5** Although facet injections were ordered in May, 1998, plaintiff did not actually receive the injections until April, 1999 (Chester–Spitzer Dec., Ex. C & & 21, 29). According to Dr. Mamis, whose statements have not been contradicted by plaintiff, he submitted a request to Westchester County Medical Center ("WCMC") on June 1, 1998, requesting that they schedule facet injection treatment for plaintiff (Chester–Spitzer Dec., Ex. C & 22). WCMC authorized the request on July 15, 1998, but because the treatment was deemed to be "non-urgent," WCMC could not provide a date for an initial consultation prior to October 15, 1998. Dr. Mamis scheduled an initial consultation for plaintiff at WCMC for October 31, 1998 (Chester–Spitzer Dec., Ex. C & 22).

In light of the long delay, and in an effort to take steps to alleviate plaintiff's discomfort, Dr. Mamis authorized a wheelchair for plaintiff in October 1998 (Chester–Spitzer Dec., Ex. D at D 74–75). Plaintiff used the wheelchair until June, 2000, at which point he returned it stating that he no longer needed it (Chester–Spitzer Dec., Ex. C & 23).

Plaintiff was transported to WCMC on October 31, 1998 for an initial consultation (Chester–Spitzer Dec., Ex. C & 24).

In early November 1998, Dr. Mamis submitted a second request for a consultation to an entity called Correctional Physicians Service ("CPS"), which appears to be an health management organization that had been newly retained by the Department of Correctional Services. CPS advised Dr. Mamis that the procedure would take place at St. Agnes Hospital Pain Clinic ("St.Agnes") in White Plains and that the first available appointment was not until February 24, 1999. In addition, Dr. Mamis was advised that another "initial consultation" would be required before the treatments could be administered (ChesterSpitzer Dec., Ex. C & 25). Dr. Mamis had no control over when CPS scheduled the treatment (Chester–Spitzer Dec., Ex. C & 26).

In an effort to ameliorate plaintiff's pain, Dr. Mamis issued an order in January 1999 permitting plaintiff to have his meals in his cell block, and an additional order in February 1999 permitting plaintiff to have a double mattress (Chester–Spitzer Dec., Ex. C & 26).

On February 24, 1999, plaintiff was transported to St. Agnes for a second "initial" consultation, and was evaluated for facet injection treatment. Plaintiff was also advised by staff members of St. Agnes that he would have to undergo a series of blood tests (Chester–Spitzer Dec., Ex. C & 27). Plaintiff's blood tests were completed on March 12, 1999, and staff members at St. Agnes scheduled plaintiff's first treatment for March 24, 1999 (Chester–Spitzer Dec., Ex. C & 28). Due to a scheduling conflict on the part of St. Agnes, plaintiff's appointment was rescheduled for April 29, 1999 (Chester–Spitzer Dec., Ex. C & 28). Plaintiff subsequently received facet injection treatments on April 29 and May 24, 1999 (Chester–Spitzer Dec., Ex. C & 29). The facet injection treatments temporarily relieved plaintiff's pain (Chester–Spitzer Dec., Ex. A at 123, Ex. C & 30). Accordingly, Dr. Mamis subsequently ordered additional physical therapy and additional steroidal injections for plaintiff (Chester–Spitzer Dec., Ex. C & 30).

**\*6** On March 8, 2000, Dr. Mamis ordered another MRI study of plaintiff's spine (Chester–Spitzer Dec., Ex. C & 37, Ex. D at D 257). The report of this procedure states:

[A] normal alignment is demonstrated. No compression fractures are identified. The vertebral bodies are of normal height and signal intensity throughout.

The intervertebral discs are of normal height and signal intensity throughout.

Bulging of the disc margin at the L4–5 level is noted.

There is no evidence of spinal stenosis.

The spinal cord ends normally at the L1 level and is of normal signal intensity. The soft tissues are unremarkable.

*IMPRESSION:*

Bulging disc L4–5.

(Chester–Spitzer Dec., Ex. D at D 256).

In August 2001, plaintiff was transferred out of Green Haven (Chester–Spitzer Dec., Ex. C & 36).

### B. *Proceedings to Date*

Plaintiff commenced this action on January 10, 2000. On or about May 15, 2000, defendants moved to dismiss the complaint on various grounds, and on March 2, 2001, I issued a report and recommendation recommending the dismissal of all claims against all defendants except for plaintiff's deliberate indifference claims against Dr. Mamis, Dr. Selwin and Mr. Zwillinger. That report and recommendation was accepted by the Honorable Laura Taylor Swain, United States District Judge, on July 25, 2001. Thus, the pending motion addresses the only claims remaining in this matter.

### III. *Analysis*

#### a. *Summary Judgment Standard*

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

> To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). In deciding such a motion, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.

*Giano v. Senkowski,* 54 F.3d 1050, 1052 (2d Cir.1995).

*Hemphill v. Schott,* 141 F.3d 412, 415 (2d Cir.1998). *See also Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000); *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997).

Once the moving party has met its initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party, in order to defeat the motion, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial" in order to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. *Deliberate Indifference Claim*

**\*7** The Supreme Court set forth the standard for deliberate indifference claims in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976): "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment." *See also Helling v. McKinney,* 509 U.S. 25, 31–32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998) (a plaintiff has to establish that the "defendants knew of the health dangers and yet refused to remedy the situation"). "Proof of mere negligence ... will not give rise to a constitutional violation." *Doyle v. Coombe,* 976 F.Supp. 183, 186 (W.D.N.Y.1997), *aff'd without opinion,* 159 F.3d 1346 (2d Cir.1998). *See also Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991).

A claim of deliberate indifference involves an objective component and a subjective component. *Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); *Hemmings v. Gorczyk,* 134 F.3d 104, 108–09 (2d Cir.1998). *See generally Garraway v. Artuz,* 01 Civ. 3126(DLC), 2002 WL 221584 at \*6–\*7 (S.D.N.Y. Feb. 13, 2002).

The objective component is satisfied if the alleged deprivation is "sufficiently serious." *Farmer v. Brennan, supra,* 511 U.S. at 834; *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ( "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious.") (internal quotation marks omitted). A medical condition is considered serious if it is "a condition of urgency" that may result in "degeneration" or "extreme pain." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). *See also Thomas v. Arevalo,* 95 Civ. 4704(SS), 1998 WL 427623 at *5 (S.D.N.Y. July 28, 1998).

The subjective component of a deliberate indifference claim is satisfied where a plaintiff can show that the defendants acted with "a sufficiently culpable state of mind." *Farmer v. Brennan, supra,* 511 U.S. at 834–35. An official acts with deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. *See also Wilson v. Seiter,* 501 U.S. 294, 298–302, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Morales v. Mackalm,* 278 F.3d 126, 132–33 (2d Cir.2002); *Hathaway v. Coughlin, supra,* 37 F.3d at 66. "The subjective element requires a state of mind that is the equivalent of criminal recklessness...." *Hathaway v. Coughlin, supra,* 99 F.3d at 553. "In certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Chance v. Armstrong, supra,* 143 F.3d at 703. " " '[M]ere medical malpractice' is not tantamount to deliberate indifference,' but it may rise to the level of deliberate indifference when it 'involves culpable recklessness, i.e., an act or a failure to act ... that evinces "a conscious disregard of a substantial risk of serious harm." ' " *Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir.2000), *quoting Chance v. Armstrong, supra,* 143 F.3d at 703.

**\*8** The Eighth Amendment does not require prison officials to provide every form of treatment that is theoretically possible or every form of treatment that would be available to an individual who is not incarcerated. *See Hudson v. McMillian, supra,* 503 U.S. at 9.

"At a minimum, there must be at least some allegations of a conscious or callous indifference to a prisoner's rights." *Zaire v. Dalsheim,* 698 F.Supp. 57, 59, *aff'd,* 904 F.2d 33 (2d Cir.1990). Claims based on differences of opinion,

however, are not sufficient to constitute "conscious or callous indifference." *Williams v. Coughlin,* 650 F.Supp. 955, 956 (S.D.N.Y.1987). Medical decisions will constitute "indifference" only when they are contrary to accepted medical standards. *Harding [v. Kuhlmann,* 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), *aff'd,* 762 F.2d 990 (2d Cir.1985) ].

*Webb v. Jackson,* 92 Civ. 2149(SS), 1994 WL 86390 at *2 (S.D.N.Y. Mar. 16, 1994), *aff'd without opinion,* 47 F.3d 1158 (2d Cir.1995). *See also Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (civilly committed patient states a claim for liability under Section 1983 "only when the decision by the [medical] professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment").

For purposes of the present motion, defendants assume that plaintiff has asserted a "serious" medical condition (Defendants' Memorandum of Law, dated December 20, 2001 ("Defendants' Mem."), at 12). Nevertheless, defendants claim that there is insufficient evidence for a reasonable jury to conclude that the subjective component of a deliberate indifference claim has been satisfied and that they are, therefore, entitled to summary judgment.

Judged by the standards set forth above, I conclude that plaintiff's claim of deliberate indifference cannot withstand summary judgment.

### 1. Dr. Mamis

**[2]** Dr. Mamis was plaintiff's primary care physician at Green Haven from the time of February 1997 through plaintiff's transfer from Green Haven (Chester–Spitzer Dec., Ex. C & 5). Although the handwritten medical records submitted in support of the current motion are, at times, difficult to read, it appears that Dr. Mamis, or members of his staff, saw plaintiff concerning his back pain over 150 times from the date of the accident through the date on which this accident was commenced (ChesterSpitzer Dec., Ex. D at D 34—D 131). In addition to the specific incidents described in Section II, above, plaintiff's medical records indicate that Dr. Mamis renewed plaintiff's prescriptions on an ongoing basis, and issued multiple orders permitting plaintiff to receive meals in his cell and use a cane and a wheelchair.

In addition, there is unrebutted evidence in the record that Dr. Mamis's treatment of plaintiff was appropriate to plaintiff's complaints. Defendants have submitted an affidavit from Dr. Arnold M. Illman, a Board certified orthopedist and Associate Clinical Professor of Orthopedic Surgery at Stony Brook Medical School with over thirty years of experience treating back problems in both private practice and with the United States Air Force (Chester–Spitzer Dec., Ex. I at 3). Dr. Illman has reviewed plaintiff's medical records and concluded as follows:

 **\*9**  I feel that this patient probably sprained his lower back on February 2, 1997 and that the minimal changes of a pre-existing problem of his lower back with diminution of the interspace of L 5–S 1 probably was not significant.

This patient was seen by either the physician, physician's assistant or physical therap[ist], or [an] individual giving out pain medication a total of approximately 220 times over the period of March 1997 through March 10, 2001 and has ample opportunity to be re-examined and treated and in fact was over this period of time.

All of [plaintiff's] physicians during this period of time diligently and completely had performed all possible pertinent tests in an attempt to treat this individual's complaints and in fact repeated the MRI in order not to leave anything to chance.

I feel this patient was given a very careful, considerate pain management treatment in order to alleviate his pain despite the fact that all his tests were normal. In fact, in order to comply [with] this claimant's symptomatology, which was symptomatic, which was subjective and not borne out by objective medical tests, he was given light duty excuses and the use of a wheelchair. Therefore I feel that in no way were the allegations made by this claimant against the doctors and other medical personnel treating him and the institution reasonable.

(Chester–Spitzer Dec., Ex. I at 2).

Against this array of evidence, plaintiff makes four specific complaints. First, plaintiff complains about the fact that the treatments did not successfully cure his pain. Although I assume this claim to be true, it cannot support a finding of deliberate indifference. The fact that a course of treatment is unsuccessful does not even establish medical malpractice. 1A *New York Pattern Jury Instructions—Civil,* Instruction 2–150 at 723–24 (3rd Ed.2002). *A fortiori,* it cannot support a finding of deliberate indifference since deliberate indifference requires a level of culpability beyond malpractice. Moreover, when plaintiff was asked at his deposition to identify any form of treatment that he believes was improperly denied to him, he could not identify any such treatment (Chester–Spitzer Dec., Ex. A at 128–29).

Plaintiff also complains that he believed Dr. Mamis was not empathetic and did not release him from work (Chester–Spitzer Dec., Ex. A at 56–57). As to the former complaint, the Eighth Amendment does not require empathy. If prison officials provide the level of care the Eighth Amendment requires, their alleged lack of empathy is immaterial. As to the alleged failure to release plaintiff from work, plaintiff has no evidence that any physician told him that he should not have been working (Chester–Spitzer Dec., Ex. A at 112–13). Moreover, after his accident, plaintiff admits that his work assignments did not include arduous physical labor (Chester–Spitzer Dec., Ex. A at 111 (drafting and working with mentally ill inmates).

To the extent plaintiff complains of delays in his being given a flat steel bed and delays on receiving facet injections, Dr. Mamis has offered uncontradicted evidence that he did all in his power to provide plaintiff with both, and plaintiff has offered no evidence to the contrary. In the absence of some evidence that Dr. Mamis was responsible for the delay, there is no evidence that Dr. Mamis was responsible for a substantial departure from accepted medical standards. In addition, delay in providing non-critical care, in the absence of evidence that the delay was the product of wantonness or other improper motive, will rarely sustain a deliberate indifference claim.

 **\*10**  Although a delay in providing necessary medical care may, in some cases, support an inference of deliberate indifference, the Second Circuit has reserved such a classification for cases in which, for example, officials ignored a "life-threatening and fast-degenerating" condition for three days, *Liscio,* 901 F.2d at 277, or delayed major surgery for over two years, *Hathaway v. Coughlin,* 841 F.2d 48 (1988) ...; *see also Archer v. Dutcher,* 733 F.2d 14, 16–17 (2d Cir.1984) (a prisoner must allege that he was intentionally denied needed medical are over a period of

time by prison officials, while he was
in extreme pain, or that medical care
was completely withheld).

*Sully–Martinez v. Glover*, 00 Civ. 5997(GEL), 2001 WL
1491278 at *5 (S.D.N.Y. Nov. 26, 2001).

Finally, to the extent plaintiff bases his claim on his being
denied a wheelchair in April, 1998, Dr. Mamis explained
in his affidavit that this decision was based on his opinion,
shared by both Drs. Mamis, Moldover and Selwin, that
plaintiff's use of a wheelchair would actually aggravate
his condition. Again, there is simply no evidence that
this decision was incorrect, let alone reached the level of
culpability sufficient to constitute deliberate indifference.

In view of the ample evidence that Dr. Mamis provided
plaintiff with a substantial amount of care appropriate to
plaintiff's condition and the total dearth of evidence that
Dr. Mamis departed from accepted medical standards to any
degree, I conclude that no reasonable juror could conclude
that Dr. Mamis is guilty of deliberate indifference.

### 2. *Dr. Selwin*

**[3]** Dr. Selwin was Green Haven's Acting Medical Director
from 1995 through February 1999, and, in that capacity,
was responsible for overseeing the doctors and physician's
assistants assigned to the facility and the x-ray, physical
therapy, laboratory and pharmacy departments (Chester–
Spitzer Dec., Ex. E & & 3, 5). The record reveals that
Dr. Selwin's only clinical contact with plaintiff was the
examination and treatment Dr. Selwin rendered to plaintiff
after his January 1998 fall (Complaint at 8; Chester–Spitzer
Dec., Ex. A at 25, Ex. E & & 10–13). Plaintiff claims that
during the course of this consultation, Dr. Selwin harassed
him about the numerous grievance complaints that he had
filed (Complaint at 8, & 1; Chester–Spitzer Dec., Ex. A
at 87). In addition, plaintiff wrote to Dr. Selwin, as Green
Haven's Acting Medical Director, on several occasions to
complain about the care that he was receiving from Dr. Mamis
(Chester–Spitzer Dec., Ex. J).

To the extent plaintiff is asserting a deliberate indifference
claim against Dr. Selwin based on the January 1998 visit,
there is no evidence in the record establishing deliberate
indifference. After the fall plaintiff suffered at that time, Dr.
Selwin admitted plaintiff to the infirmary for a twenty-four

hour observation period and discharged him at the end of that
period, having found no abnormalities (Chester–Spitzer Dec.,
Ex. E & & 11–12). The entry in plaintiff's medical records
concerning plaintiff's discharge indicates that plaintiff told Dr.
Selwin that he was "moving around better" both on the day of
his discharge and that plaintiff was given both Ultram and
Flexaril upon his discharge (Chester–Spitzer Dec., Ex. D at
D 98). In view of the facial reasonableness of Dr. Selwin's
treatment of plaintiff, the affidavit of Dr. Illman quoted
above and the total absence of any evidence that Dr. Selwin's
treatment constituted any type of departure from acceptable
medical standards, no reasonable juror could conclude that
Dr. Selwin's treatment of plaintiff in January 1998 constituted
deliberate indifference.

**\*11** To the extent plaintiff's allegations can be read to
assert a deliberate indifference claim against Dr. Selwin
based on plaintiff's letters requesting that Dr. Selwin either
assign a new doctor to plaintiff or make some other changes
in plaintiff's treatment (*see* Chester–Spitzer Dec., Ex. J),
plaintiff's claim also fails. Although a supervisor's failure to
take corrective action in response to a subordinate's violation
of constitutional protections can, in some circumstances, be
a basis for liability under Section 1983, *Heron v. Dalsheim,*
95 Civ. 2625(JFK), 1999 WL 2871 at *5 (S.D.N.Y. Jan.
4, 1999) ("Courts have found personal involvement of a
supervisory official where a plaintiff has sent letters to or
orally informed the official of an ongoing constitutional
violation." (citations omitted)); *see also Colon v. Coughlin,* 58
F.3d 865, 873 (2d Cir.1995) (Supervisor may be liable under
Section 1983 where "the defendant, after being informed of
the violation through a report or appeal, failed to remedy the
wrong, ... the defendant was grossly negligent in supervising
subordinates who committed the wrongful acts, or ... the
defendant exhibited deliberate indifference to the rights of
inmates by failing to act on information indicating that
unconstitutional acts were occurring."), [2] plaintiff's claim
of supervisory liability cannot survive here because, as
discussed above, there was no constitutional violation by Dr.
Mamis. If Dr. Mamis did not violate plaintiff's constitutional
rights, Dr. Selwin's failure, as his supervisor, to take corrective
measures is necessarily immaterial.

[2]   A number of judges in this Circuit have, however,
reached a different conclusion based on the
facts before them. *See Woods v. Goord,* 97 Civ.
5143(RWS), 1998 WL 740782 at *6 (S.D.N.Y.
Oct. 23, 1998) ("Receiving letters or complaints,
however, does not render [defendant] personally

liable under '1983."); *Cox v. Colgane,* 94 Civ. 6361(DAB), 1998 WL 148424 at \*9 (S.D.N.Y. Mar. 27, 1998) (" 'It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.' "), *quoting Higgins v. Artuz,* 94 Civ. 4810(SS), 1997 WL 466505 at \*7 (S.D.N .Y Aug. 14, 1997), *citing Greenwaldt v. Coughlin,* 93 Civ. 6551(LAP), 1995 WL 232736 (S.D.N.Y. Apr. 19, 1995); *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997); *Bolanos v. Coughlin,* 91 Civ. 5330(KC), 1993 WL 762112 at \*25 (S.D.N.Y. Oct. 15, 1993) ("To impose liability under such circumstances would be inconsistent with the purpose of Section 1983 to hold only those responsible for violations liable."); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) ( "[Defendant's] only alleged connection to this case—that he ignored [plaintiff's] letter of protest and request for an investigation of the allegations made in this action—is insufficient to hold him liable ... for the alleged violations.").

[4]   Finally, to the extent plaintiff alleges that Dr. Selwin verbally abused him or harassed him for asserting grievances against Dr. Mamis, these allegations fail to state a claim on which relief can be granted. *Cuoco v. Moritsugu, supra,* 222 F.3d at 109; *Liner v. Goord,* 196 F.3d 132, 134– 35 (2d Cir.1999); *Ivey v. Wilson,* 832 F.2d 950, 955–56 (6th Cir.1987); *Oltarzewski v. Ruggiero,* 830 F.2d 136, 139 (9th Cir.1987); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986).

### 3. *Lawrence Zwillinger*

Since April 1991, Zwillinger has been employed by DOCS as a Regional Health Services Administrator and has been assigned by DOCS to oversee the administrative operations of the medical department at Green Haven (Chester–Spitzer Dec., Ex. G & 1). Zwillinger does not himself provide any of the health care services to inmates, nor does he supervise any of the health care providers at Green Haven (Chester– Spitzer Dec., Ex. G & 3). Zwillinger's only interaction with plaintiff was his drafting responses to letters plaintiff sent to Dr. Selwin and Christopher Artuz, Green Haven's Superintendent [3] (Chester–Spitzer Dec., Ex. G & 4).

[3]   As explained in my March 2, 2001 Report and Recommendation, plaintiff's allegations against Zwillinger are not set forth in the complaint. Rather they are set forth in a putative crossmotion filed in response to defendants' motion to dismiss (Plaintiff's Cross–Motion, dated July 21, 2000 ("Cross–Motion")). In light of plaintiff's *pro se* status, I consider the allegations contained in his cross motion as if they were asserted in the complaint.

The theory on which plaintiff seeks to hold Zwillinger liable is not entirely clear. In his opposition to the current motion, plaintiff claims that Zwillinger and Drs. Mamis and Selwin somehow merged together (Plaintiff's Affidavit in Support in Opposition of Summary Judgment [*sic* ], sworn to July 10, 2002 at & 23). Alternatively, plaintiff claims that Zwillinger, even though he did not supervise Drs. Mamis or Selwin, is somehow liable for not correcting their constitutionally deficient care.

**\*12** [5]   With respect to the former theory, there is no legally cognizable "merger" theory under Section 1983. To the contrary, a long line of authority requires that each defendant named in a Section 1983 claim be personally involved in the commission of the constitutional violation. *E.g., Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Leonhard v. United States,* 633 F.2d 599, 621 n. 30 (2d Cir.1980).

[6]   Plaintiff's second theory is also deficient for at least two reasons. First, as explained above, there is no evidence of any deficiency of constitutional magnitude in the care given to plaintiff. In the absence of evidence of an underlying constitutional violation, there was nothing for Zwillinger, or anybody else, to correct. Second, there is uncontradicted evidence in the record that Zwillinger, who is not a health care professional, did not supervise either Dr. Mamis or Selwin (Chester–Spitzer Dec., Ex. G & 3). Thus, Zwillinger was never in a position of sufficient authority to take corrective action.

Since plaintiff has not offered any colorable legal theory on which to impose liability on Zwillinger and has not offered any evidence of any facts that could support a theory of liability, Zwillinger is also entitled to summary judgment dismissing the claims against him.

#### 4. *Summary*

Plaintiff's dissatisfaction with his situation is understandable; while engaged in the ordinary act of lifting a bucket he did something to his back that has caused him serious pain for more than five years. However, any physician, whether employed by a prison or employed in the private sector, "is not an insurer of a cure nor is he a guarantor of the result of his prescriptive treatment." *McGrady v. United States,* 650 F.Supp. 379, 381 (D.S.C.1986); *accord Orozco v. Children's Hosp.,* 638 F.Supp. 280, 284 (E.D.Pa.1986), *aff'd without opinion.* 813 F.2d 398 (3rd Cir.1987); *see also Harrigan v. United States,* 408 F.Supp. 177, 189 (E.D.Pa.1976) ("[a] physician is not liable merely because a course of treatment does not produce desired results; [ordinarily] a doctor is neither a warrantor of a cure nor a guarantor of the result of his treatment."). We know from personal injury litigation that sometimes pain and suffering is permanent and that medicine cannot cure all maladies. At most, plaintiff has shown that Drs. Mamis and Selwin have been unsuccessful at treating his back pain. In light of the substantial medical evidence submitted in connection with this motion that all reasonable care was provided to plaintiff, the mere lack of success does not constitute deliberate indifference. Accordingly, I conclude that Drs. Mamis and Selwin and Mr. Zwillinger are all entitled to summary judgment.

#### C. *Qualified Immunity*

 **[7]**    Defendants next argue that they are also entitled to summary judgment on the ground of qualified immunity.

 **\*13**   Under certain circumstances, a governmental agent who performs a discretionary function may be entitled to qualified immunity from suit for constitutional violations. The qualified immunity inquiry has two parts. "[T]he first inquiry must be whether a constitutional right would have been violated on the facts alleged; second, assuming the violation is established," the constitutional right in issue must have been "clearly established" with an adequate level of specificity. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). *Accord Caldarola v. Calabrese,* Docket No. 01–9053, 2002 WL 1759778 at *3 (2d Cir. July 31, 2002); *Koch v. Town of Brattleboro,* 287 F.3d 162, 165–66 (2d Cir.2002); *Poe v. Leonard,* 282 F.3d 123, 132–33 (2d Cir.2002).

In order to be "clearly established," a right must be established with a level of specificity that goes beyond the statement of

a "general proposition." *Saucier v. Katz, supra,* 533 U.S. at 201–02.

[W]e emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." [*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ]. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("[A]s we explained in *Anderson,* the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established").

... If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

*Saucier v. Katz, supra,* 533 U.S. at 202.

Although some level of specificity beyond the statement of a general proposition is required before a right is "clearly established," " '[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ...; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." ' *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002), *quoting Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (inner citations omitted).

In this case, there can be no serious issue that plaintiff has alleged the violation of a constitutional right. Ever since *Estelle v. Gamble, supra,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), there has been no doubt that state prisoners have a right under the Eighth Amendment to be free from deliberate indifference to serious medical conditions.

 **\*14**   Whether the right was "clearly established" with the level of specificity required by *Saucier v. Katz, supra,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, presents a more

2003 WL 342347

difficult question since *Saucier* establishes that the mere broad statement of a "general proposition ... is not enough" to clearly establish a right. *Saucier v. Katz, supra,* 533 U.S. 201–02.

Defendants here were presented with an inmate complaining of serious back pain for which X-rays, MRI and EMG studies revealed no observable, physical cause. Nevertheless, Dr. Mamis, plaintiff's principal physician, provided plaintiff with ongoing treatment, including pain medication to ameliorate plaintiff's symptoms. When Dr. Mamis found that he was unable to treat plaintiff's condition successfully, he had plaintiff seen by several outside consultants. Ultimately, plaintiff was provided with facet injections which provided only limited relief.

In *Saucier,* the Supreme Court stated that:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

> *Graham* does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts. This is the nature of a test which must accommodate limitless factual circumstances. This reality serves to refute respondent's claimed distinction between excessive force and other Fourth Amendment contexts; in both spheres the law must be elaborated from case to case. Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force," *Priester v. Riviera Beach,* 208 F.3d 919, 926–927 (C.A.11 2000), and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.

533 U.S. at 205–07.

In this case, defendants provided plaintiff with a substantial amount of care which, according to the evidence in the record, was entirely appropriate. In light of *Saucier,* in order to defeat defendants' claim of immunity, plaintiff would have to show there was some obvious, effective, risk-free and moderately-priced treatment that defendants refused to provide to plaintiff. Even if there was some treatment defendants wrongfully failed to provide, plaintiff has not shown that that failure was so blatant that defendants' putatively illegal conduct should have been obvious to them. Even if I assume there was some diagnostic technique or modality of treatment that defendants denied to plaintiff, there is not a shred of evidence that such technique or modality was the clearly preferable and standard choice. Thus, defendants' conduct, at worst, falls into the "hazy" area between proper and improper treatment, and defendants are, therefore, protected by the doctrine of qualified immunity.

V. *Objections*

 **\*15** Pursuant to 28 U.S.C. '636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and 6(e). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, United States District Judge, 40 Centre Street, Room 426, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO OBJECT WITHIN TEN (10) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 342347

---

**End of Document**                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4183894
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Brian MACK, Plaintiff,

v.

Ronald G. WOOD, II, Sergeant, Clinton Correctional
Facility; John Doe, Correction Officers #1-3,
Clinton Correctional Facility, Defendants.

9:17-cv-1146 (BKS/ATB)
|
Signed 09/04/2019

**Attorneys and Law Firms**

Plaintiff, pro se: Brian Mack, 15-A-4845, Wallkill
Correctional Facility, Box G, Wallkill, NY 12589.

For Defendants: Letitia James, Attorney General of the State
of New York, Christopher J. Hummel, Assistant Attorney
General, of Counsel, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff pro se Brian Mack brought this action under 42
U.S.C. § 1983 alleging that Defendant Sergeant Ronald G.
Wood II, and John Doe Corrections Officers # 1–3 violated his
constitutional rights under the First and Eighth Amendments
while he was incarcerated at the Clinton Correctional Facility.
(Dkt. No. 39). On April 29, 2019, Defendant Wood moved for
summary judgment on Plaintiff's First Amendment retaliation
claim and sought dismissal of the John Doe Defendants. (Dkt.
No. 65). Plaintiff filed a response in opposition to the motion.
(Dkt. Nos. 69, 70 and 71). This matter was referred to United
States Magistrate Judge Andrew T. Baxter who, on July 26,
2019, issued a Report-Recommendation recommending that
the motion to dismiss the amended complaint as against the
John Doe Defendants be granted and that the motion for
summary judgment on Plaintiff's First Amendment claim
be denied. (Dkt. No. 77). Defendant Wood filed a timely
objection to the Report-Recommendation. (Dkt. No. 79). [1]
For the reasons set forth below, the Report-Recommendation
is adopted in its entirety.

[1]     Plaintiff submitted a letter to the Court, dated
August 22, 2019, but it does not contain
any objection to Magistrate Judge Baxter's
recommendation, and it is therefore not considered
here. (Dkt. No. 81).

**II. STANDARD OF REVIEW**

This Court reviews *de novo* those portions of the Magistrate
Judge's findings and recommendations that have been
properly preserved with a specific objection. *Petersen v.
Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C.
§ 636(b)(1)(C). "A proper objection is one that identifies
the specific portions of the [report-recommendation] that
the objector asserts are erroneous and provides a basis for
this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F.
Supp. 2d 290, 296 (E.D.N.Y. 2013) (internal quotation marks
omitted). Properly raised objections must be "specific and
clearly aimed at particular findings" in the report. *Molefe
v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487
(S.D.N.Y. 2009). "[E]ven a pro se party's objections to a
Report and Recommendation must be specific and clearly
aimed at particular findings in the magistrate's proposal...."
*Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920 at
*2, 2011 U.S. Dist. LEXIS 95351, at *4 (S.D.N.Y. Aug. 25,
2011) (citation omitted). Findings and recommendations as to
which there was no properly preserved objection are reviewed
for clear error. *Id.*

**III. DISCUSSION**

Defendant moved for summary judgment on the ground that
Plaintiff failed to elicit sufficient facts to show a causal
nexus between the alleged protected activity and the alleged
sexual assault. (Dkt. No. 65-5). In his objection to the Report-
Recommendation, Defendant argues that Magistrate Judge
Baxter erred because Plaintiff's "self-serving testimony and
allegations in his complaint" were insufficient to demonstrate
the requisite causal connection for a First Amendment
retaliation claim. (Dkt. No. 79, at 3). Magistrate Judge Baxter
thoroughly considered, and rejected, that argument in the
Report-Recommendation. (Dkt. No. 77, at 14-18). Having
reviewed Defendant's objection de novo, the Court concurs
in Magistrate Judge Baxter's well-reasoned determination
for the reasons set forth in the Report-Recommendation.
The Court has reviewed the remainder of the Report-
Recommendation for clear error and found none.

**IV. CONCLUSION**

**\*2** For these reasons, it is hereby

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 77) is **ADOPTED** in all respects; and it is further

**ORDERED** that Defendant's motion to dismiss the amended complaint as against Defendants John Doe Correction Officers #1-3 (Dkt. No. 65) is **GRANTED** and Plaintiff's complaint is **DISMISSED without prejudice** as against Defendants John Doe Correction Officers #1-3; and it is further

**ORDERED** that Defendant Wood's partial motion for summary judgment on Plaintiff's First Amendment claim (Dkt. No. 65) is **DENIED**; and it is further

**ORDERED** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 4183894

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 216 of 267

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

2016 WL 5440596
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Trazz SAWYER, Plaintiff,
v.
Albert PRACK, et al., Defendants.

Civil Action No. 9:14-CV-1198 (DNH/DEP)
|
Signed 07/29/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: TRAZZ SAWYER, Pro se, 97-B-2413, Orleans Correctional Facility, 3531 Gaines Basin Road, Albion, NY 14411.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, Attorney General of the, State of New York, The Capitol, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Albany, NY 12224.

REPORT AND RECOMMENDATION

David E. Peebles, U.S. Magistrate Judge

 **\*1** *Pro se* plaintiff Trazz Sawyer, a New York state prison inmate, has commenced this civil rights action against several employees of the New York State Department of Corrections and Supervision ("DOCCS"), four who are identified by name and three of whom are sued as "John Doe" defendants, pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff alleges that he was assaulted by corrections officers, and that a prison nurse failed to intervene and later refused to treat his injuries resulting from the beating. Plaintiff also contends that he was denied procedural due process at a related disciplinary hearing, resulting in a finding of guilt and service of five months confinement in a special housing unit ("SHU").

Currently pending before the court is a motion for summary judgment brought by the defendants seeking dismissal of plaintiff's pending claims. In their motion, defendants argue that (1) plaintiff failed to exhaust his administrative remedies before commencing suit, (2) no reasonable factfinder could conclude plaintiff's procedural due process rights were violated based upon the record now before the court, (3) the claim asserted against defendant Albert Prack, the

DOCCS Director of Special Housing/Inmate Disciplinary Program should alternatively be dismissed for lack of personal involvement, (4) the John Doe defendants should be dismissed from the action based upon plaintiff's failure to timely identify and serve process upon them, and (5) in any event all defendants are entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion be granted, in part, but otherwise denied, and that plaintiff's claims against defendants Phelix and Prack and the John Doe defendants be dismissed.

I. BACKGROUND [1]

[1] In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 1. At the times relevant to his claims in this action, he was confined at the Bare Hill Correctional Facility ("Bare Hill"), located in Malone, New York. *Id.*

On the morning of October 1, 2011, plaintiff was working in the music room at Bare Hill. Dkt. No. 1 at 8; Dkt. No. 37-1 at 1; Dkt. No. 35-21 at 1. For reasons that are in dispute, the plaintiff was ordered to submit to a pat frisk, and was holding a pen in his hand when corrections officers Richards and Langdon, both of whom are defendants in this case, began conducting the frisk. Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. Defendants Richards and Langdon forcibly removed the pen from plaintiff's hand and took him to the ground. *Id.* Dkt. No. 1 at 11-12; Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. The parties dispute whether additional force was used once plaintiff was on the ground. Dkt. No. 35-21 at 2; Dkt. No. 37-1 at 2-3. Plaintiff claims that defendants Richards and Langdon "violently slammed him to the floor" and dislocated his shoulder. Dkt. No. 1 at 12.

 **\*2** Plaintiff alleges that after being transported to the Bare Hill SHU, he was again assaulted by corrections personnel. Dkt. No. 1 at 3, 12-14. At the time he filed his complaint, plaintiff did not know the identities of the corrections officers who assaulted him, and therefore asserted claims related to this alleged second assault against three John Doe defendants. *Id.* Plaintiff now "believe[s]" that one of the three corrections officers who assaulted him in the SHU was defendant Richards. Dkt. No. 37-2 at 5.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 217 of 267

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

Based on the events of October 1, 2011, plaintiff was issued a Tier III misbehavior report for violent conduct, disobeying a direct order, interference, and harassment.[2] Dkt. No. 1 at 15; Dkt. No. 35-21 at 2; Dkt. No. 37-1 at 3. In preparation for the hearing, plaintiff met with a counselor, who plaintiff refers to as an employee assistant, three days before the hearing. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Plaintiff contends that the "employee assistant was inadequate." Dkt. No. 37-2 at 5. Plaintiff also contends that his due process rights were violated at the ensuing Tier III disciplinary hearing, and with respect to the notice that gave rise to the hearing. Dkt. No. 37-2 at 5-6.

[2]     The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

On October 6, 2011, a disciplinary hearing was conducted by Deputy Superintendent of Security D. Phelix, another defendant in this action. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 3. During the hearing, defendants Langdon and Richards testified regarding the incident that occurred on the morning of October 1, 2011. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 4; Dkt. No. 35-10 at 17, 22. Defendant Phelix also heard testimony from plaintiff and considered the following documents: (1) the October 1, 2011 misbehavior report signed by defendant Richards; (2) a memorandum from defendant Richards to Sergeant Carey, dated October 1, 2011; (3) a memorandum written by Sergeant Carey to Lieutenant Munson, dated October 1, 2011; (4) a use of force report, dated October 1, 2011; and (5) an inmate injury report, dated October 1, 2011. Dkt. No. 35-10 at 7-16.

As part of his defense, plaintiff requested that inmates Ponder and Farrell be called to testify on his behalf. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. While inmate Ponder was called as a witness, he testified that he was not present during the encounter between the plaintiff and defendants Langdon

and Richards. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Inmate Farrell refused to appear as a witness at the plaintiff's disciplinary hearing. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

During the hearing plaintiff also requested a sign-in sheet from the music room. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Defendant Phelix recessed the hearing so that an attempt could be made to locate the requested sign-in sheet. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Upon reconvening the hearing, defendant Phelix advised plaintiff that the sign-in sheets are not kept on file, and were therefore unavailable. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

**\*3** Defendant Phelix then called Officer Sauve as a witness, who testified that the sign-in sheets are not maintained by Bare Hill staff. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Officer Sauve did, however, provide defendant Phelix with a list of ten porters who worked in the music room area on October 1, 2011. Dkt. No. 35-10 at 49; Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Plaintiff requested that he be permitted to call all ten of the listed porters as witnesses. Dkt. No. 35-10 at 49. Plaintiff was unable to identify which of the ten porters were working in the music room during the relevant events on October 1, 2011, stating only that he "saw a whole bunch of guys that day." Dkt. No. 35-10 at 50. Defendant Phelix declined to allow plaintiff to call all ten porters as witnesses, but did permit him to identify five inmate porters that he desired to call as witnesses, and then contacted each of those five porters. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 50-51. All five of the requested inmate porters that defendant Phelix contacted refused to testify. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. There was no testimony at the hearing from any witnesses other than the officers involved and plaintiff as to what happened during the pat frisk. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 7-12. Plaintiff also did not provide defendant Phelix with any documentary evidence, other than medical records, in defense of the charges brought against him. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5-6.

At the conclusion of the hearing, defendant Phelix found plaintiff guilty of all charges, except as to the allegation of interference, and sentenced Sawyer to two years of disciplinary SHU confinement. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff appealed the hearing officer's determination to defendant Prack, another defendant in this case. Dkt. No. 1 at 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. In his decision, defendant Prack upheld the hearing officer's finding of guilt, but reduced the sentence to six months in

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 218 of 267

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

SHU. Dkt. No. 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff subsequently filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in New York state court. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. While that petition was pending, the disciplinary determination was administratively reversed. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. By that time, plaintiff had spent approximately five months in SHU confinement. Dkt. No. 1 at 17; Dkt. No. 35-3 at 79.

Plaintiff claims that defendant Phelix violated his Fourteenth Amendment right to due process by failing to provide him with proper notice regarding the charges against him, finding him guilty without supporting evidence, denying him adequate assistance in preparation for the hearing, and rejecting his request for witnesses. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff claims that defendant Prack violated plaintiff's Fourteenth Amendment right to due process by ignoring "strong" evidence that would have warranted a reversal of defendant Phelix's determination. Dkt. No. 1 at 17-18; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8.

## II. PROCEDURAL HISTORY

Plaintiff, who is proceeding *pro se* and *in forma pauperis*, commenced this action on October 1, 2014. Dkt. No. 1. Plaintiff's complaint named as defendants the following DOCCS employees: (1) Albert Prack, the DOCCS Director of Special Housing/Inmate Discipline Program; (2) D. Phelix, a deputy superintendent of security at Bare Hill; (3) Bare Hill corrections officers D. Richards and S. Langdon; (4) Ms. Mulverhill, a registered nurse at Bare Hill; and (5) two John Doe corrections officers and a John Doe corrections sergeant at Bare Hill. *Id.* at 1.

On December 31, 2014, the court issued an order granting plaintiff's request for leave to proceed *in forma pauperis* and *sua sponte* dismissing certain causes of action in his complaint pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Dkt. No. 4. Based on that decision, plaintiff's two remaining claims include: (1) excessive use of force and failure to protect claims under the Eighth Amendment, asserted against defendants Richards, Langdon, John Doe #1, John Doe #2, and John Doe #3; and (2) a violation of due process cause of action under the Fourteenth Amendment, asserted against defendants Phelix and Prack. *Id.* at 9-11, 22-23. As relief, plaintiff seeks compensatory damages for his injuries, including for pain and suffering, as well as for his allegedly wrongful disciplinary confinement. Dkt. No. 1 at 18-20.

**\*4** Following the close of discovery, defendants filed a motion for summary judgment, arguing that plaintiff's complaint should be dismissed because the record evidence conclusively establishes that plaintiff inexcusably failed to exhaust his administrative remedies and, in any event, defendants are all entitled to qualified immunity. *See generally* Dkt. No. 35. In their motion, defendants additionally argue that the John Doe defendants should be dismissed from the action based upon plaintiff's failure to identify and serve them with process, and that the record evidence does not give rise to a genuine dispute of material fact regarding whether (1) defendants Phelix and Prack violated plaintiff's due process rights; or (2) defendant Prack was personally involved in the Fourteenth Amendment constitutional violation alleged. *Id.* Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 219 of 267
Sawyer v. Prack, Not Reported in Fed. Supp. (2016)
2016 WL 5440596

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Available Administrative Remedies

#### 1. Controlling Legal Principles

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007).

[3]  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*5** Compliance with the PLRA's exhaustion requirement may be excused when administrative remedies are "unavailable" to an inmate. *Ross v. Blake,* 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently identified

three circumstances in which such unavailability can be found. *Id.* at 1859-1860. First, administrative procedures are unavailable when they "operate[ ] as a simple dead end – with officers unable or consistently unwilling to provide any relief[.]" *Id.* at 1859. Second, they are unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* at 1859-1860. Lastly, exhaustion can be excused "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[4] *Id.* at 1860.

[4]  Notably, in *Ross* the Court specifically rejected the "special circumstances" exception to the PLRA's rule of exhaustion that had previously been engrafted into the exhaustion requirement by the Second Circuit in such cases as *Hemphill v. New York,* 380 F. 3d 680 (2d Cir. 2004).

#### 2. The DOCCS IGP

The DOCCS has instituted a grievance procedure, entitled the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that an inmate must satisfy when he has a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson,* No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* Representatives of the facility's inmate grievance resolution committee ("IGRC") have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[5] *Id.* at § 701.5(c)(i), (ii).

[5]  Depending on the type of matter complained of by the grievant, the superintendent has either seven or

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)
2016 WL 5440596

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 220 of 267

twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be rendered within a specified time period. Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

### 3. <u>Analysis</u>

Plaintiff has conceded that he did not fully exhaust his administrative remedies with respect to any of the claims currently remaining in this action. *Compare* Dkt. No. 35-21 at 7 *with* Dkt. No. 37-1 at 8-9. When asked during his deposition whether he attempted to exhaust his administrative remedies with respect to the first use-of-force incident that occurred on October 1, 2011, plaintiff testified that he did not file a grievance while he was in SHU because he thought "it would have been futile" to do so based on his understanding that mail he was "sending out" was not "arriving where it was going." Dkt. No. 35-3 at 70. Plaintiff further testified that he did not "believe" he filed a grievance once he was "out of that particular SHU," but further stated, "maybe I did[,] I'm not one hundred percent sure[,] I would have to look at the documents."[6] Dkt. No. 35-3 at 70. With regard to the alleged second incident of assault that occurred on October 1, 2011 in the Bare Hill SHU, plaintiff testified candidly that he did not file a grievance. *Id.* at 71. Plaintiff further testified that he did not file a grievance against either defendant Phelix or defendant Prack based on their alleged violations of his due process rights because, according to him, formal exhaustion is not a requirement for raising a Fourteenth Amendment due process claim when an inmate has pursued an administrative appeal from a hearing officer's determination. *Id.* at 80; *see also* Dkt. No. 37-1 at 10.

[6]
    Plaintiff testified that he was held in SHU at Bare Hill for sixteen days before being transferred into the Upstate Correctional Facility ("Upstate"). Dkt. No. 1 at 14; Dkt. No. 35-3 at 71.

**\*6** The record evidence adduced by defendants in support of their non-exhaustion defense includes a declaration from Jeffery Hale, the Assistant Director of the DOCCS IGP, and the custodian of records maintained by the CORC. Dkt. No. 35-6. In his declaration, Hale states that his office conducted a search of the appeals filed by plaintiff with the CORC, which revealed that plaintiff filed twenty-four appeals to the CORC between August 21, 2000 and January 3, 2012. *Id.* at 2. Hale further states that plaintiff filed a grievance with the CORC bearing grievance number UST-48092-12, and that grievance alleges that "[p]laintiff tried to file a related grievance on October 26, 2011 at Bare Hill."[7] *Id.* at 3. Hale indicates that plaintiff's grievance dated October 26, 2011 was "properly returned to [p]laintiff by the Bare Hill IGRC" because plaintiff was not housed at Bare Hill at that time, and that plaintiff's subsequent filing of a grievance on December 27, 2011 at Upstate, where he was housed, was "untimely." *Id.*

[7]
    A letter sent to plaintiff on November 9, 2011 from the Director of the Inmate Grievance Program, Karen Bellamy, identifies October 20, 2011, and not October 26, 2011, as the actual date that plaintiff attempted to file a grievance at Bare Hill. Dkt. No. 35-8 at 15.

Grievance Number UST-48092-12 mentions the October 1, 2011 use of force incident, but does not name any specific officers and does not raise any due process complaints. *Id.*; Dkt. No. 35-8 at 6-10, 17-20. Plaintiff also states in that grievance that he "attempted to file a grievance" regarding the alleged assault as early as October 11, 2011,[8] "[f]irst at Bare Hill where the assault occurred, then here at Upstate[,]" and that "[e]very attempt to file a grievance concerning the assault by officers have [sic] been prevented[.]" Dkt. No. 35-8 at 17. Plaintiff identifies October 20, 2011 as the second date on which he attempted to file a grievance, and states that this grievance was mailed from Upstate to the Bare Hill IGRC, and responded to on October 26, 2011, with a notation that the grievance needed to be filed at Upstate. *Id.* Plaintiff further states that on November 7, 2011, after he was released from the hospital at Upstate, he sent a letter to the Upstate IGRC requesting a forty-five day extension of his deadline to grieve the events of October 1, 2011, and attached to that

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 221 of 267

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

letter a copy of the grievance he filed on October 20, 2011. *Id.* at 18. Plaintiff claims he never received a response to that request, but did receive a letter from "director Bellamy" on November 9, 2011, informing him that "Upstate and Bare Hill claim their IGRC were not receiving [his] grievances and none were on file." *Id.* Against this backdrop, the court must decide whether plaintiff's failure to exhaust his administrative remedies regarding the use of excessive force is excusable.

8    In that grievance, plaintiff initially states that he was assaulted on September 1, 2011, and first attempted to file a grievance on September 11, 2011. At a later point in the same grievance, plaintiff identifies the date he first attempted to file a grievance as October 11, 2011. Dkt. No. 35-8 at 17. In his affidavit submitted in opposition to defendants' motion, plaintiff identifies October 11, 2011 as the first date on which he attempted to file a grievance. Dkt. No. 37-2 at 7. The affidavit does not indicate whether the grievance plaintiff attempted to file on October 11, 2011 pertained to both alleged incidents of assault that occurred on October 1, 2011, or just the first use of force incident. Plaintiff also states in paragraph 72 of his statement of additional material facts that his reference to September 11 was incorrect, and should have read October 11, 2011. Dkt. No. 37-1 at 12. Defendants have not responded to plaintiff's statement of additional material facts. In light of this, the deference owed to plaintiff as the non-movant, the undisputed fact that a use-of-force incident occurred on October 1, 2011, and the impossibility of plaintiff filing a grievance in September with respect to an event that occurred in October of the same year, I view all references to a September date in Grievance Number UST-48092-12 as mistakes.

**\*7** Plaintiff has submitted record evidence, in the form of an affidavit, indicating that he attempted to file a grievance at Bare Hill on October 11, 2011, and that "guards at Bare Hill in-take the grievances and they would then disappear." Dkt. No. 37-2 at 7. Plaintiff also testified that, while he was confined in the SHU at Bare Hill, he attempted to mail letters to his sisters, and that those letters never arrived. Dkt. No. 35-3 at 71. While the court has not been provided with a copy of the October 11, 2011 grievance and understands defendants' position to be that no such grievance was ever filed, viewing the evidence in the light most favorable to plaintiff, these assertions create questions of fact regarding the filing of the grievance and availability of a grievance

procedure to plaintiff. *See Ross*, 136 S. Ct. at 1860 (noting that "thwart[ing] [the] inmate[ ] from taking advantage of [the] grievance process through machination, misrepresentation, or intimidation" may effectively render a grievance program unavailable to an inmate).

I note, moreover, that the undisputed record before the court conclusively establishes plaintiff mailed a grievance to the IGRC at Bare Hill on October 20, 2011, nineteen days after the incidents that occurred on October 1, 2011, pertaining to at least the first alleged assault. [9] While it is also undisputed that plaintiff should have filed this grievance at Upstate, where he was housed on October 20, 2011, [10] it appears that Bare Hill did not receive plaintiff's grievance until October 26, 2011, and therefore plaintiff did not receive a response notifying him of his mistake until October 26, 2011. *See* Dkt. No. 35-8 at 1, 18. This date, of course, is beyond the twenty-one day exhaustion deadline. Plaintiff's grievance dated December 29, 2011 also contains a statement by him that within twelve days of receiving a response from Bare Hill regarding his October 20, 2011 grievance, he submitted a request to the Upstate IGRC for an extension of his exhaustion deadline relative to the events of October 1, 2011, pursuant to 7 N.Y.C.R.R. § 701.6(g), and attached to that request a copy of the October 20, 2011 grievance. [11] *See* Dkt. No. 35-8 at 8. Plaintiff states that he did not receive a response to his request, but did speak with a woman "whom [he was] told was grievance staff," which caused him to believe that his grievance was being investigated. [12] *Id.*; *see also* Dkt. No. 37-1 at 12.

9    Neither party has submitted a copy of this grievance. While I have serious doubts regarding whether plaintiff ever attempted to exhaust his administrative remedies with respect to the second alleged incident of assault, based on his deposition testimony, I am unable to decide this issue based on the current record.

10    *See* 7 N.Y.C.R.R. § 701.5.

11    Plaintiff's grievance dated December 29, 2011 also indicates that he was in the hospital at Upstate beginning on an undisclosed date and concluding on November 7, 2011, and that he was unable to "mail anything" from the hospital during this period. Dkt. No. 35-8 at 8.

12    While not citing any record evidence in support of this statement, plaintiff has indicated in his

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 222 of 267

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

statement of additional material facts that he submitted the October 20, 2011 grievance to the Upstate IGRC on November 7, 2011, and that the grievance was "held without filing until 45 days expired, then deemed untimely." *See* Dkt. No. 37-1 at 12.

The regulation on which plaintiff purportedly relied in requesting his extension, 7 N.Y.C.R.R. § 701.6(g), contemplates an extension of an inmate's time to grieve when the request is made beyond twenty-one days but within forty-five days of the incident, upon a showing of mitigating circumstances. Assuming plaintiff made his request to the Upstate IGRC on November 7, 2011, that is within forty-five days of October 1, 2011. Assuming further that plaintiff never received a response to his request for an extension of time, as he states, a question of fact remains regarding whether the process for requesting an extension of time under 7 N.Y.C.R.R. § 701.6(g) was available to plaintiff within forty-five days of October 1, 2011.

 **\*8**  Moreover, plaintiff has adduced evidence of mitigating circumstances, in that he tried to timely file his grievance but submitted it to the wrong facility, and has further established that he filed a separate complaint grieving, among other things, the denial of an extension to the time limit. Dkt. No. 35-8 at 6-9. Defendants have not responded to plaintiff's contention that he requested an extension of time to exhaust his administrative remedies and never received a response to this request. It is therefore unclear whether, if the Upstate IGRC received plaintiff's request for an extension and the October 20, 2011 grievance within forty-five days of October 1, 2011, the request would have been granted. Based on these circumstances as well, I recommend that defendants' motion for summary judgment be denied to the extent it seeks dismissal of plaintiff's excessive force claims for failure to exhaust available administrative remedies. [13]

[13]    Recently, the Second Circuit ruled in *Williams v. Priatno*, ___ F.3d ___, 2016 WL 3729383 (2d Cir. July 12, 2016) that a *pro se* inmate plaintiff was excused from exhausting his administrative remedies where the record showed that he (1) attempted to file a grievance at a facility where he was assaulted, (2) followed up with the Superintendent at the facility about the grievance after having received no response, (3) was then transferred to another facility, and (4) never appealed the grievance. 2016 WL 3729383, at

\*2, \*5-\*6. The *Williams* court rejected defendants' argument that the plaintiff in that case "still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g)" even if the grievance was never filed in the first place and despite the fact that he had been transferred to a new facility prior to receiving a response, and concluded that "even if Williams technically could have appealed his grievance, ... the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use [it].' " *Id.* at \*5 (quoting *Ross*, 136 S. Ct. at 1859). Based on the Second Circuit's holding in *Williams*, it would seem that plaintiff's failure to appeal the non-decision on his request for an extension, as well as plaintiff's failure to appeal the non-decision on his grievance submitted on October 11, 2011, is excusable.

With respect to plaintiff's due process claim, plaintiff does not contend that administrative remedies were not available to him. Rather, his argument appears to be that the IGP procedure need not be followed in situations where the claim is for a due process violation stemming from a disciplinary hearing and there has been a "final administrative appeal." Dkt. No. 35-21 at 7; Dkt. No. 37-1 at 10.

There is support for plaintiff's claim that formal exhaustion may not be required with respect to plaintiff's due process claim against defendant Phelix, based on his having appealed defendant Prack's affirmance of defendant Phelix's determination into the New York state courts. *See, e.g. Toliver v. Stefinick*, 12-cv-0077, 2016 WL 3351974, at \*2 (N.D.N.Y. Mar. 22, 2016) (Baxter, M.J.) ("This court agrees that, before he initiated this lawsuit, plaintiff failed to exhaust his administrative remedies with respect to all of his remaining claims, except for the due process claims relating to disciplinary proceedings, which must be exhausted by administrative appeals of the sanctions imposed, not through the grievance process."), *adopted by* 2016 WL 3349316 (N.D.N.Y. June 15, 2016) (D'Agostino, J.); *see also LaBounty v. Johnson*, 253 F. Supp.2d 496, 502 n. 5 (W.D.N.Y. 2003) (citing *Flanagan v. Maly*, No. 99-CV-12336, 2002 WL 122921, at \*2 (S.D.N.Y. Jan. 29, 2002)); *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at \*8 (S.D.N.Y. Sept. 12, 2002). Based upon these decisions, I recommend that plaintiff's due process claim be addressed on the merits.

C. <u>Merits of Plaintiff's Claims</u>

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

**\*9** Defendants maintain that in the event plaintiff is allowed to pursue his due process claim on the merits, summary judgment dismissing that claim is nonetheless appropriate because, based upon the record now before the court, no reasonable factfinder could conclude that plaintiff's due process rights were violated during the course of his disciplinary hearing.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. [14] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases

involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

| 14 | In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). |
|---|---|

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

**\*10** In this instance, the record evidence shows that, as a result of defendant Phelix's decision following the disciplinary hearing, plaintiff was held in disciplinary confinement for approximately 150 days before the decision was administratively reversed. Dkt. No. 35-3 at 79. Defendants do not dispute this fact.

The Second Circuit has explained that when an inmate plaintiff claims a due process violation plaintiff has been confined for an intermediate duration of between 101 and 305 days, the court must develop "a detailed record of the conditions of the confinement relative to ordinary prison conditions ... and make a fact-intensive inquiry, ... examining the actual circumstances of SHU confinement in the case before it without relying on its familiarity with SHU conditions in previous cases." *Palmer v. Richards*, 364

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

F.3d 60, 65 (2d Cir. 2004) (internal quotation marks and citations omitted). "Disputes about conditions may not be resolved on summary judgment, ... but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." *Id.*

Plaintiff has introduced minimal evidence regarding the conditions of his SHU confinement during the period in question. [15] Defendants, however, have failed to introduce any evidence concerning the conditions of SHU confinement at Bare Hill and Upstate. Because the parties have provided the court with little evidence regarding the conditions of plaintiff's SHU confinement, I have assumed, for purposes of this report, that plaintiff was deprived of a constitutionally cognizable liberty interest as a result of defendant Phelix's determination.

[15]  Plaintiff argues in his opposition brief that the conditions were atypical because he was denied medical treatment, prevented from filing complaints, and had his mail tampered with. Dkt. No. 37 at 12. Plaintiff has offered some evidence in support of his argument that his mail was tampered with and that, on one occasion, he was prevented from filing a grievance while in Bare Hill. However, plaintiff has not offered any evidence that he was denied medical treatment at either facility, aside from his conclusory statement, or subject to any atypical conditions of confinement while housed in Upstate's SHU. Plaintiff merely states that the conditions he experienced while confined in SHU were "terrible," and that while there he faced "extreme hostile, threating [sic] conditions." Dkt. No. 1 at 17.

## 2. Procedural Safeguards

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and

the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

**\*11**  The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill*, 472 U.S. at 455).

Examining the record to determine whether plaintiff was afforded procedural due process at the disciplinary hearing, I find no reasonable factfinder could conclude that defendant Phelix or defendant Prack denied plaintiff the protections afforded under the due process clause. Plaintiff was served with formal notice of the charges against him four days before the hearing, was provided with an assistant three days prior to the hearing, was present for the hearing and allowed to question witnesses, had witnesses called on his behalf, and had the opportunity to respond to statements made by DOCCS employees as well as provide his own version of the events giving rise to the charges against him. Dkt. No. 35-10; Dkt. No. 35-21 at 3-5; Dkt. No. 37-1 at 3-7.

Plaintiff contends that the notice of charges provided to him was deficient, that defendant Phelix denied him the opportunity to call five witnesses, identified as inmate porters who may or may not have been working in the music room on October 1, 2011, that defendant Phelix was biased, and

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 225 of 267

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

that defendant Phelix's determination was not supported by any credible evidence. Dkt. No. 37-2 at 5-6. Plaintiff further claims that the assistant provided to him was "inadequate." *Id.* at 5.

With respect to plaintiff's challenge to the notice, plaintiff appears to be arguing that the notice charging him with "violent conduct" was procedurally improper because it did not identify the specific incident of violent conduct that gave rise to the charge. Dkt. No. 37-2 at 5-6. The misbehavior report that listed the charges against plaintiff, which was read into the record at the outset of plaintiff's disciplinary hearing, [16] set forth the date, time, and location of the incident giving rise to the charges, and included a very specific account of the interaction between plaintiff and defendants Richards and Langdon. *See* Dkt. No. 35-12. The description of the incident also explained that plaintiff refused to release an uncapped pen during a pat frisk procedure despite multiple orders for him to do so. *Id.*

[16]    *See* Dkt. No. 35-10 at 10-11.

It appears to be plaintiff's position that a refusal to release an uncapped pen when a guard is preparing a pat frisk cannot be construed as "violent conduct." It is unnecessary to resolve that question, since in any event there is no dispute that plaintiff was apprised of the charges against him in a manner that allowed him to prepare his defense, which is the relevant inquiry as it relates to plaintiff's due process claim against defendant Phelix based on improper notice. *See, e.g., Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir. 1999) (rejecting inmate plaintiff's due process challenge based upon a "discrepancy as to the precise nature of the threatened harm" because the discrepancy "did not represent a failure of specificity that would impair Kalwasinski's ability to prepare his defense" given that the variance between the charge and proof arose in the context of an otherwise detailed misbehavior report). Moreover, to the extent plaintiff felt that the charge of violent conduct was improper or unwarranted, such a belief does not give rise to a due process claim against defendant Phelix. *See, e.g., Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986) (holding that an inmate who was found guilty by a prison disciplinary committee based on a false report did not have an actionable due process claim because the inmate was granted a hearing and the opportunity to rebut the false charges against him); *Fulmore v. Raimo,* 10-cv-1096, 2012 WL 4033731, at *4 (N.D.N.Y. Sept. 12, 2012) ("[J]ust as an inmate possesses no due process right to be free from being issued a false misbehavior report, an inmate

possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at a disciplinary hearing."); *see also Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."); *Alexander v. Fischer,* 14-cv-0548, 2015 WL 10568892, at *8 (N.D.N.Y. Dec. 21, 2015) (Baxter, M.J.) ("A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process."), *adopted by* 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016) (Sharpe, J.).

**\*12**    Turning next to the issue of uncalled witnesses, the record clearly shows that (1) plaintiff did not know which inmate porters were working in the music room on October 1, 2011, (2) plaintiff did not know whether any of the inmate porters who were working in the music room on October 1, 2011 witnessed the use of force by defendants Langdon and Richards, (3) plaintiff was allowed to choose five out of the ten inmate porters to call as witnesses, and (4) defendant Phelix asked the five inmate porters identified by plaintiff to be witnesses, and each declined. Dkt. No. 35-10 at 50-52. Plaintiff contends that, once the five inmate porters that he identified refused to testify as witnesses, defendant Phelix was obligated to ask the other five inmate porters to participate as witnesses, and his failure to do so violated plaintiff's due process rights. Dkt. No. 37 at 6-7, 15; Dkt. No. 37-2 at 5-6.

Prison disciplinary hearings are subject to judicial review for harmless error in a setting such as that now presented. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir. 1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation."). Moreover, it is well-established that "[d]isciplinary hearing officers ... have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy,* 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff v. McDonnell,* 418 U.S. 539, 566-67 (1974).)

2016 WL 5440596

In denying plaintiff's request to call all ten inmate porters, defendant Phelix noted that plaintiff's request was "a little excessive," and that whether any of these inmate porters had relevant testimony to offer was "a shot in the dark" given that plaintiff did not know who was in the music room on October 1, 2011, or what they witnessed, if anything. Dkt. No. 35-10 at 50. Plaintiff did not object to this characterization by defendant Phelix. Instead, he chose the witnesses he wanted to call, and informed defendant Phelix that he spoke with one of these witnesses, implying that he knew the identity of at least one inmate porter who was working in the music room on October 1, 2011. Dkt. No. 35-10 at 50. That witness, as well as the other four inmate porters identified by plaintiff, refused to testify.

An inmate's refusal to testify at the disciplinary hearing of another inmate does not give rise to a due process claim against the hearing officer. *See, e.g., Creech v. Schoellkoph,* 688 F.Supp.2d 205, 213 (W.D.N.Y. 2010) (finding no due process violation where two witnesses called by inmate refused to testify). Similarly, an inmate's speculation regarding what testimony a potential witness might have offered is not enough to demonstrate prejudice and non-harmless error from a disciplinary hearing officer's refusal to ask that potential witness to participate in the hearing. *See Tafari v. Rock,* 10-cv-0729, 2012 WL 1340799, at *7 (W.D.N.Y. Apr. 18, 2012) (dismissing due process claim based on denial of right to call employee witnesses where inmate plaintiff "failed to show how he was prejudiced, if at all, by the alleged lack of their testimony" and "it appear[ed] that [the plaintiff did] not know whether [these witnesses] would have provided helpful or even relevant testimony"). Accordingly, defendant Phelix's decision not to ask five inmate porters whether they would be witnesses in plaintiff's disciplinary hearing based on plaintiff's speculation that one or more of them could potentially possess relevant information regarding the charges against him does not rise to the level of a due process violation. *Id.*; *see also Hinton v. Prack,* 12-CV-1844, 2014 WL 4627120, at *12 (N.D.N.Y. Sept. 11, 2014) (although "a denial of the right to call witnesses without an explanation is a violation of New York's ... regulations, ... [the] decision to deny, without reason, Plaintiff's request to call ... witnesses ... did not rise to the level of a due process violation because Plaintiff failed to allege ... how he was prejudiced").

**\*13** Plaintiff's claim of bias on the part of defendant Phelix is entirely conclusory with no evidentiary support, and is therefore insufficient to withstand a motion for summary

judgment. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460-61 (S.D.N.Y. 2006) ("[I]n order to defeat a motion for summary judgment, a plaintiff-inmate must 'be armed with [something] more than conclusory allegations of bias and prejudgment' " of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir. 1989)). Indeed, there is no evidence in the record that defendant Phelix ever even had any interactions with plaintiff prior to the disputed disciplinary hearing, nor is there any evidence in the record that would in any way suggest a prejudging of the charges by defendant Phelix. Similarly, plaintiff's contention that his assistant was inadequate does not give rise to a claim against defendant Phelix, who was not personally involved in any alleged inadequate services rendered by the corrections counselor assigned to assist plaintiff at his disciplinary hearing.

Finally, with respect to plaintiff's contention that defendant Phelix's ruling on the charges was not supported by "any real credible evidence," plaintiff is misguided. The Supreme Court has made clear that "where a prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty on the basis of insufficient evidence, the claim must be rejected if there was at least 'some evidence' to support the decision." *Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir. 2001) (quoting *Superintendent, Massachusetts Correctional Institution v. Hill,* 472 U.S. 445, 455 (1985)).

In this case, plaintiff was charged with violent conduct, interference with an employee, harassment, violating a direct order, and refusal of a search and frisk. Dkt. No. 35-10 at 4-5, 17. Plaintiff was found guilty of all charges with the exception of the charge of interference with an employee. *Id.* at 55. In addition to both the misbehavior report and written memorandum created by defendant Richards setting forth grounds for the charges against plaintiff for which he was found guilty, defendants Langdon and Richards testified at plaintiff's disciplinary hearing. Dkt. No. 35-10 at 17-19, 23-25. Both testified that plaintiff refused several orders to drop an uncapped pen in his hand while he was in a pat frisk position, despite having time to drop the pen and knowing that defendants Langdon and Richards were ordered by Sergeant Carey to conduct a pat frisk. *Id.* Defendant Richards further testified that, after plaintiff was ordered to drop the pen, plaintiff cursed at defendant Richards and then resisted his and defendant Langdon's effort to place him in restraints, while still holding the pen. *Id.* at 17-19. This testimony constitutes "some evidence" that plaintiff was guilty of the

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)
Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 227 of 267
2016 WL 5440596

charges against him other than interference, as defendant Phelix concluded. *Id.* at 55.

In short, for all the reasons discussed above, I recommend a finding that plaintiff's allegations regarding the violation of his due process rights are unfounded, and that no reasonable factfinder could conclude plaintiff was deprived of due process by defendant Phelix during the course of his disciplinary hearing. Accordingly, defendants' motion for summary judgment should be granted and plaintiff's claims against defendants Phelix and Prack should be dismissed. [17]

[17]    It could be argued that plaintiff's due process claim against defendant Prack is also potentially subject to dismissal for lack of personal involvement. Plaintiff's claim against defendant Prack is based on defendant Prack's failure to overturn defendant Phelix's determination. While the issue is the subject of debate in this circuit, at least some courts have held that a failure to reverse a disciplinary hearing officer's determination at the administrative appellate level does not, by itself, give rise to a separate constitutional violation. *See Jackson v. Bradt*, 13-cv-0004, 2014 WL 2505218, at *4 (W.D.N.Y. May 28, 2014) ("As to defendant Prack, the only allegation is that he affirmed Murray's disposition[, and] [t]his allegation alone is insufficient to state a claim against Prack."); *Parks v. Smith*, 08-CV-0586, 2011 U.S. Dist. LEXIS 102460, 2011 WL 4055415, at *13 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y. Sept. 12, 2011) (McAvoy, J.); *Woodward v. Mullah*, No. 08-CV-463A, 2009 U.S. Dist. LEXIS 113917, 2009 WL 4730309, at *2-3 (W.D.N.Y. Dec. 7, 2009); *but see Smith v. Rosati*, 10-cv-1502, 2013 WL 1500422, at *7 (N.D.N.Y. Feb. 20, 2013) (collecting cases holding that "the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon [v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)].") (Peebles, M.J.), *adopted by* 2013 WL 1501022 (N.D.N.Y. Apr. 10, 2013) (Hurd, J.).

### D. Qualified Immunity

**\*14** Defendants also seek dismissal of plaintiff's claims asserted against them based on the doctrine of qualified immunity. Dkt. No. 35-22 at 20. Having already dismissed plaintiff's due process claims against defendants Phelix and Prack on the merits, I will only address this argument with respect to plaintiff's excessive force claims against defendants Langdon and Richards.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However,

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 228 of 267

2016 WL 5440596

'[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful.' " *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995).

**\*15** In this case, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for defendants Langdon and Richards to believe their acts were lawful when they used force against plaintiff on the morning of October 1, 2011. For example, plaintiff testified that defendant Richards knew plaintiff to be in possession of a pen before commencing a pat frisk, and proceeded with the frisk while at the same time preventing plaintiff from releasing the pen. Dkt. No. 35-3 at 18-19, 38-45. The misbehavior report drafted by defendant Richards also indicates that plaintiff's possession of the pen was the reason why force was used against him.[18] Dkt. No. 35-12. Crediting plaintiff's version of the events, a reasonable factfinder could conclude that no amount of force was needed to effectuate a pat frisk under the circumstances such that defendant Richards and Langdon's use of force was not objectively reasonable. Plaintiff also testified that, as a result of the force used against him, he suffered a dislocated shoulder. Dkt. No. 35-3 at 56-57. Accordingly, I recommend that defendants' motion for summary judgment dismissing plaintiff's claims against defendants Langdon and Richards on the basis of qualified immunity be denied.

---

[18]     The misbehavior report notes that Sergeant Casey ordered defendants Richards and Langdon to take plaintiff to the floor. *See* Dkt. No. 35-12. Plaintiff, however, testified that it was defendant Richards who gave that order. *See* Dkt. No. 35-3 at 43-45.

With respect to the second alleged use-of-force incident that occurred on October 1, 2011, plaintiff testified that, while at the SHU facility and facing the wall in a room, he was approached from behind and punched in the ribs by a sergeant

he did not know, after which point he was hit multiple times on the head, legs and inner-thigh by other unknown officers, all without provocation or any justification. Dkt. No. 35-3 at 58, 61-63. Defendants have not offered any evidence to contradict plaintiff's version of the events. Accordingly, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for any force to be used against plaintiff while he was in SHU on October 1, 2011.

### E. Status of Doe Defendants

In his complaint, plaintiff alleges that he was assaulted twice on October 1, 2011. Dkt. No. 1 at 12-14. With respect to the second alleged incident of assault, plaintiff names as defendants John Doe #1, John Doe #2, and John Doe #3. *Id.* at 3. Plaintiff admitted during his deposition that he did not know the identity of anyone who participated in this second alleged incident of assault. Dkt. No. 35-3 at 63, 68. In plaintiff's response to defendants' motion for summary judgment, plaintiff now states for the first time that he believes defendant Richards was one of the individuals present during this second assault. Dkt. No. 37-2 at 5. Plaintiff cites as support for this believe an inmate injury report. *Id.* (citing Dkt. No. 37-3 at 21).

Leaving aside the question of whether defendant Richards was involved in the second assault on October 1, 2011, plaintiff has failed to take any steps to identify any other of the Doe defendants despite his testimony that the names of the officers who escorted him "around in the SHU area to a cell" after the second alleged assault ended was "probably part of discovery" because he "asked who was present including those people who was working there." Dkt. No. 35-3 at 68.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547, at \*21 (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N.Y.*, 07-cv-2027, 2010 WL 882990, at \* 5 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 229 of 267

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)

2016 WL 5440596

and opportunity to identify and serve John Doe Defendants");
*Coward v. Town & Vill. of Harrison*, 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009)* ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."). Likewise, on a motion from a defendant, and in the absence of a showing of good cause by the plaintiff, dismissal of a claim under Rule 4(m) is appropriate if the defendant has not been served within ninety days after the complaint is filed.

 **\*16**  The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against the John Doe defendants, provided that plaintiff "take reasonable steps to ascertain the identity" of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them. Dkt. No. 4 at 22. That order warned plaintiff, however, as follows: "If plaintiff fails to ascertain the identity of any defendant so as to permit the timely service of process, all claims against that individual will be dismissed." *Id.* The deadline for joining parties to this lawsuit and amending pleadings was originally July 2, 2015. Dkt. No. 15 at 5. That deadline was extended twice, and ultimately passed on September 8, 2015. Dkt. Nos. 19, 21. Discovery in this matter was originally scheduled to close on September 4, 2015. Dkt. No. 15 at 5. That deadline was subsequently extended four times, ultimately to December 18, 2015. Dkt. Nos. 19, 21, 28, 31.

It is now more than ten months past the extended deadline for joinder of parties. Yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed corrections officers. As such, I recommend that the claims brought against these unnamed Doe defendants be *sua sponte* dismissed, without prejudice.

## IV. SUMMARY AND RECOMMENDATION

Defendants seek dismissal of all of plaintiff's claims set forth in the complaint based on a variety of grounds, both procedural and substantive. While plaintiff's due process claim is subject to dismissal on the merits, plaintiff's excessive force claim asserted against defendants Langdon and Richards should survive defendants' motion because

questions of fact remain relating to the procedural issue of exhaustion, and at least the factual issue of whether the amount of force used against plaintiff was reasonable under the circumstances. Plaintiff's excessive force claim asserted against the John Doe defendants, however, should be dismissed based upon plaintiff's failure to take the steps necessary to identify the three Doe defendants and join them in the action. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED in part and DENIED in part, as follows:

(1) Plaintiff's due process claim asserted against defendants Phelix and Prack should be DISMISSED;

(2) Plaintiff's excessive force claims asserted against the John Doe defendants should be DISMISSED; and

(3) Plaintiff's excessive force claims, asserted against defendants Richards and Langdon, should survive defendants' motion; and it is further respectfully

RECOMMENDED that defendants Phelix, Prack, John Doe #1, John Doe #2 and John Doe #3 be DISMISSED from this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: July 29, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5440596

---

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 230 of 267

Sawyer v. Prack, Not Reported in Fed. Supp. (2016)
2016 WL 5415790

⚑ KeyCite Yellow Flag - Negative Treatment
Order Amended by Sawyer v. Langdon, N.D.N.Y., February 5, 2018
2016 WL 5415790
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Trazz SAWYER, Plaintiff,
v.
Albert PRACK; D. Phelix; D. Richards;
S. Langdon, John Doe #1-3, Defendants.

9:14-CV-1198 (DNH/DEP)
|
Signed 09/28/2016

**Attorneys and Law Firms**

TRAZZ SAWYER, 97-B-2413, 3531 Gasin Basin Road, Albion, NY 14411, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capitol, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Ass't Attorney General, Albany, NY 12224, Attorneys for Defendant James Thomsen.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

*1 *Pro se* plaintiff Trazz Sawyer brought this civil rights action pursuant to 42 U.S.C. § 1983. On July 29, 2016, the Honorable David E. Peebles, United States Magistrate Judge, advised by Report-Recommendation that defendant's motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56 be granted in part and denied in part. See ECF No. 40. Plaintiff has filed timely objections. See ECF No. 41.

Based upon a de novo review of the portions of the Report-Recommendation to which plaintiff objected, the Report-Recommendation is accepted and adopted in all respects. See 28 U.S.C. § 636(b)(1).

Therefore, it is ORDERED that:

(1) Defendants' motion for summary judgment (ECF No. 35) is **GRANTED** in part and **DENIED** in part;

(2) Plaintiff's due process claim asserted against defendants Phelix and Prack is **DISMISSED WITH PREJUDICE**;

(3) Plaintiff's excessive force claims asserted against the John Doe defendants are **DISMISSED WITH PREJUDICE**;

(4) Defendants' motion with regards to plaintiff's excessive force claims against defendants Richards and Langdon is **DENIED** and such claims remain;

(5) Defendants Phelix, Prack, John Doe #1, John Doe #2 and John Doe #3 are **DISMISSED** from this action; and

(6) The Clerk serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

Dated: September 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5415790

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 902795
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE, 1 and Superintendent,
Eastern Correctional Facility, Defendants.

No. 9:11–CV–250.
|
Signed March 3, 2015.

**Attorneys and Law Firms**

Benji D. Reed, Pine City, NY, for Plaintiff.

Hon. Eric T. Schneiderman, New York State Attorney General, James Seaman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 and state law, alleges violations of Plaintiff's civil rights as a result of being served contaminated food while a prisoner at Eastern Correctional Facility in New York. The matter was referred to David E. Peebles, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In the Report–Recommendation, dated January 30, 2015, Magistrate Judge Peebles recommends that the Defendants' Motion for Summary Judgment be granted with prejudice with respect to the Superintendent and without prejudice with respect to John Doe, 1. *See* dkt. # 56. The Plaintiff did not respond to the motion.

Defendants filed timely objections to the Report–Recommendation pursuant to 28 U.S.C. § 636(b)(1), arguing that the motion should be granted with prejudice with respect to both the Superintendent and the unnamed Defendant. When objections to a magistrate judge's Report–Recommendation are lodged, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings

or recommendations to which the objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Defendants' objections, this Court has determined to accept the recommendation of Magistrate Judge Peebles for the reasons stated in the Report–Recommendation.

It is therefore ordered that:

(1) Defendants' Objections, dkt. # 57, to the Report–Recommendation of Magistrate Judge Peebles, dkt. # 56, are hereby OVERRULED;

(2) The Report–Recommendation is hereby ADOPTED;

(3) The Defendants' Motion for Summary Judgment, dkt. # 53, is GRANTED. Plaintiff's claims against the Defendant Superintendent are hereby DISMISSED WITH PREJUDICE. Plaintiff's claims against Defendant John Doe 1 are hereby DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

***REPORT AND RECOMMENDATION***

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Benji D. Reed, a New York State prison inmate, commenced this action in March 2011 alleging, *inter alia,* that some of the defendants employed at the Eastern Correctional Facility violated his civil rights and committed negligence during the course of his incarceration in that facility. The scope of this action has been narrowed as a result motion practice, and the only remaining cause of action is an Eighth Amendment conditions of confinement claim asserted against defendant John Doe 1, who has not been identified by plaintiff. To assist plaintiff in identifying defendant John Doe 1, the court substituted the superintendent of Eastern for purposes of service and discovery only. Following the close of discovery, the superintendent filed the currently pending motion seeking the entry of summary judgment in his favor in light of the absence of any record evidence that he was personally involved in the allegations giving rise to this

action. For the reasons set forth below, I recommend that the superintendent's motion be granted.

## I. BACKGROUND [1]

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiffs favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). In light of the severance and transfer of plaintiffs claims arising out of his confinement in the Southport Correctional Facility to the Western District of New York, and dismissal of plaintiffs retaliation claim against defendants M. Soto and John Doe 2, as will be discussed below, I have included only the facts relevant to plaintiff's remaining claim asserted against defendant John Doe 1.

**\*2**  Plaintiff is a prison inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally Dkt. No. 30.* Although he is now incarcerated elsewhere, at the times relevant to his claims Reed was confined in the Eastern Correctional Facility ("Eastern"), located in Napanock, New York. *Id.; Dkt. No. 55.*

Plaintiff commenced this action on March 8, 2011, asserting the deprivation of his constitutional and federal statutory rights, as well as common law claims, against two unnamed defendants, designated as John Doe 1 and John Doe 2, and defendant M. Soto, a Corrections Counselor at Eastern. [2] *See generally Dkt. No. 30.* In his complaint, as amended, plaintiff alleges that on September 14, 2010, he became ill after consuming spoiled corn and rice at the Eastern mess hall. *Id.* at 3. As a result, plaintiff suffered abdominal pain and extreme bouts of diarrhea. *Id.* Plaintiff alleges that defendant John Doe 1 was advised that the corn and rice emitted a foul odor and could be contaminated, but failed to heed the warning and ordered that it be served to the general prison population. *Id.* at 4.

[2]    Plaintiff's complaint also named seven corrections employees assigned to the Southport Correctional Facility ("Southport") as defendants. All claims stemming from events occurring at Southport were severed from those arising out of Eastern, however, and were transferred to the Western District of

New York by order issued by Senior District Judge Thomas J. McAvoy on August 2, 2011. *Dkt. No. 4.*

Plaintiff was initially treated on the following day at the Eastern medical clinic, along with several other infected inmates, and was given "dymo tablets" to address the condition. *Dkt. No 30 at 3.* He was subsequently directed to return to the clinic later that day, however, and instructed to discontinue the use of the dymo tablets and told that he would instead be placed on a water diet and confined to his cell for one day to flush out any infection. *Id.* at 4.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on March 8, 2011. *Dkt. No. 1.* As defendants, plaintiffs complaint named two "Doe" defendants, M. Soto, and seven corrections employees assigned to Southport. *Id.* at 2. The complaint asserted claims under the Eighth Amendment to the United States Constitution; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* section 504 of the Rehabilitation Act of 1973 ("section 504"), 29 U.S.C. § 794; and New York State common law. *See generally id.* Based upon an initial review of plaintiffs complaint and an accompanying *in forma pauperis* application, pursuant to 28 U.S.C. § 1915(e)(2), Senior District Judge Thomas J. McAvoy directed all claims arising from the events occurring at Southport severed and transferred to the Western District of New York. *Dkt. No. 4.*

In response to plaintiff's complaint, defendant Soto, the sole remaining named defendant in the action following Judge McAvoy's decision, moved for dismissal of plaintiffs claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Dkt. No. 11.* Plaintiff followed with a motion, filed on December 7, 2011, seeking leave to amend his complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. *Dkt. No. 14.* Plaintiff's motion was intended, in part, to clarify and expand upon the allegations set forth in his original complaint related to the events at Eastern and eliminate claims and references to the defendants affected by the transfer to the Western District of New York. [3] *Id.* In a report issued on July 26, 2012, I recommended dismissal of plaintiff's claims against defendant Soto with leave to amend regarding plaintiff's cause of action for retaliation. *Dkt. No. 22.* Judge McAvoy adopted that recommendation on September 30, 2012, and plaintiff was granted leave to replead within thirty days. *Dkt. No. 28.*

[3]    In his motion, plaintiff also sought the appointment of *pro bono* counsel to represent him in the action.

2015 WL 902795

*Dkt. No. 15.* That motion was denied without prejudice. *Dkt. No. 17.*

**\*3** Plaintiff availed himself of the opportunity to amend, and submitted an amended complaint on October 12, 2012. *Dkt. No. 30.* Upon review of that amended complaint, I issued a report dated November 9, 2012, in which I recommended that (1) the amended complaint be rejected insofar as it asserts a retaliation claim against defendant Soto and that the claim be dismissed with prejudice; (2) the amended complaint be rejected with respect to plaintiffs state common law claims against defendant John Doe 2; (3) plaintiffs amended complaint be accepted as it relates to the constitutional claims asserted against defendant John Doe 1; (4) the superintendent at Eastern be added as a defendant for the purposes of service and discovery to assist plaintiff in identifying defendant John Doe 1; and (5) Judge McAvoy direct plaintiff to take reasonable steps to ascertain the identity of defendant John Doe 1 and seek permission to add that individual by name as a defendant in the action. *Dkt. No. 33 at 18–21.* On September 27, 2013, Judge McAvoy adopted these recommendations. *Dkt. No. 39.*

Following the joinder of issue, I issued a standard Rule 16 scheduling order, which, *inter alia,* required that both parties provide mandatory disclosures and established April 4, 2014 as a deadline for completion of all discovery in the action. *Dkt. No. 49.*

Following the close of discovery, the Eastern superintendent filed the pending motion seeking the entry of summary judgment in his favor. *Dkt. No. 53.* The superintendent contends that dismissal is appropriate in light of the fact that he is not implicated in plaintiffs claims and plaintiff has failed to identify and join the individual identified in the amended complaint as defendant John Doe 1. Plaintiff has not responded to defendant's motion, which is now ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4; *Sec. Ins. Co.,* 391 F .3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Plaintiff's Failure to Respond to the Superintendent's Motion*

Pursuant to local rule 7.1(b)(3), by failing to oppose the Eastern superintendent's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-

moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir.2014)* (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to the pending motion, which was properly filed by the superintendent. Through his motion, the superintendent has satisfied his burden of demonstrating entitlement to the relief requested. With respect to the question of the superintendent's burden, I note that his "burden of persuasion is lightened such that, in order to succeed, [their] motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has met its burden to demonstrate entitlement to a dismissal under local rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)). [4] Because the superintendent has accurately cited both proper legal authority and evidence in the record supporting the grounds upon which his motion is based, and plaintiff has failed to respond in opposition, I find the motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant the superintendent's motion on this basis. [5]

[4]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

[5]   For the sake of completeness, I have addressed the merits of the superintendent's motion for summary judgment as well.

C. *Eastern Superintendent*

**\*5**  The superintendent at Eastern, the sole remaining named defendant in the action, has moved for the entry of summary judgment dismissing plaintiff's claims against him based upon lack of personal involvement. *Dkt. No. 53–14 at 5–7.* "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal,* 556 U .S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic"). To prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,* No. 91–CV–8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

When the superintendent was added as a defendant by the court, it was done for the express purpose of permitting plaintiff to engage in discovery in an attempt to ascertain the identity of defendant John Doe 1. In my report dated November 9, 2012, I stated the following:

> I recommend that the clerk of the court be directed to add the superintendent of Eastern as a defendant for service and discovery purposes only. By doing so, I do not suggest in any way that the superintendent of Eastern was personally involved in the events allegedly giving rise to the Eighth Amendment claim asserted against defendant John Doe # 1.

*Dkt. No. 33 at 16.* Since the issuance of that report and recommendation, plaintiff has not identified defendant John Doe 1, and there is no record evidence suggesting that the superintendent was personally involved in the decision to serve allegedly spoiled food to the inmates at Eastern. [6]

6    As a supervisory employee, the superintendent at Eastern cannot be held liable for damages under section 1983 solely because he occupies that position of authority, or on the basis of *respondeat superior*. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501. The record evidence, including plaintiff's amended complaint, does not suggest that any of these grounds are applicable in this instance.

In light of the fact that plaintiff has failed to adduce any evidence suggesting that the superintendent was personally involved in the alleged constitutional violation, and his presence in the lawsuit for discovery purposes is no longer needed, I recommend that plaintiff's claims against him be dismissed.

D. *John Doe 1*

In his motion, the Eastern superintendent also urges the court to dismiss plaintiff's claims against defendant John Doe No. 1. *Dkt. No. 53–14* at 7.

In the court's order issued on September 27, 2013, plaintiff was directed to take reasonable steps to ascertain the identity of defendant John Doe 1. *Dkt. No. 39* at 6. In that decision, Judge McAvoy pointedly advised that "[p]laintiff's failure to ascertain the identity of Defendant John Doe # 1 will result in the dismissal of this action[.]" *Id.* Because plaintiff failed to heed that warning and take timely measures reasonably calculated to ascertain the identity of John Doe # 1, I recommend that his claims against that defendant be dismissed without prejudice.[7] *See, e.g., Pravada v. City of Albany,* 178 F.R.D. 25, 26 (N.D.N.Y.1998) (Scullin, J.)

(dismissing the unidentified "John Doe" and "Jane Roe" defendants after the plaintiff had been provided "over two years to identify and serve these individuals, including the full discovery period").

7    On or about April 29, 2014, plaintiff mailed to Assistant Attorney General James J. Seaman, Esq., a request for the production of documents. *Dkt. No. 53–11*. The request bears the correct caption but an incorrect civil action number (No. 10–CV–1446) (LEK/RFT)) and was not received by Attorney Seaman until May 22, 2014. *Id.; Dkt. No. 53–1 at 3.* Plaintiff's demands, however, relate to the allegations in his amended complaint, confirming that they were served in connection with this matter. *Dkt. No. 53–11 at 1.* In response, the superintendent properly objected to the discovery demands as untimely in light of the fact that (1) the deadline for completion of all discovery was April 4, 2014, and (2) plaintiff was alerted to his obligation to serve written discovery demands sufficiently in advance of the discovery deadline to ensure that the latest date on which responses would be due would fall on or before the discovery deadline. *See Dkt. No. 49 at 4; Dkt. No. 53–12.*

IV. *SUMMARY AND RECOMMDATION*

**\*6**  The sole remaining claim in this action is asserted against an unidentified corrections employee based on plaintiff's allegation that he served spoiled food to the general inmate population at Eastern. In deference to his *pro se* status, the court directed that the superintendent at Eastern be named as a defendant so that plaintiff could be afforded a reasonable opportunity to engage in discovery calculated to lead to the identity of defendant John Doe 1. Despite this and the court's warnings that the failure to identify defendant John Doe 1 would result in dismissal of plaintiff's claims against him, plaintiff has not yet done so. Accordingly, I recommend that all of the remaining claims in this action, which was commenced nearly four years ago, be dismissed with regard to the superintendent, who was not personally involved in the constitutional violations alleged, and as against defendant John Doe 1, who remains unidentified. Accordingly, it is hereby respectfully

RECOMMENDED that the Eastern superintendent's motion for summary judgment (*Dkt. No. 53* ) be GRANTED; and it is further

RECOMMENDED that plaintiff's claims against defendant superintendent be DISMISSED with prejudice and his claims against defendant John Doe 1 be DISMISSED without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Jan. 30, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 902795

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 315058
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Maleatra MONTANEZ, Plaintiff,

v.

CITY OF SYRACUSE; Police Officer Chester
D. Thompson; Chief of Police Frank L. Fowler;
and Police Captain Thomas Galvin, Defendants.

6:16-cv-00550 (BKS/TWD)
|
Signed 01/23/2019

**Attorneys and Law Firms**

For Plaintiff: Edward Sivin, Sivin & Miller, LLP, 20 Vesey
Street, Suite 1400, New York, NY 10007.

For Defendants City of Syracuse, Frank L. Fowler, and
Thomas Galvin: Khalid Bashjawish, Assistant Corporation
Counsel, City of Syracuse, 233 E. Washington Street, Suite
300, Syracuse, NY 13202 John G. Powers, Paul J. Tuck,
Hancock Estabrook LLP, 1500 AXA Tower I, 100 Madison
Street, Syracuse, NY 13202.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, U.S. District Judge

**I. INTRODUCTION**

 **\*1** Plaintiff Maleatra Montanez brings this action against
Defendants City of Syracuse (the "City"), Police Officer
Chester D. Thompson, Chief of Police Frank L. Fowler,
and Police Captain Thomas Galvin. (Dkt. No. 1). These
claims arise from Plaintiff's allegation that, on February
14, 2015, Thompson, a patrol officer with the Syracuse
Police Department ("SPD"), reported to her residence in
response to a 911 call and, while he was there, directed her
to engage in sexual acts with him. (Dkt. No. 1).[1] Plaintiff
brings: (1) a battery claim against Thompson and the City;
(2) an intentional infliction of emotional distress ("IIED")
claim against Thompson and the City; (3) a prima facie
tort claim against Thompson and the City; (4) a negligent
hiring, training, supervision, and retention claim against
the City; (5) a Fourth Amendment excessive force and
unreasonable search and seizure claim against Thompson;
(6) a Fourteenth Amendment substantive due process claim

against Thompson; (7) a supervisory liability claim against
Fowler; (8) a supervisory liability claim against Galvin; and
(9) a Monell municipal liability claim against the City. (Id.).
The City, Fowler, and Galvin[2] move for summary judgment
under Rule 56 of the Federal Rules of Civil Procedure. (Dkt.
No. 89). Plaintiff does not oppose dismissal of her battery,
IIED, prima facie tort, and negligent hiring claims against the
City but otherwise opposes summary judgment and submits
evidence in support of her contention that there are material
issues of fact requiring trial. (Dkt. No. 97, at 5). Defendants
move to strike certain aspects of that evidence, (Dkt. No. 102),
and Plaintiff opposes the motion to strike. (Dkt. No. 107). The
Court held oral argument on January 8, 2019. For the reasons
that follow, Defendants' motion for summary judgment is
granted in part and denied in part, and Defendants' motion to
strike is denied.

[1]     The facts regarding this encounter are disputed.
        Defendants assert that the sex was consensual.
        (Dkt. No. 89-1, at 9; Dkt. No. 99-3, at 72–
        99). Plaintiff says that she complied with Officer
        Thompson's direction to give him oral sex because
        she was terrified; that he raped her after directing
        her to get a condom; and that she went to the
        hospital the next day to report the rape. (Dkt. No.
        99-2, ¶¶ 5–9). That dispute is immaterial to the
        resolution of the present motion. Construing the
        facts in the light most favorable to the Plaintiff, the
        Court refers to the incident as a sexual assault.

[2]     For convenience, the Court refers to the City,
        Fowler, and Galvin collectively as "Defendants."
        This reference does not include Defendant
        Thompson, who is represented by separate counsel
        and has no motion before the Court at this time.

**II. FACTS**[3]

[3]     The facts are drawn from Defendants' statement
        of material facts, (Dkt. No. 89-2), Plaintiff's
        responses thereto (Dkt. No. 98), and the attached
        affidavits, declarations, exhibits, and depositions.
        The facts are taken in the light most favorable to
        Plaintiff.

**A. Thompson's Employment at SPD**[4]

[4]     As Defendants seek summary judgment dismissing
        the negligent training, supervision, and retention
        claims and § 1983 supervisory and municipal

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 238 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

liability claims, the material facts principally relate to Defendants' knowledge of and response to Thompson's alleged misconduct throughout his career as a police officer at the SPD.

**\*2** Thompson began his employment as a patrol officer with the SPD on January 3, 1997. In general, during his shifts, Thompson worked by himself—without a partner—and drove a marked SPD vehicle. (Dkt. No. 99-3, at 9). On February 15, 2015, the day after he allegedly sexually assaulted Plaintiff, Thompson was suspended pending investigation of Plaintiff's complaint. (Dkt. No. 89-31, at 4). The SPD terminated Thompson's employment following the investigation. (Dkt. No. 89-10, ¶ 91). Prior to the incident at issue in this case, Thompson was the subject of five complaints, four of which the SPD investigated or responded to in some manner.

### B. Prior Complaints

#### 1. 1999 to 2001 – Bassett/Malenick Complaint

Cheryle Bassett has submitted a declaration detailing the following contact with Thompson. (Dkt. No. 99-10). Bassett met Thompson at some point between 1999 and 2001, when he pulled over her motor vehicle "because of a traffic infraction." (Dkt. No. 99-10, ¶¶ 1, 3; Dkt. No. 99-16, ¶ 2). Bassett told Thompson that she was struggling financially and "he offered to lease to [her] a portion of a house that he managed" in Syracuse. (Dkt. No. 99-10, ¶ 3). Bassett states that, after she moved in, she fell behind on rent. (*Id.* ¶ 4). Thompson "began to make sexual advances, which [Bassett] did not rebuke." (*Id.*). Bassett and Thompson "had sexual relations for several weeks and during that time period [Bassett] paid little or no rent." (*Id.*). Subsequently, Bassett was arrested for prostitution. (*Id.* ¶ 5). During an interview with SPD officers, "in an attempt to avoid the criminal charges," Bassett told them about her relationship with Thompson. (*Id.*). According to Bassett, "[t]his appeared to anger the officers," and the charges were dismissed. (*Id.*).

Bassett states that, after "this incident," Thompson was angry with her, and their relationship ended. (*Id.* ¶ 6). Thompson demanded that she pay the back rent, which she was unable to do, and "then demanded that [Bassett] have sex with him," but Bassett "told him that [she] did not want to." (*Id.*). Bassett remained at the residence and attempted to pay Thompson what she owed. (*Id.*). Thompson, however, "threatened" eviction if she "did not have sex with him." (*Id.*). Bassett

states that, "[o]ver the next several months," "Thompson showed up at the [residence] at various hours of the day and night, mostly unannounced and often in uniform, and raped me." (*Id.* ¶ 7).

At some point during this time period, Bassett became friends with John Malenick, to whom she confided "what Chester Thompson was doing to [her]." (*Id.* ¶ 8). Malenick advised her to report Thompson to the police, but she "was afraid to do so." (*Id.*). Malenick "then took it upon himself to contact the [SPD] to notify them of what Chester Thompson was doing" to Bassett. (*Id.*). Malenick has submitted a declaration regarding his report. (Dkt. No. 99-16, ¶ 6). In late 2001 or early 2002 Malenick told an officer at SPD's Internal Affairs [5] that he believed Thompson "had forced [Bassett] to have sex with him and that he threatened to evict her ... if she didn't have sex with him." (*Id.*). The officer asked whether Malenick had any direct proof of the accusation. (*Id.*). When Malenick said that he did not, the officer responded that "without any direct proof there was nothing that could be done." (*Id.*). There is no evidence of an investigation.

[5]     Defendant Galvin, who was head of the SPD's Internal Affairs Division—later known as the Office of Professional Standards ("OPS")—from 1989 until he retired in June 2015, (Dkt. No. 99-8, at 7–9), states in his declaration that "[t]he purpose of OPS is to receive and fairly investigate any complaints made, whether external or internal, against police officers serving within the Department whose conduct is a violation of law or otherwise a failure to comply with Department policies, rules, or regulations." (Dkt. No. 89-10, ¶ 6).

#### 2. 2002 – Health Insurance Complaint

**\*3** In 2002, the SPD received information concerning Thompson's 2000 application for, and procurement of, health insurance coverage for his ex-wife, whom he had divorced in 1995. (Dkt. No. 99-18, at 9). On the application, Thompson filled in the date of marriage but left the marital status box blank. (Dkt. No. 99-18, at 10). As Thompson's ex-wife "appear[ed] not to be an eligible dependent," the SPD commenced an internal investigation. (Dkt. No. 99-18, at 7). As part of the investigation, Captain John Agne from the Human Resources Division and Captain Mark McArdle from the Patrol Services Division, searched SPD

*Montañez v. City of Syracuse*, Not Reported in Fed. Supp. (2019)

2019 WL 315058

records, made inquiries to the health insurance office, and interviewed Thompson. (Dkt. No. 99-18, at 7–12). Captain Agne concluded that his investigation showed "a pattern of the [sic] less than truthful behavior of Ofc. Thompson, as well as the fact that he may have participated in criminal behavior by filing these documents and receiving insurance benefits that he is not entitled to." (*Id.* at 8). Then-Chief of Police Dennis DuVal found Thompson in violation of the SPD's Rules and Regulations governing unbecoming conduct, unsatisfactory performance, and performance of duties, and on October 17, 2002, he issued a letter of reprimand reminding Thompson "that future acts in violation of the Rules & Regulations would bring discredit upon yourself and this Department and would be dealt with more severely." (Dkt. No. 99-18, at 1).[6] Defendant Galvin personally served the letter on Thompson. (*Id.*).

[6]     Chief DuVal also suspended Galvin for three days without pay. (*Id.* at 2).

### 3. 2005–Complaint From Woman at Syracuse Corporation Counsel

According to an October 6, 2005 SPD interdepartmental memo, a woman employed by the Syracuse Corporation Counsel made a complaint of "Unbecoming Conduct" against Thompson ("the SCC complaint"). (Dkt. No. 99-20, at 1). The woman complained that Thompson had "struck up a conversation" with her outside a bar and "offered to follow her home to make sure she made it there safely." (*Id.*). "[O]nce they arrived at her home ... he walked her on to the porch," and then she "opened the door to let herself in and Officer Thompson walked inside." (*Id.*). The woman said "goodbye so Officer Thompson would leave and Officer Thompson said he needed a hug first." (*Id.*). "She gave him a hug so he would leave and he left." (*Id.*). "[O]n another night," Thompson was working and saw the woman getting out of her car; Thompson thought she flashed her lights "at him wanting to talk." (*Id.*). The woman, however, "related [to Thompson] that she was only locking her car remotely." (*Id.*). Thompson provided a different account of these events. He acknowledged knowing her but stated that "she asked him to follow her home" and that he did not go inside, "request a hug," or "receive or give a hug to her." (*Id.*). The SPD determined that "all that was needed at this time was to talk to Officer Thompson and instruct him not to contact" her; SPD did not speak to her. (*Id.*). Thompson agreed to comply with the instruction "not to have further contact" with her. (*Id.*).

### 4. 2006 – Buske Complaint

In 2006, Candy Buske made a complaint to the SPD about Thompson. (Dkt. No. 99-8, at 14). Buske was "incarcerated at the time ... on a Robbery charge" and "made it known that she had information about two Syracuse police officers that she would like to provide in order to obtain leniency on her ... pending criminal charge." (Dkt. No. 89-10, ¶ 37). Then-Chief of Police Gary Miguel [7] instructed Galvin, who was the head of the SPD's Office of Professional Standards ("OPS"), *see supra* note 5, to open an investigation. (Dkt. No. 89-10, ¶¶ 4, 34). Galvin interviewed Buske at the jail on May 17, 2006 (*Id.* ¶ 38). Buske acknowledged that she had a drug habit that she supported through prostitution. (Dkt. No. 99-21, at 1, 11). Buske stated that, in February or March 2006, she was walking "in the area of No. State St ... between three and four in the morning," when a marked SPD car "pulled up next to" her. (*Id.* at 11). Buske stated that the police officer in the car, whom she identified as Thompson, "called [her] by name and asked if [she] was working." (*Id.*). Thompson told her to "get into the back seat of the car" so he could "run [her] name." (*Id.*). After Buske got into the car, they drove "around the north side of the city" and talked. (*Id.*). Buske believed that there was a warrant for her arrest for violating probation, but concluded that Thompson did not check her name because he did not speak on the radio, use the computer, or ask for her identification. (*Id.*). Thompson asked her if she "would do something for him," which Buske knew meant "something sexual." (*Id.*). Buske "was afraid [Thompson] would arrest [her] if [she] refused" so she said she would. (*Id.*). Thompson asked Buske to "give him a blow job" and she agreed. (*Id.*). Thompson got into the back seat of the car, "unzipped his pants and [Buske] performed oral sex on him." (*Id.* at 12). Afterwards, Thompson gave her twenty dollars, dropped her off, and said he would like to see her again. (*Id.*). Buske stated that she saw Thompson three weeks later, again in a marked SPD vehicle, and that he asked her to meet him in "a little while"; she agreed but "never went." (*Id.*). In addition, Buske "indicated that her adult daughter, who was also a prostitute and a drug user, also knew, and had some dealings with, Officer Thompson." (Dkt. No. 89-10, ¶ 43).

[7]     Fowler was appointed Chief of Police at some point in 2009. (Dkt. No. 99-7, at 9).

**\*4** Galvin "pulled" Thompson's "activity Detail Reports from the beginning of 2006 on occasions where he was

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 240 of 267

Montañez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

working the North side of the City, to see if [he] could place [Thompson] at the location described by Ms. Buske." (*Id.* ¶ 44). "The reports did not conclusively confirm the information provided by Ms. Buske." (*Id.*). Galvin presented a photo array to Buske; "[s]he picked out a photo of Chester Thompson as the police officer that had paid her for oral sex." (*Id.* ¶ 45). Galvin obtained a sworn statement from Buske and included it in the investigation file. (*Id.* ¶ 46).

Galvin states that he also contacted Cari Buske, Candy Buske's daughter, who told him that she met Thompson "in late 2005 or early 2006, and that afterward, Thompson would contact her via cell phone wanting to meet her in person." (*Id.* ¶ 47). Cari Buske stated that she never "had any relationship with him." (*Id.*). Galvin "subpoenaed Cari Buske's cell phone records to try to determine whether Chester Thompson's number appeared," but it did not. (*Id.* ¶ 48). Galvin also researched both Candy and Cary Buske's criminal histories, which contained arrests for prostitution. (*Id.* ¶ 49).

Galvin interviewed Thompson regarding the allegations by Candy and Cari Buske. (*Id.* ¶ 50). Thompson said that "he was, from time to time, involved in investigations on the North side of the City that involved him stopping prostitutes to obtain information ... on drug houses and illegal weapons possession, because he assumed that ... prostitutes may have inside information on other criminal activity." (*Id.* ¶ 51). Thompson "denied ever having Candy Buske in his police vehicle" or "engaging in any sexual activity with ... any ... prostitute, while he was on duty." (*Id.* ¶ 52). Thompson, however, "admitted that approximately eight months previously he had another prostitute [in] his vehicle, who he could not identify." (*Id.* ¶ 53). Thompson told Galvin that he "did not notify the dispatcher of the transport." (Dkt. No. 99-21, at 6).

During the interview, Galvin showed Thompson a picture of Cari Buske, who was "also a prostitute." (*Id.* at 2, 5). Thompson told Galvin that "he had dealt with her on a call six to eight months ago" and "at that time" obtained her cell phone number. (*Id.* at 5). Thompson acknowledged that he called Cari Buske "on a personal note" "three or four times" and that he should not have called her because "he was married." (*Id.*). Thompson indicated that he "may have" tried to meet with Cari Buske "but that did not occur." (*Id.*). Galvin noted that Thompson was "extremely agitated" during the interview, which led Galvin "to question [Thompson's] denial." (Dkt. No. 89-10, ¶ 56).

Following the interview, Thompson submitted a memo to Galvin regarding Candy Buske's complaint and his knowledge of Cari Buske. (Dkt. No. 99-21, at 9–10). Thompson stated that he stopped Candy Buske six months before, that he asked her why she was in the area, and that Candy Buske responded that she was searching for her daughter Cari Buske, "whom she believed to be in a troubled situation." (*Id.* at 9). As the memo detailed, Thompson told Candy Buske that he knew who her daughter was and that, if he saw Cari, he would tell her that her mother was looking for her. (*Id.*). In his memo, Thompson acknowledged that he called Cari Buske's "cell phone approximately 6 times" but did so "at her request" to discuss "matters which she had questions about of a police nature." (*Id.*). Thompson acknowledged that, "approximately 6 to 8 months" previously, a female he believed to be a prostitute "flag[ged] [him] down and ask[ed] if [he] could transport her"; however, Thompson did "not recall if [he] called out on this occasion or not." (*Id.*).

**\*5** The same day, Galvin completed a case report for Chief Miguel about the complaint against Thompson summarizing his investigation. (*Id.* at 1–7). Galvin noted that there were inconsistencies between Thompson's interview and the memo Thompson submitted after the interview: "His [memo] was consistent with what was stated during the interview, with the exception of telephoning Cari Buske. It was no longer done 'inappropriately', 'on a personal note' but be called her cell phone approximately six times 'at her request' as she had questions of a police nature." (*Id.* at 6).

In the case report, Galvin concluded that the "basic allegation made by Candy Buske" against Thompson had "not been substantiated" [8] but that "some concerns have been raised." (*Id.* at 6). Galvin explained that "Officer Thompson was extremely agitated during the interview, and after having been apprised of Buske's allegation asked several times if that was the only complaint against him. He ... appeared to have a questionable relationship with prostitutes, repeatedly telephoning Cari Buske 'on a personal note,' and giving one a ride without contacting the dispatcher." (*Id.*). Next to "Recommendation," Galvin wrote: Thompson "violated the Departmental Rules and Regulations regarding persons in police vehicles. Disciplinary action initiated." (*Id.*).

8        Galvin explained that there are three basic findings
         —unfounded, substantiated, and unsubstantiated—
         and explained that: "unfounded" means "conduct
         that is disproved or demonstrated to have not

occurred"; "unsubstantiated" means "conduct that is not conclusively disproven but ... there is insufficient evidence to conclude one way or the other whether the alleged conduct occurred"; and substantiated means "there is sufficient evidence to conclude that the misconduct as alleged has actually occurred." (Dkt. No. 89-10, ¶¶ 16–18).

"Consistent with the SPD disciplinary process," Galvin prepared a Discipline Report stating: "In the month of January or February 2006, Officer Chester Thompson did transport a female in his assigned police unit without permission and without notifying the dispatcher," in the SPD's Rules and Regulations. (*Id.* at 16). Galvin sent the Discipline Report, "Investigative Case Report, the entire investigation file, and a summary of Officer Thompson's prior disciplinary history" to "the chain of command" and to Chief Miguel. (Dkt. No. 89-10, ¶ 58).

Though he recommended a finding of unsubstantiated as to Buske's allegations, because Galvin found her "description of events as being plausible" and Thompson had been "very nervous" during his interview, Galvin advised Chief Miguel that because Thompson "worked the midnight shift ... [a]nd that's when prostitutes are out working and they can be manipulated sometimes" it was "something that should be monitored." (Dkt. No. 99-8, at 14–16). Ultimately, "[t]he chain of command ... recommended," and Chief Miguel ordered, that Officer Thompson be disciplined with a formal letter of reprimand for transporting "a female in his assigned police unit." (Dkt. No. 89-10, ¶¶ 59–60; Dkt. No. 99-21, at 16). Chief Miguel adopted the finding that the Buske allegation was not substantiated. (Dkt. No. 99-21, at 7).

On July 26, 2006, Galvin served the letter of reprimand, signed by Chief Miguel, on Thompson. Dkt. No. 89-10. The letter also contained a reminder "that future acts in violation of the Rules and Regulations would bring discredit upon yourself and this Department and would be dealt with more severely." (Dkt. No. 89-14, at 14).

Thompson's duties did not change following Buske's complaint: the SPD did not place any restrictions on him, and he was not aware of any additional monitoring. (Dkt. No. 99-3, at 192). Thompson testified that Galvin never expressed any disapproval of his interactions with Candy Buske or Carrie Buske. (*Id.* at 193).

### 5. 2014 – Melissa Popcun-Roach Complaint

**\*6** On June 2, 2014, the SPD received a complaint by "Patricia Popcun over the alleged activities of an unidentified [SPD] officer and her thirty-five-year-old daughter Melissa Popcun Roach" at Melissa's home on Cayuga Street in Syracuse. (Dkt. No. 99-6, at 1, 4). Galvin initiated an investigation, and interviewed Popcun, who related that her daughter Melissa had told her that:

> a Syracuse Police officer followed her into her apartment unannounced and uninvited ... and that she told the officer that she didn't want any trouble because she already had problems with the police. The officer told her that he would take care of any police problems in exchange for oral sex, which [she] then gave him.

(Dkt. No. 99-5, at 1). Popcun also relayed to Galvin that Melissa said that "[s]he performed the act and the officer left" and that the officer had "worn a wedding ring." (Dkt. No. 99-6, at 1; Dkt. No. 89-10, ¶ 68). Galvin testified that Popcun told him that she felt what the officer had done "wasn't right" and that he had taken "advantage of her daughter, who was a heavy drinker and bipolar medication [sic] and that she was a drug abuser," and that "the officer should have been aware that [her daughter, Melissa,] was not capable of consent." (Dkt. No. 99-8, at 47).

To "determine the identity of the officer in question," Galvin reviewed the Officer Activity Detail Reports for June 1, 2014 and found that Thompson and Officer Thomas Nicolini had responded to the Cayuga Street area "on an animal complaint." (Dkt. No. 89-10, ¶ 72). Since "of the two, only Officer Thompson wore a wedding band," Galvin identified Thompson "as the potential subject." (*Id.*).

Galvin then interviewed Nicolini, who confirmed that he and Thompson had responded to a call in the Cayuga Street area, where a "pit bull ... had been found running lose." (Dkt. No. 99-6, at 2; Dkt. No. 89-10, ¶ 73). According to Galvin, Nicolini stated that, while they were there, "they were approached by a woman named Melissa," who "stated she had information regarding the owner of the dog that was the

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 242 of 267

Montañez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

subject of the complaint." (Dkt. No. 89-10, ¶ 73). [9] Nicolini reported that "[i]t appeared that Melissa was intoxicated as she was stumbling when she walked and there was alcohol on her breath." (Dkt. No. 99-6, at 5). Nicolini told Melissa "to leave this area due to the aggressive dog." (*Id.*). After Melissa went back inside her apartment, Thompson went to the apartment for roughly 10-15 minutes, and returned "with no more information." (*Id.* at 2, 5).

[9]     Officer Nicolini's written report to Galvin regarding the incident does not mention any conversation indicating that Melissa had information about the dog. (Dkt. No. 99-6, at 5).

Galvin next interviewed Thompson, who "admitted going into Melissa Popcun[-Roach's] apartment ... to attempt to collect information from her about the animal control complaint that was being investigated," "denied that anything improper occurred but indicated that he was not able to learn anything useful from her regarding the investigation." (Dkt. No. 89-10, ¶ 75). Galvin directed Thompson to prepare a written statement, which Galvin "included in the investigation file." (*Id.*; Dkt. No. 99-6, at 6). In his written statement, Thompson maintains that he "spoke briefly" with Melissa in her apartment "for approximately 10 minutes regarding the neighbors [sic] dog." (*Id.*).

**\*7** Galvin did not obtain a written statement or affidavit from Popcun or Melissa. In a declaration filed in connection with this summary judgment motion, Popcun states that she spoke with Galvin a second time after her daughter was upset about the fact that Popcun reported the incident to the police. (Dkt. No. 89-21, ¶¶ 9–10). Popcun told Galvin that her "daughter did not intend to cooperate with the investigation and that if they pursued it with her she would likely say it didn't happen." (*Id.* ¶ 10). Galvin did not interview or attempt to interview Melissa Popcun-Roach. (Dkt. No. 99-8, at 9). [10] After completing the investigation, Galvin prepared a case report and recommended that the case be closed as "unsubstantiated." (Dkt. No. 99-6, at 3). As described below, Plaintiff has highlighted discrepancies in the evidence regarding aspects of this report, including: (1) Galvin's report that Melissa "refused to meet" and "was not available," (*Id.* at 2) and (2) Galvin's report that Melissa had "retracted her accusations .. soon after they were made," and that Melissa "said it did not happen," (*Id.* at 1–2).

[10]     Melissa Popcun-Roach has submitted an affidavit stating that no one from the SPD "ever contacted

[her] or, to [her] knowledge, attempted to contact" her. (Dkt. No. 99-4, at 1). She further states that, had someone from the SPD contacted her, she "would have spoken to them and told them about what happened with the police officer." (*Id.*). She "did not contact anyone at the SPD on [her] own because [she] was not in a good mental state during the time period when this incident happened." (*Id.*). She recounts the incident with Thompson as follows:

> Some time in 2014 a [SPD] officer entered my apartment unannounced and without my permission.... I jokingly asked the officer if he could help me with some open traffic tickets. In response, the officer walked over to the couch on which I was seated, unzipped his pants, removed his erect penis, and told me to give him oral sex. The officer had a very scary and demanding demeanor and I was afraid and intimidated by him so I began to give him oral sex.

(*Id.* at 1).

Galvin has explained that he recommended a finding of "unsubstantiated" because he "could not corroborate through first-hand testimony that the incident did occur" and "there were serious credibility issues with Melissa Popcun[-Roach] based on her mother's credible representations that her daughter was struggling with substance abuse and had recanted her original account of the events in question." (Dkt. No. 89-10, ¶ 80; Dkt. No. 99-6, at 1–3). In his report, Galvin stated that "Officer Thompson and I discussed at length the fact that any allegation of impropriety could be prevented by using basic common sense and avoiding certain situations. He was reminded of the penalties should such conduct be verified as true. He understood the Departments [sic] concerns." (Dkt. No. 99-6, at 2). Galvin testified that, during the course of the investigation, he became "aware" of the Buske allegations, which he had investigated in 2006, eight years before. (Dkt. No. 99-8, at 21). The Buske allegations are not referred to in the Popcun-Roach case report.

Upon completion of the case report, Galvin sent the Popcun-Roach case file, including the report, to Rebecca Thompson, [11] a deputy chief at the SPD for review and signature. (Dkt. No. 99-9, at 8, 20–21). Deputy Chief Thompson testified that at the time she reviewed the case file, she had no questions or follow up for Galvin. (Dkt. No. 99-9, at 21–22). When she was asked during her deposition about the indication in the case report that Popcun-Roach "refused to meet with any police officers," Deputy Chief Thompson

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 243 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

responded that Galvin had told her that he had "reached out" to Melissa Popcun-Roach but that "she would not return any of his calls or give him any information." (*Id.* at 23). Chief Deputy Thompson "concurred with the investigation of Captain Galvin, that it was unfounded" and signed the case report. (*Id.* at 31).

<sup></sup>

11    There is no familial relation between Defendant Chester Thompson and Chief Deputy Rebecca Thompson.

**\*8** Chief of Police Fowler, as the "final decision" maker, conducted the "final review" of the Popcun-Roach report. (Dkt. No. 99-7, at 28). Fowler testified that he understood that the SPD had received a "complaint from a mother who alleged that her daughter ... had been coerced to perform oral sex on Officer Thompson." (*Id.* at 22). The only document in the file Fowler recalled receiving in connection with the Popcun-Roach investigation was the case report. (*Id.* at 33). According to his declaration, Fowler "carefully considered all the facts and noted, as discussed by Captain Galvin, that there was no first hand testimony that the act had actually occurred." (Dkt. No. 89-3, ¶ 60). Fowler testified that "Captain Galvin made every effort to contact the subject of the investigation" but "wasn't able to speak with her." (Dkt. No. 99-7, at 41). Although Fowler found Ms. Popcun's allegations "concerning," he determined that "the evidence was not sufficient to substantiate that Officer Thompson had committed misconduct," and explained this "was a judgment call made based on consideration of all the evidence and the investigation experience of myself and Captain Galvin." [12] (Dkt. No. 89-3, ¶ 61). Fowler signed the Popcun-Roach case report, adopting the recommendation that the case be closed as "unsubstantiated." (Dkt. No. 99-6, at 3). [13] During his deposition, when Fowler was asked whether, "[a]t the time that [he] signed off on this report" he was "concerned about the possibility that Chester Thompson had done what was alleged and that he might do it again in the future," he responded: "No." (Dkt. No. 99-7, at 40).

12    In his declaration, Fowler states that, in determining the "appropriate discipline for substantiated complaints," he reviews, among other things, "the officer's prior performance history and prior disciplinary history." (Dkt. No. 89-3, ¶ 24). The Popcun-Roach case report, however, recommended, and Fowler adopted, a finding of unsubstantiated. (Dkt. No. 99-6, at 3). There is no evidence that Fowler reviewed Thompson's prior

history or that SPD policy required such review in the event of an unsubstantiated finding.

13    Fowler stated that, at the time he learned of the "incident regarding Melissa Popcun[-Roach]," he was not aware of any other allegations of sexual impropriety by Thompson, and that he did not learn about Buske's allegations until after the present lawsuit. (Dkt. No. 99-7, at 43–44). Galvin, on the other hand, testified that he apprised Fowler of Galvin's concerns that "this is a second time. Even though there was a gap of eight years, it was a similar allegation. She was a vulnerable person, in my perspective, and it would have been easy to take advantage of that, as it would have been with a prostitute." (Dkt. No. 99-8, at 25–26).

Thompson testified that he was never disciplined in connection with Popcun-Roach's allegations, that his duties with the SPD did not change following the investigation, that he did not perceive that he was being "monitored any more closely than before" the allegations, and that he was not asked to undergo any training. (Dkt. No. 99-3, at 234–35).

### C. 2015 Montanez Incident

Thompson met Plaintiff Maleatra Montanez approximately eight months after the Popcun-Roach incident. Plaintiff alleges the following. On February 14, 2015, she "called 911 to report that her sister had taken [Plaintiff's] minor daughter from Syracuse to Alabama without [Plaintiff's] permission." (Dkt. No. 98, ¶ 62). Thompson, who was already at Plaintiff's building on an unrelated call, responded to Plaintiff's apartment. (Dkt. No. 99-3, at 18–19). Plaintiff and her newborn son were in the apartment. (Dkt. No. 99-2, ¶ 4). Once inside her apartment, Thompson, who was in uniform and equipped with his service weapon and a baton, (Dkt. No. 99-3, at 53–54), told Plaintiff she "was pretty," "commented on [her] rear end and made a sexual comment about [her] lips." (Dkt. No. 99-2, ¶ 5). "He also started to rub himself in his groin area over his pants" and "then removed his penis from his pants and told [Plaintiff] to 'suck it.' " (*Id.*). Plaintiff "did not try to fight Officer Thompson, but ... told him 'Whoa, we don't have to do this.' " (*Id.*). "In response, he just repeated, 'suck it.' " (*Id.*). Plaintiff "was terrified for [her] safety and for the safety of [her] newborn son, so [she] began to give Officer Thompson oral sex." (*Id.*). Thompson then told Plaintiff "to get a condom" and raped her. (*Id.* ¶¶ 7–8). The next day, February 15, 2015, Plaintiff went to a local hospital, where

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 244 of 267

2019 WL 315058

she reported that she "had been raped by a Syracuse police officer with the last name 'Thompson.' " (*Id.* ¶ 9). [14]

[14] Thompson disputes her account. Thompson asserts that Montanez initiated the sexual encounter when she "reached back" and "grabbed [him] in his penis area," as he was about to leave his apartment. (Dkt. No. 99-3, at 72–75). According to Thompson, Montanez then led him into the living room, unzipped his pants and began giving him oral sex. (*Id.* at 72–85). Thompson testified that after about three minutes of oral sex Montanez stood up, told him to wait, and got a condom from her bedroom. (*Id.* at 86–90). According to Thompson, Montanez then again began giving Thompson oral sex and he did not enter her vaginally because he had already ejaculated. (*Id.* at 95–99).

 *9 Fowler learned of the incident the same day Plaintiff reported it, on February 15, 2015. Dkt. No. 89-13. Following a briefing, Fowler met with Thompson's supervisor and the police officer who initially interviewed Plaintiff, referred the matter to the district attorney's office for investigation, and, after conferring with Galvin, suspended Thompson pending investigation. (Dkt. No. 89-3, ¶¶ 29–33; Dkt. No. 89-10, ¶ 88). Galvin states that he "recommended the immediate suspension of Officer Thompson ... pending further investigation of the allegations" "based, in part, on [his] prior experience with Officer Thompson, including the nature of the allegations, though unproven, from the 2006 Buske and 2014 Popcun complaints." (Dkt. No. 89-10, ¶ 88).

Galvin commenced an investigation, which included interviews of Plaintiff and Thompson, and provided their versions of the incident in a case report dated February 20, 2015. (Dkt. No. 99-24). Galvin recounted the following aspect of his interview of Thompson:

> This writer asked Officer Thompson why he thought it would be allowable for an officer to engage with a complainant in sex, whether consensual or not, while on duty. He replied he did not think it would be a problem. I asked if he recalled my having counseled him six months before in regards to an allegation having been made at the time that

he had allowed a vulnerable female (drugs, mental) to perform oral sex on him while he was on duty and he said that he did.

(Dkt. No. 99-24, at 4). Galvin recommended that disciplinary action be initiated. (*Id.*).

An SPD discipline report dated February 24, 2015 contains findings that Thompson violated SPD's Rules and Regulations governing unbecoming conduct. (Dkt. No. 89-5, at 31). The report describes the violation as follows: "On 14 February 15 while on duty and during the course of his official duties, Officer Thompson did engage in sexual intercourse and fellatio with a female complainant while conducting an investigation at her residence." (*Id.*). The report is signed by Galvin and Fowler. (*Id.*). According to the report, on February 24, 2015, Galvin notified Thompson that he was terminated. (*Id.*). A certificate of conviction dated January 11, 2016 indicates that Thompson was convicted of official misconduct in violation of New York Penal Law § 195.00 [15] and sentenced to three years of probation. (Dkt. No. 89-9).

[15] New York Penal Law § 195.00, as relevant here, provides that: "A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit: 1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized."

**D. Rumors and Other Alleged Incidents**

Plaintiff has submitted evidence of Thompson's alleged sexual activity with respect to four other women while on duty. (Dkt. No. 99-15; Dkt. No. 99-23; Dkt. No. 99-3, at 139–40; 195–209, 236–43). It is undisputed, however, that these alleged incidents "were not officially reported to the SPD." (Dkt. No. 107, at 6).

Plaintiff has also offered the deposition testimony of John Baggett, who was an SPD police officer at the same time as Thompson, (Dkt. No. 99-14, at 11, 30), who testified that "rumors were running rampant throughout the SPD" concerning allegations that, while on duty, Thompson had "sexually assaulted" women. (*Id.* at 44–45). Baggett could not "pinpoint" when, during his approximately 21-year career, he first started hearing those rumors, (*Id.* at 22), but he

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 245 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

believed Miguel might have been Chief of Police when they first came out, (*id.* at 49). To illustrate how "widespread" the rumors were throughout the SPD, Baggett explained that, even though he did not work with or "run in the same circles" as Thompson, the rumors "got to [him] somehow." (*Id.* at 23). Both Galvin and Fowler testified, however, that they had no knowledge of these rumors. (Dkt. No. 99-8, at 30; Dkt. No. 99-7, at 59).

### E. Brown Declaration

**\*10** In opposition to Defendants' motion for summary judgment, Plaintiff filed a declaration by Robert Brown, whom she offers as an expert in the area of internal investigations into allegations of police misconduct as well as "strateg[ies] and penalties" in connection with criminal cases against members of a police force. (Dkt. No. 107, at 8). Brown has been "a practicing attorney [16] with an emphasis on criminal defense" for the past 17 years. (Dkt. No. 99-13, ¶ 4). Prior to becoming an attorney, Brown worked for the New York Police Department ("NYPD"), from which he retired "with the rank of captain." (*Id.* ¶ 1). As captain, Brown "supervised over two-hundred members of the NYPD." (*Id.*). Brown was also "the Commanding Officer and Chief Investigator of the NYPD's Special Prosecutor's Office." (*Id.*). In this role, he "investigated allegations of police misconduct and conducted administrative interrogations ... of police personnel accused of high-profile corruption and serious misconduct"; further, he "conducted a department-wide review of all open cases against members of the NYPD and made recommendations regarding strategy and penalties." (*Id.*).

[16]    As an attorney, Brown has "defended both private citizens and law enforcement officials against various criminal charges," has defended "law enforcement officials against civil and administrative charges," and has "represented plaintiffs and defendants in civil actions involving allegations of police misconduct." (Dkt. No. 99-13, ¶ 4). In addition, he has served as a guest lecturer on "police procedures and culture," "police drug enforcement policy," and "police use of force" at three law schools. (*Id.*).

Brown states that his declaration is based on his review of "various documents and deposition testimony generated in connection with" this matter, including the SPD General Rules and Procedure Manual; relevant literature regarding issues of police integrity and proper responses to allegation of

police misconduct; and his "years of training and experience" as a criminal defense lawyer and employment with the NYPD and New York City Housing Police Department ("NYCHPD"). (*Id.* ¶ 6). In Brown's opinion, Galvin failed to address "reported instances of misconduct by Thompson" "in a manner that was consistent with" the SPD Manual. (*Id.* ¶ 15). According to Brown, although the SPD manual "prohibits officers from knowingly associating with persons known to have a reputation of criminal conduct except in the performance of their assigned duties, and further prohibits officers from utilizing their on-duty time in the pursuit of private business or association," Galvin did not discipline or recommend discipline against Thompson "for knowingly associating for personal reasons with Cari Buske, a known prostitute." (*Id.*). Brown further notes that, "[w]hen interviewing Thompson in connection with the Buske, Popcun, and Montanez incidents, Galvin also failed to record the interviews mechanically or by a stenographer," "failed to interview Popcun's daughter," "failed to obtain an affidavit from Popcun or her daughter," and "failed to document what he alleges were his unsuccessful attempts to obtain the cooperation of Popcun and her daughter, as required by the Manual." (*Id.*). In Brown's opinion, Fowler and Galvin "should have made every attempt to interview Popcun's daughter," and "Popcun's alleged statement to Galvin that she did not want her daughter to be interviewed —even if true—did not justify Galvin's failure to interview the daughter." (*Id.* ¶ 18). Brown opines that, following the Popcun-Roach investigation, "the SPD definitely should have implemented" increased monitoring and supervision of Thompson. (*Id.* ¶ 19). Brown further opines that the SPD's "investigations and responses to these prior reported allegations also deviated materially from good and accepted standards of police practice, including the SPD's own internal rules and policies." (*Id.* ¶ 7).

## III. MOTION TO STRIKE

Defendants seek an order striking from Plaintiff's statement of material facts paragraphs concerning: (1) "rumors that Chester Thompson sexually assaulted women while on duty"; (2) "sexual misconduct about which the SPD was never notified"; and (3) "the declaration of Robert Brown." (Dkt. No. 102-1, at 2).

**\*11** The evidence concerning "rumors" and Thompson's alleged sexual misconduct against four women, about which the SPD was never formally notified, is discussed above. (*See supra* Section II.D). While the Court finds this evidence insufficient to raise a material issue of fact, (*see infra* Section

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 246 of 267

Montañez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

V.B.2.b.) the Court declines to strike paragraphs concerning this evidence from Plaintiff's statement of material facts.

The Court also declines to strike the paragraph in Plaintiff's statement of material facts that cites Brown's declaration. Plaintiff cites Brown's declaration only once in her statement of material facts, (Dkt. No. 98, ¶ 3), and it is one cite among six. Paragraph 3 of Defendants' statement of material facts, and Plaintiff's responses, are as follows:

> 3. The Office of Professional Standards ("OPS") is responsible for the SPD's internal affairs function and investigates any internal or external complaints made against any SPD officers whose conduct is a violation of law or otherwise fails to comply with SPD policies, rules, or regulations. *See* Fowler Decl. at ¶¶ 8, 9.

> *Plaintiff admits only that OPS is responsible for the SPD's internal affairs function and is **obligated** to investigate internal or external complaints made against any SPD officers whose conduct is a violation of law or otherwise fails to comply with SPD policies, rules, or regulations, but denies any suggestion that OPS always complied with that obligation. Specifically, OPS and its predecessor in name, the Internal Affairs Division, either failed to investigate allegations of sexual predation by Chester Thompson or failed to conduct any meaningful investigation of those allegations. See Exhibit 4 (Affidavit of Melissa Popcun), Exhibit 5 (Affidavit of Patricia Popcun), Exhibit 10 (Declaration of Cheryle Bassett), Exhibit 11 (SPD General Rules and Procedure Manual (the Manual), Vol. 1, Article 3, titled "Sex Crime Investigations," Sections 22.13(A)(1), (3), & (9) and Section 22.14(A)(3), Exhibit 13 Declaration of Robert Brown), and Exhibit 15 (Declaration of John Malenick).*

(Dkt. No. 98, ¶ 3). As the proposition for which Plaintiff cites Brown's declaration is supported by other admissible evidence—specifically, the Popcun and Popcun-Roach affidavits (Dkt. Nos. 99-4, 99-5)—and Plaintiff has not offered it for any other purpose, Defendant's motion to strike "the portion of Plaintiff's opposition to Defendants' Statement of Material Facts that relies on the Brown Declaration, as well as the Brown Declaration itself," (Dkt. No. 102-1, at 14), is denied as moot. Any dispute regarding the admissibility of Brown's testimony at trial should be addressed by the parties in a motion in limine. Accordingly, Defendants' motion to strike is denied.

## IV. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson* ). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

**\*12** If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

## V. DISCUSSION

### A. State Law Claims

#### 1. Battery, IIED, Prima Facie Tort, and Negligent Hiring Claims

Defendants seek, and Plaintiff does not oppose, dismissal of her battery, IIED, prima facie tort, and negligent hiring claims against the City. (Dkt. No. 97, at 5). Accordingly, those claims are dismissed against the City.

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 247 of 267

Montañez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

**2. Negligent Training, Supervision, and Retention**

The City moves for summary judgment dismissing the negligent training, supervision, and retention claims as barred by governmental immunity. (Dkt. No. 89-1, at 20–24). Plaintiff argues that the City is not entitled to governmental immunity because its responses to "prior allegations of malfeasance by Thompson were either ignored, involved no real exercise or discretion, or involved an exercise of discretion that violated the SPD's own internal rules and policies." (Dkt. No. 97, at 23).

"New York courts have held governmental employers liable for placing employees, like police officers who are known to be violent, in positions in which they can harm others." *Gonzalez v. City of New York*, 133 A.D.3d 65, 68 (1st Dep't 2015). "A necessary element of a cause of action alleging negligent retention or negligent supervision is that the 'employer knew or should have known of the employee's propensity for the conduct which caused the injury.' " *Bumpus v. N.Y.C. Transit Auth.*, 47 A.D.3d 653, 654, 851 N.Y.S.2d 591 (2d Dep't 2008) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161, 654 N.Y.S.2d 791 (2d Dep't 1997) ).

Under New York law, municipalities, however, enjoy governmental immunity when "official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial." *Mon v. City of New York*, 78 N.Y.2d 309, 313, 574 N.Y.S.2d 529, 579 N.E.2d 689 (1991). Immunity "insulates a municipality for its employees' performance of their duties where the ... conduct involves the exercise of professional judgment such as electing one among many acceptable methods of carrying out tasks, or making tactical decisions." *Johnson v. City of New York*, 15 N.Y.3d 676, 681, 917 N.Y.S.2d 10, 942 N.E.2d 219 (2010) (quoting *McCormack v. City of New York*, 80 N.Y.2d 808, 811, 587 N.Y.S.2d 580, 600 N.E.2d 211 (1992) (internal quotations omitted) ). When, however, "the retention of an employee may involve a known risk of bodily harm to others, the field in which [a police official's] discretion may be exercised ... is limited [and] is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." *McCrink v. City of New York*, 296 N.Y. 99, 106, 71 N.E.2d 419 (1947). Further, "immunity ... presupposes that judgment and discretion are exercised in compliance with the municipality's procedures, because 'the very basis for the value judgment supporting immunity and denying individual recovery becomes irrelevant where the municipality violates its own internal rules and policies and exercises no judgment or discretion.' " *Johnson*, 15 N.Y.3d at 681, 917 N.Y.S.2d 10, 942 N.E.2d 219 (quoting *Haddock v. City of New York*, 75 N.Y.2d 478, 485, 554 N.Y.S.2d 439, 553 N.E.2d 987 (1990) ).

 **\*13** A municipality is not, therefore, entitled to summary judgment based on immunity if there is a question of fact as to whether the employees' conduct at issue violated applicable procedures. *See, e.g., id.* (affirming summary judgment in favor of the city after finding no question of fact "as to whether officers' discharge of their firearms violated the [NYPD deadly physical force] guideline"); *Newsome v. Cty. of Suffolk*, 109 A.D.3d 802, 802–03, 971 N.Y.S.2d 208 (2d Dep't 2013) (denying summary judgment to municipality because there was "[a] question of fact with respect to whether the conduct of the dog's handler was consistent with acceptable police practice"); *Galapo v. City of New York*, 219 A.D.2d 581, 582–83, 631 N.Y.S.2d 366 (2d Dep't 1995) (finding "triable issues of fact with respect to whether Officer Martin's actions were consistent with or in contravention of the procedures relating to use of firearms as set forth in the New York City Police Department Patrol Guide"); *see also Lubecki v. City of New York*, 304 A.D.3d 224, 235, 758 N.Y.S.2d 610 (1st Dep't 2003) (ruling that city is not immune when "the evidence established that the police violate clearly established protocols and procedures" concerning the discharge of weapons).

In this case, construing the record in the light most favorable to Plaintiff, the SPD was aware of allegations that Thompson had forced a woman (Bassett) to have sex with him on threat of eviction in 2001; coerced another woman (Buske) who was afraid of being arrested to give him oral sex in 2006; and offered to expunge the criminal record of an intoxicated woman (Popcun-Roach) in exchange for oral sex in 2014. Although there was no investigation of, and thus no exercise of discretion regarding, the first allegation concerning Bassett, the City argues that this complaint is "immaterial" and cannot be a "cause in fact or proximate cause" of Plaintiff's injuries because "over thirteen years separates the alleged ... complaint and the incident at issue." (Dkt. No. 103, at 7–8). The City further argues because Galvin and Fowler exercised discretion in investigating and responding to Thompson's two other alleged acts of misconduct (Buske and Popcun-Roach), governmental immunity applies. (Dkt. No. 89-1, at 23). [17]

Case 9:18-cv-01067-DNH-TWD Document 37 Filed 08/03/20 Page 248 of 267
Montañez v. City of Syracuse, Not Reported in Fed. Supp. (2019)
2019 WL 315058

[17] As the commanding officer of OPS and chief of Police, Galvin and Fowler were required to exercise discretion and judgment in the investigation of complaints, determinations regarding whether complaints were substantiated and, if substantiated, determinations regarding the appropriate discipline. The City has submitted evidence outlining the SPD procedures for investigating a complaint against an officer as well as the disciplinary, supervisory, and training options available when needed. (*See, e.g.*, Dkt. No. 89-12 (SPD "Disciplinary System" Policy); Dkt. No. 89-3, ¶ 26 (Fowler Declaration listing disciplinary options); Dkt. No. 89-10, ¶¶ 11–33 (Galvin Declaration detailing "Process for Investigating and Adjudicating Police Misconduct") ).

Even assuming that the first two complaints (Bassett and Buske) were temporally too distant to be a proximate cause of Plaintiff's injuries, or, in the case of the Buske complaint, the investigation entailed an exercise of discretion to which immunity attaches, there are triable issues of fact as to whether Galvin's actions in the Popcun-Roach investigation were consistent with the SPD's procedures and within the realm of acceptable practice.

The procedures governing complaints of police officer misconduct require that the supervisor or command officer "document a preliminary investigation to include: (a) [i]nterviewing the complainant; (b) [o]btaining, as soon as practical, an affidavit ... containing details of his/her complaint; [and] (c) [l]ocating and interviewing available witnesses." (Dkt. No. 99-11, at 47).[18] Galvin himself acknowledged "the importance of interviewing every percipient witness to an event" and agreed that he would consider contacting Popcun-Roach to be the "most essential aspect of [his] investigation." (Dkt. No. 89-10, ¶ 78; Dkt. No. 99-8, at 42).

[18] Plaintiff cites the SPD procedures for "sex crime complaints" which require that the investigator "[c]onduct a detailed interview and obtain the victim's affidavit." (Dkt. No. 99-11, at 13, section 22.14(A)(3) ). Defendants argue that this was not a sex crime complaint and rely on the procedures applicable to complaints made against the police. (*Id.* at 43). For the purposes of this motion, the Court has considered the procedures applicable to complaints made against the police.

**\*14** Galvin maintains his decision not to interview Popcun-Roach "was a very difficult judgment call," (Dkt. No. 89-10, ¶ 78), and the Defendants argue that the City of Syracuse is immune from any errors in the judgments made by Galvin and Fowler in their discretionary decisions. Plaintiff, on the other hand, argues she has raised a triable issue of fact as to whether Galvin's acts were a consistent and acceptable method of complying with SPD procedures, noting that not only did Galvin not interview Popun-Roach or obtain any affidavit from Popcun-Roach, but that he has provided entirely different explanations for this failure. (Dkt. No. 97, at 8–9).

In his case report Galvin stated that Popcun-Roach "was not available" and "refused to meet with any police officers investigating her claim." (Dkt. No. 99-6, at 2). Chief Deputy Thompson and Fowler, the officers who were responsible for deciding whether to adopt his recommendation that the complaint be deemed unsubstantiated, testified that Galvin told them that he had "reached out" to Popcun-Roach but that "she would not return any of his calls or give him any information," (*see also* Dkt. No. 99-7, at 41 (Fowler testifying that "Captain Galvin made every effort to contact the subject of the investigation" but "wasn't able to speak with her") ). His case report does not refer to any attempts to contact Popcun-Roach, and Galvin acknowledged during his deposition that he did not in fact attempt to contact Popcun-Roach. (Dkt. No. 99-8, at 9).

Plaintiff notes that Galvin's most recent explanation for not interviewing Popcun-Roach is "completely different" from what he reported in his report and what he told his superiors. (Dkt. No. 97, at 9). In his deposition and declaration submitted in support of his motion for summary judgment, Galvin states that Popcun was "adamant that [he] not speak with her daughter," who "had bipolar problems" and "was an alcoholic," because Popcun was raising her daughter's child and "was afraid that if she had sent to the police to talk to her daughter about the alleged incident" it might cause a "rift" and "some problem with the parents raising the ... child." (Dkt. No. 99-8, at 34). This explanation is not reflected in Galvin's report, any statement from Popcun or any other contemporaneous records concerning the investigation. To the extent that this was in fact Galvin's discretionary decision, it was undocumented and apparently unknown to the supervisors tasked with reviewing Galvin's report and making a judgment regarding Thompson's conduct.

Montañez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 249 of 267

In addition, Galvin stated in the case report, and to Fowler, that Popcun told him that "her daughter [had] refuted the claim and said it did not happen." (Dkt. No. 99-6, at 1). Since Galvin did not interview Popcun-Roach or obtain an affidavit from either Popcun or Popcun-Roach, there is no witness statement documenting this alleged refutation. And Popcun avers that she told Galvin something different; she states that she said that Melissa "did not intend to cooperate with the investigation and that if they pursued it with her she would likely say it didn't happen." (Dkt. No. 89-21, ¶ 21). The difference between a representation that an alleged victim threatened to recant an allegation to avoid speaking to law enforcement and a representation that an alleged victim expressly stated that that the alleged incident "never happened," may be material to a decision-maker assessing both the investigation and whether the alleged misconduct was substantiated. Indeed, Fowler stated in his declaration that he "carefully considered," among other things, the fact that "Melissa Popcun, had, according to her mother, recanted the story and 'said that it did not happen,' " in determining that "the evidence was not sufficient to substantiate that Officer Thompson had committed misconduct." (Dkt. No. 89-3, ¶¶ 60–61).

**\*15** There are, therefore, factual questions as to whether Galvin complied with the SPD's procedures requiring that he document an investigation including an interview of the complainant, and an affidavit containing details of the complaint and interview available witnesses. (Dkt. No. 99-11, at 47) (section 8.16(D)(2) ). Since the outcome of that investigation was determinative of whether Thompson would return to his solo patrol duties, unsupervised and without additional training, which "may involve a known risk of bodily harm to others," if, as he was likely to, he encountered vulnerable individuals on patrol, *McCrink*, 296 N.Y. at 106, 71 N.E.2d 419, "the field in which [the officers'] discretion" could be exercised, was "limited" and "superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." *Id.* Thus, while Galvin had the authority to exercise discretion in his investigation, under the circumstances of this case, there is a triable issue of fact as to whether he exercised that discretion consistent with SPD's procedures and whether it was one of "many acceptable methods of carrying out" the investigation. *Kenavan v. City of New York*, 70 N.Y.2d 558, 569, 523 N.Y.S.2d 60, 517 N.E.2d 872 (1987), *superseded by statute on other grounds as recognized by Galapo v. City of New York*, 95 N.Y.2d 568, 721 N.Y.S.2d 857, 744 N.E.2d 685 (2000).

Citing *Mon*, the City argues that where a municipality's officers have exercised discretion, a procedural violation does not render governmental immunity inapplicable, and that it is only inapplicable when there is a "total failure to exercise discretion." (Dkt. No. 103, at 3). In *Mon*, the Court of Appeals found that the discretionary hiring of the employee at issue did not violate the applicable civil service rules because the rules were "permissive," the "applicant's nondisclosures" of a prior disorderly conduct conviction was not "such as would mandate his disqualification" under the rules, and "any violation" of the "provisions" "was because the officials *did exercise their discretion*, but did so improperly." 78 N.Y.2d at 316–17, 574 N.Y.S.2d 529, 579 N.E.2d 689. In contrast, here, the SPD's provisions governing an investigation are not permissive, (*see* Dkt. No. 99-11, at 47 ("Command Officer ... *shall* ... document a preliminary investigation to include ...) (emphasis added) ). And here, unlike *Mon*, there is a triable question of fact as to whether Galvin exercised his discretion in compliance with SPD procedures. It will be up to the jury to decide whether his alleged negligent investigation was "an error of judgment and immune from liability," or was, instead, "outside the realm of accepted practice and therefore actionable." *See Kenavan*, 70 N.Y.2d at 571, 523 N.Y.S.2d 60, 517 N.E.2d 872 (Titone, J. dissent). Thus, the City's motion for summary judgment dismissing the negligent retention, supervision, and training claim on grounds of governmental immunity is denied.[19]

19    The parties refer to training, supervision, and retention as one claim. As neither party has briefed the substantive elements of these claims, the Court does not address them.

**B. Section 1983 Claims**

**1. Plaintiff's Constitutional Claim**

Plaintiff alleges that Thompson violated her Fourth Amendment right "to be free from the use of excessive force and unreasonable searches and seizures" and her Fourteenth Amendment right to substantive due process. (Dkt. No. 1, ¶¶ 78–81). The parties have not addressed which constitutional provision applies to Plaintiff's allegations. Although Thompson was in Plaintiff's apartment in response to a 911 call, and thus on police business, there is no evidence that Thompson sexually assaulted Plaintiff during the course of an arrest or seizure or that Plaintiff was under suspicion

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 250 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

of criminal activity. Thus, for the purposes of this motion, the Court assumes that Plaintiff's "claim is appropriately analyzed pursuant to the Fourteenth Amendment's guarantee of substantive due process." *Poe v. Leonard*, 282 F.3d 123,137 (2d Cir. 2002) (citing, *inter alia*, *Haberthur v. City of Raymore*, 119 F.3d 720, 723–24 (8th Cir. 1997) (concluding that the plaintiff, who was not under arrest or under suspicion of criminal activity, adequately alleged that police officer's sexual assault violated her substantive due process right to bodily integrity or privacy) and *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (holding that claim brought by a plaintiff, who was not arrested or a criminal suspect but was raped by a police officer, was properly viewed as asserting a violation of her substantive due process right to bodily integrity under the Fourteenth Amendment, rather than as a violation of her Fourth Amendment rights) ).

**\*16** "The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable governmental interference." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ). The Second Circuit has explained, however, that "the Due Process Clause 'does not transform every tort committed by a state actor into a constitutional violation.' " *Id.* (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 202, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ). "Government action resulting in bodily harm is not a substantive due process violation unless 'the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* (quoting *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) ).

Courts have recognized a police officer's use of his position to coerce sex as a violation of a right to bodily integrity that violates substantive due process. *See, e.g.,* *Villanueva v. City of Scottsbluff*, 779 F.3d 507, 513 (8th Cir. 2015) (noting that an encounter in which a woman who was followed home by "an on-duty, armed, and uniformed officer," who entered her house "demanded that she undress, and had sexual intercourse with her," was "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate government objective," even though she did not object); *see also United States v. Giordano*, 260 F.Supp.2d 477, 484 (D. Conn. 2002) (explaining that the Fourteenth Amendment right to bodily integrity "includes the right to be free from ... coerced sexual activity."); *c.f. Poe*, 282 F.3d at 139 (holding that police officer's manipulation of the

situation in making a police training video "to ensure that [the plaintiff] would be videotaped unclothed from the waist up" "all while purporting to act for the benefit of the police academy" qualified as "conscience-shocking" in violation of the Fourteenth Amendment). Mindful of these principles, the Court turns to Defendants' motion for summary judgment on the federal claims.

## 2. Supervisory Liability

Defendants Galvin and Fowler seek summary judgment dismissing Plaintiff's claims that their failure to supervise and discipline Thompson caused the violation of her constitutional rights. Plaintiff opposes dismissal of her supervisory liability claims.

"A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe*, 282 F.3d at 140. As the Second Circuit has explained, the personal involvement of supervisory personnel may be shown through evidence that they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information indicating that an unconstitutional act was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

Before proceeding to the merits, the Court must address the argument Defendants Fowler and Galvin have advanced concerning the continued viability of the *Colon* factors. (Dkt. No. 89-1, at 24). Defendants assert that, in view of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the personal involvement of a supervisory defendant may no longer "be proven by evidence that the supervisory defendant's conduct met any of the five so-called *Colon* factors, which, inter alia, purported to equate 'personal involvement' with types of indirect involvement." (*Id.*). Thus, Defendants argue, where, as here, there is no evidence that they "participated in, were present for, ordered, or acquiesced to the alleged sexual assault of the Plaintiff," they cannot be held liable. (Dkt. No. 89-1, at 24).

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 251 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

**\*17** In *Ashcroft v. Iqbal*, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court noted that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* There, the alleged constitutional violation was discrimination based on race, religion or national origin, in violation of the First and Fifth Amendment. *Id.* at 668–69, 129 S.Ct. 1937. For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 677, 129 S.Ct. 1937. The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," because "purpose, rather than knowledge is required" to impose liability. *Id.*

While "*Iqbal* has ... engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012), the Second Circuit has not resolved this conflict, *see Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, ... 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.' " (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) ) ).

As Defendants note, some district courts have held that only the first and third *Colon* factors survive *Iqbal*. (Dkt. No. 89-1, at 25 (citing *Bouche v. City of Mount Vernon*, No. 11-cv-5246, 2012 WL 987592, at \*8, 2012 U.S. Dist. LEXIS 40246 (S.D.N.Y. Mar. 23, 2012) ) ). However, "neither the Second Circuit nor the Supreme Court has endorsed this reading of *Iqbal*," and the Court declines to follow that caselaw. *Doe v. New York*, 97 F.Supp.3d 5, 12 (E.D.N.Y. 2015) (quoting *Cano v. City of New York*, 44 F.Supp.3d 324, 336 (E.D.N.Y. 2014) ); *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at \*15, 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) ("The holding in *Iqbal* does not stand for the proposition that a supervisor can never be found personally liable for a constitutional deprivation on a showing that he was 'grossly negligent' or 'deliberately indifferent.' ").

As Defendants also note, some courts have continued to apply the *Colon* factors. *See, e.g., Lebron v. Mrzyglod*, No. 14-

cv-10290, 2017 WL 365493, at \*4, 2017 U.S. Dist. LEXIS 9751 (S.D.N.Y. Jan. 24, 2017) (noting that "[s]ome courts have simply concluded that, in the absence of Second Circuit precedent suggesting otherwise, they will continue to apply the Colon test.") (citing *Doe*, 97 F.Supp.3d at 12 and *Johnson v. Fischer*, No. 12-CV-210, 2015 WL 670429, at \*7 n.6, 2014 U.S. Dist. LEXIS 182153 (N.D.N.Y. August 5, 2014), *report and recommendation adopted by,* 2015 WL 670429, 2015 U.S. Dist. LEXIS 18601 (N.D.N.Y. Feb. 17, 2015) ). Defendants urge the Court not to adopt this position because the Supreme Court reversed the Second Circuit's application of the *Colon factors* in *Iqbal*. (Dkt. No. 89-1, at 25–26).

Many district courts have considered "the constitutional provision at issue," *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937, in determining whether to apply the *Colon* factors. *See, e.g., Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at \*9, 2011 U.S. Dist. LEXIS 51917 (S.D.N.Y. May 9, 2011); *Qasem v. Toro*, 737 F.Supp.2d 147, 151–52 (S.D.N.Y. 2010). Some of these courts have concluded that "where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still apply insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Id.* They have thus applied the *Colon* factors when the constitutional claim relies on "the unreasonable conduct or deliberate indifference standards of the Fourth, Eight or Fourteenth Amendments." *Shepherd v. Powers*, No. 11-cv-6860, 2012 WL 4477241, at \*10, 2012 U.S. Dist. LEXIS 141179 (S.D.N.Y. Sept. 27, 2012) (collecting cases). Other courts have applied the *Colon* factors as long as the constitutional violation at issue does not require a showing of discriminatory intent. *See, e.g., Carpenter v. Apple*, No. 15-cv-1269, 2017 WL 3887908, at \*9, 2017 U.S. Dist. LEXIS 143296 (N.D.N.Y. Sept. 5, 2017) (collecting cases).

**\*18** The Court agrees with the reasoning of the cases holding that the *Colon* analysis may still apply where the claim does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at \*9, 2011 U.S. Dist. LEXIS 51917 (S.D.N.Y. May 9, 2011) (quoting *Qasem*, 737 F.Supp.2d at 151–52; *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at \*15, 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) (noting that all five *Colon* factors should be viable for false arrest and excessive force claims based on an objectively reasonable standard, but not for First Amendment retaliation claims which have an intent requirement); *Sash v. United States*, 674 F.Supp.2d 531,

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 252 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.") ). In this case because Plaintiff's claims do not require a showing of discriminatory intent and are based on the unreasonable conduct standard of the Fourteenth Amendment, the Court will apply the *Colon* factors.

### a. Defendant Galvin

Plaintiff argues that Galvin acted with gross negligence and deliberate indifference in supervising and disciplining Thompson.[20] (Dkt. No. 97, at 26). The Second Circuit has explained that " 'gross negligence' denotes a higher degree of culpability than mere negligence" and "is 'the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of ... harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.' " *Raspardo*, 770 F.3d at 116 (quoting *Poe*, 282 F.3d at 140 n.14, 146). "The standard of gross negligence is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Id.* Thus, Plaintiff "must allege sufficient facts to raise a triable issue of fact as to whether [Galvin] knew or should have known that there was a high degree of risk that [Thompson] would behave inappropriately with a woman [while on duty], but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [Plaintiff]." *Poe*, 282 F.3d at 142.

[20]   To the extent Plaintiff argues that Galvin and Fowler are subject to supervisory liability based on their alleged failure to act on information that a constitutional violation was occurring, (*see* Dkt. No. 97, at 26 ("Fowler and Galvin can be found liable under § 1983 pursuant to the fourth and fifth *Colon* factors, i.e., if they were 'grossly negligent' in supervising Thompson or if they 'exhibited deliberate indifference' rights of others by 'failing to act on information indicating that unconstitutional acts' were being committed by Thompson.") ), the Court notes that there

is no evidence that either Galvin or Fowler knew that Thompson allegedly sexually assaulted Plaintiff until after she formally complained the following day. *See, e.g., Raspardo,* 770 F.3d at 124 (finding "no evidentiary basis to conclude that Gagliardi knew that Carlone was sexually harassing Russell or Raspardo and impermissibly allowed this harassment to continue" where the "plaintiffs did not report the sexual harassment of them by Carlone until after Gagliardi had already placed Carlone on administrative leave").

Here, viewed in the light most favorable to Plaintiff, there is evidence that Galvin received two complaints—the 2006 Buske complaint and 2014 Popcun-Roach complaint—that Thompson, while on duty, had coerced women into sexual acts. Galvin acknowledged having concern about Buske's complaint because he found her "description of events as being plausible" and Thompson was "very nervous" during his interview. Although Galvin recommended that Buske's complaint be deemed "unsubstantiated," he advised Chief Miguel that Thompson's midnight shift hours "should be monitored" because prostitutes working those hours can be manipulated. Although Galvin recommended that the next complaint, from Popcun-Roach, be deemed "unsubstantiated," there is evidence from which a reasonable factfinder could infer that Galvin's investigation of that complaint was inadequate. *See H.H. v. City of New York,* 11-cv-4905, 2017 WL 3396434, at *8, 2017 U.S. Dist. LEXIS 124317 (E.D.N.Y. Aug. 7, 2017) ("Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate."). As previously described, Galvin never attempted to interview Popcun-Roach, and yet represented in his case report that Popcun-Roach "was not available" and "refused to meet with any police officers investigating her claim." (Dkt. No. 99-6, at 1–2). There is nothing in the record of the investigation or in the record currently before the Court to support Galvin's deposition testimony that Popcun was "adamant" that he not speak with her daughter. And Galvin's report that Popcun-Roach "retracted" her claim, and "said it didn't happen" are not supported by what Popcun states she told Galvin. Plaintiff has adduced evidence that Popcun-Roach was willing to speak to police and tell "them about what happened with the police officer."

**\*19** Drawing all inferences in favor of Plaintiff, the evidence, if credited, would allow a reasonable factfinder to conclude that Galvin, in failing to adequately investigate

Montañez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 253 of 267

2019 WL 315058

the Popcun-Roach complaint, was indifferent to the truth of the allegations that Thompson had engaged in coercive sexual conduct, and "exhibited gross negligence or deliberate indifference to a high risk" that Thompson would violate the rights of other women, and that Galvin's deliberate indifference caused Thompson to violate Plaintiff's rights. *Poe*, 282 F.3d at 140; *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("[I]f the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims."). Thus, in view of these factual disputes, summary judgment as to Galvin's supervisory liability is inappropriate.

### b. Defendant Fowler

Plaintiff argues that Defendant Fowler's testimony that he was not "concerned about the possibility that in the future Thompson would do to others what he was accused of having done to [Popcun-Roach]" and his failure to take "precautionary or remedial steps with respect to Thompson" demonstrate his "deliberate indifference to the rights of others." (Dkt. No. 97, at 26). Thus, Plaintiff alleges that Fowler was grossly negligent in the exercise of his supervisory duties.

To establish gross negligence Plaintiff must adduce evidence that Fowler had "reason to know of facts creating a high degree of risk of physical harm to another and deliberately act[ed] or fail[ed] to act in conscious disregard or indifference to that risk." *Poe*, 282 F.3d at 140 n.14. The evidence suggesting that Fowler had reason to know that Thompson may have posed a risk of using his position as a police officer to coerce women to engage in sexual acts consists of his evaluation of the Popcun-Roach case report and Galvin's testimony that he advised Fowler there had been a "similar" complaint against Thompson involving a "vulnerable person" eight years before. (Dkt. No. 99-8, at 25–26). There is no other evidence about what Fowler knew about Buske's complaint, which was several years before Fowler became chief, and Plaintiff does not rely on Galvin's limited testimony. Plaintiff in fact cites to Fowler's testimony that he was *unaware* of Buske's complaint, as evidence of SPD's inadequate response to the Popcun-Roach investigation. (Dkt. No. 97, at 10) (citing Dkt. No. 99-7 at 43, 44, 57) (emphasis added). In any event, this limited evidence about a "similar" complaint that a prior chief deemed unsubstantiated is, in and of itself,

insufficient to raise a material issue of fact as to Fowler's gross negligence.

The Popcun-Roach case report recommended a finding of "unsubstantiated" and indicated that the alleged victim "refused to meet with any police officers," was "not available" for interview and had "retracted" her allegations "soon after they were made" and "said it did not happen." (Dkt. No. 99-6, at 2–3). [21] Nothing in the report or information *provided to Fowler* indicated otherwise. Thus, the Popcun-Roach investigation would not allow an inference that Fowler knew or had reason to know that Thompson posed a high risk of using his position as a police officer to coerce women to engage in sexual acts. *See Raspardo*, 770 F.3d at 124 (concluding that the "prior incidents of misconduct" by the subordinate, which involved, among other things, "allegations concerning improper comments and behavior toward female officers and personnel," "an inappropriate joke about a female officer," picking up female officers in his patrol vehicle despite being ordered not to, and the inappropriate use of a mobile messaging system," all of which supervisor was aware of and in response to which "disciplined [subordinate] through verbal counseling" "were not sufficient to put [supervisor] on notice that [subordinate] was likely to sexually harass" female officers).

[21]    Further, according to the report, Galvin and Thompson "discussed at length the fact that any allegation of impropriety could be prevented by using basic common sense and avoiding certain situations" and that Galvin had reminded Thompson "of the penalties should such conduct be verified as true." (Dkt. No. 99-6, at 2).

**\*20** Further, to the extent Plaintiff contends the Popcun-Roach complaint should have prompted Fowler to review Thompson's disciplinary history, such a contention would not raise a material issue of fact as to Fowler's gross negligence. The Buske complaint was deemed unsubstantiated, and "[s]upervisors cannot be expected to reinvent the wheel with every decision, for that is administratively unfeasible; rather, they are entitled to rely upon the decisions of their predecessors or subordinates so long as those decisions do not appear to be obviously invalid, illegal or otherwise inadequate." *Poe*, 282 F.3d at 144; *see also Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992) ("Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

subordinates reasonably believed to be competent as to whether their investigations were negligent.").

Plaintiff cites Baggett's testimony that there were "rampant" rumors regarding Thompson's sexual misconduct toward women while on duty as evidence that Fowler was on notice that Thompson was prone to sexual misconduct with respect to women. Plaintiff argues that the evidence regarding Thompson's sexual misconduct with respect to four other women "corroborates Officer Baggett's testimony that rumors of prior sexual assault by Thompson were rampant." (Dkt. No. 107, at 7). While allegations that other officers were in a position to have seen Thompson's conduct is consistent with Baggett's testimony concerning rumors,[22] Baggett's testimony is conclusory in nature. It contains no specifics concerning the content of the rumors, where they came from, who spread them, or when they were circulating. Further, there is no evidence that Fowler was aware of the rumors or that any complaints had been made to the SPD concerning Thompson's conduct with respect to these four women. Thus, the rumors and evidence of unreported incidents are insufficient to create a material issue of fact as to whether Fowler had notice that there was a high degree of risk that Thompson would coerce sex from women while on duty. *See, e.g., Romero v. City of New York*, 839 F.Supp.2d 588, 608 (E.D.N.Y. 2012) ("[T]he unspecified rumors circulating among students at Richmond Hill about a possible relationship between Mr. Benavides and Ms. Doe is not sufficient to constitute actual knowledge by school officials of sexual harassment, particularly where there is no evidence that any NYCDOE officials even heard the rumors."). Accordingly, Fowler is entitled to summary judgment dismissing the supervisory liability claim.

[22]    One of the women, for example, who alleges that in 1997 Thompson followed her into a porta potty at a rock concert; locked the door; and raped her inside; described how a uniformed officer with Thompson remained outside the porta potty during the rape. (Dkt. No. 99-15, at 1–2).

### c. Qualified Immunity

Defendants Galvin and Fowler argue that they are entitled to qualified immunity because there are no facts that would have placed them on notice that their conduct violated the Plaintiff's "clearly established" rights and because their decision-making is "only arguably incorrect

in hindsight." (Dkt. No. 89-1, at 27; Dkt. No. 103, at 9–10).[23] "Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe*, 282 F.3d at 132 (quoting *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir. 2001) ). "In deciding 'questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.' " *Raspardo*, 770 F.3d at 113 (quoting *Tolan v. Cotton*, 572 U.S. 650, 655, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) ). "The first prong 'asks whether the facts, taken in the light most favorable to the party asserting the injury ... show the officer's conduct violated a federal right[,] ... [and] [t]he second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation.' " *Id.* (quoting *Tolan*, 572 U.S. at 655–56, 134 S.Ct. 1861); *see also Kisela v. Hughes*, —— U.S. ——, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (quoting *White v. Pauly*, —— U.S. ——, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) ) ). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ).

[23]    Defendants also argue that they were only on notice that Thompson had committed acts of consensual sex while on duty, but that ignores the reasonable inferences in Plaintiff's favor, i.e., that Officer Thompson coerced sex while on duty.

**\*21** Here, as Plaintiff has failed to raise a material issue of fact as to Fowler's supervisory liability, the first prong is met, and the Court need proceed no further in the qualified immunity analysis as to Fowler.[24] But the Court has found that the facts, taken in the light most favorable to Plaintiff, raise a material issue of fact as to whether Galvin was grossly negligent in the investigation of and response to allegations of sexual coercion by Thompson. Thus, the Court must turn to the second prong of the qualified immunity analysis; this requires consideration of whether the law Thompson

Case 9:18-cv-01067-DNH-TWD   Document 37   Filed 08/03/20   Page 255 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

allegedly violated was clearly established as well as whether the supervisory liability theory under which Plaintiff seeks to hold Galvin liable was clearly established. *Grice v. McVeigh*, 873 F.3d 162, 169 (2d Cir. 2017) ("Defendants are entitled to qualified immunity on a supervisory liability claim unless the actions of the supervisor and the subordinate both violate clearly established law."); *see also Poe*, 282 F.3d at 135 (explaining that the court "must determine whether both laws, the law violated by [the subordinate] and the specific supervisory liability theory under which [the plaintiff] wishes to hold [the supervisor] liable, were clearly established by ... the time of the incident.").

24 Even if there were a material issue of fact as to Fowler's gross negligence, Fowler would be entitled to qualified immunity because, interpreting the facts in the light most favorable to Plaintiff, it was not clearly established that Fowler's conduct violated Plaintiff's constitutional rights for the reasons discussed in Section V.B.2.b. *See Poe*, 282 F.3d at 141-147.

Thompson's alleged conduct of sexually assaulting Plaintiff after she allowed him into her apartment in response to her 911 call, if proved, "would constitute a violation of Plaintiff's substantive due process right to bodily integrity, a right which was clearly established" in 2015. *Atwood v. Town of Ellington*, 468 F.Supp.2d 340, 352 (D. Conn. 2007). The supervisory liability theory under which Plaintiff seeks to hold Galvin liable was also clearly established at the time of the incident: "Case law clearly establishes that a supervisor may be liable for failing to screen or otherwise inquire about his subordinates or into their actions." *Poe*, 282 F.3d at 141 (citing *Fiacco*, 783 F.2d at 331 (finding sufficient evidence to support a jury's conclusion that a police chief was deliberately indifferent "to whether or not excessive force was used[ ]" based on the failure "to conduct a nonsuperficial investigation into civilian claims of excessive force") ). Thus, in order to defeat a police supervisor's claim of qualified immunity, Plaintiff

> must allege sufficient facts to raise a triable issue of fact as to whether [the supervisor] knew or should have known that there was a high degree of risk that [the subordinate] would behave inappropriately with a woman during his assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury. The issue [with respect to] qualified immunity then, is whether

a plaintiff "has ... proffer[ed] sufficient evidence to meet this standard."

*Raspardo*, 770 F.3d at 123–24 (quoting *Poe*, 282 F.3d at 142).

Here, there are material issues of fact regarding whether Galvin conducted a nonsuperficial investigation into Popcun-Roach's allegation that Thompson, while on duty, coerced her, while she was intoxicated and suffering from mental health issues, to perform oral sex by promising to help with her police problems. Specifically, the material issues of fact include: (i) whether Galvin misrepresented in his case report and to his superiors that Popcun-Roach refused to meet with police officers, was not available and had retracted her allegation; (ii) whether Galvin failed to account for his "lingering concerns" about Buske's prior allegation of similar coercive sexual misconduct when investigating the Popcun-Roach complaint; and (iii) whether Galvin failed to caution Thompson about such conduct. (Dkt. No. 99-3, at 231–34). On this record, considering all inferences in the light most favorable to the Plaintiff, the Court finds that there are material issues of fact as to whether Galvin knew or should have known that there was a high degree of risk that Thompson would coerce sex from a woman while on duty, and whether, in failing to adequately investigate the Popcun-Roach complaint or caution Thompson in any manner, Gavin disregarded that risk, and that his failure caused Plaintiff's alleged constitutional injury. Accordingly, given these disputed facts, a finding of qualified immunity is inappropriate at this stage.

### 3. Municipal Liability

**\*22** "For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ).

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 256 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

A municipal policy or custom may be established where the facts show: (1) a formal policy, officially promulgated by the municipality, *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127–30, 108 S.Ct. 915, 99 L.Ed.2d 107 (1985); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials." *Zahra,* 48 F.3d at 685. Further, "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." *Batista,* 702 F.2d at 397; *see also Turpin v. Mailet,* 619 F.2d 196, 200 (2d Cir. 1980) (holding that "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts").

In this case, Plaintiff's theory of municipal liability is that the City's failure to adequately investigate the complaints against Thompson and supervise him properly amounted to deliberate indifference to the rights of those with whom he interacted as an SPD patrol officer. (Dkt. No. 97, at 27–28). "Where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) (internal quotation marks omitted).

Deliberate indifference, however, "is a stringent standard of fault," *Connick v. Thompson,* 563 U.S. 51, 70, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (quoting *Board of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ), "and necessarily depends on a careful assessment of the facts at issue in a particular case," *Cash v. County of Erie,* 654 F.3d 324, 334 (2d Cir. 2011). The Second Circuit has instructed that "[t]he operative inquiry is whether

those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.' " *Id.* (quoting *Amnesty Am.,* 361 F.3d at 128). Deliberate indifference, therefore, "may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker [25] 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiff.' " *Id.* (citation omitted) (quoting first *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir. 1995), then *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007) ).

[25]    The City makes no argument with respect to who should be considered a policymaker for purposes of the *Monell* analysis; its argument centers exclusively on deliberate indifference. (Dkt. No. 89-1, at 28–33; Dkt. No. 103, at 10–11).

**\*23**  Here, Plaintiff cites five complaints made against Thompson during the course of his career with the SPD to support her claim that Defendant City was deliberately indifferent toward Thompson's misconduct. While the health insurance complaint does not reflect sexual misconduct, the SPD concluded that Thompson had engaged in "a pattern of the less [sic] than truthful behavior." (Dkt. No. 99-18, at 8). The SCC complaint, while troubling to the extent it includes an allegation that Thompson walked inside a woman's home uninvited and then demanded a "hug" before he would leave, (Dkt. No. 99-20), is insufficient to show that Defendant City was on notice that Thompson, while on duty, was coercing women to perform sexual acts. The complaints concerning Bassett, Buske, and Popcun-Roach, in contrast, all allege that Thompson engaged in sexual misconduct toward women, and the latter two allege that Thompson engaged in sexual misconduct while on duty. Though Galvin credited Thompson's explanations, and found the Buske and Popcun-Roach complaints to be "unsubstantiated," this meant only that they were "not conclusively disproven but ... there is insufficient evidence to conclude one way or the other whether the alleged conduct occurred." (Dkt. No. 89-10, ¶¶ 16–18). In addition, to the issue of material fact already identified regarding the adequacy of the Popcun-Roach investigation, there are material issues of fact as to whether the SPD received and failed to investigate a complaint about Bassett.

If credited, Plaintiff has provided evidence from which a reasonable factfinder could conclude that, had the City adequately investigated the complaints against Thompson and supervised and disciplined him appropriately, Plaintiff's

Case 9:18-cv-01067-DNH-TWD    Document 37    Filed 08/03/20    Page 257 of 267

Montanez v. City of Syracuse, Not Reported in Fed. Supp. (2019)

2019 WL 315058

rights would not have been violated. The allegations by Buske and Popcun—that, in performing his patrol duties, Thompson coerced women he encountered to perform sexual acts—"sufficiently resemble" his actions toward Plaintiff so as to render Plaintiff's injury "foreseeable." *H.H.*, 2017 WL 3396434, at *10, 2017 U.S. Dist. LEXIS 124317. Indeed, even after being investigated twice in connection with the Buske and Popcun-Roach complaint, Thompson indicated to Galvin that he "did not think it would be a problem" "for an officer to engage with a complainant in sex, whether consensual or not, while on duty." (Dkt. No. 99-24, at 4). A reasonable jury could find from this evidence that a more thorough investigation and increased supervision and discipline would have prevented Thompson from engaging in such conduct, and consequently, from violating Plaintiff's rights.

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is **GRANTED** as to the battery, IIED, prima facie tort, and negligent hiring claims against the City and the supervisory liability claims against Fowler; and it is further

**ORDERED** that the battery, IIED, prima facie tort, and negligent hiring claims against the City and the supervisory liability claims against Fowler are **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is otherwise **DENIED** in its entirety; and it is further

**ORDERED** that Defendants' motion to strike (Dkt. No. 102) is **DENIED.**

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2019 WL 315058

---

**End of Document**                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3412728
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ricco SANTANA, Plaintiff,

v.

Steven RACETTE, Stephen Brown,
and Tammy Bezio, Defendants.

9:17-cv-00102 (BKS/ML)

|

Signed 06/22/2020

**Attorneys and Law Firms**

For Plaintiff: Martin E. Adams, Adams & Commissiong LLP, 65 Broadway, Suite 1603, New York, NY 10006

For Defendants: Letitia James, Attorney General for the State of New York, Ryan W. Hickey, Assistant Attorney General, of Counsel, The Capitol, Albany, NY 12224-0341

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

**\*1** Plaintiff Ricco Santana brings this civil rights action under 42 U.S.C. § 1983, raising claims arising from his incarceration at Clinton Correctional Facility ("Clinton") against Defendants Steven Racette, Stephen Brown, and Tammy Bezio. (Dkt. No. 33). Plaintiff brings Eighth Amendment failure to protect, failure to intervene, and denial of medical care claims, as well as claims that Defendants failed to adequately train and supervise security staff. (*Id.*). Defendants now move for summary judgment under Federal Rule of Civil Procedure 56, which Plaintiff opposes. (Dkt. Nos. 58, 65, 66). The parties also jointly move to seal certain documents that were filed with Plaintiff's summary judgment response. (Dkt. Nos. 67, 69). For the reasons that follow, Defendants' motion for summary judgment is granted, and the parties' motion to seal is granted in part.

**II. JOINT REQUEST TO SEAL**

**A. Legal Standard**

Under Northern District of New York Local Rule 83.13(a), "[a] party seeking to have a document, a portion of a document, a party or an entire case sealed bears the burden of filing an application setting forth the reason(s) that the referenced material should be sealed under the governing legal standard." L.R. 83.13(a). "Federal courts employ two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 163 (2d Cir. 2013).

**1. Common Law Right of Access**

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo ("Amodeo II")*, 71 F.3d 1044, 1048 (2d Cir. 1995). Before this "common law right can attach, however, a court must first conclude that the documents at issue are indeed 'judicial documents.' " *Lugosch*, 435 F.3d at 119. "[T]he mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access.... [T]he item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." *United States v. Amodeo ("Amodeo I")*, 44 F.3d 141, 145 (2d Cir. 1995). "[T]here is a presumption of access to documents submitted to the court at summary judgment." *Lugosch*, 435 F.3d at 122 (citing *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).

After determining that the documents are judicial documents and that the "common law presumption of access attaches," the court must "determine the weight of that presumption." *Id.* at 119. When a document plays a role in a court's adjudication of litigants' substantive rights—a function that is "at the heart of Article III"—the presumption is strong, but "[a]s one moves along the continuum, the weight of the presumption declines." *Id.* "[E]vidence introduced at trial or in connection with summary judgment enjoys a strong presumption of public access." *Brown v. Maxwell*, 929 F.3d 41, 49–50 (2d Cir. 2019).

**\*2** Finally, the court must balance "competing considerations" against the weight of the presumption of

2020 WL 3412728

access. *Lugosch*, 435 F.3d at 120. Such considerations "include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.' " *Id.* (quoting *Amodeo II*, 71 F.3d at 1050); *accord Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 143 (2d Cir. 2016). When weighing privacy interests, courts should consider "the degree to which the subject matter is traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051.

### 2. First Amendment Right of Access

"[T]here exists a qualified First Amendment right of access to documents submitted to the court in connection with a summary judgment motion." *Lugosch*, 435 F.3d at 124. The First Amendment right of access stems from the qualified right of the public and the press "to attend judicial proceedings and to access certain judicial documents." *Id.* at 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)). Once a court concludes that there is a qualified First Amendment right of access to the judicial documents at issue, it may only seal the documents "if specific, on the record findings are made demonstrating the closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)). Examples of "higher values," *Lugosch*, 435 F.3d at 125, include law enforcement interests and the privacy of innocent third parties. *Amodeo II*, 71 F.3d at 1050.

### B. Application

The parties jointly request an order sealing certain documents that Plaintiff filed with his summary judgment response. [1] (Dkt. No. 69). Specifically, they move to seal: a non-party inmate's disciplinary history, (Dkt. No. 65-4); prison walkthrough records, disciplinary, movement, classification, and programming histories of two non-party prisoners, (Dkt. No. 65-6); [2] and a non-party inmate's hearing record sheet. (Dkt. No. 65-9). Defendants argue that these documents overcome the presumption of access because they concern both law enforcement and privacy interests. (Dkt. No. 69, at 2–3). As Defendants acknowledge, the two non-party prisoners whose records are at issue were involved in the events of this case. (Dkt. No. 69, at 2).

[1]    On June 11, 2019, Magistrate Judge David E. Peebles approved a protective order in this case. (Dkt. No. 50). However, that documents are governed by a protective order in civil discovery does not satisfy a party's burden under *Lugosch*, 435 F.3d. *See e.g.*, *Collado v. City of New York*, 193 F. Supp. 3d 286, 289–90 (S.D.N.Y. 2016) ("[T]hat a document was produced in discovery pursuant to a protective order has no bearing on the presumption of access that attaches when it becomes a judicial document.").

[2]    Docket Number 65-6 can be broken down as follows: pages 1–4 and 9-39 contain disciplinary, classification, facility employment, and inter and intra-facility movement records concerning the first non-party prisoner; pages 40–70 contain similar documents concerning the second non-party prisoner; pages 71–98 contain similar documents concerning Plaintiff; and pages 5-8 and 99–101 appear to be reports and activity logs referencing the three altercations underlying Plaintiff's claims. (Dkt. No. 65-6). The letter brief does not address the documents concerning Plaintiff in Docket Number 65-6, at pages 71–98. The Court notes, however, that these documents contain personal identifiers, which should be redacted. *See* N.D.N.Y. Local Rule 8.1. Defendants are therefore directed to resubmit a redacted version of Docket Number 65-6, pages 71–98, with personal identifiers redacted.

**\*3** "[I]t is well-settled that 'documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment.' " *Brown*, 929 F.3d at 47 (quoting *Lugosch*, 435 F.3d at 121). As the documents the parties seek to seal are summary judgment submissions "used to determine litigants' substantive legal rights," they are subject to the "highest" presumption of access, and "should, absent exceptional circumstances, be subject to public scrutiny." *Lugosch*, 435 F.3d at 121, 123, 124 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).

Next the Court balances the competing considerations. Here, the documents the parties seek to seal implicate law enforcement interests. Defendants assert that public access to "disciplinary, internal movement, classification, [and] programming records" relating to Clinton's operation, "poses

potential security risks." (Dkt. No. 69, at 1–2). Defendants note that Department of Corrections and Community Supervision ("DOCCS") "inmates are not permitted to possess" these kinds of records of "other inmates"; that inmates may use such records for "nefarious purposes"; and that security risks are heightened here, as the prisoners at issue have gang affiliations. (*Id.* at 2). Indeed, the Second Circuit has explained that "consideration not only of the sensitivity of the information and the subject but also of how the person seeking access intends to use the information" is relevant to the balancing inquiry. *Amodeo II*, 71 F.3d at 1051; *Mirlis v. Greer*, 952 F.3d 51, 56 (2d Cir. 2020); *Burns v. Nagy*, No. 16-cv-782, 2019 WL 2409737, at *2, 2019 U.S. Dist. LEXIS 96576, at *5 (S.D.N.Y. June 7, 2019) (finding that identifying features of a chemical agent should remain sealed where disclosure "could impair law enforcement by apprising inmates of the nature and use of a law enforcement tool necessary for maintaining institutional security").

The documents, which contain references to unrelated disciplinary hearings, details of the two inmates' underlying crimes and their physical and mental health histories, also implicate privacy interests. Although the non-party inmates were involved in the events of this case, the Court finds that the privacy interests of third parties nevertheless apply, particularly when considered in conjunction with the law enforcement interests identified above. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-4394, 2017 WL 1331288, at *11, 2017 U.S. Dist. LEXIS 55881, at *41–42 (S.D.N.Y. Apr. 4, 2017) (finding that "non-parties' confidential customer information" was "sufficiently sensitive to merit protection"); *see also Amodeo II*, 71 F.3d at 1051 (instructing that courts should "consider the degree to which the subject matter is traditionally considered private rather than public").

The Court notes that the documents in Docket Number 65-6 include reports and logs concerning the altercations underlying Plaintiff's claims which are described in the complaint and in the parties' memoranda. (*See* Dkt. No. 65-6, at 99 (log documenting February 28, 2015 altercation); *id.* at 5–8, 100 (reports and log concerning March 30, 2015 altercation); *id.* at 101 (log documenting May 21, 2015 altercation)). Counsel have not identified any basis for sealing those documents.

Thus, as both law enforcement and third-party privacy concerns are present in the remaining documents, the Court finds that these "higher values" warrant a "narrowly tailored"

sealing, *Lugosch*, 435 F.3d at 126, of the following: Docket Numbers 65-4 and 65-9 and the following pages of Docket Number 65-6: 1–4 and 9–70.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Facts [3]

[3]
    In resolving Defendants' motion for summary judgment, the facts are drawn, in part, from the Defendants' statement of material facts. (Dkt. Nos. 58-15). Plaintiff responded to each of Defendants' factual statements by stating that the "facts contained" in each statement "are not in dispute." (Dkt. No. 65-2, at 1–5). The Court has also considered Plaintiff's statement of material facts, (*id.* at 5–7), and the parties' attached exhibits. The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

**\*4** Plaintiff was a prisoner in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") until he was paroled on November 5, 2015. (Dkt. No. 58-15, ¶¶ 1–4). During the relevant period, Plaintiff was incarcerated at Clinton. (*Id.* ¶ 2; Dkt. No. 58-3, at 32–33; Dkt. No. 65-6, at 85). Plaintiff joined the "Bloods" gang prior to his incarceration. (Dkt. No. 58-15, ¶ 3). When Plaintiff arrived at Clinton, he was classified by DOCCS as a gang member. [4] (Dkt. No. 58-3, at 38–39). Plaintiff was subsequently involved in three altercations with other prisoners.

[4]
    Plaintiff testified that when he entered DOCCS in 2014, he was questioned as to whether he was aware of any enemies that he had in the prison system; he answered that he was not aware of any enemies. (Dkt. No. 58-3, at 149). Plaintiff further testified that he was assigned a counselor upon arrival to Clinton and that he never discussed his gang affiliation with his counselor. (Dkt. No. 58-15, ¶ 42; Dkt. No. 58-3, at 41–42).

### 1. February 28, 2015 – First Altercation

The first altercation occurred on February 28, 2015 at approximately 10:25 a.m. in Clinton's north yard (Dkt. No. 58-15, ¶ 5). Plaintiff testified that he was approached by a prisoner, Inmate Johnson, who was also a member of the

Santana v. Racette, Slip Copy (2020)

2020 WL 3412728

Bloods. (Dkt. No. 58-3, at 39, 42). Plaintiff had seen Johnson "in the street a couple of times" in 2001 or 2002 for "gang-related stuff" in New York City. (*Id.* at 40). Plaintiff had not seen Johnson since then. (*Id.*).

Plaintiff testified that when Johnson approached him in the "north yard," he instructed Plaintiff to perform a hit on someone at the prison "in order to get out."[5] (*Id.* at 43). Plaintiff testified that he refused Johnson's request because Plaintiff was at Clinton "for a parole violation" and if he performed the hit, he would "catch a new charge." (*Id.* at 42). Once Plaintiff refused, Johnson swung at Plaintiff, who got in "defense mode" and the two "roll[ed] around" until they were instructed to "stop." (*Id.*). Plaintiff estimated that the altercation lasted a minute or less. (*Id.* at 156). Plaintiff testified that he had no issues with Johnson prior to this first altercation, (*id.* at 41), and that he did not know how Johnson learned that Plaintiff wanted to leave the gang. (*Id.* at 43).

[5]    Although Plaintiff's deposition transcript is not entirely clear, this appears to refer to Plaintiff's efforts to leave the Bloods. (Dkt. No. 58-3, at 42–43).

Plaintiff was seen by a facility nurse that day as a result of the fight in the yard. (Dkt. No. 58-15, ¶¶ 10–12; Dkt. No. 58-9). The nurse prepared an injury report, noting that Plaintiff was "alert, oriented, [and] ambulatory" and that Plaintiff stated that his altercation with Johnson stemmed from "a problem from the street." (Dkt. No. 58-15, ¶¶ 11–12; Dkt. No. 58-9). Plaintiff suffered scratches on his cheek and forehead as well as a "small abrasion." (Dkt. No. 58-9; Dkt. No. 58-3, at 141–42).

That same day, Plaintiff signed a memorandum addressed to Defendant Stephen Brown, Clinton's Deputy Superintendent for Security, declining an offer to be placed in protective custody.[6] (Dkt. No. 58-15, ¶ 15). The memorandum stated, "I feel I do not need protection at this time. If I feel I need protection in the near future, I will so inform you."[7] (*Id.*; Dkt. No. 58-5; Dkt. No. 58-3, at 95–97). The document has a "Witnessed by" line that is signed by a Sergeant J. Ludwig. (Dkt. No. 58-5; Dkt. No. 58-3, at 100–01). Although he could not remember Sergeant Ludwig, Plaintiff agreed that this officer would have been involved in offering him protective custody and that if Plaintiff had told Sergeant Ludwig that he wanted to go to protective custody that day, he would have been able to do so.[8] (*Id.*). Plaintiff also agreed that the only way to guarantee that prisoners do not encounter one

another in the facility is to enter protective custody. (*Id.* at 105). Plaintiff testified that he never notified anybody that he was in fear for his safety prior to this first incident. (*Id.* at 161).

[6]    In his deposition, Brown testified that although his name is printed on the protective custody refusal forms that Plaintiff signed, he would not review an incident unless it were unusual. (Dkt. No. 58-13, at 54). He further testified that, with respect to involuntary protective custody, that would be "a direct line supervisor's responsibility" to make such a recommendation. (*Id.* at 56).

[7]    Plaintiff testified that he refused protective custody because "it's like being in jail and you're already in jail." (Dkt. No. 58-3, at 97).

[8]    Plaintiff further testified that, at the time, he did not "know that it was going to be an ongoing thing," (Dkt. No. 58-3, at 102), referring to the subsequent altercations.

**\*5** Plaintiff received and pled guilty to a misbehavior report for the fight with Johnson. (Dkt. No. 58-15, ¶¶ 6–9; Dkt. No. 58-3, at 44; Dkt. No. 58-4; Dkt. No. 65-3, at 1). As a result, Plaintiff was sentenced to and served 30 days of keeplock in Clinton's D Block. (Dkt. No. 58-15, ¶ 10). At no point during his time in keeplock—from February 28th through March 30th—did Plaintiff raise any concern regarding being placed back into the general population, although he testified that he had opportunities to do so. (Dkt. No. 58-3, at 113–14).

### 2. March 30, 2015 – Second Altercation

On March 30, 2015, Plaintiff was released from keeplock and returned to the general population. (Dkt. No. 58-15, ¶ 17). Plaintiff and Johnson were housed in the same cell block, with Plaintiff housed in cell 21 and Johnson in cell 24. (Dkt. No. 65-5; Dkt. No. 65-6, at 32). That same day, Plaintiff and Johnson had a second altercation. (Dkt. No. 58-15, ¶ 18; Dkt. No. 58-3, at 52–53). Approximately three hours after Plaintiff reentered general population, Plaintiff exited his cell "to go to the mess hall," and was "walking down the corridor," when Johnson struck him in "the side of [his] face." (Dkt. No. 58-3, at 53–54, 157). Corrections officers separated the two men, and Plaintiff heard an unidentified officer say, "didn't you guys just have an incident, didn't you just get off keeplock?" (*Id.* at 54).

2020 WL 3412728

That same day, Plaintiff again was offered and declined to be placed in protective custody, signing the same kind of memorandum as before. (Dkt. No. 58-15, ¶¶ 21–23; Dkt. No. 58-6). Plaintiff was given a misbehavior report for this altercation, a hearing was held, and Plaintiff was found not guilty. (Dkt. No. 58-15, at 62). Plaintiff testified that he now believed something was going on related to him attempting to leave the gang and that "this could escalate even worse" but that he never notified anybody at the prison that he feared for his safety prior to this second incident. (Dkt. No. 58-3, at 112, 161–62).

After this second altercation, the officers took Plaintiff "straight to the infirmary" where he was seen by a nurse. (Dkt. No. 58-3, at 54; Dkt. No. 58-15, ¶ 19; Dkt. No. 58-10). Plaintiff estimated that he spent six days in the Clinton infirmary before he was taken to Adirondack Medical Center ("Adirondack") where he was diagnosed with a fractured jaw and had surgery. (Dkt. No. 58-15, ¶ 20; Dkt. No. 58-3, at 66). After about two days in the hospital, Plaintiff returned to Clinton's medical unit where Plaintiff remained for "a couple of months." (Dkt. No. 58-15, ¶ 20; Dkt. No. 58-3, at 68–69). Plaintiff testified that he returned to Adirondack to have wires removed that had been installed in his mouth. (Dkt. No. 58-3, at 72). When Plaintiff returned to Clinton, he was placed in general population. (*Id.*).

### 3. May 21, 2015 – Third Altercation

On May 21, 2015, Plaintiff was involved in a third altercation, this time with Inmate Lathrop in the Clinton yard. (Dkt. No. 58-15, ¶ 24; Dkt. No. 58-3, at 73). Plaintiff testified that this occurred on the "same day they ... removed the wires off [his] mouth" and that he had been in general population for approximately one to three hours. (Dkt. No. 58-3, at 73). Plaintiff went to the yard to use the phone to call his family to "touch base with them" and "let them know that [he was] all right" because he had not "been able to speak to them" while his jaw was "wired shut." (Dkt. No. 58-3, at 74).

**\*6** At that point, Lathrop "came at" Plaintiff and "started attacking [him]." (Dkt. No. 58-3, at 74). Corrections officers ordered the men "on the ground," and Plaintiff complied. (Dkt. No. 58-3, at 74, 77). Plaintiff testified that he did not know why Lathrop attacked him; Plaintiff did not know Lathrop and had never seen or interacted with him before this incident. (Dkt. No. 58-15, ¶ 25; Dkt. No. 58-3, at 75, 79, 139). As a result of the altercation, Plaintiff testified that

he aggravated his jaw injury. (*Id.* at 74, 146–47). Plaintiff thought the attack might be gang related, (*id.* at 75), and that inmates and the Bloods posed a danger. (*Id.* at 117). Plaintiff testified that he was placed "back on keeplock." (*Id.* at 78). On May 21, 2015, Plaintiff again declined an offer to be placed in protective custody, signing a memorandum just as before.[9] (Dkt. No. 58-15, ¶¶ 26–28; Dkt. No. 58-7; Dkt. No. 58-3, at 115).

> [9]  Plaintiff testified that he refused protective custody on May 21st because he would be "classified as being ... a stone-cold rat" and that he "was scared." (Dkt. No. 58-3, at 117).

### 4. June 4, 2015 – Plaintiff Requests Protective Custody

On June 4, 2015, Plaintiff for the first time expressed concern to Clinton staff regarding his safety, signing a form stating that he was in danger due to gang-related issues with other prisoners and that he wished to be placed in voluntary protective custody. (Dkt. No. 58-15, ¶ 29; Dkt. No. 58-8; Dkt. No. 58-3, at 163–64). He was placed in protective custody that day.[10] (Dkt. No. 58-15, ¶ 30). Plaintiff testified that "hearing people talk" about his situation and "want[ing] to get out of that jail" and "want[ing] to get home" caused him to change his mind about protective custody following the May 21st incident. (Dkt. No. 58-3, at 118). Plaintiff further testified that once he was placed in protective custody, he had no further gang-related incidents with Johnson, Lathrop, or any other inmates. (*Id.* at 121). Plaintiff remained in protective custody until August 24, 2015 when he was transferred to Great Meadow Correctional Facility ("Great Meadow"). (Dkt. No. 65-6, at 85; Dkt. No. 58-3, at 122, 135).

> [10]  This paragraph of Defendants' statement of facts says "June 4, 2014," but the Court presumes the parties mean June 4, 2015. (Dkt. No. 58-15, ¶ 30; *see also id.* ¶¶ 29, 31; Dkt. No. 58-8).

Plaintiff could not recall any communication with Defendants. (Dkt. No. 58-15, ¶ 37; Dkt. No. 58-3, at 128–29, 135). Defendant Brown did not recall participating in any investigation regarding Plaintiff's three altercations or "reviewing any protective custody request or refusal" from Plaintiff. (Dkt. No. 58-15, ¶ 3).

### 5. Prisoners Escape from Clinton

On June 5, 2015, the day after Plaintiff was placed in protective custody, two prisoners escaped from Clinton. (Dkt. No. 65-2, ¶ 17; Dkt. No. 65-10; Dkt. No. 58-12, at 22). Without being detected, they made a hole in the walls of their cells and escaped. (Dkt. No. 65-2, ¶ 18; *see also* Dkt. No. 65-10). The State of New York Office of the Inspector General ("OIG") investigated the escape. (*See generally id.*). According to an OIG report, a DOCCS deputy commissioner testified that "multiple failures amounted to 'a culture of carelessness' regarding security at Clinton," and the report described deficiencies in DOCCS's training of security and civilian staff. (Dkt. No. 65-10, at 91, 141–43).

### 6. Defendants' Duties

#### a. Defendant Racette

At the time of the three altercations described above, Defendant Steven Racette was Clinton's Superintendent. He testified that he would not review the placement of prisoners in either voluntary or involuntary protective custody. (Dkt. No. 58-12, at 15). He further testified that he had generally no involvement in handling prisoner discipline. (*Id.* at 16). Racette testified that he had not reviewed any documents, reports, or incidents involving Plaintiff. (*Id.* at 23).

#### a. Defendant Brown

**\*7** During the relevant time period, Brown was Clinton's Deputy Superintendent. (Dkt. No. 58-15, ¶ 33). Brown was not involved in the investigation of the incidents involving Plaintiff described above. (*Id.* ¶ 38; Dkt. No. 58-13, at 53). He did not recall reviewing any protective custody request or refusal from Plaintiff. (Dkt. No. 58-15, ¶ 39; Dkt. No. 58-13, at 53). He testified that he did not author or review any of the documents involving Plaintiff that he subsequently reviewed during his deposition, including the disposition of Plaintiff's hearing following the February 28, 2015 incident or the misbehavior report from the March 30th incident that Plaintiff signed. (*Id.* at 33, 53).

#### b. Defendant Bezio

Defendant Tammy Bezio was a corrections officer employed at Clinton as a "movement and control officer." (Dkt. No. 58-15, ¶ 34; Dkt. No. 58-14, at 9). In that role, Bezio's duties were limited to identifying open cells in Clinton's computer system when asked to do so by a sergeant. (Dkt. No. 58-15, ¶ 35). Bezio testified that she would "just move the inmate" after others investigated whether there should be any constraints as to where that inmate should be housed. (Dkt. No. 58-14, at 28). Bezio was not involved in decisions regarding whether to move a prisoner from one cell to another and did not participate in investigating incidents or inmate medical care. (Dkt. No. 58-15, ¶ 36; Dkt. No. 58-14, at 28–29).

### B. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### C. Discussion

#### 1. Personal Involvement

Defendants argue they are entitled to summary judgment because Plaintiff has failed to establish that any of them was personally involved in the alleged constitutional violations. (Dkt. No. 58-16, at 7–11). Plaintiff does not address Bezio's involvement but argues that Brown and Racette had personal involvement because "Racette was the policy maker and supervisor of Clinton" during the relevant time period and that Racette and Brown were grossly negligent and that "there were significant lapses in training," pointing to the OIG report regarding the prison escapees. (Dkt. No. 65, at 8–9).

**\*8** "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (first quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); and then citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). Personal involvement of a supervisory defendant may be shown in several ways. In addition to (1) direct participation, a plaintiff may show that:

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring

(the "*Colon* factors"). *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) [11] (quoting *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)). "To succeed on a supervisory liability claim, a plaintiff must 'show an affirmative causal link between the supervisor's inaction and [the plaintiff's] injury.' " *Estate of Chamberlain v. City of White Plains*, No. 16-3935, 2020 WL 2820176, at \*13, 2020 U.S. App. LEXIS 17229, at \*34 (2d Cir. May 29, 2020) (quoting *Poe v. Leonard*, 282 F.3d 123, 140 (2002)).

[11]   Defendants note that the "continued viability" of some of the *Colon* factors is "arguably called into question by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)." (Dkt. No. 58-16, at 8 n.3). In *Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's individual actions, has violated the Constitution." The Second Circuit has not yet resolved how *Iqbal* affects *Colon*'s standard for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*"). This Court has concluded that the *Colon* analysis still applies where the constitutional claim asserted does not require a showing of discriminatory intent, "insofar as it is consistent with the particular constitutional provision alleged to have been violated." *Montanez v. City of Syracuse*, No. 16-cv-0550, 2019 WL 315058, \*18, 2019 U.S. Dist. LEXIS 10351, \*50 (N.D.N.Y. Jan. 23, 2019) (internal quotation marks and citation omitted). Here, since Plaintiff's constitutional claims do not require a showing of discriminatory intent, but rest on the Eighth Amendment's deliberate indifference standard, the Court will apply the *Colon* factors. *See, e.g.,* *Tangreti v. Semple*, 2019 WL 4958053, at \*7 n.3, 2019 U.S. Dist. LEXIS 174360, at \*19 n.3 (D. Conn. Oct. 8, 2019).

#### a. Defendant Bezio

Defendants argue that Bezio is entitled to summary judgment because "the record contains no indication" that Bezio "has knowledge of the plaintiff or the incidents alleged in the Complaint." (Dkt. No. 58-16, at 8). As noted, Plaintiff's response to Defendants' motion does not specifically mention Bezio. [12] (*See* Dkt. No. 65). The Court agrees with Defendants.

[12]   The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim. *E.g.*, *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008). In its discretion, the Court elects to address the claim.

**\*9** Bezio testified that she was a "movement and control officer" at Clinton in 2015. (Dkt. No. 58-14, at 9). She explained that she would "move inmates throughout the day." (*Id.*). It is undisputed that Bezio's role in inmate transfers was limited to "identifying open cells within Clinton's computer system when asked to do so by a sergeant" and that she had "no involvement in the decision whether to move an inmate, did not participate in the investigation of incidents at Clinton that might precipitate an inmate move, and did not participate in inmate medical care." (Dkt. No. 58-15, ¶¶ 35–36). By the time Bezio was required to place a prisoner in a cell, she testified that she would receive "information from the sergeant" saying that prisoner was "cleared" and that the prisoner had "signed off" on the fact that "they have no enemies" in the prison. (Dkt. No. 58-14, at 21). Bezio further testified that she would not review prisoner records or information and that she would "just move the inmate after [sergeants] do all that investigation." (*Id.* at 22). *See Bratton v. Goord*, No. 02-cv-185, 2006 WL 5564143, at \*3, 2006 U.S. Dist. LEXIS 97128, at \*9 (N.D.N.Y. May 23, 2006) (finding a nurse "did not have the requisite personal involvement" for a medical indifference claim where "it was not within [the nurse's] discretion to assent" to the plaintiff's treatment); *see also Kuck v. Danaher*, 822 F. Supp. 2d 109, 140 (D. Conn. 2011) (finding that the plaintiffs "failed to plausibly allege" that a state employee "was personally involved in [an] alleged due process violation" where the employee had no "discretion regarding scheduling decisions or that she was performing anything other than purely ministerial and administrative duties").

Moreover, Plaintiff has cited nothing in the record demonstrating that Bezio had any involvement in any alleged constitutional violation; Plaintiff testified at his deposition that he did not recognize Bezio's name. (Dkt. No. 58-3, at 136). Thus, summary judgment is granted to Bezio.

#### b. Defendants Racette and Brown

Plaintiff argues that Racette and Brown are liable under the third and fourth *Colon* factors. (Dkt. No. 65, at 8). Specifically, Plaintiff argues that Racette "was the policy maker and supervisor of Clinton from February 28, to May 21, 2015" and that the "policy and custom was to allow for a chronic indifference toward security." (Dkt. No. 65, at 8). Plaintiff points to the fact that "prior to" and "[d]uring that time," "two inmates" managed to "dig a hole undetected by corrections officers" and that this shows that "security at Clinton was in a state of disarray." (Dkt. No. 65, at 8). In their reply, Defendants argue that with respect to the third *Colon* factor, Plaintiff has not shown that his alleged constitutional violations were brought about by any DOCCS policy or custom. (Dkt. No. 66, at 4). With respect to the fourth *Colon* factor, Defendants argue that Plaintiff has not shown the requisite gross negligence to establish personal involvement because a "defendant is not personally involved simply because he or she holds a position of authority or supervision over other officials." (*Id.*).

#### i. Third *Colon* Factor

Under the third *Colon* factor, Plaintiff must establish that the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom. *Colon*, 58 F.3d at 873.

Plaintiff's assertion of personal involvement under the third *Colon* factor fails to withstand summary judgment. First, the alleged "policy and custom" in this case, which Plaintiff identifies as "a chronic indifference to security," (Dkt. No. 65, at 8), appears to quote a conclusion from the OIG report regarding the two escaped prisoners. [13] (*See* Dkt. No. 65-10, at 144). Plaintiff does not point to any relevant DOCCS policy or custom of inadequate security practices concerning inmate safety, much less one that Racette or Brown created or permitted to continue. *See Rogoz v. City of Hartford*, No. 11-cv-00500, 2012 WL 4372189, at \*8, 2012 U.S. Dist. LEXIS 136405, at \*25 (D. Conn. Sept. 24, 2012) (dismissing

supervisory liability claim where the complaint failed to allege that the supervisor "created a specific policy or custom under which the alleged unconstitutional practices occurred, or allowed them to continue").

13    The OIG report focuses on security lapses at Clinton that allowed the two prisoners to escape and not on issues of inmate conflict or safety. (*See generally* Dkt. No. 65-10).

**\*10** Nor is there evidence of any underlying constitutional violation, as *Colon* requires. *See Elek v. Incorporated Village of Monroe*, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) ("[B]ecause Plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisor liability."). In order to establish an Eighth Amendment violation for failure to protect an inmate from harm, a plaintiff must "show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison official acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted); *Lewis v. Siwicki*, 944 F.3d 427, 430–31 (2d Cir. 2019). Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.[14]

14    Plaintiff has not responded to Defendants' motion for summary judgment on his claim of deliberate indifference to his medical needs, or failure to intervene and the Court deems those claims abandoned. *Feacher*, 563 F. Supp. 2d at, 399. In any event, those claims also fail for lack of evidence of any constitutional violation or supervisory liability.

Here, there is no evidence of deliberate indifference by any prison official. On February 28th, Plaintiff and Johnson fought in the Clinton yard. (Dkt. No. 58-15, ¶ 5). That day, Plaintiff was offered placement in protective custody, which he declined by signing the form stating, "I feel I do not need protection at this time. If I feel I need protection in the near future, I will so inform you." (*Id.* ¶¶ 13–15). At no point prior to the March 30, 2015 altercation with Johnson did Plaintiff alert "any Clinton staff that he feared for his safety in general population and that he wished to go to protective custody when his 'keeplock time ended." (*Id.* ¶ 16). Plaintiff again declined protective custody and signed

the same form following the March 30th and May 21st incidents. (*Id.* ¶¶ 22–23, 26–28). Then, on June 4, 2015, it is undisputed that Plaintiff "for the first time expressed his concern to Clinton staff that he was in danger due to gang-related issues with other inmates and indicated that he wished to be in protective custody." (*Id.* ¶ 29). That same day, Plaintiff was admitted to protective custody where he remained until his transfer to Great Meadow. (*Id.* ¶ 30). Thus, Plaintiff has failed to establish either the requisite underlying constitutional violation or any causal link to a supervisor's conduct. *Nicholson v. Fischer*, No. 13-cv-6072, 2018 WL 2009432, at \*5, 2018 U.S. Dist. LEXIS 72199, at \*16 (W.D.N.Y. Apr. 30, 2018). Accordingly, his argument with respect to the third *Colon* factor fails.

### ii. Fourth *Colon* Factor

Under the fourth *Colon* factor, Plaintiff must establish that Racette and Brown were "grossly negligent in supervising subordinates who committed the wrongful acts." *Colon*, 58 F.3d at 873. The Second Circuit has defined gross negligence as "conduct that demonstrates a 'heedless indifference to consequences to another,' meaning the 'kind of conduct ... where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Estate of Chamberlain*, 2020 WL 2820176, at \*13, 2020 U.S. App. LEXIS 17229, at \*24 (quoting *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir. 1991)). A constitutional violation is necessary to establish supervisory liability under the fourth *Colon* factor. *See Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).

Plaintiff's claim fails because he has not adduced evidence of either an underlying constitutional violation or of gross negligence. It is undisputed that Brown did not participate in investigating the incidents described in Plaintiff's complaint and that he "did not recall reviewing any protective custody request or refusal" by Plaintiff. (Dkt. No. 58-15, ¶¶ 38– 39). Racette, for his part, testified that he did not "recall reviewing" any documents, reports, or incidents involving Plaintiff and that reviewing the assessment or placement of someone in voluntary protective custody "would not rise to [the superintendent's] level." (Dkt. No. 58-12, at 15, 23).

**\*11** Thus, Plaintiff's argument to establish personal involvement under the fourth *Colon* factor fails. *Colon*, 58 F.3d at 873–74 (explaining that the plaintiff's evidence

2020 WL 3412728

"contains nothing that would support a claim that [the supervisory defendant] either knew or should have known of the events of which [the plaintiff] complains" and that "[i]n the absence of such facts, there is no basis for a jury finding of gross negligence (or deliberate indifference), and summary judgment is proper"). [15] Because Plaintiff has failed to establish the personal involvement of Racette and Brown, his § 1983 claims against them fail as a matter of law.

[15]     Plaintiff's reliance on *Alexander v. Cuomo*, No. 17-cv-309, 2018 WL 2041576, at *6, 2018 U.S. Dist. LEXIS 219712, at *17–19 (N.D.N.Y. Feb. 26, 2018) is misplaced. In *Alexander*, unlike here, the aftermath surrounding the escaped prisoners was directly related to the plaintiff's alleged constitutional deprivations. *Id.* Further, unlike here, the plaintiff in *Alexander* plausibly alleged that Racette "had reason to know" of the alleged constitutional violations. *Id.*, 2018 WL 2041576, at *6, 2018 U.S. Dist. LEXIS 219712, at *18. Plaintiff has advanced no such evidence here.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the parties' joint request for the entry of a sealing order for Docket Numbers 65-4, 65-6, and 65-9, (Dkt. Nos. 67, 69), is **GRANTED in part**; and it is further

**ORDERED** that the clerk of court is instructed to change the restriction on the docket for Docket Numbers 65-4, 65-6, and 65-9 to sealed; and it is further

**ORDERED** that Defendants are directed to submit a separate, redacted version of Docket Number 65-6, for public filing, by July 10, 2020, as follows: pages 5–8 and 99–101 should be refiled without alteration; pages 71–98 should be refiled with personal identifiers redacted in accordance with N.D.N.Y Local Rule 8.1; finally, placeholder pages should be submitted for pages 1–4 and 9–70 with a notation on each page "Filed with the Court under seal"; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that the Second Amended Complaint (Dkt. No. 33) is **DISMISSED** in its **ENTIRETY**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 3412728

© 2020 Thomson Reuters. No claim to original U.S. Government Works.